1   GREGORY P. STONE (SBN 078329)
    Gregory.Stone@mto.com
2   MUNGER, TOLLES & OLSON LLP
    355 South Grand Avenue
3   Thirty-Fifth Floor
    Los Angeles, CA  90071-1560
4   Telephone:    (213) 683-9100
    Facsimile:    (213) 687-3702
5
    HOJOON HWANG (SBN 184950)
6   Hojoon.Hwang@mto.com
    ROHIT K. SINGLA (SBN 213057)
7   Rohit.Singla@mto.com
    JONATHAN H. BLAVIN (SBN 230269)
8   Jonathan.Blavin@mto.com
    MUNGER, TOLLES & OLSON LLP
9   560 Mission Street,
    Twenty-Seventh Floor
10  San Francisco, CA  94105-2907
    Telephone:    (415) 512-4032
11  Facsimile:    (415) 512-4077

12  Attorneys for Defendant
    MICROSOFT CORPORATION
13
                    UNITED STATES DISTRICT COURT
14
                    NORTHERN DISTRICT OF CALIFORNIA
15
                    SAN FRANCISCO DIVISION
16

17

18  DATEL HOLDINGS LTD. and DATEL          CASE NO.  CV 09-5535 EDL
    DESIGN & DEVELOPMENT, INC.,
19                                          **NOTICE OF MOTION AND MOTION OF**
                                            **DEFENDANT MICROSOFT CORP. TO**
                     Plaintiffs,            **DISMISS DATEL'S COMPLAINT**
20
              vs.                           Date:       March 2, 2010
21                                          Time:       9:00 a.m.
    MICROSOFT CORPORATION,                  Courtroom:  E, 15th Floor
22                                          Judge:      Mag. Judge Elizabeth D. Laporte
                     Defendant.
23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION & SUMMARY OF ARGUMENT ................................................................. 1

II. BACKGROUND AND FACTS ............................................................................................ 4

    A.    The Parties ............................................................................................................ 4

    B.    The Xbox 360's Contractual Prohibition on Unauthorized Accessories ............... 5

    C.    Datel's Xbox 360-Related Products ...................................................................... 6

    D.    Datel's Antitrust Claims ........................................................................................ 8

III. ARGUMENT ................................................................................................................... 9

    A.    Datel's "Primary Market" Monopolization Claim Should Be Dismissed. ............ 9

            1.    Datel Lacks the Antitrust Injury Needed to Challenge Microsoft's Alleged Conduct in the Primary Market ................................................. 10

                 a.    Datel is not a participant in the primary market ........................... 10

                 b.    Datel does not satisfy the exception to the market participant test ................................................................................................ 12

                 c.    Datel does not plead any injury caused by Microsoft's alleged conduct in the primary market ......................................... 12

            2.    Exclusion of Other Gaming Systems from the Primary Market is Legally Untenable. .................................................................................. 13

            3.    Datel Fails to Plead Exclusionary Conduct by Microsoft ........................ 15

    B.    Datel's "Aftermarket" Monopolization Claim Should Be Dismissed Because Datel Has Failed to Plead a Legally Cognizable Aftermarket ............... 16

            1.    The Kodak Exception Does Not Apply Where the Purported Aftermarket Restriction Arises From Consumers' Knowing and Voluntary Consent ............................................................................... 17

            2.    Xbox 360 Purchasers Knowingly and Voluntarily Gave Microsoft the Right to Prohibit Unauthorized Third-Party Peripheral Devices. ....... 20

    C.    Datel's Tying Claim Should Be Dismissed for Failure to Plead a Viable Primary Market and Aftermark**e**t ....................................................................... 23

    D.    Datel's Unfair Competition Claims (Fourth and Fifth Causes of Action) Should Be Dismissed for the Same Reasons ...................................................... 24

IV. CONCLUSION ............................................................................................................... 25

**FEDERAL CASES**

*Am. Ad Mgmt. v. GTE*,
190 F.3d 1051 (9th Cir. 1999)...................................................................... 10, 12, 13

*Am. Prof'l Testing Servs., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*,108
F.3d 1147 (9th Cir. 1997)................................................................................... 15

*Apple, Inc. v. Psystar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ....................................................... passim

*Ashcraft v. Iqbal*,
129 S. Ct. 1937 (2009) .................................................................... 9, 13, 16

*Associated Gen. Contractors v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) ........................................................................................ 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................... 9, 13

*Bhan v. NME Hosps., Inc.*,
772 F.2d 1467 (9th Cir. 1985)........................................................................ 10

*Blue Shield v. McCready*,
457 U.S. 465 (1982)........................................................................................ 12

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986) ....................................................................................... 10

*Dicar, Inc. v. Stafford Corrugated Products, Inc.*,
No. 2:05-cv-5426 (DMC) (MF), 2009 WL 1796053 (D.N.J. June 22, 2009) ........... 16

*Digital Equip. Corp. v. Uniq Digital Techs., Inc.*,
73 F.3d 756 (7th Cir. 1996)............................................................................ 19

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
732 F.2d 480 (5th Cir. 1984)......................................................................... 16

*Eastman Kodak Company v. Image Technical Servs., Inc.*,
504 U.S. 451 (1992)................................................................................... passim

*Exhibitors' Serv., Inc. v. Am. Multi-Cinema, Inc.*,
788 F.2d 574 (9th Cir. 1986)..................................................................... 11, 12

*Formula One Licensing, B.V. v. Purple Interactive Ltd.*,
No. C 00-2222 MMC, 2001 WL 34792530 (N.D. Cal. Feb. 6, 2001)................................... 25

*Forsyth v. Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997)........................................................................ 19

*Green Country Food Mkt., Inc. v. Bottling Group, LLC*,
371 F.3d 1275 (10th Cir. 2004)...................................................................... 16

*Hack v. President & Fellows of Yale College*,
237 F.3d 81 (2d Cir. 2000)............................................................................. 19

*Illinois Tool Works Inc. v. Independent Ink, Inc.*,
547 U.S. 28 (2006) ......................................................................................... 24

*In re Actimmune Mktg. Litig.*,
614 F. Supp. 2d 1037 (N.D. Cal. 2009) ......................................................... 13

*In Re Apple & AT&TM Antitrust Litig.*,
596 F. Supp. 2d 1288 (N.D. Cal. 2008) ......................................................... 18

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

*In re Samsung Elecs. Am., Inc. Blu-Ray Class Action Litig.*,
   No. 08-0663 (JAG), 2008 WL 5451024 (D.N.J. Dec. 31, 2008)........................................... 22

*In re Super Premium Ice Cream Distribution Antitrust Litig.*,
   691 F. Supp. 1262 (N.D. Cal. 1988) ............................................................................... 3, 14

*Inter-Mark USA, Inc. v. Intuit, Inc.*,
   No. C-07-04178 JCS, 2008 WL 552482 (N.D. Cal. Feb. 27, 2008)..................................... 22

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984)....................................................................................................................... 24

*Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*,
   146 F.3d 691 (9th Cir. 1998)..................................................................................................... 25

*Lucas v. Bechtel Corp.*,
   800 F.2d 839 (9th Cir. 1986)..................................................................................................... 11

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008)..................................................................................................... 9

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus.*,
   889 F.2d 524 (4th Cir. 1989)..................................................................................................... 14

*Newcal Indus., Inc. v. IKON Office Solution, Inc.*,
   513 F.3d 1038 (9th Cir. 2009)............................................................................................. passim

*Novell, Inc. v. Unicom Sales, Inc.*,
   No. C-03-2785 MMC, 2004 WL 1839117 (N.D. Cal. Aug. 17, 2004).................................. 22

*Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*,
   185 F.3d 957 (9th Cir. 1999)..................................................................................................... 11

*ProCD, Inc. v. Zeidenberg*,
   86 F.3d 1447 (7th Cir.1996)....................................................................................................... 22

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
   104 F.3d 811 (6th Cir. 1997)..................................................................................................... 19

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)....................................................................................................... 19

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
   532 F.3d 963 (9th Cir. 2008)..................................................................................................... 24

*Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.*,
   No. 1:08-CV-186, 2009 WL 1545829 (D. Vt. May 29, 2009) ............................................... 24

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir.), amended on other grounds, 275 F.3d 1187 (9th Cir. 2001)......... 9, 22

*Swierkiewicz v. Sorema N.A.*,
   534 U.S. 506 (2002)................................................................................................................... 19

*Tanaka v. Univ. of S. Cal.*,
   252 F.3d 1059 (9th Cir. 2001)................................................................................................... 13

*Ticketmaster LLC v. Designer Tickets & Tours, Inc.*,
   No. CV 07-1092 ABC (JCx), 2008 WL 649804, at *3-4 (C.D. Cal. Mar. 10, 2008)....... 11, 12

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)................................................................................................................... 15

*W. Parcel Express v. United Parcel Serv. of Am., Inc.*,
   65 F. Supp. 2d 1052 (N.D. Cal. 1998) ...................................................................................... 15

**STATE CASES**

*People's Choice Wireless, Inc. v. Verizon Wireless,*
    131 Cal. App. 4th 656 (2005) .............................................................................................. 25

**STATUTES AND RULES**

Fed. R. Civ. P. 12(b)(6)................................................................................................................ 9

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

**NOTICE OF MOTION AND MOTION TO DISMISS**

TO DATEL HOLDINGS, LTD. AND DATEL DESIGN & DEVELOPMENT, INC. ("Datel"), PLEASE TAKE NOTICE that on March 2, 2010, at 9:00 a.m., in Courtroom E, 15th Floor of the above-captioned Court, located at 450 Golden Gate Avenue, San Francisco, California, 94102, or as soon thereafter as counsel may be heard, Microsoft Corporation ("Microsoft") will and hereby does move for an Order dismissing Datel's Complaint.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities set forth below, the accompanying Request for Judicial Notice, and such other submissions or arguments as may be presented to the Court at or before the hearing.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**   **INTRODUCTION & SUMMARY OF ARGUMENT**

Datel has filed this antitrust case seeking judicial sanction for its sale of cloned, unauthorized accessories for the Microsoft Xbox 360 — accessories that open the door for cheating that harms the Xbox 360 ecosystem.  Nothing in the law supports such a result or requires that this case continue further.

Microsoft developed both the original Xbox gaming system and its successor, the Xbox 360.  The Xbox systems permit, *inter alia*, online multiplayer gaming in which players compete against each other over the Internet.  As detailed below, Datel is a self-proclaimed "leading developer and manufacturer" of the "best-selling" brand of "cheat systems" for such gaming systems.[1]  For example, Datel sells "specially enhanced" memory cards for the original Xbox, the Sony PlayStation 2, and the Nintendo Wii gaming systems that Datel itself describes as part of a "revolutionary cheat system . . . preloaded with hundreds of game-busting cheats."  As Datel explains, these memory card cheat systems permit players to "[i]nstantly acquire infinite health, infinite ammo, heaps of money or whatever else you need in your game."  Datel also sells "Turbofire" controllers that — unlike the authorized controllers sold with video game systems — have a "secret weapon," an extra button that enables "a programmable Turbo Rapid Fire mode."

---

[1] http://www.datel.co.uk/ (last visited January 21, 2010).

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

1   This Turbofire button gives an unfair "firepower advantage" over other players in online

2   multiplayer gaming by transforming "weapons like single shot pistols" into "lethal, fully

3   automatic weapons."

4          When Microsoft developed its second generation Xbox 360 platform, it took steps to

5   ensure that only authorized memory cards and controllers could be used on the system.  This has

6   the effect of providing a consistent and positive customer experience with the accessories and

7   limiting cheating that undermines the competitive gaming environment.  As explained below,

8   consumers are required to agree to contractual terms restricting their use of the Xbox 360

9   software to only authorized accessories.  When consumers sign up for the Xbox LIVE online

10  gaming service, they are again required to agree that only authorized accessories will be used.  To

11  enforce these contractual limitations, the Xbox 360 includes an authentication scheme that

12  permits only licensed memory cards and controllers to connect to the system.  Microsoft makes

13  clear in the Xbox LIVE terms of use that it may distribute software updates to the authentication

14  protocols to disable unauthorized accessories.

15         Datel now brings this antitrust complaint alleging that Microsoft has monopolized two

16  alleged markets: the "primary market" for "multiplayer online dedicated gaming systems" as well

17  as the so-called "aftermarket" for Xbox 360 accessories.  As to the latter market, Datel began

18  selling its "MAX Memory Card" for the Xbox 360 in May 2009.  The Datel memory card is,

19  needless to say, not alleged to be authorized or certified by Microsoft.  Rather, as Datel brazenly

20  boasts, it circumvented the Xbox 360's "authorization protocols and Security Integrated Circuit

21  processes" to develop the card.  Datel now complains that Microsoft issued a software update to

22  Xbox LIVE users in October 2009 disabling these unauthorized cards.  Datel also complains that

23  Microsoft's authentication protocols delayed its ability to sell "Turbofire" controllers for the

24  Xbox 360.  Datel has, however, apparently hacked even Microsoft's updated authentication

25  protocols, because it has recently begun selling Turbofire controllers for the Xbox 360.

26         Datel's claims should be dismissed at the threshold.  With respect to the primary market,

27  Datel cannot satisfy *any* element of the claim.  First, even if Datel had defined a proper market,

28  Datel does not have standing to pursue such a claim because it is not a participant in that alleged

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

primary market and has not suffered an injury causally related to the alleged monopolization of that market, as required by controlling Ninth Circuit precedent. Second, even if a market could be meaningfully defined as limited to "multiplayer online dedicated gaming systems," Datel's monopolization theory depends on excluding from the relevant market numerous products that fit Datel's own definition, such as the Nintendo Wii, the Nintendo DS, the Sony PSP, and the Sony PlayStation 2 — all multiplayer online dedicated gaming systems. Many of these products have outsold the Xbox 360 (perhaps explaining Datel's desire to exclude them from its constricted market definition). The only rationale Datel provides is that the Nintendo Wii is cheaper and has somewhat less functionality than the Xbox 360. But the law is quite clear that markets cannot be defined "'by price variances or product quality variances. Such distinctions are economically meaningless. . . .'" *In re Super Premium Ice Cream Distribution Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) (collecting cases). Third, Datel has not pled that Microsoft's alleged monopoly is the direct result of some exclusionary conduct, as opposed to innovation and lawful aggressive competition.

With respect to the aftermaket monopolization claim, the general rule is that antitrust markets cannot be limited to a single brand, such as "Xbox 360 accessories." Datel is attempting to fit into the exception to that general rule, as set forth in *Eastman Kodak Company v. Image Technical Services, Inc.*, 504 U.S. 451 (1992). That exception, however, is not available where the supposed "aftermarket" restriction — here, that Microsoft would not permit unauthorized accessories — was a contractual term of consumers' purchase of the primary product. *See id.* at 464-478 (permitting aftermarket claim where Kodak had restricted aftermarket only *after* the customers had already purchased Kodak equipment and therefore were improperly "locked in" to Kodak parts and service); *Newcal Indus., Inc. v. IKON Office Solution, Inc.*, 513 F.3d 1038, 1048-49 (9th Cir. 2009). As Judge Alsup recently explained, there is no aftermarket claim where consumers "knowingly agree to the challenged restraint" in a software license. *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1201 (N.D. Cal. 2008). Here, in both the Xbox 360 software license and the Xbox LIVE terms of use (which are both subject to judicial notice) consumers knowingly and voluntarily agree that they would be limited to authorized Xbox 360

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

1   accessories.  Datel, thus, cannot rely on the *Kodak* exception.

2          Dismissal of Datel's other claims necessarily follows from dismissal of Datel's first two

3   claims.  Datel's tying claim requires viable definitions of the markets for the tying and the tied

4   products, here the primary and aftermarkets respectively.  But as explained above, Datel has

5   failed to allege either a viable "tying" product market (the alleged primary market) or a viable

6   "tied" product market (the alleged aftermarket).  Datel's statutory and common law unfair

7   competition claims also should be dismissed because they rest on the same untenable allegations

8   as its federal antitrust claims.

9          Ultimately, Datel seeks in this lawsuit not only judicial sanction but an order mandating

10  that Microsoft permit Datel (and other companies) to continue selling unauthorized accessories

11  and cheating tools for the Xbox 360 — tools that undermine quality user experience and the fair

12  playing field that Microsoft seeks to ensure for its gamers, Xbox LIVE members, game

13  developers, and providers of authorized Xbox accessories.  There is no basis in law or common

14  sense for such a result.  This action should be dismissed with prejudice.

15  **II.     BACKGROUND AND FACTS**

16          **A.     The Parties**

17          Microsoft released the original Xbox video game console in 2001 and released the current

18  version, the Xbox 360, in 2005.  ¶ 11.[2]  The Xbox and Xbox 360, like other contemporary gaming

19  platforms, such as the PlayStation and the Wii, are used for both individual game playing as well

20  as multiplayer online gaming, *i.e.*, playing games over the Internet with an entire community of

21  gamers.  ¶¶ 12, 37-38.  Microsoft offers consumers, on an annual subscription basis, a service

22  called "Xbox LIVE," which is an "online multiplayer gaming service" through which users can

23  access "web-based multiplayer gaming and digital media."  ¶ 12.

24          Datel is a major, if not the major, developer and distributor of cheating systems for all

25  video gaming platforms.  As Datel explains on its website, it "creates the world's best-selling

26  videogame cheat products, generating annual sales of over $150 [million] through a global

27  ───────────────────
[2] Except as otherwise indicated, all "¶" cites are to Datel's Complaint, filed on November 20,

28  2009.

DEF'S MOTION TO DISMISS COMPLAINT
                                                                      CV 09-5535 EDL

network of distribution and retail partners."[3]

Codejunkies.com, "Datel's consumer site," employs a "dedicated team of cheat code developers" to provide "cheat codes" and "game saves" for "the latest games as soon as they are released."[4]  On that site, Datel advertises and sells numerous different kinds of cheat products. For the original Xbox, Datel sells "specially enhanced 16MB memory cards" described as part of a "revolutionary cheat system . . . preloaded with hundreds of game-busting cheats."[5]  Similar memory cards are offered for the PlayStation 2 and the Wii.[6]  As Datel explains, these memory card cheat systems permit players to "[i]nstantly acquire infinite health, infinite ammo, heaps of money or whatever else you need in your game."  These cheats are called "game saves" or "Powersaves" and permit users to obtain benefits in the game — like additional health or weapons or status — that are either impossible or difficult to obtain when playing by the rules.

Datel also sells "Turbofire" controllers ("gamepads" or "joypads") that have a "secret weapon" — an extra button enabling a "programmable Turbo Rapid Fire mode" that gives a "firepower advantage" over other players in online multiplayer gaming.[7]  Microsoft authorized controllers do not have any such button for cheating.  As Datel explains, its Turbofire button "can make all the difference" in who wins and who loses online games.  With these Turbofire controllers "weapons like single shot pistols" suddenly "become lethal, fully automatic weapons."

**B.    The Xbox 360's Contractual Prohibition on Unauthorized Accessories**

Cheating by some players — whether by using Turbofire buttons to turn pistols into machineguns or gaining additional health or ammunition — obviously degrades the gaming experience for other players.  One way to combat cheating and maintain a level playing field for

---

[3] http://www.datel.co.uk/pages/about_us.aspx (last visited January 21, 2010).

[4] http://www.datel.co.uk/pages/codejunkies.aspx (last visited January 21, 2010).

[5] http://us.codejunkies.com/Products/XBOX-Action-Replay-MAX-16MB---USA___EF000314.aspx (last visited January 21, 2010).

[6] http://us.codejunkies.com/Products/PS2-Action-Replay-MAX-EVO-Edition-16MB---USA___EF000071.aspx (PlayStation 2); http://us.codejunkies.com/Products/Wii-Powersaves-512MB---USA___EF000442.aspx (Wii) (all last visited January 21, 2010).

[7] http://us.codejunkies.com/Products/TurboFire-Controller-for-PS3___EF000805.aspx (last visited January 21, 2010).

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

1    online gamers is to restrict the memory cards and controllers that can be used with the system.

2    Each Xbox 360 comes packaged with a software license that requires the system software to be

3    used only with Microsoft-authorized accessories: the "software included in the Xbox Product is

4    licensed to you, not sold.  *You are licensed to use such software only in your Xbox Product*."

5    Request for Judicial Notice ("RJN"), Ex. A at 7 (emphasis added).  "Xbox Product" is defined to

6    be either "the Xbox 360™ Video Game System" or "Microsoft branded Xbox 360-compatible

7    hardware accessories manufactured by or for Microsoft, whether included with the Console or

8    purchased separately."  *Id*., Ex. A at 5.

9           Microsoft also employs an authentication mechanism to ensure that only authorized and

10   licensed accessories and add-ons can be connected to the console and used in gaming.  As Datel

11   itself explains, Microsoft enforces its prohibition against unauthorized third-party accessories

12   through "authorization protocols and Security Integrated Circuit processes." ¶ 25.  Microsoft has

13   a "licensed accessories program" for third-party manufacturers under which their devices are

14   "tested for compatibility" and "certified for safety and compliance standards."  ¶¶ 20-21; *see also*

15   ¶ 20 (noting "officially licensed Xbox 360 storage devices" and "accessories"); ¶ 27 ("Microsoft

16   and its licensees" offer accessories and add-ons); ¶ 32 (accessories "supplied by Microsoft and its

17   licensees").

18           **C.      Datel's Xbox 360-Related Products**

19          Datel sells a wide range of accessories for the Xbox 360, including hard drives, hard drive

20   adapters, headsets, and rechargers.  ¶ 15.  Notably, Datel complains only that its memory cards

21   and controllers have been blocked by Microsoft's authentication scheme.  There is no allegation

22   that any of these other products are being blocked.

23          Datel began offering unauthorized "memory cards compatible with the Xbox 360" in May

24   2009.  These memory cards are called the "Memory MAX card" and referred to in the Complaint

25   as "DMMCs."  ¶ 17.  Datel does not suggest that its controllers and memory cards are authorized

26   by Microsoft or meet Microsoft's compliance standards for compatibility, safety, cheating or

27   anything else.  Rather, Datel hacked Microsoft's authentication algorithm with "a substantial

28   investment in analyzing the security and authentication techniques employed by the Xbox." ¶ 30.

- 6 -                            DEF'S MOTION TO DISMISS COMPLAINT
                                 CV 09-5535 EDL

1  Datel boasts that it is the "only firm that has been able to overcome these deliberately-erected

2  technical barriers." *Id.*

3      Datel itself alleges that Microsoft has expressed concern that unauthorized memory cards

4  facilitate cheating.  ¶ 21.  But Datel fails to mention, for example, that the MAX memory card

5  comes pre-packaged with software that permits consumers to transfer data freely between the

6  memory card and a PC, something that cannot be done with a Microsoft authorized memory card

7  (at least without the aid of additional unauthorized accessories).[8]  As Datel explains, because of

8  that functionality "MAX Memory is the perfect Xbox 360 memory card if you want to make use

9  of suitable game saves and content downloaded from the internet."[9]

10     Datel complains that in October 2009, Microsoft deployed a software update to Xbox 360

11  LIVE subscribers, the "dashboard update," that disabled Datel's unauthorized memory cards for

12  Xbox LIVE users.  ¶ 2.  According to Datel's own allegations, Xbox 360 users who are *not* Xbox

13  LIVE subscribers, or who discontinued Xbox LIVE service following Microsoft's warning,

14  continue to be able to use Datel's memory cards.  ¶¶ 20-21.  Datel claims that this update also

15  delayed the release of the Xbox 360 version of Datel's Turbofire controller (or "joypad"),

16  described above.  ¶ 25.

17     This software update was entirely in keeping with Xbox LIVE's Terms of Use ("TOU")

18  agreed to by LIVE users in advance.  When consumers sign up for the Xbox LIVE Service, they

19  are presented with the TOU which require them, by clicking "ACCEPT," to "agree that you are

20  using only *authorized software and hardware* to access the Service."  RJN, Ex. B at 1, 10

21  (emphasis added).[10]  The TOU then specifically provide that Microsoft may institute the

22  "automatic download" of software updates "that prevent[ ] you from . . . using unauthorized

23  hardware peripheral devices."  *Id.*, Ex. B at 11.  Moreover, prior to deploying this update, as

24  Datel admits, Microsoft notified Xbox LIVE subscribers on its official blog that "unauthorized"

25  _____

26  [8] http://us.codejunkies.com/Products/XB360-MAX-Memory-4GB__EF000778.aspx (last visited January 21, 2010).

27  [9] *Id.*

28  [10] The Xbox 360 console packaging also states that Xbox LIVE service is "Subject to Terms of Use (at www.xbox.com/live/termsofuse/)."  RJN, Ex. C.

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

1    memory cards would "no longer work" with subscribers' Xbox 360s and that they should back up

2    their profile or saved games onto an "authorized Xbox 360 storage device prior to taking the

3    update." ¶ 20.

4          Despite that update, since filing its complaint Datel has released the Xbox 360 version of

5    its "Turbofire" controller, which like the PlayStation 3 and Wii versions, has a "secret weapon"

6    — "its programmable Turbo Rapid Fire" designed to give Datel customers a huge advantage over

7    other players in online games.[11]  Datel also has released an "Arcade pro Joystick" which works

8    with the Xbox 360, Play Station 3, and PCs.[12]  This Datel product also has a "programmable

9    Turbo Rapid Fire" button.

10          **D.    Datel's Antitrust Claims**

11          Datel's complaint asserts three separate antitrust claims.

12          (1) Datel alleges (in its Second Claim for Relief) that Microsoft has monopolized an

13    alleged "primary market" for "video game systems that feature multiplayer online gaming in

14    addition to personal gaming," which Datel calls the "Multiplayer Online Dedicated Gaming

15    Systems Market." ¶¶ 26, 36, 61; *see* ¶¶ 61-70.  Datel insists, however, this market is limited to

16    "[o]nly two systems," the Xbox 360 and Sony's Playstation 3, to the exclusion of Nintendo's Wii

17    gaming system, older-generation gaming systems like the PlayStation 2, handheld gaming

18    systems like the Sony PSP and the Nintendo DS, or personal computers — even though all are

19    indisputably used for online multiplayer gaming.  ¶¶ 37-39, 42.  Datel's only rationale for that

20    limitation are alleged price and quality differences among the Xbox 360, the Wii, the PlayStation

21    3, and PCs.  *Id.*  Datel does not even explain its exclusion of portable gaming systems or the

22    PlayStation 2.  Datel does not allege that it is a participant in the gaming systems market.

23          (2) Datel alleges (in its First Claim for Relief) that Microsoft also has monopolized an

24    "aftermarket" for "accessories and add-ons specific to the Xbox brand." ¶ 26; *see* ¶¶ 47-59.

25    Datel insists that the aftermarket is a "distinct" market from the primary market but is "wholly

26    _____

[11] http://us.codejunkies.com/Products/Xbox-360-Turbofire-Wired-Controller__EF000810.aspx
(last visited January 21, 2010).

27    [12] http://us.codejunkies.com/Products/Arcade-pro-Joystick-for-Xbox-360--PS3-and-

28    PC__ER000228.aspx (last visited January 21, 2010).

DEF'S MOTION TO DISMISS COMPLAINT
                                                          CV 09-5535 EDL

1   derivative of and dependent upon the primary market for the Xbox gaming system." ¶ 27.

2   Datel's market definition does not distinguish between memory cards and controllers and other

3   accessories like headsets and chargers for which there is no allegation that Datel has been unable

4   to sell.

5          (3) Datel alleges (in its Third Claim for Relief) that Microsoft has engaged in tying, by

6   tying the sale of Xbox 360 accessories to the sale of its Xbox 360 console.  ¶¶ 71-81.

7          Finally, Datel brings California state law unfair competition claims derivative of these

8   same alleged antitrust violations.  ¶¶ 82-90.

9   **III.    ARGUMENT**

10         A complaint must be dismissed when a plaintiff's allegations fail to state a claim upon

11  which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Although allegations of material fact are

12  taken as true, "legal conclusion[s] couched as a factual allegation . . . are not entitled to the

13  assumption of truth." *Ashcraft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).  A "plaintiff's obligation to

14  provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions,

15  and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v.*

16  *Twombly,* 550 U.S. 544, 555 (2007).  The complaint must instead contain "sufficient factual

17  matter" apart from legal conclusions, "to state a claim that is plausible on its face." *Iqbal*, 129 S.

18  Ct. at 1949.  The "court need not . . . accept as true allegations that contradict matters properly

19  subject to judicial notice or by exhibit," *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988

20  (9th Cir.), *amended on other grounds*, 275 F.3d 1187 (9th Cir. 2001), and may not indulge

21  unwarranted inferences to save a complaint.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,

22  540 F.3d 1049, 1064-65 (9th Cir. 2008).

23         **A.    Datel's "Primary Market" Monopolization Claim Should Be Dismissed.**

24         Datel brings a claim against Microsoft for monopolization or attempted monopolization of

25  an alleged "primary market" for "Multiplayer Online Dedicated Gaming Systems," which it

26  insists is conveniently limited to two products: the Xbox 360 and Sony's PlayStation 3.  This

27  claim should be dismissed because Datel does not adequately plead any of the elements of a

28  monopolization claim.  (1) Datel lacks antitrust injury, and thus antitrust standing to bring the

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

claim, because it is not a participant in this alleged market.  Indeed, Datel has not even pled any causal injury resulting from Microsoft's conduct in that market.  (2) Datel has not pled a legally tenable market because, for example, it has excluded products based solely on alleged differences in product quality and price.  (3) Datel does not plead any exclusionary acts by Microsoft in the online gaming systems market.  Each of these failures is an independent and sufficient basis to dismiss the claim.

> **1.   Datel Lacks the Antitrust Injury Needed to Challenge Microsoft's Alleged Conduct in the Primary Market.**

In addition to Article III standing, an antitrust plaintiff has to satisfy the requirement of antitrust standing.  *See Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983) ("*AGC*").  Although the *AGC* Court laid out a multi-factor test for analyzing antitrust standing, the first and most essential element is antitrust injury: "[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing." *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 110 n.5 (1986).  Antitrust injury requires more than a causally related injury.  It requires that "the plaintiff has suffered an injury of the type which the antitrust statute was intended to forestall."  *Bhan v. NME Hosps., Inc.,* 772 F.2d 1467, 1470 n.3 (9th Cir. 1985) (noting "primacy of this requirement").

> **a.   *Datel is not a participant in the primary market.***

In the landmark Supreme Court analysis of antitrust standing, the Court "emphasized the central interest [of the Sherman Act] in protecting the economic freedom *of participants in the relevant market*."  *AGC*, 459 U.S. at 538 (emphasis added).  The Ninth Circuit has "derived from this principle the 'corollary' that the 'injured party be a participant in the same market as the alleged malefactors,'" *i.e.*, the "market participant" test:

> Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained.  Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury.

*Am. Ad Mgmt. v. GTE*, 190 F.3d 1051, 1057 (9th Cir. 1999) (quoting *Bhan,* 772 F.2d at 1470).

Under this test, with few exceptions, a plaintiff "must be either a consumer of the alleged

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

violator's goods or services or a competitor of the alleged violator in the restrained market" to have standing. *Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 966 (9th Cir. 1999).

Given the danger that meritless antitrust litigation and the threat of treble damages can *inhibit* robust competition, the restriction on standing is designed to limit suits of marginal merit. If the parties most directly injured are not bringing suit, there is reason to doubt the wisdom of antitrust litigation. As the Ninth Circuit has explained, for plaintiffs who "are not the natural vindicators of the claimed antitrust violation," denying them antitrust standing "'is not likely to leave a significant antitrust violation undetected or unremedied.'" *Lucas v. Bechtel Corp.*, 800 F.2d 839, 846 (9th Cir. 1986). The Ninth Circuit has expressly rejected the "premise that every restraint must become the subject of a private antitrust action even when those directly injured do not choose to make it so." *Exhibitors' Serv., Inc. v. Am. Multi-Cinema, Inc.*, 788 F.2d 574, 581 (9th Cir. 1986).

Datel's primary market monopolization claim fails because Datel is not a consumer or competitor or other participant in the market for Multiplayer Online Gaming Systems. Datel does not buy, sell, broker, lease or otherwise deal in gaming systems. Rather, Datel manufactures and sells *accessories* like memory cards, controllers, headsets, hard drives, and adapters — not the gaming systems themselves. Datel itself insists that this supposed "aftermarket" for accessories is a "distinct" market from the "primary market." ¶¶ 15, 27.[13] Thus, Datel is not a participant in the primary market.

Nor has Datel suffered any injury in the alleged primary market. Rather, Datel's averred injuries — disablement of its memory cards and purported "preemptive" technical "barriers" to other Datel accessories (¶¶ 20-25) — all indisputably occurred in the alleged aftermarket. Datel thus lacks antitrust injury and antitrust standing to assert monopolization of the primary market. *See also Ticketmaster LLC v. Designer Tickets & Tours, Inc.*, No. CV 07-1092 ABC (JCx), 2008

---

[13] Datel's claim that it competes against Microsoft in the "aftermarket" is irrelevant to its primary market monopolization claim. *See, e.g., Exhibitors' Serv.*, 788 F.2d at 579 (although "two firms" might "compete" in a secondary market, "the requirement laid down in [*AGC*] is that the plaintiff and [the defendant] compete in the '*market in which trade was restrained*'" (emphasis added)).

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

1  WL 649804, at *3-4 (C.D. Cal. Mar. 10, 2008) (plaintiff lacked standing to assert claim that

2  "competition is allegedly being restrained is the market for 'primary ticket distribution services,'"

3  where plaintiff alleged "only that it is 'engaged in the secondary ticket distribution business'" and

4  did "not allege that it participates in the market for 'primary ticket distribution services'").

5                                      **b.      *Datel does not satisfy the exception to the market participant test.***

6            There is a "narrow exception" to the "market participant" test for "parties whose injuries

7  are 'inextricably intertwined' with the injuries of market participants" or with "the injury the

8  conspirators sought to inflict." *Am. Ad Mgmt*, 190 F.3d at 1057 n.5.  The exception is limited to

9  situations where the plaintiff's injury was the "necessary step" and "means" by which, the

10  conspiracy was enacted. *Blue Shield v. McCready*, 457 U.S. 465, 483-84 (1982).  In other words,

11  the alleged harm to the plaintiff must have been "necessary for the creation or implementation of

12  the trade-restraining" conduct and the anticompetitive scheme could not have been implemented

13  otherwise. *Exhibitors' Serv.,* 788 F.2d at 580.  The exception does not apply here because there is

14  no way in which blocking Datel's memory cards or accessories was a "necessary step" in

15  Microsoft's supposed dominance of the gaming systems market.  Datel, after all, only introduced

16  its memory cards in May 2009 (¶ 17), and Microsoft is alleged to have blocked the use of those

17  cards in October 2009 (¶ 20).  Yet Microsoft is alleged to have been dominating the gaming

18  systems market since 2006.  ¶ 13.  Nor does Datel purport to explain how it could have been

19  necessary for Microsoft to block unauthorized memory cards or controllers to gain power in the

20  gaming systems market.  Indeed, what Datel actually alleges is that Microsoft gained "substantial

21  market power" in the primary market and *then* "deployed this power" supposedly to dominate the

22  aftermarket in which Datel competes.  ¶ 62.  Thus, according to Datel's own allegations,

23  Microsoft obtained substantial market power in the primary market first, separate and apart from

24  any conduct in the aftermarket that harmed Datel.

25                                      **c.      *Datel does not plead any injury caused by Microsoft's alleged
                                                  conduct in the primary market.***

26

27            Even more fundamentally, Datel has no standing to bring its primary market

28  monopolization claim because Datel does not plead any causal connection between its alleged

DEF'S MOTION TO DISMISS COMPLAINT
                                                          CV 09-5535 EDL

injury and Microsoft's alleged dominance of the primary market.  Antitrust standing, like Article III standing, requires first and foremost "some credible injury caused by the unlawful conduct." *Am. Ad Mgmt.*, 190 F.3d at 1056.  Datel's alleged injury in this case is being unable to sell its memory cards because Microsoft supposedly blocked their use.  There is no causal connection alleged between that injury and Microsoft's conduct in the alleged primary market.  Datel offers only the conclusory allegation that "Microsoft has deployed" its "power" in the primary market "to impede the development" of the aftermarket.  ¶¶ 62-63.  But no facts are alleged as to how the alleged monopolization of the alleged primary market caused Datel's accessories to be disabled.  Under *Twombly* and *Iqbal*, "[m]ere recitations of the causation element . . . do not provide sufficient grounds for entitlement to relief."  *In re Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037, 1051 (N.D. Cal. 2009) (citing *Twombly*, 550 U.S. at 555).  Datel's "speculative allegations" and "legal conclusions about a 'direct and proximate' causation of injuries" fail to state a claim for relief.  *Id*. at 1051-52.

## 2.     Exclusion of Other Gaming Systems from the Primary Market is Legally Untenable.

Datel alleges that the primary market is the "Multiplayer Online Dedicated Gaming Systems Market," but insists that the market should be limited to "[o]nly two systems—Microsoft's Xbox 360 and Sony's Playstation 3."  ¶ 37.  Even if a market could be limited to "multiplayer online dedicated gaming systems," Datel's exclusion of other systems — such as the Nintendo Wii, older gaming systems like the PlayStation 2, and handheld systems like the Nintendo DS and the Sony PSP — that meet its own market definition requires dismissal of the primary market monopolization claim.  An antitrust complaint will not survive Rule 12(b)(6) scrutiny where "it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect" and "is facially unsustainable."  *Newcal Indus., Inc. v. IKON Office Solution, Inc.*, 513 F.3d 1038, 1045 (9th Cir. 2009); *see also Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("[f]ailure to identify a relevant market is a proper ground for dismiss[al]").

Datel does not try to support its exclusion of all these products from the market.  With respect to the Nintendo Wii, Datel even admits that it is a dedicated video gaming system, like the

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

Xbox 360 and the Sony PlayStation 3, and concedes that the Wii has online multiplayer gaming functionality.[14]   ¶ 38.  Because the Wii, in fact, has outsold *both* the PlayStation3 and the Xbox 360, Datel must exclude the Wii from its alleged market to maintain an even colorable claim of monopolization.  The only basis that Datel alleges for excluding a product that meets each of the five elements of its own market definition — multiplayer-online-dedicated-gaming-systems — is that the Wii has "reduced functionality" and a "lower price point" than the Xbox 360 and the PlayStation 3.  ¶ 38.  But that alone is not a tenable basis to exclude a product from an antitrust market.  The very term *market*, after all, refers to various products arrayed along a range of qualities and prices, among which antitrust law "presumes that consumers are willing to make tradeoffs."  *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus.*, 889 F.2d 524, 528 (4th Cir. 1989) (rejecting "better branded" furniture as a distinct market from other furniture).  The PlayStation 3 and the Xbox 360 also differ in price and product features, yet Datel admits that those products compete with each other.[15]

Datel's attempt to exclude competitive products based on differences in price or quality is impermissible.  "'Courts have repeatedly rejected efforts to define markets by price variances or product quality variances.  Such distinctions are economically meaningless where the differences are actually a *spectrum* of price and quality differences.'"  *In re Super Premium Ice Cream Distribution Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) (collecting cases).  In *Super Premium Ice Cream*, Judge Legge held that Haagen-Daz super-premium ice cream was not a separate market from other ice cream even though "Haagen-Daz's ice creams are distinguishable, at least for purposes of marketing, by the fact that they have higher butterfat content, lower air volume, and more natural ingredients."  691 F. Supp. at 1268.  It did not matter

---

[14] Indeed, Datel itself sells products designed for the Wii's "on-line enabled multiplayer games."  *See, e.g.,* http://us.codejunkies.com/Products/WiFi-MAX___EF000625.aspx (last visited January 21, 2010).

[15] Datel cites to Microsoft press releases referencing PlayStation 3 sales, but that proves nothing about whether the Wii also competes with the Xbox 360 and the PlayStation.  There are, for example, also Microsoft press releases comparing Xbox 360 sales to Wii sales.  *See, e.g.,* http://www.microsoft.com/emea/presscentre/pressreleases/MediaAlertPR_041208.mspx; http://www.microsoft.com/Presspass/press/2008/may08/05-14360First10PR.mspx (all last visited January 21, 2010).

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

1   that the defendant's own documents showed that "its products have high customer recognition

2   and sales because of those characteristics."  In *Psystar*, Judge Alsup similarly rejected on a

3   motion to dismiss a market definition based on "a mere price differential" because a price or

4   quality difference does not "mean that a product is unconstrained by competition."  *Apple, Inc. v.*

5   *Psystar Corp.*, 586 F. Supp. 2d 1190, 1199 (N.D. Cal. 2008).  *See also W. Parcel Express v.*

6   *United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1059-60 (N.D. Cal. 1998) ("WPX's

7   attempt to define the market on the basis of price or product variances is contrary to case law

8   holding that '[s]uch distinctions are economically meaningless where the differences are actually

9   part of a *spectrum* of price and [product options].'").

10       The failure to plead a plausible product market is an independent basis to dismiss the

11   primary market monopolization claim.

12               **3.       Datel Fails to Plead Exclusionary Conduct by Microsoft.**

13       Another essential element of a monopolization or attempted monopolization claim is some

14   exclusionary conduct that is producing or maintaining the monopoly.  *See e.g.*, *American Prof'l*

15   *Testing Servs., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147,

16   1152 (9th Cir. 1997).  Even if the market could be limited to the Xbox 360 and the PlayStation 3,

17   dominant market share, or even a monopoly, achieved due to product innovation or quality, does

18   not state an antitrust claim.  "The mere possession of monopoly power, and the concomitant

19   charging of monopoly prices, is not only not unlawful; it is an important element of the free-

20   market system."  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398,

21   407 (2004).  Datel's claim must be dismissed because it has not alleged facts demonstrating that

22   Microsoft's alleged exclusionary conduct, *i.e.*, exclusion of unauthorized accessories, could allow

23   Microsoft to achieve or maintain monopoly power in the gaming console market.

24       All Datel has alleged is that *after* Microsoft achieved market power in the gaming systems

25   market, it "deployed" that "power" to restrict competition in the accessory aftermarket and then

26   used *that* power in turn to "facilitate price discrimination, increase switching costs, and erect

27   substantial barriers to potential entrants" in the primary market.  (¶¶ 62- 63.)  But there are no

28   facts alleged to back-up any of that verbiage.  The recitation of "magic words" or economic terms

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

of art like "switching costs" or "barriers to entry" do not satisfy the pleading requirements for antitrust cases. *See Iqbal*, 129 S. Ct. at 1950 ("legal conclusion[s] couched as a factual allegation . . . are not entitled to the assumption of truth"); *Dicar, Inc. v. Stafford Corrugated Products, Inc.*, No. 2:05-cv-5426 (DMC) (MF), 2009 WL 1796053, at *8 (D.N.J. June 22, 2009) ("conclusory statements" like "barriers to entry" are insufficient in absence of averred "facts that make it plausible" that party has "power to control prices or exclude competition"). Nor do Datel's allegations make any sense. There is no allegation in the Complaint that Microsoft has engaged in any "price discrimination," *i.e.*, the sale of the same product to different persons at different prices. No facts are alleged that would explain how excluding unauthorized accessories could enable Microsoft to engage in price discrimination or erect barriers to entry in the gaming system market. Similarly, if Microsoft were to raise the price of Xbox 360 accessories to supra-competitive levels, that would not "increase switching costs" for people switching from the Xbox 360 to the PlayStation 3 or Wii. The price to switch to those products would remain the same. If anything, Xbox 360 users would have greater reasons to switch away. Moreover, the cost of switching *to* the Xbox 360 would increase, undermining the Xbox 360's supposed market dominance.

The Court should dismiss Datel's claim for monopolization or attempted monopolization of the alleged primary market.

### B.     Datel's "Aftermarket" Monopolization Claim Should Be Dismissed Because Datel Has Failed to Plead a Legally Cognizable Aftermarket.

Datel also alleges monopolization or attempted monopolization of an alleged "aftermarket" limited to "Xbox 360 Accessories and Add-ons." It is well established, however, that plaintiffs cannot pursue antitrust claims based on such a single-brand market. *See, e.g., Green Country Food Mkt., Inc. v. Bottling Group, LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004) ("Even where brand loyalty is intense, courts reject the argument that a single branded product constitutes a relevant market."); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir. 1984) ( "absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market").

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

1    Datel, however, is hoping to fall within a narrow exception to this rule established in

2    *Eastman Kodak Company v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), for

3    "aftermarkets" of products or services to be used with a single brand of primary products.  In

4    *Kodak*, for example, the aftermarket consisted of repair parts and services designed for Kodak-

5    brand copiers, the primary product.  But the *Kodak* exception is not available to Datel because,

6    unlike in *Kodak* and its progeny, the purchasers of the Xbox 360 knew and agreed that they could

7    only use Microsoft-authorized accessories with their systems.  Microsoft's purported power in

8    this alleged aftermarket thus arises not from some exclusionary conduct, but from contractual

9    rights that consumers knowingly and voluntarily gave to it.

10   **1.    The *Kodak* Exception Does Not Apply Where the Purported**
         **Aftermarket Restriction Arises From Consumers' Knowing and**
11       **Voluntary Consent.**

12       Antitrust law does not permit claims alleging restraints in a proposed single-brand

13   aftermarket where the purchasers knew and/or agreed in advance that they would be required to

14   purchase aftermarket products from the same seller.  The basis for this rule can be traced back to

15   *Kodak* itself.  There, the plaintiffs, a group of independent service organizations ("ISO's"), began

16   servicing Kodak's photocopiers in the early 1980s, in competition with Kodak's own provision of

17   service and parts for its machines.  *Kodak*, 504 U.S. at 457.  In the mid-1980s, Kodak pulled the

18   rug out from under the feet of those ISOs when it implemented a ***new policy*** of selling

19   replacement parts "only to buyers of Kodak equipment who use Kodak service or repair their own

20   machines."  *Id*. at 458.  In permitting a claim to proceed for monopolization of the single-brand

21   parts and services aftermarket, the Supreme Court emphasized that Kodak had imposed the

22   restriction only *after* the customers had already purchased Kodak equipment, and therefore the

23   customers were improperly "locked in" to Kodak parts and service without any advance notice or

24   agreement.  *Id*. at 464-78.

25       In case after case, courts have thus held that the *Kodak* exception is limited to situations

26   where the aftermarket restrictions are not disclosed or agreed to by customers.  In *Newcal*, 513

27   F.3d 1038, the most recent such decision in this circuit, the Ninth Circuit explained that the

28   "critical distinction" between *Kodak* and cases rejecting single-brand aftermarkets was "that the

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

1  Kodak customers did not knowingly enter a contract that gave Kodak the exclusive right to

2  provide parts and services for the life of the equipment." *Newcal*, 513 F.3d at 1048.  Kodak

3  "consumers could not, at the time of purchase, reasonably discover that Kodak monopolized the

4  service market and charged supracompetitive prices for its service. . . . Kodak's market power in

5  parts and services, therefore, did not arise from a knowing contractual (or quasi-contractual)

6  arrangement." *Id.*

7         The *Newcal* Court permitted a single-brand aftermarket claim to proceed because the

8  defendant IKON, which leased copier equipment, allegedly "defraud[ed] IKON customers by

9  amending those customers' lease agreements and service contracts" *after* they had already signed

10  up for service "without disclosing that the amendments would lengthen the term of the original

11  agreement." *Id.* at 1043.  The Ninth Circuit emphasized that, as in *Kodak*, IKON obtained the

12  amended "agreements only *after* obtaining an initial lease or contract" without disclosing at the

13  outset that the customers' contracts subsequently would be extended.  *Id.* at 1050 (emphasis in

14  original).

15         Similarly, in *In re Apple & AT&TM Antitrust Litigation*, 596 F. Supp. 2d 1288 (N.D. Cal.

16  2008), consumers brought a class action against Apple and AT&T alleging monopolization and

17  attempted monopolization of an aftermarket for iPhone voice and data services.  The plaintiffs'

18  claims were based upon an alleged agreement between Apple and AT&T that restricted iPhone

19  users to AT&T service for five years.  That aftermarket restriction was allegedly never disclosed

20  to consumers.  Instead, consumers allegedly knew only of "*two-year*" AT&T "service contracts at

21  the time of purchase." *Id.* at 1303 (emphasis added).  Under *Newcal*, Judge Ware held that the

22  plaintiffs adequately had alleged an aftermarket claim precisely because of the alleged

23  undisclosed five-year agreement.  *Id.*  He further held that "[u]ltimately, the dispositive issue is

24  whether [consumers] 'knowingly placed [Defendants] in a monopoly position' in the alleged . . .

25  aftermarket" by agreeing in advance to whatever restrictions are placed on iPhones.  *Id.* at 1305

26  (quoting *Newcal*, 513 F.3d at 1049).

27         This is an almost universally held understanding of the *Kodak* exception: it requires a

28  restriction in the aftermarket that was not disclosed to consumers in advance.  "[T]he change in

- 18 -

policy in *Kodak* was the crucial factor in the Court's decision. By changing its policy after its customers were 'locked in,' Kodak took advantage of the fact that its customers lacked the information to anticipate this change." *PSI Repair Servs., Inc. v. Honeywell, Inc*., 104 F.3d 811, 820 (6th Cir. 1997). If "Kodak had informed customers about its policies before they bought its machines, purchasers could have shopped around for competitive life-cycle prices" and there would not have been a viable claim relating to the aftermarket. *Digital Equip. Corp. v. Uniq Digital Techs., Inc*., 73 F.3d 756, 763 (7th Cir. 1996). *See also, e.g., Hack v. President & Fellows of Yale College*, 237 F.3d 81, 85 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (affirming dismissal of claim for monopolization of aftermarket for housing for Yale college students based on college's advance requirement that students agree to live in dormitories for freshman and sophomore years).

The Third Circuit applied this rule in *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) to reject a single-brand aftermarket claim relating to ingredients for Domino's Pizza franchisees, where the restriction was disclosed and agreed to in advance. The court stressed that the plaintiff franchisees "knew that Domino's Pizza retained significant power over their ability to purchase cheaper supplies from alternative sources because that authority was spelled out in detail" in the "franchise agreement," and thus they "could assess the potential costs and economic risks at the time they signed" the agreement *Id*. at 440. The court stressed that the plaintiffs "need not have become Domino's franchisees," and if the restrictions in the franchise agreement "were viewed as overly burdensome or risky at the time they were proposed," they "could have purchased a different form of restaurant, or made some alternative investment." *Id*. at 441. The court distinguished *Kodak* on the ground, again, that the challenged restraint in *Kodak* was "not authorized by contract terms disclosed at the time of the original transaction" and the "change in policy was not foreseen at the time of sale," so buyers "had no ability to calculate" the "higher costs at the time of purchase and incorporate them into their purchase decision." *Id*. at 440. *See also Forsyth v. Humana, Inc*., 114 F.3d 1467, 1476 (9th Cir. 1997) (rejecting claims for monopolization of the market for hospital services for a single company's insureds because the purported restraint arose from pre-disclosed "contractual provisions" in the plaintiffs'

1    "insurance policies").

2           Judge Alsup's decision in *Psystar* is particularly instructive.  Apple sued Psystar for

3    copyright and trademark infringement for Psystar's use of Apple's operating system ("OS") on

4    non-Apple hardware.  Psystar then filed monopolization and tying claims, much like those alleged

5    by Datel, alleging that Apple had sought to monopolize a primary market for the Mac OS as well

6    as the aftermarket for hardware that could be used with the Mac OS and had tied the Mac OS to

7    its own hardware.  *Psystar,* 586 F. Supp. 2d at 1194-95.  Psystar alleged that Apple had "erected

8    technical barriers that prevent Mac OS from operating on non-Apple computers" (like Datel's

9    claims that Microsoft has placed technological limits on the use of its memory cards and

10   controllers with the Xbox 360).  *Id.* at 1194.  Psystar acknowledged, however, that Apple's End

11   User License Agreement for the Mac OS "specifically prohibits customers from installing the

12   operating system on non-Apple computers."  *Id.*

13          Judge Alsup granted Apple's motion to dismiss all of Psystar's antitrust claims, holding

14   that Psystar had failed to plead a plausible aftermarket claim because through "its End User

15   License Agreement and other means, Apple specifically restricts the use of Mac OS to Apple-

16   labeled computer hardware systems" and "[c]ustomers, therefore, knowingly agree to the

17   challenged restraint."  *Id.* at 1201.  Judge Alsup stressed that "[u]nlike in *Kodak*—where

18   customers did not knowingly bind themselves to a single brand of the aftermarket and market

19   imperfections (information costs and switching costs) prohibited customers from imposing

20   market discipline in the *aftermarket* by switching among competitors in the *primary* market—

21   here Apple asks its customers to purchase Mac OS knowing that it is to be used only with Apple

22   computers."  *Id.*  (emphasis in original).

23          **2.      Xbox 360 Purchasers Knowingly and Voluntarily Gave Microsoft the
                       Right to Prohibit Unauthorized Third-Party Peripheral Devices.**

24
25          Under the principles set forth in *Newcal* and the authorities discussed above, Datel's

26   aftermarket monopolization claim should be dismissed because Xbox 360 purchasers knowingly

27   and voluntarily gave Microsoft the right to prohibit the use of unauthorized accessories.  As

28   explained above, each Xbox 360 comes packaged with a software license requiring consumers to

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

1   agree that the Xbox 360 software can be used only with Microsoft authorized accessories.  The

2   Xbox 360 documentation provides that the "software included in the Xbox Product is licensed to

3   you, not sold.  *You are licensed to use such software only in your Xbox Product*."  *Id.*, Ex. A at 7

4   (emphasis added).  "Xbox Product" is defined to be either "the Microsoft Xbox 360™ Video

5   Game System" or "Microsoft branded Xbox 360-compatible hardware accessories manufactured

6   by or for Microsoft, whether included with the Console or purchased separately."  *Id.*, Ex. A at 5.

7           Thus, like *Psystar*, *Queen City*, and *Forsyth* (and unlike *Kodak*, *Newcal*, and *Apple &*

8   *AT&TM*), consumers knew that Microsoft prohibits the use of unauthorized third-party

9   accessories, such as Datel's memory cards, at the time they purchased their Xbox 360 and they

10  agreed to that restriction.

11          If that were not enough, Microsoft even disclosed in advance the specific steps it took to

12  disable Datel's unauthorized memory cards.  Datel's Complaint is limited to users of the Xbox

13  LIVE online gaming service.  Datel's accusation is that Microsoft disabled Datel Max memory

14  cards through an on-line update for Xbox LIVE users.  ¶¶ 2-4.  Under Datel's own allegations,

15  Xbox 360 users who are *not* Xbox LIVE subscribers, or who discontinued Xbox LIVE service

16  following Microsoft's disablement warning, are able to continue to use Datel's memory cards.

17  ¶¶ 20-21.  When consumers sign up for the Xbox LIVE Service they are presented with the LIVE

18  TOU which require them to "agree that you are using only *authorized software and hardware* to

19  access the Service."  RJN, Ex. B at 10 (emphasis added).  The TOU further provide an explicit

20  notice that Microsoft may issue software updates to disable unauthorized accessories ("peripheral

21  devices"):

22              [Microsoft] may, among other things . . . discontinue any
                functionality or feature of the Service, . . .  or any hardware or
23              software associated with the Service or with an original Xbox or
                Xbox 360 console, or personal computer, from time to time without
24              notice, which may involve *the automatic download of related*
                *software* directly to your original Xbox, Xbox 360 console, or
25              personal computer, including software *that prevents you from . . .*
                *using unauthorized hardware peripheral devices*."
26
    *Id*. at 10-11 (emphases added).  There can no doubt that Xbox LIVE consumers were on notice
27
    and agreed to the precise "aftermarket" restrictions of which Datel complains.  The TOU
28

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

1  expressly states in bold that "**This Is a Contract between You and Microsoft**" and that Xbox

2  LIVE service is "conditioned on your acceptance of all terms in this contract."[16]  *Id.*, Ex. B at 1

3  (bold in original).  The Xbox 360 console packaging also states that Xbox LIVE service is

4  "Subject to Terms of Use (at www.xbox.com/live/termsofuse/)."  RJN, Ex. C.[17]

5          Datel attempts to claw its way back into the *Kodak* exception through a variety of

6  conclusory allegations.  For example, Datel asserts that "Microsoft's market power in the

7  Aftermarket for Xbox 360 Accessories and Add-ons . . . does not derive from contractual rights

8  that consumers knowingly and voluntarily gave Microsoft at the time of purchase."  ¶ 31.  The

9  Court may, and should, disregard this allegation because it is directly "contradict[ed]" by the

10  Xbox 360 software license and the Xbox LIVE TOU, documents "properly subject to judicial

11  notice."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on other*

12  *grounds*, 275 F.3d 1187 (9th Cir. 2001).

13          Similarly, Datel alleges that there are "[m]arket imperfections" which have "prevented

14  consumers from realizing the impact that their choice in the primary market would have on their

15  ───────────────

16  [16] The software license and Xbox LIVE TOU are enforceable contracts, just like the terms of use

17  in the *Psystar* case.  *See, e.g., Novell, Inc. v. Unicom Sales, Inc.*, No. C-03-2785 MMC, 2004 WL 1839117, at * 11 (N.D. Cal. Aug. 17, 2004) ("contracts contained in software boxes, which are

sometimes referred to as 'shrink wrap licenses,' are no less enforceable than any other type of

18  contract"); *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1452-53 (7th Cir. 1996) (upholding validity

of "shrinkwrap license" and noting that consumer had opportunity to return the software if he or

19  she "conclude[d] that the terms of the license make the software worth less than the purchase

price"); *In re Samsung Elecs. Am., Inc. Blu-Ray Class Action Litig.*, No. 08-0663 (JAG), 2008

20  WL 5451024, at *4 (D.N.J. Dec. 31, 2008) ("law does not require warranties or disclaimers to be

printed on packaging, as Plaintiffs contend, so that customers can 'readily' see and consider the

21  terms before purchasing the product."); *Inter-Mark USA, Inc. v. Intuit, Inc.*, No. C-07-04178 JCS,

2008 WL 552482, at *8-9 (N.D. Cal. Feb. 27, 2008) (granting motion to dismiss breach of an

22  implied warranty of merchantability claim based on "clickwrap" software license; rejecting

plaintiff's argument that it was a "factual question" whether plaintiff was "bound by the Software

23  License Agreement").  In any case, it is enough that the software license and the Xbox Live TOU

provide adequate advance notice to consumers of Microsoft's alleged restrictions in the

24  aftermarket.

25  [17] For the reasons detailed in Microsoft's Request for Judicial Notice, the Court may take judicial

notice of the software license and the TOU in adjudicating this Motion.  They are publicly

26  available documents, not subject to reasonable dispute.  And without attaching the software

license or TOU, Datel's Complaint alleges that "Microsoft's market power in the Aftermarket for

27  Xbox 360 Accessories and Add-ons . . . does not derive from contractual rights that consumers

knowingly and voluntarily gave Microsoft at the time of purchase."  ¶ 31.  In fact, the software

28  license and TOU directly contradict this allegation, which, as demonstrated above, is fatal to

Datel's claims.

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

freedom in the aftermarket." ¶ 32. This allegation is not only wholly conclusory, but irrelevant. Under *Newcal*, the issue of market imperfections comes into play only in the *absence* of advance disclosures and contractual provisions. In lieu of such a contractual disclosure, a defendant may assert that "consumers make a knowing choice to restrict their aftermarket options" when they purchase the initial product from among many choices. *Newcal*, 513 F.3d at 1050. As the Ninth Circuit explained, "a consumer's selection of a particular brand in the competitive market *is the functional equivalent of a contractual commitment*, giving that brand an agreed-upon right to monopolize its consumers in an aftermarket." *Id.* at 1049 (emphasis added). In that situation, the plaintiff may seek to demonstrate "market imperfections" to rebut the showing that consumer comparison shopping is the functional equivalent of a contract. *Id.* at 1048-49. But the issue of market imperfection is irrelevant here, where consumers already have "entered an[] express agreement" restricting the purported aftermarket.[18] *Psystar*, 586 F. Supp. 2d at 1201 n.4. Microsoft need not resort to the functional equivalent test.

       Datel's aftermarket claim should be dismissed because Microsoft's express and repeated contractual disclosures to consumers that only authorized accessories can be used with the Xbox 360 — and consumers' agreement to those terms — take this case out of the *Kodak* exception.

### C.     <u>Datel's Tying Claim Should Be Dismissed for Failure to Plead a Viable Primary Market and Aftermarket.</u>

       Datel also alleges that Microsoft has "tied" Xbox 360 consoles to "accessories and add-ons . . . in the Aftermarket for Xbox 360 Accessories and Add-ons." ¶¶ 74, 76. This claim should be dismissed for the same reasons as the monopolization claims. First, a fundamental element of a tying claim is market power over the "tying product," here the Xbox 360 console.

---

[18] Moreover, each of the purported "imperfections" are insufficiently pled under *Twombly* and *Iqbal*. Datel alleges that Microsoft leads consumers to believe they can use third-party accessories with their Xbox 360s. But that does not mean that consumers believe they could use *unauthorized* third party accessories, particularly given the disclosures discussed above. As Datel itself alleges, Microsoft has authorized numerous third-party accessories for use with the Xbox 360. ¶ 20 (Microsoft's authorized third-party licensees offer "officially licensed Xbox 360 storage devices" and "accessories"); ¶ 27 ("Microsoft and its licensees" offer accessories and add-ons); ¶ 32 (accessories "supplied by Microsoft and its licensees"). Similarly, Datel's claim that Microsoft "apparent[ly] accept[ed]" the "compatibility" of Datel's memory cards is contradicted by Datel's allegation that it had to hack or circumvent "security and authentication techniques" to get its product to work on the Xbox 360. ¶ 30.

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

1  *See, e.g., Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 972 (9th Cir. 2008)

2  (where defendant "lacks market power in the [tying] market, there can be no cognizable tying

3  claim").  In *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 36, 43 (2006), the

4  Supreme Court explained that tying was no longer viewed as inherently anticompetitive, and so

5  such claims could not proceed in the absence of "a true monopoly or a marketwide conspiracy."

6  But as discussed above (at 13-15), Datel's allegation of a market limited to "Multiplayer Online

7  Dedicated Gaming Systems" is implausibly narrow and so Datel's allegation that Microsoft has

8  power in that market fails.

9  Second, Datel's tying claim also requires a legally plausible definition of the market for

10  the tied products.  *See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 20-21 (1984)

11  ("a tying arrangement cannot exist unless *two separate* product markets have been linked"

12  (emphasis added)).  But again, as demonstrated above (at 16- 23), Datel's effort to plead a distinct

13  "aftermarket" limited to "Xbox accessories and add-ons" is legally improper, dooming its tying

14  claim just as much as its aftermarket monopolization claim.  In the *Psystar* case, for example, the

15  plaintiff had alleged tying of the Mac-OS to the aftermarket for "Mac-OS capable computers" as

16  well as monopolization of that aftermarket.  *See Psystar*, 586 F. Supp. 2d at 1200.  Judge Alsup

17  dismissed the tying claims once it was clear that there was no tenable separate aftermarket for

18  Mac-OS compatible hardware because Apple customers had "knowingly agree[d] to the

19  challenged restraint."  *Id.* at 1201.  As discussed above, the same holds true here.  *See also*

20  *Newcal*, 513 F.3d at 1044 & n.3 (pleading requirements for relevant markets and market power

21  "apply identically" to monopolization and tying claims); *Smugglers Notch Homeowners' Ass'n v.*

22  *Smugglers' Notch Mgmt. Co.*, No. 1:08-CV-186, 2009 WL 1545829, at *4 (D. Vt. May 29, 2009)

23  (granting motion to dismiss tying claim for lack of plausible secondary market given that

24  plaintiffs entered into agreements providing for the alleged tie and they "could have avoided the

25  effects of which they now complain simply by purchasing a different, or no, vacation property").

26  **D.    Datel's Unfair Competition Claims (Fourth and Fifth Causes of Action)
       Should Be Dismissed for the Same Reasons.**

27  Because Datel's common law and California Business and Professions Code section

28

DEF'S MOTION TO DISMISS COMPLAINT
CV 09-5535 EDL

1   17200 ("UCL") unfair competition claims are based on the same allegations as its antitrust

2   claims, they are subject to dismissal on the same basis.  "Where a Plaintiff fails to state an

3   antitrust claim, and where an unfair competition claim is based upon the same allegations, such

4   [unfair competition] claims are properly dismissed."  *Formula One Licensing, B.V. v. Purple*

5   *Interactive Ltd.*, No. C 00-2222 MMC, 2001 WL 34792530, at *4 (N.D. Cal. Feb. 6, 2001) (citing

6   *Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*, 146 F.3d 691, 695 (9th Cir. 1998) (state claims "fail

7   for the same reasons that the federal claims fail")).  *See also Psystar,* 586 F. Supp. 2d at 1203-04

8   (dismissing UCL and common law unfair competition claims given the lack of "relevant

9   distinction" from the standard for federal antitrust claims); *People's Choice Wireless, Inc. v.*

10  *Verizon Wireless*, 131 Cal. App. 4th 656, 668 (2005) (dismissing UCL claim because antitrust

11  claim failed as a matter of law).

12  **IV.      CONCLUSION**

13          For these reasons, the Court should dismiss Datel's Complaint with prejudice.

14
15  DATED: January 22, 2010                          Munger, Tolles & Olson LLP

16
17                                                   By:_____/s/ *Rohit K. Singla*_____
                                                         ROHIT K. SINGLA

18                                                   Attorneys for Defendant
19                                                   MICROSOFT CORPORATION

20

21

22

23

24

25

26

27

28

DEF'S MOTION TO DISMISS COMPLAINT
                                                 CV 09-5535 EDL