1    MARTIN R. GLICK (No. 40187)
     Email:  mglick@howardrice.com
2    BERNARD A. BURK (No. 118083)
     Email:  bburk@howardrice.com
3    DANIEL B. ASIMOW (No. 165661)
     Email:  dasimow@howardrice.com
4    ROBERT D. HALLMAN (No. 239949)
     Email:  rhallman@howardrice.com
5    MICHELLE S. YBARRA (No. 260697)
     Email:  mybarra@howardrice.com
6    HOWARD RICE NEMEROVSKI CANADY
        FALK & RABKIN
7    A Professional Corporation
     Three Embarcadero Center, 7th Floor
8    San Francisco, California  94111-4024
     Telephone:   415/434-1600
9    Facsimile:    415/677-6262

10   Attorneys for Plaintiffs
     DATEL HOLDINGS LTD. and DATEL
11   DESIGN & DEVELOPMENT, INC.

12

13                    UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15                     SAN FRANCISCO DIVISION

16

17   DATEL HOLDINGS LTD. and DATEL        No. 09-CV-05535 EDL
     DESIGN & DEVELOPMENT, INC.,
18                                        Action Filed:  November 20, 2009
                    Plaintiffs,
19                                        PLAINTIFFS' MEMORANDUM IN
           v.                             OPPOSITION TO MOTION OF
20                                        DEFENDANT MICROSOFT CORP.
     MICROSOFT CORPORATION,               TO DISMISS COMPLAINT
21
                    Defendant.            Date:        March 9, 2010
22                                        Time:        9:00 a.m.
                                          Courtroom:   E, 15th Floor
23                                        Judge:       Hon. Elizabeth D. Laporte

24

25

26

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......................................................................................... 1

SUMMARY OF ARGUMENT ...................................................................... 3

I.   LEGAL STANDARD ........................................................................ 5

II.  DATEL HAS STATED A CLAIM FOR MONOPOLIZATION OF THE XBOX 360 ACCESSORIES AFTERMARKET. ........................... 5

    A.   Microsoft Fails To Show That Consumers Agreed At The Time Of Purchase That Microsoft Could Monopolize The Aftermarket. ........................................................................................ 6

        1.   The Warranty And LIVE TOU Did Not Inform Purchase Decisions And They Do Not Cover The Entire Market. .............. 7

        2.   The Warranty And LIVE TOU Do Not Prohibit The Use Of Third Party Accessories. ....................................................... 8

        3.   There Is No Record Of When The Warranty And LIVE TOU Were In Effect, Or How They Changed Over Time. ...... 10

        4.   On The Record Before The Court, The LIVE TOU And Warranty Are Not Enforceable. ................................................. 11

    B.   Even If The Court Somehow Assumes The Existence Of Agreements Between Microsoft And Consumers Not To Use Third Party Accessories, Microsoft's Motion Must Be Denied. .............. 12

        1.   Microsoft's Use Of Its Power In The Foremarket To Monopolize The Aftermarket Violates Section 2. .................. 12

        2.   The Existence Of Customer Agreements Does Not Preclude A Finding Of A Relevant Antitrust Aftermarket. .................. 13

III. DATEL HAS STATED A CLAIM FOR MONOPOLIZATION OF THE MULTIPLAYER ONLINE DEDICATED GAMING SYSTEMS MARKET. ........................................................................................... 17

    A.   The Relevant Market Is Adequately Pled. ..................................... 17

    B.   Exclusionary Conduct Is Adequately Pled. .................................... 20

    C.   Datel Has Standing. ........................................................................ 21

        1.   Datel Has Standing As A Market Participant. ........................ 22

        2.   Datel Has Standing Under The Blue Shield Exception. ......... 23

        3.   Datel Has Pled The Necessary Causal Connection. ............... 24

IV.  DATEL HAS STATED A CLAIM FOR TYING. ............................ 24

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# TABLE OF CONTENTS

**Page**

V.      DATEL HAS STATED A CLAIM FOR UNFAIR COMPETITION.                25

CONCLUSION                25

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allstate Ins. Co. v. Hammonds*, 72 Wash. App. 664 (1994)    10

*Amarel v. Connell*, 102 F.3d 1494 (9th Cir. 1996)    17

*Am. Ad Mgmt. v. GTE*, 190 F.3d 1051 (9th Cir. 1999)    21, 22

*Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190 (N.D. Cal. 2008)    15, 20

*Ariz. Retail Sys., Inc. v. Software Link, Inc.*, 831 F. Supp. 759 (D. Ariz. 1993)    11

*Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983)    22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)    5

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 262 (2d Cir. 1979)    2

*Blue Shield v. McCready*, 457 U.S. 465 (1982)    23

*Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297 (9th Cir. 1982)    5

*Bragg v. Linden Research, Inc.*, 487 F. Supp. 2d 593 (E.D. Pa. 2007)    12

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962)    19

*Cal. Nat'l Bank v. Woodbridge Plaza LLC*, 164 Cal. App. 4th 137 (2008)    10

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999)    25

*Cost Mgmt. Servs. v. Wash. Natural Gas*, 99 F.3d 937 (9th Cir. 1996)    13

*Covad Commc'ns Co. v. BellSouth Corp.*, 299 F.3d 1272 (11th Cir. 2002)    5

*Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756 (7th Cir. 1996)    17

*Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992)    12, 13, 14, 25

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007)    5

*Exhibitors' Serv., Inc. v. Am. Multi-Cinema, Inc.*, 788 F.2d 574 (9th Cir. 1986)    22

*Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997)    16

*Fortner Enters. v. United States Steel Corp.*, 394 U.S. 495 (1969)    25

*Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81 (2d Cir. 2000)    17

*High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987 (9th Cir. 1993)    18

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3   *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997)     17, 18

4   *In re Apple & AT & TM Antitrust Litigation*, 596 F. Supp. 2d 1288 (N.D. Cal. 2008)     16, 17

5   *In re Samsung Elecs. Am., Inc. Blu-Ray Class Action Litig.*, No. 08-0663(JAG),
    2008 WL 5451024 (D. N.J. Dec. 31, 2008)     12

6

7   *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262 (N.D.
    Cal. 1988)     19

8   *Inter-Mark USA, Inc. v. Intuit, Inc*., No. C-07-04178 JCS, 2008 WL 552482 (N.D.
    Cal. Feb. 27, 2008)     12

9

    *Jamsports & Entm't, LLC. v. Paradama Prods., Inc.*, No. No. 02-C-2298, 2003 WL
10   1873563 (N.D. Ill. Apr. 15, 2003)     18

11  *Jefferson Parish Hosp. Dist. No. 2. v. Hyde*, 466 U.S. 2 (1984)     25

12  *Kelly v. William Morrow & Co.*, 186 Cal. App. 3d 1625 (1986)     9

13  *Klocek v. Gateway, Inc.*, 104 F. Supp. 2d 1332 (D. Kan. 2000)     11

14  *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965 (9th Cir. 1992)     3

15  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004)     2

16  *M.A. Mortenson Co., Inc. v. Timberline Software Corp*., 140 Wash. 2d 568 (Wash.
    2000)     11

17

    *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d
18   524 (4th Cir. 1989)     19

19  *Newcal Industries, Inc. v. Ikon Office Solutions*, 513 F.3d 1038 (9th Cir. 2008)     14, 18, 19

20  *No. 84 Employer-Teamster v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003)     5

21  *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302 (4th Cir. 2007)     22, 23

22  *Novell, Inc. v. Unicom Sales, Inc.*, No. C-03-2785 MMC, 2004 WL 1839117 (N.D.
    Cal. Aug. 17, 2004)     12

23

24  *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739 (9th Cir. 1984)     23

    *Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d 974 (E.D. Cal. 2000)     12
25

26  *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996)     12

    *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997)     17
27

28  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997)     14

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

**TABLE OF AUTHORITIES**

Page(s)

*Rebel Oil Co. v. Alt. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995)     13

*Specht v. Netscape Commc'ns Corp.*, 150 F. Supp. 2d 585 (S.D.N.Y. 2001), *aff'd*, 306 F.3d 17 (2d Cir. 2002)     11

*Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91 (3d Cir. 1991)     11

*Tanaka v. Univ. So. Cal.*, 252 F.3d 1059 (9th Cir. 2001)     20

*Ticketmaster LLC v. Designer Tickets & Tours, Inc.*, No. CV 07-1092 ABC (JCX), 2008 WL 649804 (C.D. Cal. Mar. 10, 2008)     22

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001)     18

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982)     18

*United States v. Griffith*, 334 U.S. 100 (1948)     13

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)     13, 23

*W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052 (N.D. Cal. 1998)     19

**Statutes**

17 U.S.C. §1201(f)     3

Fed. Rule Civ. Proc. 12(b)(6)     5

**Other Authorities**

H. Hovenkamp, *Federal Antitrust Policy§7.6c* (3d ed. 2005)     25

P. Areeda & H. Hovenkamp, *Antitrust Law* (2d ed. 2003; 3d ed. 2007)
¶530     19
¶531     18
¶564b     16
¶1721     25

P. Samuelson, *Intellectual Property and the Digital Economy,* 14 Berkeley Tech. L.J. 519 (1999)     3

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

**INTRODUCTION**

Microsoft's Motion to Dismiss ("Motion" or "Mot.") is laden with pejorative allegations that go well beyond the pleadings and that are demonstrably untrue or misleading at best. All of this is an attempt by Microsoft to deflect attention from the well pleaded allegations that more than adequately detail Microsoft's unlawful monopolization of the relevant markets for the Xbox 360 and its accessories. Microsoft does not and cannot, at least here, dispute that its so-called upgrade limiting memory cards to 512 megabytes served no purpose other than to disable Datel's memory cards. Microsoft does not and cannot dispute that this "upgrade" resulted in no performance improvement of the Xbox or that it eliminated Microsoft's sole competitor in the market for Xbox memory cards.

In the pages that follow we demonstrate that the Motion has no merit. It is tempting just to stop there and point out that the attempt to brand Datel as "cheats," "brazen," "clone(rs)" and "hackers" is entirely improper and that it will be dealt with later. But Microsoft's effort to bias the court with this early attack is so broad that we cannot let it pass. Nor can we let pass fundamental and entirely erroneous assertions of fact in the memorandum that Microsoft has filed:

1.    Microsoft asserts that consumers who have purchased the Xbox 360 and do not use Xbox LIVE can simply ignore the update and Datel's memory cards will work just fine. Mot. at 7, 21. Not so. Microsoft failed to inform the Court that new videogames contain the update and the games *will not work* unless the update has been accepted. *See* Datel's Conditional Request for Judicial Notice ("CRJN") Ex. A (screen from the game "Mass Effect 2"—*a single player game that does not go on-line*):

> "Update Required    An update must be applied to your console to play this game. If you decline this update, you will not be able to play this game. Do you want to apply the update now?  ... Yes, update now    No, don't update"

CRJN Ex. A at 2; *see also* Complaint ("Compl.") ¶2 (alleging on information and belief that "other users . . . will be prompted to download the update when they install new games").

2.    Microsoft asserts that Datel's controllers have a rapid fire feature and that "Microsoft authorized controllers do not have any such button for cheating." Mot. at 5. Not so. Microsoft has licensed a company called Hori to make an Xbox 360 controller with turbo fire and that controller is available for purchase at Wal-Mart. *See* CRJN Ex. B. Thus notwithstanding the allegations to the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   contrary about turbo fire in Microsoft's memorandum and its statements about "quality user

2   experience and the fair playing field" (Mot. at 4), Microsoft has itself authorized controllers with this

3   feature and profited from them.

4        3.   In the same vein, Microsoft's authorized licensees have offered special advantages to

5   online gaming customers who are willing to pay more.  For instance, users who paid more for the

6   "gold edition" of the game "Battle Field: Bad Company" received additional (virtual) weapons that

7   could be used against other players who did not pay as much (and would only be able to access these

8   weapons after reaching a certain game achievement level).  CRJN Ex. C.

9        4.   Microsoft asserts that Datel "apparently hacked even Microsoft's updated authentication

10   protocols, because it has recently begun selling Turbofire controllers for the Xbox 360." Mot. at 2;

11   *see also id.* at 8.  Microsoft seems to imply that Datel has not been injured.  In fact, because of

12   Microsoft's lockout of Datel's memory cards after tens of thousands of them were already in

13   consumers' hands, no significant United States retailer will carry the Datel memory card or the

14   controller.  Likewise, consumers burned by Microsoft's exercise of its absolute power are not likely

15   to purchase any new product that similarly might be rendered useless by an arbitrary update.

16        5.   Microsoft attacks Datel's successful reverse engineering of the Xbox 360 lockout as

17   "hacked," "cloned" and even "brazen."  *Id.* at 2, 6-7.  Not surprisingly, Microsoft asserts that it is

18   free to block and disable competitors to provide a "consistent and positive consumer experience" and

19   to "meet Microsoft Compliance Standards for compatibility and safety."  Left to its own devices, no

20   doubt Kodak would assert that controlling all film used in their cameras would be a "consistent and

21   positive consumer experience" for its customers.  *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603

22   F.2d 262 (2d Cir. 1979).  Lexmark would want to require its "Compliance Standards for

23   compatibility and safety" so that it would be the sole provider of toner cartridges for its printers.  *See*

24   *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004).  Ford might

25   prefer to ban "unauthorized" replacement tires it had not licensed for a fee.  But that is not the law

26   and Microsoft knows it.  Indeed, Microsoft was a prominent participant in the effort that produced

27   the Digital Millennium Copyright Act.  The legislative history reveals that as part of the compromise

28   that went into the final version of that Act, Congress explicitly immunized makers of replacement

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

DATEL'S OPPOSITION TO MICROSOFT'S MOTION TO DISMISS

-2-

and complementary products who reverse engineer for the purpose of making their products compatible. *See* 17 U.S.C. §1201(f); P. Samuelson, *Intellectual Property and the Digital Economy*, 14 Berkeley Tech. L.J. 519, 541 (1999).

6.    Microsoft references "cheats" and "cheating" approximately twenty times even though it is well aware that "cheats" in the videogame industry has a far different meaning from the one that they imply.  Videogames are full of hidden features and the opportunity to find these features or even to modify the play of games is a well-established aspect of videogame culture.  As early as 1992, the Ninth Circuit recognized that a device to alter video games to "increase the number of lives of the player's character, increase the speed at which the character moves, and allow the character to float above obstacles"—indeed even to make the character "invincible"—did not violate copyright law. *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965, 967 (9th Cir. 1992).  In the years since, game enhancers and "cheat" code devices have become entirely commonplace and are sold by Datel and others for every platform.  Microsoft itself publicizes and benefits from such "cheats."  For instance, Microsoft links to the web page of IGN Entertainment, which proclaims "Welcome to the cheats and codes section at TeamXbox . . . you've come to the right place because we are listing *thousands* of cheat codes covering hundreds of different Xbox games."  CRJN Exs. D, E.  Microsoft even published information on specific codes that could be used with Datel's "Action Replay" to alter games on the original Xbox.  *Id.*, Ex. F.  Notwithstanding Microsoft's familiarity with the term "cheat" in the gaming world and on Datel's web site, its brief deliberately distorts this reality to make it appear that Datel is some sort of outlaw or pirate.  And beyond being false and not properly before the court at this time, Microsoft's assertion is irrelevant: the memory cards at issue have nothing to do with "cheats" and promote "cheating" no more than Microsoft's own memory cards which can be connected to a computer and loaded with a "game save" of a more advanced player.  *See id.* Ex. G.

## SUMMARY OF ARGUMENT

With perhaps a little bit of this underbrush of disparagement cleared away, we turn to the actual legal arguments in Microsoft's motion.  With respect to Datel's First Claim (Monopolization of the Aftermarket), Microsoft contends that two agreements attached to its Request for Judicial Notice establish that every consumer "knew that Microsoft prohibits the use of unauthorized third-party

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

accessories, such as Datel's memory cards, at the time they purchased their Xbox 360 and they agreed to this restriction." Mot. at 21. From this, Microsoft argues that there is no viable antitrust market in Xbox 360 accessories because consumers took into account the risk of monopoly accessory pricing when they purchased the Xbox console. This arguments fails on multiple levels. These agreements are not properly before the Court, and even if they were, they do not in fact ban the use of aftermarket accessories, they do not cover the entire market, they were not entered at the time of purchase, there has been no showing of how they changed over time (even though they clearly did), and they are quite likely unenforceable under state law. There is nothing remotely resembling proof that every consumer entered into an agreement with Microsoft to permit monopolization of the accessory market. Part IA, *infra*. Even if there were, it would not suffice. The Complaint alleges that Microsoft monopolizes not only the aftermarket but the foremarket for Multiplayer Online Dedicated Gaming Systems as well. Microsoft cannot use its monopoly power in one market (consoles) to monopolize or attempt to monopolize another market (accessories). And in any event, the existence of restrictive agreements made at the time of the original purchase is but one of the factors the Ninth Circuit considers in determining if an aftermarket is a relevant antitrust market, and here the other factors all point to a viable market. Part IB, *infra*.

With respect to the Second Claim (Monopolization of the Foremarket), Microsoft primarily relies on summary judgment cases to quibble with Datel's market definition and the exclusion of the functionally distinct Nintendo Wii system as well as small, handheld videogame units. A monopolist will always attempt to define the market so broadly as to hide its real power, but this is an issue for the trier of fact to determine. Datel more than adequately explained why it defined the market the way it did. Part IIA, *infra*. Microsoft also complains that the exclusionary acts pled in the Complaint are acts in the aftermarket only. However, the Complaint properly and specifically alleges an alteration of the Xbox 360 operating system—part of Microsoft's foremarket product—in order to harm aftermarket competition and reinforce foremarket power. Part IIB, *infra*. Finally, Microsoft complains that Datel lacks standing to pursue this claim because it competes with Microsoft in the aftermarket and not the foremarket. But case law specifically permits an aftermarket competitor to bring an action against a foremarket monopolist whose acts concurrently harm the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

DATEL'S OPPOSITION TO MICROSOFT'S MOTION TO DISMISS

-4-

aftermarket and reinforce barriers to entry in the foremarket.  Part IIC, *infra.*

With respect to the remaining causes of action—the Third Claim (Tying) and the Fourth and Fifth Claims (Unfair Competition)—Microsoft's recycled arguments about market definition fare no better.  Microsoft also ignores important features of tying and unfair competition law that would allows these claims to stand even in the absence of the other claims.  Part III-IV, *infra.*

## I.   LEGAL STANDARD

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, the allegations of the complaint must be accepted as true and are to be construed in the light most favorable to the nonmoving party.  *No. 84 Employer-Teamster v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).  A complaint survives a motion to dismiss where it pleads "enough facts to state a claim for relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).  "Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).  Rule 12(b)(6) motions "are particularly disfavored in fact-intensive antitrust cases."  *Covad Commc'ns Co. v. BellSouth Corp.*, 299 F.3d 1272, 1279 (11th Cir. 2002).[1]

## II.   DATEL HAS STATED A CLAIM FOR MONOPOLIZATION OF THE XBOX 360 ACCESSORIES AFTERMARKET.

Despite all the rhetoric about maintaining a "quality user experience," and preventing harm to "the Xbox ecosystem" (Mot. at 1, 4), Microsoft does not seek to dismiss Datel's aftermarket monopolization claim by defending the reasonableness of its systems update or by establishing that the update represented a product improvement.  In fact, Microsoft does not challenge Datel's allegation that the systems update was intended to lock out competitive aftermarket accessories, does not rebut Datel's allegation that the update in fact degrades system performance, and does not deny that this type of predatory redesign is an actionable antitrust violation.  Instead, Microsoft contends

---

[1]In ruling on a Rule 12(b)(6) motion, a court cannot consider materials outside the complaint. *Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297, 1301 (9th Cir. 1982) ("[A] district court commits reversible error when it considers matters extraneous to the pleadings" on a motion to dismiss)**.**  Here, Microsoft has asked the court to accept as true three documents extraneous to the pleadings and not in fact subject to judicial notice.  *See* Datel's Objections to Request for Judicial Notice.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    only that "Datel has failed to plead a legally cognizable aftermarket." *Id.* at 16.

2          In advancing that argument, Microsoft concedes that the law recognizes single brand

3    aftermarkets as relevant markets for antitrust claims. *Id.* at 17. Its narrow objection to Datel's

4    defined aftermarket for Xbox 360 accessories is that "purchasers of the Xbox 360 knew and agreed

5    that they could only use Microsoft-authorized accessories with their systems." *Id*. Microsoft is

6    wrong. Consumers did *not* agree at the time of purchase that Microsoft could monopolize the

7    aftermarket, and, in any event, such agreements would not allow dismissal of Datel's claim.

8          **A.   Microsoft Fails To Show That Consumers Agreed At The Time Of Purchase That**
     **Microsoft Could Monopolize The Aftermarket.**
9

10         Datel alleges in its Complaint that Microsoft's monopolization of the aftermarket "does not

11   derive from contractual rights that consumers knowingly and voluntarily gave Microsoft at the time

12   of purchase." Compl. ¶31. It also alleges that "[m]arket imperfections have prevented consumers

13   from realizing the impact that their choice in the primary market would have on their freedom in the

14   aftermarket." *Id*. ¶32. Microsoft contends that these are "wholly conclusory" allegations—and thus

15   *ignores* the specific factual allegations supporting Datel's position[2]—but its central argument is that

16   two exemplar documents contradict Datel's allegations and represent "Microsoft's express and

17   repeated contractual disclosures to consumers that only authorized accessories can be used with the

18   Xbox 360." Mot. at 23. Microsoft's reliance on (1) the Xbox LIVE service's click-through Terms of

19   Use (RJN Ex. B ("LIVE TOU")), and (2) the Xbox 360 Limited Warranty (RJN Ex. A ("Warranty"))

20   to establish such a contractual arrangement is simply not tenable. As an initial matter, these

21   documents are not properly before the Court. But even if they were considered, they do not in fact

22   prohibit the use of unauthorized accessories, they do not cover the entire market, there is no record of

23   when they were published or how they changed over time, and they are likely unenforceable under

24   _____

25         [2]For example, Datel specifically alleges that (1) the built-in USB port suggests to Xbox 360
     consumers that they can plug in third party accessories (Compl. ¶32); (2) Microsoft's apparent
     acceptance of Datel's memory cards also suggested there was no rule against unlicensed accessories
26   (*id.*); and (3) Microsoft's own spokesperson had described "a lot of third party alternatives" in Xbox
     360 accessories and had indicated that consumers tended to choose Microsoft's out of brand loyalty,
27   not because of any restrictions. (*id.* ¶¶33-34). These factual allegations must be taken as true, and
     they are more than sufficient to establish for purposes of this motion that Xbox 360 consumers did
28   not knowingly grant Microsoft a monopoly over Xbox 360 accessories.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

state law.

**1.    The Warranty And LIVE TOU Did Not Inform Purchase Decisions And They Do Not Cover The Entire Market.**

Even if the Warranty and LIVE TOU are considered on this Motion, they do not support Microsoft's argument that consumers were aware of, and agreed to, restrictions on the use of third party accessories when they purchased their Xbox 360 system.  Assuming for the sake of argument that some version of the Warranty was made available to all Xbox 360 purchasers (which is not to say that they *read* it), it was only *after* they purchased the Xbox 360 system—having opened the package and gone through its contents—that they even had the opportunity to locate and review the "Limited Warranty And Return Information" documentation that Microsoft relies on in its motion.

Not even that can be said of the LIVE TOU, which cannot possibly have informed consumers' purchasing decisions for the obvious reason that Xbox LIVE is a *separate optional service* that gamers cannot sign up for until they are already Xbox 360 owners.[3]  Not all Xbox 360 owners join the Xbox LIVE service,[4] so the LIVE TOU would not cover the entire defined market even if its terms were reasonably accessible to consumers at the time of purchase.  The LIVE TOU is, in short, entirely irrelevant to the allegation that Microsoft says it directly contradicts, namely that Microsoft's power in the aftermarket "does not derive from contractual rights that consumers knowingly and voluntarily gave Microsoft *at the time of purchase*."  Mot. at 22 & n.17 (emphasis added).

Microsoft's alternative argument, that the LIVE TOU is relevant because only Xbox 360 owners who are LIVE subscribers experienced the dashboard update, is also demonstrably false.  For one thing, new consoles may come equipped with the dashboard version at issue.  Moreover, as Datel alleged in the Complaint, the dashboard update is written onto new game disks and forced upon *all*

---

[3]Microsoft asks the Court to take notice of a magnified copy of some of the fine print on the bottom of the console packaging, which notes that Xbox LIVE Silver Membership is "Subject to Terms of Use."  RJN Ex. C.  Apparently, we are meant to infer that a potential consumer *could* acquaint herself with the LIVE TOU, but not even Microsoft suggests any consumer has actually done so, and for good reason.  Unless she put the box back down, suspended the purchase process, got online, located the Xbox LIVE TOU, and read the 9000-word document, she could not know at the time of purchase what the terms consist of.  And of course even this improbable scenario is unavailable to a consumer purchasing the Xbox 360 on-line.
[4]Datel alleges in its complaint that, as of May 2009, Microsoft reported 30 million life-to-date Xbox 360 console sales and 20 million Xbox LIVE users.  Compl. ¶¶12-13.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   existing Xbox 360 owners—whether or not they use Xbox LIVE—as a condition to installing new

2   games.  Compl. ¶2.  Since filing the Complaint, Datel has confirmed that accepting the dashboard

3   update is mandatory even if the new game has no Xbox LIVE functionality.  *See* CRJN Ex. A.

**2.  The Warranty And LIVE TOU Do Not Prohibit The Use Of Third Party Accessories.**

6   Microsoft asserts that the Warranty contains "a software license requiring consumers to agree

7   that the Xbox 360 software can be used only with Microsoft authorized accessories."  Mot. at 20-21.

8   This gloss may win points for creativity but it fails every rule of contract construction.

9   On its face, the Warranty provision on which Microsoft relies says nothing at all about the use of

10  third party accessories[5]:

> The software included in the Xbox Product is licensed to you, not sold.  You are licensed to use such software only in your Xbox Product and you may not reverse engineer it . . . .  (Warranty, Part G)

13  Microsoft asserts that this language bars unauthorized accessories because the term "Xbox

14  Product" is earlier defined to mean, "depending on the context . . . *either*: (i) the Microsoft Xbox

15  360™ Video Game System console . . ., *or* (ii) Microsoft branded Xbox 360-compatible hardware

16  accessories manufactured by or for Microsoft, whether included with the Console or purchased

17  separately."  Warranty, Preamble at 5 (emphasis added); Mot. at 21.  But neither of these definitions

18  for "Xbox Product" supports Microsoft's interpretation.  Applying the first definition, the clause

19  reads:

> The software included in the *Xbox 360 console* is licensed to you, not sold.  You are licensed to use such software only in your *Xbox 360 console* . . . .

22  This is probably the definition of "Xbox Product" meant to apply, since it is the one recited in fine

23  print on the bottom of the box.[6]  If so, there is no limit set on the use of accessories.  (Or, if there is

---

[5]The only express reference to third party accessories in the Warranty does not restrict their use. It merely provides that the Warranty does not extend to "any accessories or peripheral devices that are not manufactured by or for Microsoft."  (Warranty, Part E).  Indeed, going to the trouble to exclude such third-party devices from warranty coverage reasonably implies that Microsoft expects that many consumers will be using them.

[6]That provision reads "License: Software in and with the Xbox 360 Console is licensed to you, not sold.  You are licensed to use the software only with your Xbox 360 Console and you may not reverse engineer it, except as expressly permitted by applicable law notwithstanding this limitation." CJRN Ex. 1.  Microsoft's reading of the Warranty provision puts it in conflict with the box language.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   one, it disallows use of *all accessories*—including those made by Microsoft.)

2       Alternatively, applying the second definition, the clause reads:

3       The software included in the Microsoft branded Xbox 360-compatible accessories is
        licensed to you, not sold.  You are licensed to use such software only in your Microsoft
4       branded Xbox 360-compatible accessories . . . .

5   This reading would, rather oddly, tell the user he or she was licensed to use software in *Microsoft*

6   *branded accessories* in those accessories.  That too would set no restrictions on the use of third party

7   accessories with the Xbox 360 console.

8       Only by combining both defined meanings of "Xbox Product" can Microsoft advance its

9   interpretation.  But the Warranty clearly does not accommodate that construction.  "Xbox Product"

10  means *either* (i) the Xbox 360 console, *or* (ii) Microsoft branded Xbox 360-compatible accessories,

11  depending on the context, but it does not mean *both* in any context.[7]

12      If that were not enough, one could look to the truly absurd results that flow from Microsoft's

13  construction, under which *only* "Microsoft branded" accessories that are "manufactured by or for

14  Microsoft" could be attached to the Xbox 360 console: Xbox 360 owners could not use *licensed*

15  *accessories.*[8]  For example, the Mad Katz controller or Logitech guitar controller—though officially

16  licensed—are not "Microsoft branded" nor "manufactured by or for Microsoft."  According to

17  Microsoft's reading of the Warranty, such items may not be connected to the Xbox 360 console.

18  Xbox 360 owners could not even use third party accessories that Microsoft elsewhere *encourages*

19  them to use.  An iPod—obviously not "Microsoft branded" or "manufactured by or for Microsoft"—

20  could not be connected to the console, despite Microsoft's encouragement to do so.[9]  The same goes

21  for other portable audio players, for digital cameras, even for "USB storage devices."  In fact, even

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

22  ───────────────
        [7]Although in rare cases "or" may be construed as conjunctive rather than disjunctive (*e.g.*, *Kelly*
23  *v. William Morrow & Co.*, 186 Cal. App. 3d 1625, 1630 (1986) (use of the word 'or' to mean 'and'
    "is sanctioned only when such construction is found necessary to carry out the obvious intent of the
24  parties to a contract"), here the Warranty is an unambiguously disjunctive *either . . . or* formulation.
        [8]Conversely, if "Microsoft branded Xbox 360-compatible hardware accessories manufactured by
25  or for Microsoft" was somehow read to include licensed third party accessories, other provisions of
    the "Limited Warranty" would require Microsoft to "[r]epair or replace a defective" third party
26  accessory, or reimburse a customer at its option.  *See* Warranty, Part C.  In fact, such a reading would
    destroy the consistency of the "Limited Warranty" because it would have Microsoft warrant third
27  party accessories at the same time that it specifically excludes from coverage "any accessories or
    peripheral devices that are not manufactured by or for Microsoft."  Warranty, Part E.
        [9]*See* CRJN Ex. H (Microsoft support web page showing how to connect iPods, other audio
28  players, digital cameras, and certain USB storage devices to the Xbox 360).

1   the most basic accessories and peripherals that interact with the Xbox 360 console—USB cables,

2   HDMI cables, wireless adapters, other A/V cables, *even televisions*—would be off-limits if they were

3   not "Microsoft branded" products.

4       This sort of absurd result disfavors Microsoft's construction as a matter of contract

5   interpretation.  *E.g.*, *Cal. Nat'l Bank v. Woodbridge Plaza LLC*, 164 Cal. App. 4th 137, 143 (2008)

6   ("Construction cannot lead to unfair or absurd results but must be reasonable and fair"); *Allstate Ins.*

7   *Co. v. Hammonds*, 72 Wash. App. 664, 667 (1994).  But even more importantly for present purposes,

8   the fanciful construction Microsoft adopts and the irrational results that follow make it highly

9   unlikely that a consumer purchasing an Xbox 360 console understood the Warranty to operate as

10  Microsoft proposes.  What consumer would understand this provision—buried in a provision called

11  "Additional Conditions" within a document entitled "Limited Warranty and Return Instructions"—as

12  anything more than a limit on Microsoft's warranty obligations?

13      With regard to the LIVE TOU, whatever terms it might include are entirely irrelevant to this

14  motion because they come into play after the Xbox 360 has been purchased and because at most they

15  apply to a subset of Xbox 360 owners.[10]  Accordingly, while there are serious flaws in Microsoft's

16  interpretation of the LIVE TOU as well, they need not be resolved on this Motion.[11]

17      **3.    There Is No Record Of When The Warranty And LIVE TOU Were In Effect, Or
18           How They Changed Over Time.**

19      Even if the Court considers the samples of the Warranty and LIVE TOU Microsoft has

20  proffered, they are of no practical assistance in establishing what was disclosed to any given

21  consumer, or what any given consumer agreed to, at the time he or she purchased an Xbox 360.  The

22  sample Warranty is undated, and there is no record of when it was in effect.  The sample LIVE TOU

23  indicates it was "last updated" in September 2008 and explicitly references "prior version[s] of the

24

25  _____

    [10]Microsoft baldly asserts that "Datel's Complaint is limited to users of the Xbox LIVE online
    gaming system."  Mot. at 21.  That is entirely inaccurate.  The complaint challenges the lockout of
26  Datel's memory cards regardless of how the update was disseminated to users—whether through
    code included with new games (Compl. ¶2), an online update (*id.*), or otherwise.
    [11]To give just one example, Microsoft suggests that the phrase "[y]ou agree that you are using
27  only authorized software and hardware to access the Service" sets restrictions on third party
    accessories, when the preceding sentence clarifies that it refers instead to consoles, computers, and
28  other access points—not accessories.  LIVE TOU ¶16 at 10.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

contract" with materially different terms.  *See* LIVE TOU at 2.  There is no record of how these documents changed over time, or what the operative terms were at any given point in the nearly five-year period in which Xbox 360 systems have been sold.  We are also left to guess if the same terms apply among different geographic zones, language translations, or console models.  These issues can be addressed in discovery, but at present, there is no assurance that the documents proffered—even assuming their authenticity—were available to any given subset of Xbox 360 consumers, and they obviously were not available to all Xbox 360 consumers.

### 4. On The Record Before The Court, The LIVE TOU And Warranty Are Not Enforceable.

Microsoft contends that the LIVE TOU and Warranty are enforceable (Mot. at 22 n.16), but the record before the Court—which is scant, to say the least—supports no such claim.  "The case law on software licensing has not eroded the importance of assent in contract formation.  Mutual assent is the bedrock of any agreement to which the law will give force."  *Specht v. Netscape Commc'ns Corp.*, 150 F. Supp. 2d 585, 596 (S.D.N.Y. 2001), *aff'd*, 306 F.3d 17 (2d Cir. 2002).  Because the circumstances of the purported contract formation have yet to be established—and will not be until discovery is conducted—Microsoft's conclusory, unsupported claim is at a minimum premature.

Indeed, the enforceability of each agreement is far from certain.  The Warranty appears to be a form of "shrink-wrap" license.  Courts have often founds such license unenforceable.  *See, e.g.*, *Klocek v. Gateway, Inc.*, 104 F. Supp. 2d 1332, 1341 (D. Kan. 2000); *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 103 (3d Cir. 1991); *Ariz. Retail Sys., Inc. v. Software Link, Inc.*, 831 F. Supp. 759, 766 (D. Ariz. 1993); *accord M.A. Mortenson Co., Inc. v. Timberline Software Corp.*, 140 Wash. 2d 568, 584 (Wash. 2000) (upholding shrink-wrap license only after determining that the vendor and purchaser had utilized the license agreement in prior course of dealing and that the terms of the license "were either set forth explicitly or referenced in numerous locations.").  The LIVE TOU, in turn, is a form of "click-wrap" agreement that is of even more dubious enforceability.  In *Specht*, the Second Circuit found a click-wrap license unenforceable when the terms were visible to Internet users only if they scrolled down the screen.  The court's reviewed a well-developed record and focused on whether the consumer's interaction was sufficient to put him or her on constructive

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

notice of the terms. 306 F.3d at 30. Likewise, *Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d 974, 981-82 (E.D. Cal. 2000), held that whether a click-wrap license was sufficiently conspicuous to put users on notice presented a fact question that could not be resolved on a motion to dismiss. Shrink-wrap and click-wrap licenses may also be found unenforceable due to unconscionability. *See, e.g.*, *Bragg v. Linden Research, Inc.*, 487 F. Supp. 2d 593 (E.D. Pa. 2007) (holding online video game terms of service unconscionable under California law).[12]

**B. Even If The Court Somehow Assumes The Existence Of Agreements Between Microsoft And Consumers Not To Use Third Party Accessories, Microsoft's Motion Must Be Denied.**

For the reasons set forth, Microsoft cannot possibly establish the factual underpinnings of its argument on this Motion. But even if this Court were somehow to assume (on a motion to dismiss, no less) that every customer agreed to an aftermarket restriction at the time of purchase, that would *still* not permit dismissal of the First Claim. This is true for two separate reasons.

**1. Microsoft's Use Of Its Power In The Foremarket To Monopolize The Aftermarket Violates Section 2.**

The cases upon which Microsoft relies in seeking dismissal of the aftermarket monopolization claim are all cases in which the foremarket was competitive and consumers were able to make a knowing decision in a competitive market about whether to agree in advance to aftermarket restrictions. While foremarket power is not *required* for an aftermarket claim (*see Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992)), it is surely the case that a defendant with market power in a foremarket cannot abuse that power to gain an additional monopoly in a collateral market.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

---

[12]The largely unreported cases cited by Microsoft at most indicate that some shrink-wrap and click-wrap licenses have been upheld. *Novell, Inc. v. Unicom Sales, Inc.*, No. C-03-2785 MMC, 2004 WL 1839117, at *11 (N.D. Cal. Aug. 17, 2004), rejected on summary judgment the claim of an authorized software reseller that an agreement was unenforceable because it was "contained in software box[]." *Inter-Mark USA, Inc. v. Intuit, Inc.*, No. C-07-04178 JCS, 2008 WL 552482, at *9 (N.D. Cal. Feb. 27, 2008), held on summary judgment that a click-wrap license was enforceable, but that was because the plaintiff "conceded that the [license] is valid and has not objected to the Court taking judicial notice of the copy of the agreement that is attached to Plaintiff's request for judicial notice." *In re Samsung Elecs. Am., Inc. Blu-Ray Class Action Litig.*, No. 08-0663 (JAG), 2008 WL 5451024, at *4 (D. N.J. Dec. 31, 2008), did not address the enforceability of agreements but rather whether a disclaimer must be on the outside of the box to comply with New Jersey's Consumer Fraud Act. Finally, the Seventh Circuit in *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1449 (7th Cir. 1996), rejected a blanket challenge to *all* shrink-wrap software licenses in a case where "no one argues that the terms of the license at issue . . . are troublesome."

Microsoft of all companies knows this well, having been found to have abused its monopoly power in operating systems in manifold ways to deter the development of a competitive browser market and thereby preserve barriers to entry in the operating system market.  *United States v. Microsoft*, 253 F.3d 34, 58-78  (D.C. Cir. 2001).  The Ninth Circuit also recognizes that the abuse of market power in one market to gain or preserve a monopoly in another market violates Section 2.  *Cost Mgmt. Servs. v. Wash. Natural Gas*, 99 F.3d 937, 952 (9th Cir. 1996).

In the Complaint, Datel alleges a relevant product foremarket consisting of "Multiplayer Online Dedicated Gaming Systems Market" and that Microsoft's share of this market was approximately 66%.  Compl. ¶¶37-44.  Datel further alleges that high barriers to entry mean that Microsoft enjoys substantial power in this market.  *Id.* ¶45.  Assuming these allegations are credited (and they must be at this stage of the proceedings), it means that consumers did not agree to contractual restrictions in a competitive marketplace.  Under these circumstances, the purported agreements are not only unenforceable but they are themselves an antitrust violation.  *See, e.g.*, *U.S. v. Griffith*, 334 U.S. 100, 106-09 (1948) (use of exhibitor agreements to extend monopoly power to competitive towns violated Section 2); *Kodak*, 504 U.S. at 483-86.

### 2.   The Existence Of Customer Agreements Does Not Preclude A Finding Of A Relevant Antitrust Aftermarket.

Moreover, even if we assume the absence of foremarket power *and* the existence of agreements made at the time of purchase not to use third party accessories, that *still* does not preclude a finding that the accessory aftermarket is a relevant market.  Such agreements are just one factor that courts in this circuit consider in determining the existence of a relevant market.

In any antitrust case requiring market definition, the relevant market consists of "any grouping of sales whose sellers, if unified by a monopolist or a hypothetical cartel, would have market power in dealing with any group of buyers."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  Market power, in turn, is the ability of a firm or firms to increase their profits by restricting output or charging more than a competitive price.  *Id.*  As applied to aftermarket cases, the question is whether a firm with a monopoly share of the aftermarket could earn greater profits by charging above competitive levels or whether such profits would be more than offset by a "disastrous

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

drop" in sales in the foremarket. *Kodak*, 504 U.S. at 472. In *Kodak*, the Supreme Court reversed a summary judgment ruling in favor of the defendant on both monopolization and tying claims. In reviving both types of claims, the court rejected Kodak's argument that lack of power in the foremarket (for copiers) precluded the existence of market power in the aftermarket (for replacement parts for Kodak copiers). The Court cautioned against "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities" (*id.* at 467) and found that "the existence of significant information and switching costs" (*id.* at 473) could well permit an aftermarket monopolist to exploit locked-in customers.

Similarly, in *Newcal Industries, Inc. v. Ikon Office Solutions*, 513 F.3d 1038 (9th Cir. 2008), the Ninth Circuit reversed an order dismissing an aftermarket claim. In *Newcal*, defendants leased copiers to customers. Plaintiff complained that the defendants monopolized the aftermarkets for sales (to their own lessees) of replacement equipment and service. Defendants claimed the case was analogous to *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997), in which the Sixth Circuit rejected a claim that Domino's monopolized the aftermarket for sales of pizza supplies to its own franchisees. The Ninth Circuit identified four factors that supported its decision that the case was "more like" *Kodak* than *Queen City Pizza*. *Newcal*, 513 F.3d at 1049. First, the court identified a "critical" difference: whether the aftermarket products were unique. In *Kodak*, the replacement parts would not work on any other brand of copier; thus Kodak held a "natural monopoly in the submarket for Kodak-brand replacement parts" independent of any contractual agreement. In contrast, "[t]he markets for pizza ingredients and paper cups would exist whether or not there was a market for pizza chain franchises." *Id.* at 1049-50. Second, the court inquired into the timing of the anticompetitive action. In *Queen City*, the alleged anticompetitive act occurred at the time the franchise agreement was signed, whereas in *Kodak* it occurred after the foremarket purchase was made when the company changed its policy and stopped selling replacement parts to independent service organizations. *Id.* at 1050. Third, the court asked whether the defendant obtained its power "through contractual provisions that it obtains in the initial market." *Id.* Fourth, the court asked whether "market imperfections . . . prevent consumers from realizing that their choice in the initial market will impact their freedom to shop in the aftermarket." *Id.*

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

In the instant case, at most one of the *Newcal* factors supports Microsoft. Though it is and will be disputed by Datel, Microsoft contends that its aftermarket power derives from contractual provisions (the third factor). The other factors all go the other way. As alleged in the Complaint, Xbox accessories are unique: they will not work on other consoles, and accessories from other consoles will not work on the Xbox. Compl. ¶28. The primary anticompetitive act complained of is the *change* in Microsoft's Xbox operating system (to disable competitive accessories), not the original design of the system or the agreements allegedly imposed at the time of purchase. *Id.* ¶¶20-25, 51-53. Finally, it is far from clear that consumers would understand at the time of their initial purchase that they were subjecting themselves to a lifetime of aftermarket exploitation. Even were we to assume that consumers somehow entered into restrictive agreements with Microsoft at the time of purchase, in this market consumers cannot know what their aftermarket needs will be. *Id.* ¶¶32-35. As games become more advanced, customers find they need more memory or other accessories. And new accessories are introduced that might not even have existed at the time of the initial purchase. In addition, the foremarket purchase takes place against a background of vibrant videogame aftermarket competition for nearly every other current and past console, including the Sony PS3. Finally, Microsoft markets the Xbox as compatible with a wide variety of media and includes standard USB ports on the console. It is not reasonable to conclude—and certainly cannot be assumed on this Motion—that customers understood they would have to pay a monopoly price for an accessory as quotidian as memory.[13]

Against this background, Microsoft primarily relies on Judge Alsup's decision in *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190 (N.D. Cal. 2008). Even if rightly decided, that case was very different from the claims here. First of all, it is not even clear it was an aftermarket case. As a leading treatise notes, "[a]n aftermarket is a type of derivative market consisting of consumable

---

[13]Another important difference between this case and *Queen City* is the sophistication of the consumers and the nature of the contractual negotiations. Is it one thing to assume that a franchisee who negotiates (perhaps with the help of an attorney) an elaborate franchise agreement and pays tens if not hundreds of thousands of dollars for the franchise understands that he is restricting himself to purchase supplies from the franchisor. The franchisee is not without power and could negotiate for different terms. An Xbox purchaser, presented with a hidden, ambiguous and non-negotiable restrictive agreement, is obviously quite different.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

goods or replacement components that must be used for the proper functions of some primary good." IIB P. Areeda & H. Hovenkamp, *Antitrust Law* ¶564b at 397 (3d ed. 2007) ("Areeda").  In *Psystar*, the plaintiff complained that customers bought Mac OS and then were precluded from subsequently purchasing one of Psystar's computers and using the Mac OS on that computer.  Thus, the case is the mirror image of a traditional aftermarket case: the "component" is purchased first and the more expensive, durable equipment is purchased later.  The distinction is not merely one of semantics.  Most customers acquire an operating system as part of a bundle with a computer or to upgrade an existing computer, but the rare customer buying Mac OS as a stand-alone product surely understands that he or she will need a computer on which to run the operating system and factors the price of the computer into the decision as to whether to purchase the operating system.  This is quite different from the situation in *Kodak*, *Newcal*, and this case where it is alleged that a customer can not realistically engage in this sort of life-cycle pricing at the time of the initial purchase and is thereby subject to exploitation by the aftermarket monopolist.  In addition, in *Psystar* the alleged anticompetitive act took place at the time of the sale of the foremarket product (*Newcal*'s second factor).  Here, of course, the Complaint alleges a severe anticompetitive change by Microsoft occurring after the initial purchase: updating the operating system to deliberately disable competitive accessories already sold.  Compl. ¶53.  That is a far more anticompetitive act.

The other cases in this Circuit upon which Microsoft relies are no more apposite.  *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997), while reversing summary judgment in favor of the defendant on antitrust claims rejected one proposed market definition that was based solely on contractual restrictions and did not involve a technologically unique product (like Kodak parts or Xbox accessories).  And *In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288 (N.D. Cal. 2008) recognizes that "there can be a legally cognizable aftermarket in a single brand's products, even if that market is created by a contractual relationship." *Id.* at 1303.  In that case, Judge Ware denied the defendants' motion to dismiss because (as here) the record did not establish that purchasers understood the scope of aftermarket restrictions they were agreeing to at the time of their

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1  foremarket purchase. *Id.* at 1305-06.[14]

2  **III. DATEL HAS STATED A CLAIM FOR MONOPOLIZATION OF THE MULTIPLAYER**
3  **ONLINE DEDICATED GAMING SYSTEMS MARKET.**

4      To state a monopolization claim under Section 2 of the Sherman Act, Datel must plead

5  Microsoft's "possession of monopoly power in the relevant market and . . . [its] willful acquisition or

6  maintenance of that power." *Amarel v. Connell*, 102 F.3d 1494, 1521 (9th Cir. 1996). Likewise, to

7  state a claim for attempted monopolization, Datel must allege facts showing (1) Microsoft's "specific

8  intent to control prices or destroy competition," (2) its "predatory or anticompetitive conduct directed

9  at accomplishing that purpose," (3) its "dangerous probability of achieving 'monopoly power,'" and

10  (4) Datel's "causal antitrust injury." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195,

11  1202 (9th Cir. 1997). Datel has done all this. Microsoft's Motion to Dismiss presents (1) a *factual*

12  challenge to Datel's market definition that, if it has any merit at all, must await determination once a

13  factual record has been established, (2) an inaccurate contention that Datel's allegations of

14  exclusionary conduct are too conclusory, and (3) a challenge to Datel's standing that relies on a

15  misinterpretation of Ninth Circuit precedent and a studied avoidance of persuasive authority from

16  other circuits. None of these arguments has merit.

17      **A.  The Relevant Market Is Adequately Pled.**

18      Datel has alleged a relevant market in the Multiplayer Online Dedicated Gaming Systems

19  Market. It sounds complicated, but is in fact a straightforward, rational market definition consisting

20  of dedicated video game systems that provide robust online multiplayer functionality. *See* Compl.

21  ¶37. Microsoft complains that Datel has drawn this market too narrowly, excluding portable gaming

22  systems, an earlier generation Sony Playstation, and the Nintendo Wii. Microsoft is jumping the

23  gun. The merit of Microsoft's suggestion that these other products are reasonably interchangeable

24

25      ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [14]Microsoft also relies on decisions from other circuits that emphasize the importance of a change
26  in policies or practices by an alleged aftermarket monopolist. *See, e.g.*, *PSI Repair Servs., Inc. v.
    Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997); *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*,
27  73 F.3d 756, 763 (7th Cir. 1996); *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 85 (2d Cir.
    2000). Whatever relevance these decisions have, the Complaint in this case clearly alleges a change
    in policy or practice by the defendant: the defendant deployed an operating system update to disable
28  competitive aftermarket products. Compl. ¶53.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   with the Xbox 360 and Playstation 3 ("PS3") depends on a factual record that has not been

2   developed.  The authorities are legion holding that market definition is a fact-intensive inquiry that

3   does not lend itself to determination on a motion to dismiss.[15]  Datel was not required to plead the

4   relevant market with specificity (*Newcal*, 513 F.3d at 1045), nor was it "required to anticipate and

5   refute in its complaint all possible market substitutes."  *Jamsports & Entm't, LLC. v. Paradama

6   Prods., Inc.*, No. No. 02-C-2298, 2003 WL 1873563, at *6 (N.D. Ill. Apr. 15, 2003).  Its job was

7   simply to plead a plausible market and to put Microsoft on notice of its boundaries.  *See, e.g.*, Areeda

8   ¶531.

9          It is certainly *plausible* to exclude from the defined market the products Microsoft cites:

10  •   The handheld systems—the **Sony PSP and Nintendo DS**—have markedly distinct
11      functionality from the Xbox 360 and PS3, they are not compared in industry analyses, they
        are used in different settings, and are likely seen far more as a potential *addition to*, rather
12      than a substitute for, an Xbox 360 or PS3.

13  •   The previous generation **Playstation 2** has been on the market for a decade, is limited in
        production and sales, does not have the advanced multimedia features of the Xbox 360 and
14      PS3, and is not typically compared with them in industry analyses.  Many consumers own
        *both the Playstation 2 and PS3*.  And while the Playstation 2 has some online functionality,
15      it cannot access the Playstation Network—the hub for online multiplayer gaming with
        millions of players worldwide.  Without that core feature, the Playstation 2 is not a
16      reasonable substitute for online multiplayer systems like the Xbox 360 or PS3.

17  •   The **Nintendo Wii** is not regarded as reasonably interchangeable with the Xbox 360 and
        PS3.  Compl. ¶38.  It is often excluded from industry analyses (*id.* ¶40), caters to a distinct
18      audience of casual gamers and families (*id.* ¶38), has distinct functionality (and distinctly
        less online multiplayer functionality) (*id.* ¶¶37-38), and follows distinct pricing patterns.
19      *Id.* ¶41.  In response, Microsoft asserts that it has issued at least two press releases in which
        Wii sales are mentioned.  This is interesting, insofar as the Microsoft group product
20      manager for Xbox and the Live platform reportedly said "We don't feel the Wii customer
        and the Xbox customer are the same thing . . . We think that as soon as the Wii customer
21      turns 14, they want something else."  CRJN Ex. J ("Microsoft Says Wii is for Babies").  In
        any case, this is an obvious *factual* question that cannot be resolved now.

22

23  ―――――――――
    [15]*See, e.g.*, *Newcal*, 513 F.3d at 1045 ("since the validity of the 'relevant market' is typically a
24  factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6)
    subject to factual testing by summary judgment or trial") (citing *High Tech. Careers v. San Jose
25  Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) (market definition depends on "a factual inquiry
    into the 'commercial realities' faced by consumers")); *Image Tech. Servs., Inc.*, 125 F.3d at 1203
26  ("Ultimately what constitutes a relevant market is a factual determination for the jury"); *Twin City
    Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982) ("The definition
27  of the relevant market is basically a fact question dependent upon the special characteristics of the
    industry involved"); *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) ("Because market
28  definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to
    plead a relevant product market").

DATEL'S OPPOSITION TO MICROSOFT'S MOTION TO DISMISS

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    In short, it is not unusual for the parties to propose different boundaries to the relevant market.  *E.g.*,

2    *Areeda* ¶530 ("Whatever the market urged . . . the other party can usually contend plausibly that

3    something relevant was left out").  But objections of that nature cannot support a motion to dismiss.

4        Microsoft also argues that Datel's claim should be dismissed at this juncture because it

5    distinguishes excluded products solely based on "price or quality."  Mot. at 14.  That gets the facts

6    and the law wrong.  Datel does *not* define its relevant market simply by the price or quality of

7    various video game systems.  It alleges distinct core functionality, distinct perceptions on the part of

8    consumers, distinct customer targeting on the part of manufacturers, distinct analyses on the part of

9    both manufacturers and industry analysts, and distinct price and pricing patterns.  Those are

10   appropriate factors to consider in defining a relevant market.  *See, e.g.*, *Newcal*, 513 F.3d at 1045

11   (pointing out "practical indicia" to be considered, such as "industry or public recognition of the

12   submarket as a separate economic entity, the products' peculiar characteristics and uses, unique

13   production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized

14   vendors") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

15       Thus, Datel's relevant market definition is not at all comparable to the "better branded" furniture

16   market alleged in *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d

17   524 (4th Cir. 1989), but even that market definition was rejected *after consideration of the factual

18   record* on a motion for a preliminary injunction.  Nor is it comparable to the "super premium ice

19   cream market" alleged in *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp.

20   1262, 1266-68 (N.D. Cal. 1988), but even that definition was only rejected *on summary judgment

21   after considering an extensive factual record* consisting of documents, witness testimony and an

22   expert declaration.  And Datel's definition is far more plausible than each of the three attempts to

23   carve out a submarket for package delivery services in *W. Parcel Express v. United Parcel Serv. of

24   Am., Inc.*, 65 F. Supp. 2d 1052, 1058-60 (N.D. Cal. 1998), but even those were rejected *on summary

25   judgment after considering an extensive factual record* including expert opinions on economic issues

26   in the package delivery industry and facts derived from "lengthy discovery."  Unlike all of these

27   cases on which Microsoft relies, Datel is not attempting to separate higher end from lower end

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

products; its definition turns on what consumers would accept as a substitute should prices change.[16]

**B.   Exclusionary Conduct Is Adequately Pled.**

Datel alleges that Microsoft has "substantial market power" in the relevant market—estimating Microsoft's market share at approximately 66%—and that it has used its power "to control related and subsidiary markets" and to restrict the development of a competitive accessories aftermarket. Compl. ¶62. By doing so, Datel alleges, "Microsoft is able to facilitate price discrimination, increase switching costs, and erect substantial barriers to potential entrants to the [relevant market]." *Id*. ¶63. Datel further alleges that "[t]he profits derived from supra-competitive pricing in the subsidiary markets and the extension of Microsoft's proprietary interests there, in turn, reinforce Microsoft's power in the [relevant market]." *Id*. ¶62.

In attacking these allegations as conclusory, Microsoft ignores the numerous allegations describing the steps that Microsoft took to foreclose competition in the aftermarket. *See, e.g.*, Compl. ¶¶2-4, 20-25. There is also substantial support for Datel's claim that such conduct facilitates maintenance of Microsoft's monopoly power. For example, the Complaint alleges that Microsoft charges supra-competitive prices for its accessories, enabling it to sell the Xbox 360 console at a low price-point (*e.g.*, *id*. ¶¶14, 35, 49, 52, 62), supporting the assertion that Microsoft's anticompetitive conduct erects barriers to entry to the relevant market. It also alleges that Microsoft uses "technological barriers to restrict the interoperability of third party add-ons and accessories," (*id*. ¶29) and that such predatory measures account for its stated 4.1 "attach rate" for accessories. *Id*. ¶34. Achieving a high accessories attach rate by blocking interoperability obviously increases a

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

---

[16]Microsoft cites two cases in which a claim was rejected at this juncture because of its market definition. Neither supports Microsoft's Motion. In *Tanaka v. Univ. So. Cal.*, 252 F.3d 1059 (9th Cir. 2001), the court rejected an utterly implausible relevant market confined to a single school's athletic program, and based solely on the plaintiff's personal preference to remain in Los Angeles. *Id*. at 1063. In *Apple, Inc. v. Psystar Corp.*, the proposed market consisted of a single operating system—the Mac OS—and the only meaningful justification offered for excluding other operating systems was a price differential. 586 F. Supp. 2d at 1198-99. Since the counterclaimant had elsewhere pled that the Mac OS "performs the same functions as other operating systems," had cited marketing studies suggesting that it competes with other operating systems, and had advanced circular and internally contradictory allegations about the market, the court found its market definition implausible. *Id*. at 1199-1200. Datel's foremarket monopolization claim does not propose a single brand market, and its plausible market definition turns on more than personal preferences or product pricing. Microsoft has set forth no grounds for rejecting Datel's market definition at this stage of the litigation.

consumer's switching costs.[17]  Blocking interoperability of third party accessories and cutting off competition in the accessories aftermarket also elevates barriers to entry by preventing potential entrants from working with existing accessories or accessory developers.  Datel's allegations that Microsoft blocks third party accessories and charges locked-in consumers supra-competitive prices for its own accessories (*e.g.*, *id.* ¶¶24-25, 29, 35, 45, 49, 51) fully support its assertion that Microsoft conduct facilitates price discrimination: heavy users pay a premium since they have a higher demand for Microsoft's overpriced accessories.  These fact allegations offer more detail than *Twombly* demands, and they "raise a right to relief above the speculative level."  550 U.S. at 555.

## C.  Datel Has Standing.

Microsoft challenges Datel's standing to bring its foremarket monopolization claim, asserting that Datel lacks the requisite "antitrust injury."  Mot. at 10.  Observing the general principle that antitrust injury (and therefore standing) requires market participation (Mot. at 10 (citing *Am. Ad Mgmt. v. GTE*, 190 F.3d 1051, 1057 (9th Cir. 1999)), Microsoft adopts the remarkable position that Datel is not a market participant, that it does not fit any exception to the "market participant" principle, and that it has not pled any injury caused by Microsoft's monopolization of the relevant market.  *Id.*  None of these arguments is persuasive.

### 1.  Datel Has Standing As A Market Participant.

Microsoft asserts that "with few exceptions" only consumers and competitors in the restrained market are "market participants" with standing.  Mot. at 10-11.  That is not a fair characterization of the law in this circuit:

---

[17]Microsoft rejects this rationale and claims that blocking third party accessories and charging supra-competitive prices for its own accessories would not increase switching costs: "If anything, Xbox 360 users would have greater reasons to switch away."  Mot. at 16.  But, as alleged, market imperfections prevent consumers from recognizing the aftermarket restrictions until after they have spent a substantial amount on the Xbox 360 system (Compl. ¶¶31-35) by which time switching costs are already high.  *Id.* ¶36.  They get even higher each time an Xbox 360 owner is forced to buy Microsoft's own accessories (or licensed accessories) which will not operate on any other platform.  For example, when an Xbox 360 owner invests $60 in her system to buy a Microsoft memory unit, she increases her switching costs—the memory unit becomes useless and she will need to buy another memory unit should she switch to another platform.  On the other hand, if she is able to use the same $60 to buy a Datel memory card and compatible microSD card, she can at least use the microSD card if she switches to the PS3 (which accepts standard memory cards).  The same is true for some other Datel accessories, which cost less or offer interoperability, or both.  *See* Mot. at 8 (noting that Datel's Arcade Pro Joystick is compatible with the Xbox 360, PS3 and personal computers).  If Microsoft can block these accessories, switching costs are increased.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1
2
3
4

The Supreme Court has never imposed a "consumer or competitor" test but has instead held the antitrust laws are not so limited. . . . [¶] While consumers and competitors are most likely to suffer antitrust injury, there are situations in which other market participants can suffer antitrust injury. Not surprisingly, courts routinely recognize the antitrust claims of market participants other than consumers or competitors. . . . Further, it is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff. (*Am. Ad*, 190 F.3d at 1057-58 (citations and footnotes omitted))

5
6
7

Microsoft relies on *Exhibitors' Serv., Inc. v. Am. Multi-Cinema, Inc.*, 788 F.2d 574 (9th Cir. 1986) for the proposition that "the requirement laid down in [*Associated Gen. Contractors v. Cal.*

8
9
10

*State Council of Carpenters*, 459 U.S. 519, 538 (1983) ("*AGC*")] is that the plaintiff and [the defendant] compete in the 'market in which trade was restrained.'" Mot. at 11 n. 13 (quoting *Exhibitors' Service*, 788 F.2d at 579). But the *American Ad* court expressly rejected *Exhibitors'*

11
12

*Service*'s narrow approach. 190 F.3d 1051, 1058 & n.8 (naming *Exhibitors' Service* as the only Ninth Circuit case to reject a claim of a market participant "simply because the plaintiff was not a 'consumer or competitor' of the defendant").[18]

13
14
15
16
17
18
19
20

Under the flexible standard announced in *American Ad*, no rigid definition of "market participant" prevents a party suffering an antitrust injury in the relevant market from bringing suit. *Id.* & n.6 (recognizing potential for antitrust injury among indirect purchasers, potential entrants, suppliers, licensors, travel agents, landlords, dealers, brokers, even potential game show participants; citing authorities). Datel falls within the scope of the *American Ad* standard. Although it does not directly compete with Microsoft in the foremarket, it participates in it by offering aftermarket products that have the capacity to lower barriers of entry and switching costs in the relevant market.[19]

21
22
23
24

[18]The *American Ad* court determined that outcome in *Exhibitors' Service* was nonetheless correct, because the plaintiff's injury had not been necessary to the anticompetitive conduct. *Id.* Despite the questionable validity of *Exhibitors' Service*'s standing discussion, Microsoft relies on it three times in challenging Datel's standing. Microsoft also relied on *Exhibitors' Service* in an analogous case in the Fourth Circuit, but that court correctly noted that the Ninth Circuit "later explicitly moved away from th[at] narrowing decision[]." *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 313 n.20 (4th Cir. 2007).

24
25
26
27
28

[19]Datel's role in the relevant market distinguishes it from the counterclaimant in *Ticketmaster LLC v. Designer Tickets & Tours, Inc.*, No. CV 07-1092 ABC (JCX), 2008 WL 649804, at *4 (C.D. Cal. Mar. 10, 2008). In that case, the counterclaimant advanced largely "incomprehensible" monopoly claims, gave no hint of any participation in the primary ticket distribution services market addressed in those claims and conceded its injury was in a distinct secondary market and "may have meant to pursue this theory all along." *Id.* Here, to the contrary, the injured party participates in the relevant market, and was injured as a necessary step in the defendant's illegal monopolization of that market.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Facing analogous facts and applying the same *AGC* framework, the Fourth Circuit had no trouble concluding that Novell—a maker of software applications such as WordPerfect and Quattro Pro—had standing to assert a monopolization claim against Microsoft in the PC operating systems market. *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302 (4th Cir. 2007).[20]  Rejecting Microsoft's proposed "consumer-or-competitor" rule, the Fourth Circuit—like this circuit in *American Ad*— determined that what mattered was not the plaintiff's status as consumer or competitor, but whether it could establish antitrust injury. *Id*. at 312 & n.19.  Novell met that standard: its applications stood to lower barriers of entry to the operating systems market, and the alleged conduct by Microsoft—while it certainly affected Novell in the applications market—"was designed to and effectively did elevate the barriers to entry into the PC operating-systems market." *Id*. at 316.[21]  The exact same rationale applies in this case.

### 2. Datel Has Standing Under The *Blue Shield* Exception.

Microsoft itself acknowledges that a party need not be a "market participant" to have standing if its injury was the "'necessary step' and 'means'" by which the anticompetitive conduct was carried out.  Mot. at 12 (quoting *Blue Shield v. McCready*, 457 U.S. 465, 483-84 (1982)); *see also Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 746 (9th Cir. 1984) ("Although [plaintiff] was not a competitor or consumer in the labels market, the injury he sustained was such an integral part of the scheme to eliminate competition in that market as to constitute 'antitrust injury' as that concept is developed in *Blue Shield*").  This exception to the "market participant" principle also applies.  As noted above, and as alleged in the Complaint, the injury to Datel—blocking its accessories—was a necessary step in Microsoft's monopolization of the relevant market.  Locking out Datel's accessories was the precise means by which Microsoft elevated barriers to entry in the relevant market and raised switching

---

[20]Much like Datel's position in this case, Novell argued that "the technological connection between operating systems and applications gives rise to a significant barrier to entry into the operating-systems market and thus protects Microsoft's Windows monopoly." *Id*. at 308.

[21]The Fourth Circuit also recognized the implication in the government suit against Microsoft in the D.C. Circuit (*United States v. Microsoft Corp.*, 253 F.3d 34, 52-54 (D.C. Cir. 2001) (en banc)) that middleware makers—Sun and Netscape—would have had standing to assert a claim in a private action against Microsoft for monopolization of the operating systems market, even though they were neither consumers nor competitors in that market. *Novell Inc.*, 505 F.3d at 314 ("Microsoft's efforts to gain market share in one market (browsers) served to meet the threat to Microsoft's monopoly in another market (operating systems)").

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1  costs—thus maintaining its monopolization of that market.  Contrary to Microsoft's argument, it

2  does not change the analysis if Microsoft *acquired* monopoly power by another means (*e.g.*, its head-

3  start in the industry).  Locking out Datel's accessories in order to *maintain* its monopoly is just as

4  actionable under Section 2.

5         **3.   Datel Has Pled The Necessary Causal Connection.**

6      Microsoft's assertion that Datel fails to live up to the *Twombly* standard in pleading a "causal

7  connection between its alleged injury and Microsoft's alleged dominance of the primary market"

8  (Mot. at 12-13) has no basis.  Datel specifically alleges that Microsoft is maintaining its dominant

9  position by blocking out competition—including from Datel—in accessories and add-ons.  Compl.

10  ¶¶62-63.  That is not mere speculation:  Datel provides a detailed description of how Microsoft went

11  about this, including how it deployed a "dashboard update" to make Datel's existing products non-

12  functional and intends to block forthcoming Datel accessories.  *Id.* ¶¶20-25.  The complaint alleges

13  that Microsoft uses "technological barriers to restrict the interoperability of third party add-ons and

14  accessories," (*id.* ¶29) and that such predatory measures account for its stated 4.1 "attach rate" for

15  accessories.  *Id.* ¶34.  These allegations offer more than adequate explanation of, and support for, the

16  allegation that that Microsoft's conduct in the foremarket has caused injury to Datel.[22]

17  **IV.  DATEL HAS STATED A CLAIM FOR TYING.**

18      Microsoft asserts Datel's tying claim (the Third Claim) should be dismissed because Datel has

19  failed to adequately plead power in the tying product (Multiplayer Online Dedicated Gaming

20  Systems) and because Datel has failed to plead a legally plausible market for the tied product (Xbox

21  360 Accessories and Add-Ons).[23]  Microsoft is wrong on both counts.  For the reasons already set

22  forth, both markets have been properly pled.  In addition, Microsoft ignores two important features of

23  ─────────────────
[22]For the reasons set forth, Datel has standing to assert a monopolization claim in the defined
24  market—the Multiplayer Online Dedicated Gaming Systems Market—under both the "market
participant" framework and the *Blue Cross* exception to that framework.  Nevertheless, should the
25  Court conclude otherwise for any reason, Datel should be granted leave to define a *combined* market
consisting of (a) the Multiplayer Online Dedicated Gaming Systems Market and (b) the Aftermarket
26  for Xbox 360 Accessories and Add-Ons.  Such an amendment would obviate any technical
objections by Microsoft that its conduct in the foremarket only caused injury in the aftermarket.
27  [23]Microsoft does not dispute the other elements of an unlawful tie: that consoles and accessories
are separate products, that customers were forced to purchase accessories from Microsoft as a
28  condition of obtaining consoles, and that the tying arrangement affects a substantial volume of
interstate commerce.  *See* Compl. ¶¶74, 75.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

tying law.   First, the market power requirement for tying is much more lenient than for a monopolization.  *See, e.g.*, *Jefferson Parish Hosp. Dist. No. 2. v. Hyde*, 466 U.S. 2, 27-28 (1984) (finding 30% market share insufficient but not setting specific higher threshold); H. Hovenkamp, *Federal Antitrust Policy §7.6c* (3d ed. 2005) ("even today the minimum market share hovers in the range of 30%-40%, which is little more than half of the amount needed for a § 2 violation.")  Second, at least in the case of a *per se* tying claim, it is *not* necessary to rigorously define a market for the tied product; to the contrary, so long as a not insubstantial volume of commerce is affected, illegality can be established.  *See Kodak*, 504 U.S. at 462; *Fortner Enters. v. United States Steel Corp.*, 394 U.S. 495, 501 (1969); Areeda ¶1721 (2d ed. 2003).

## V.   DATEL HAS STATED A CLAIM FOR UNFAIR COMPETITION.

Finally, Microsoft argues that the unfair competition claims (Fourth and Fifth Claims) should be dismissed because the antitrust claims are subject to dismissal.  For the reasons already set forth, the premise of Microsoft's argument is incorrect.  In addition, California law is not so limited.  As the California Supreme Court has held, a direct competitor may challenge "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).  Microsoft's conduct is a plain violation of the antitrust law.  But at a minimum it is surely a violation of the "policy or spirit" of antitrust law for a monopolist to crush a smaller competitor through a predatory design change that offers no product improvement and provides no consumer benefit whatsoever.

### CONCLUSION

For the foregoing reasons, Microsoft's Motion to Dismiss should be denied.

DATED:  February 9, 2010.

HOWARD RICE NEMEROVSKI CANADY
FALK & RABKIN
A Professional Corporation


By: _____/s/ Martin R. Glick_____
MARTIN R. GLICK

Attorneys for Plaintiffs

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*