**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10    DATEL HOLDINGS LTD,                         No. C-09-05535 EDL

11                    Plaintiff,              **ORDER GRANTING IN PART AND
                                              DENYING IN PART DEFENDANT'S**
12        v.                                  **MOTION TO DISMISS**

13    MICROSOFT CORPORATION,

14                    Defendant.

15    _____/

16          Plaintiff Datel Holdings filed this action against Defendant Microsoft for violations of

17    Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C.

18    § 14, alleging that Defendant unlawfully monopolized the relevant markets for the Xbox 360 online

19    video game system and Xbox 360 accessories.  The complaint contains six claims: (1) violation of

20    the Sherman Act: Monopolization and Attempted Monopolization of the Aftermarket for Xbox 360

21    Accessories and Add-ons; (2) violation of the Sherman Act: Monopolization and Attempted

22    Monopolization of the Multiplayer Online Dedicated Gaming Systems Market; (3) violation of the

23    Sherman Act and Clayton Act: tying arrangement; (4) violation of California Business &

24    Professions Code section 17200; (5) common law unfair competition ; and (6) Intentional

25    Interference with Prospective Economic Advantage.  On January 22, 2010, Defendant filed this

26    motion to dismiss, which Plaintiff opposed.  On March 9, 2010, the Court held a hearing on

27    Defendant's motion.  For the reasons stated at the hearing and in this Order, Defendant's motion is

28    granted in part and denied in part.

**United States District Court**
For the Northern District of California

**Facts**

Plaintiff, a leading developer of video game enhancement products, develops and manufactures aftermarket products for the Xbox 360 video game system.  Compl. ¶ 1.  One of Plaintiff's leading products is a memory card for the Xbox known as the MAX Memory card.  Id. Plaintiff's two gigabyte MAX Memory card retails for approximately $39.99.  Id.  Defendant is the only other supplier of memory cards for the Xbox 360.  Id.  Defendant's memory card, which has only 512 megabytes of memory, also retails for approximately $39.99.  Id.

Defendant released the Xbox in 2001, and launched the second generation console, Xbox 360, in 2005.  Compl. ¶ 11.  Various models of the Xbox 360 sell for $199.99 to $299.99.  Id.  In addition to the functionality of the Xbox 360, Defendant attracts customers with its Xbox Live program, which is a subscription-based online multiplayer gaming service.  Id. ¶ 12.  As of May 2009, Defendant reported more than 20 million active members of Xbox Live.  Id.

The Xbox 360 reached the market one year before Sony, Defendant's competitor, released its Playstation 3 in November 2006.  Compl. ¶ 13. The Xbox 360 continues to control a larger share of the market that Sony's Playstation 3.  Id.  In January 2009, Defendant reported that total sales of Xbox 360 had reached 28 million, as compared to 20 million for Playstation 3.  Id. In May 2009, Defendant's unit sales passed the 30 million mark for the Xbox 360, and analysts reported sales of 23 million for the Playstation 3.  Id.

There is a considerable aftermarket for Xbox 360 accessories and add-ons, apart from Xbox 360 games.  Compl. ¶ 14.  Plaintiff, which has been developing and manufacturing electronics and video game console peripherals since the late 1980s, offers several aftermarket products for the Xbox 360: (1) the XSATA and Xport (for transferring data between an Xbox 360 and a personal computer, allowing users to store Xbox demos, game saves and other materials on personal computer); (2) MAX Memory card (memory cards compatible with the Xbox 360 available in 2GB and 4GB versions); (3) MAX Drive 160 (an external 160GB hard drive for use with the Xbox 360 console); and (4) other accessories designed for use with the Xbox 360 or Xbox Live such as game headsets and rechargers for wireless controllers.  Compl. ¶ 15.  Plaintiff has announced,  but not yet released, a Joypad controller to compete with Defendant's wireless controllers.  Id. ¶ 16.

1    Plaintiff is the only source for Xbox 360-compatible memory cards other than Defendant

2  itself.  Compl. ¶ 17.  Plaintiff's cards were first released in May 2009.  Id.  As of November 1, 2009,

3  Plaintiff's 2 gigabyte MAX Memory card ("DMMC") for the Xbox 360 console was available for

4  purchase at a retail price of $39.99, and Plaintiff's 4 gigabyte DMMC was available for $49.99.  Id.

5  ¶ 18.  The DMMCs may be purchased online or in stores, sometimes at a discount.  Id.  Plaintiff's

6  memory card is described at a retailer's website as follows: "Ensure that you have enough memory

7  to save vital game information from your Xbox 360 games.  The Max Memory 2GB Memory Card

8  provides 2 gigabytes of reliable storage.  Easily save levels, characters, and high scores with speed

9  and security."  Id. ¶ 18.

10    As of November 1, 2009, Defendant's 512 MB memory card, the only size Defendant offers,

11  retailed for approximately $39.99, and was described at xbox.com as follows: "Take your games

12  everywhere you go with eight times the space of the original Xbox 360 Memory Unit.  With 512 MB

13  of memory and a keychain carrying case, it's a snap to bring your game saves, Xbox Live gamer

14  profiles, Arcade game downloads and even exclusive kiosk content."  Compl. ¶ 19.

15    On October 16, 2009, Defendant issued a notice to Xbox users through a blog entitled

16  "Major Nelson."  Compl. ¶ 20.  The notice stated that when users receive a software update in the

17  following week, unauthorized memory cards (such as Plaintiff's) would no longer work with the

18  Xbox 360.  Id.  The blog suggested moving information from an unauthorized memory card to an

19  authorized one.  Id.

20    Defendant informed Plaintiff that the disabling of third party memory cards was an

21  unintentional effect of a software update.  Compl. ¶ 21.  Later, however, Defendant stated in an

22  October 23, 2009 article that it goes to great lengths to protect the Xbox service from cheating that

23  comes from use of unauthorized memory cards, and that use of those cards could cause compatibility

24  and safety issues.  Id.  The move from unauthorized cards has created discussion online, and Plaintiff

25  alleges that Defendant has not explained how a larger memory card promotes cheating, nor has it

26  identified a compatibility or safety issue between a DMMC and an Xbox console.  Id.  Plaintiff

27  alleges that Defendant's justification for disabling unauthorized memory cards based on cheating is

28  a pretext, and that the true purpose behind disablement of the DMMCs is to exclude competition

3

United States District Court
For the Northern District of California

1    from the Xbox 360 aftermarket for memory cards and to force consumers to buy Defendant's

2    memory cards.  Id. ¶ 24.  Plaintiff alleges that there is no benefit to consumers from Defendant's

3    decision to target Plaintiff's product that will leave approximately 50,000 consumers with useless

4    memory cards, and will forestall innovation and deprive consumers of the benefits of competition.

5    Id. at ¶ 3.

6          Plaintiff alleges that Defendant has modified the Xbox 360's authorization protocols to

7    prevent the interoperability of Plaintiff's other products, including the as-yet-unreleased Joypad.

8    Compl. ¶ 25.  Plaintiff alleges that Defendant's intention is to block the use of Plaintiff's competitive

9    devices.  Id.  Plaintiff alleges that Defendant's update does not constitute an improvement of the

10   product, but is instead an arbitrary contrivance intended to perpetuate Defendant's market power.

11   Id. at ¶ 4.

12   **Relevant markets**

13         Plaintiff alleges that Defendant's anticompetitive conduct has affected two relevant product

14   markets: (1) the aftermarket for accessories and add-ons specific to the Xbox brand; and (2) the

15   primary market for video game systems that feature multiplayer online gaming in addition to

16   personal gaming.  Compl. ¶ 26.

17         **Aftermarket for Xbox 360 Accessories and Add-ons ("Aftermarket")**

18         Plaintiff alleges that the Aftermarket is a relevant market that is wholly derivative of and

19   dependent upon the primary market for the Xbox 360 gaming system.   Compl. ¶ 27.  Plaintiff

20   alleges that Defendant dominates this Aftermarket.  Id.  Defendant's add-ons are designed

21   specifically for the Xbox 360 and are not interchangeable with products outside the Aftermarket.  Id.

22   ¶ 28.  Plaintiff alleges that Defendant controls the Aftermarket, and has effected policies and

23   practices designed to retain its control, including: (1) tying the sale of aftermarket accessories and

24   add-ons to the sale of the Xbox 360 console; (2) erecting technological barriers to restrict the

25   interoperability of third party accessories and add-ons; (3) using software updates to disable

26   otherwise functional third party add-ons and accessories; and (4) using its special access to

27   purchasers of an Xbox gaming system to promote its own add-ons and accessories and to advise

28   customers against purchasing third party products.  Id. ¶ 29.

1    Plaintiff alleges that the efficacy of Defendant's techniques is indicated by the fact that

2    Plaintiff is the only firm that has been able to overcome Defendant's technical barriers and bring to

3    market a competing memory card for the Xbox 360.  Compl. ¶ 30.  Plaintiff alleges that Defendant's

4    market power in the Aftermarket derives from Defendant's control over the Xbox 360 hardware and

5    software, and from its special access to purchasers of the gaming system, and does not derive from

6    contractual rights that consumers knowingly and voluntarily gave Defendant at the time of purchase.

7    Id. ¶ 31.  Plaintiff alleges that market imperfections have prevented consumers from realizing the

8    impact that their choice in the primary market would have on their freedom in the Aftermarket.  Id. ¶

9    32 (for example, the presence of a USB port in the Xbox 360 console suggests to consumers that

10   third party accessories and add-ons would be compatible and permissible).

11   Plaintiff alleges that Defendant misled customers into a reasonable belief at the time of

12   purchasing an Xbox 360 console that third party accessories and add-ons are available.  Compl. ¶ 33

13   (for example, Defendant's spokesperson stated that the Xbox 360 "also drives a ton of third-party

14   spend," and noted the availability of "a lot of third party alternatives.").  Plaintiff alleges that

15   Defendant has touted its "accessories attach rate" as higher than any other manufacturer, including

16   Sony. Id. ¶ 34.  Defendant attributed this high rate to customer loyalty and trust.  Id.  However,

17   Plaintiff alleges that the real reason is Defendant's anticompetitive conduct, including tying and

18   predatory design, that drives the accessories attach rate.  Id.

19   Plaintiff alleges that Defendant has used its power in the Aftermarket to charge supra-

20   competitive prices.  Compl. ¶ 35 (for example, although prices for memory cards in general have

21   decreased steadily since 2005, Defendant's proprietary Xbox 360 memory card held steady at $59.99

22   across a two-year period, until Plaintiff introduced its memory card, at which time Defendant

23   reduced its price).  Plaintiff alleges that even if there were meaningful competition in the primary

24   market for multiplayer online dedicated gaming systems, that would not check Defendant's

25   monopoly power in the Aftermarket due to: (1) the high switching costs associated with switching

26   gaming systems; (2) the high information costs; (3) the large ratio of installed customer base relative

27   to potential new customers; and (4) the substantial ability to exploit customers.  Id. ¶ 36.

28   **Multiplayer Online Dedicated Gaming Systems Market ("Online Market")**

United States District Court
For the Northern District of California

1    The Multiplayer Online Dedicated Gaming Systems Market is a specific market for

2    dedicated gaming systems with a meaningful capacity for online multiplayer gaming.  Compl. ¶ 37.

3    Plaintiff alleges that only two systems, the Xbox 360 and the Playstation 3, compete in the Online

4    Market.  Id. ¶ 37, 42.

5    Plaintiff alleges that Nintendo's Wii system has limited multiplayer gaming functionality,

6    and that the reduced functionality and lower price point reflect a target market that is distinct from

7    that of Xbox 360 and the Playstation 3.  Id. at ¶ 38.  Therefore,  the Wii system should not be

8    considered reasonably interchangeable with the Xbox 360 and the Playstation 3.  Id.

9    Plaintiff alleges that personal computers may offer multiplayer online functionality, but at a

10   higher price for a system that tends to lack other features usually included in dedicated gaming

11   systems.  Compl. ¶ 39.  Therefore, personal computers should not be considered reasonably

12   interchangeable with the Xbox 360 and the Playstation 3.  Id.

13   Plaintiff alleges that Defendant has measured the success of the Xbox 360 against the

14   Playstation 3, to the exclusion of other products or platforms.  Compl. ¶ 40 (for example, on

15   December 1, 2008, Defendant issued a press release comparing Xbox 360 sales against Playstation 3

16   sales, and did not address Wii sales or personal computer sales).  Plaintiff also alleges that

17   Defendant's pricing of the Xbox 360 line has influenced Sony's pricing of the Playstation 3 line, and

18   vice versa, but such pricing has not tracked or influenced the pricing of the Wii or personal

19   computers.  Id. ¶ 41.

20   Plaintiff alleges that Defendant enjoys market power within the Online Market.  Compl. ¶ 43.

21   Specifically, sales statistics reported by Defendant establish that the Xbox 360 console has

22   significantly more total unit sales than the Playstation 3 console.  Id.  Plaintiff alleges that

23   Defendant's share of the Online Market was approximately 66% as of July 2009, and that in June

24   2009, the Xbox 360 outsold the Playstation 3 by approximately 1.5 to 1.  Id.  Plaintiff alleges that

25   this disparity shows that Defendant's market dominance is continuing and stable.  Id.

26   Plaintiff alleges that Defendant's market power in the Online Market is unchecked by the

27   potential for competition from new market entrants due to substantial barriers to market entry other

28   than anticompetitive conduct, such as: (1) the extremely high costs of development and production

6

1    of a competing video game system; (2) the established libraries of games and online gaming

2    communities of Defendant and Sony, which tend to entrench consumers in a particular system; and

3    (3) the massive monetary, technological and human resources at the disposal of Defendant and Sony

4    and their ability to sell at below cost.   Compl. ¶ 45.

5    **Legal standard**

6            A complaint will survive a motion to dismiss if it contains "sufficient factual matter . . . to

7    'state a claim to relief that is plausible on its face.'"   Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)

8    (citing Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)).   The reviewing court's

9    "inquiry is limited to the allegations in the complaint, which are accepted  as true and construed in

10   the light most favorable to the plaintiff."   Lazy Y Ranch LTD v. Behrens, 546 F.3d 580, 588 (9th

11   Cir. 2008).

12           A court need not, however, accept as true the complaint's "legal conclusions."   Iqbal, 129 S.

13   Ct. at 1949.   "While legal conclusions can provide the framework of a complaint, they must be

14   supported by factual allegations."   Id. at 1950.   Thus, a reviewing court may begin "by identifying

15   pleadings that, because they are no more than conclusions, are not entitled to the assumption of

16   truth."   Id.

17           Courts must then determine whether the factual allegations in the complaint "plausibly give

18   rise to an entitlement of relief."   Id.   Though the plausibility inquiry "is not akin to a probability

19   requirement," a complaint will not survive a motion to dismiss if its factual allegations "do not

20   permit the court to infer more than the mere possibility of misconduct . . . ."   Id. at 1949 (internal

21   quotation marks omitted) & 1950.   That is to say, plaintiffs must "nudge[] their claims across the

22   line from conceivable to plausible."   Twombly, 550 U.S. at 570.

23   **Request for Judicial Notice**

24           On a motion to dismiss, a court normally may not look to matters beyond the complaint

25   without converting the motion into one for summary judgment.   See Mack v. South Bay Beer

26   Distributors, 798 F.2d 1279, 1282 (9th Cir. 1986), overruled on other grounds by Astoria Fed. Sav.

27   & Loan Ass'n v. Solimino, 501 U.S. 104 (1991).   There are two exceptions to this rule: (1) a court

28   may take judicial notice of  material which is either submitted as part of the complaint or necessarily

**United States District Court**
For the Northern District of California

7

United States District Court
For the Northern District of California

1   relied upon by the complaint; and (2) a court may take judicial notice of matters of public record.

2   See Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001).  Under Federal Rule of Civil

3   Procedure 201(b), a "judicially noticed fact must be one not subject to reasonable dispute in that it is

4   either: (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of

5   accurate and ready determination by resort to sources whose accuracy cannot reasonably be

6   questioned."  Furthermore, a court "shall take judicial notice if requested by a party and supplied

7   with the necessary information."  See Fed. R. Civ. P. 201(d); Mullis v. United States Bank, 828 F.2d

8   1385, 1388 fn. 9 (9th Cir. 1987).

9       Defendant seeks judicial notice of three documents: (1) the Xbox 360 "Limited Warranty and

10  Return Information," which includes the Xbox 360 software license; (2) the Xbox Live Terms of

11  Use; and (3) a portion of the Xbox 360 console packaging.  The first two documents are publicly

12  available online and the third is available in any Xbox 360 console packaging.  Plaintiff has objected

13  to judicial notice of these documents, and has filed a conditional request for judicial notice of other

14  documents if the Court grants judicial notice of Defendant's documents.  Defendant has filed a

15  response to Plaintiff's objections, but did not file objections to Plaintiff's conditional request for

16  judicial notice.

17          **Not reasonably in dispute**

18      Defendant argues that its three documents are judicially noticeable because they are publicly

19  available and not subject to reasonable dispute.  The first two documents are available online and the

20  third can be obtained from the purchase of any Xbox 360 system.  See, e.g., Mayfield . Sara Lee

21  Corp., 2005 WL 88965, at 3, n. 2 (N.D. Cal. Jan. 13, 2005) (taking judicial notice of photocopies of

22  various bread product packages displaying the Sara Lee brand"); Wright v, Gen. Mill, Inc., 2009 WL

23  3247148 at *5 (S.D. Cal. Sept. 30, 2009) (taking judicial notice of various labels and packaging

24  associated with the Nature Valley products).  Defendant further argues that the documents are easily

25  verifiable, and that documents found on the Internet have been held to constitute public records

26  subject to judicial notice.  See, e.g., Wible v. Aetna Life Ins. Co., 375 F. Supp. 2d 956, 965-66 (C.D.

27  Cal. 2005) (taking judicial notice of admissions on a website associated with a witness as well as the

28  contents of Amazon.com web pages describing books related to the case); but cf., e.g., Experian

8

United States District Court
For the Northern District of California

1  Info. Solutions, Inc. v. Lifelock, 633 F. Supp. 2d 1104, 1107 (C.D. Cal. 2009 ) (finding that

2  Governor of Connecticut's webpage was not judicially noticeable because material on website not

3  capable of accurate and ready determination by resort to sources whose accuracy cannot be

4  questioned); Ruiz v. Gap, Inc., 540 F. Supp. 2d 1121, 1124 (N.D. Cal. 2008) (declining to take

5  judicial notice of webpage containing list of reported identity theft breaches in California because

6  materials "not remotely akin to the type of facts which may be appropriately judicially noticed.").

7  Here, the documents sought to be judicially noticed are capable of accurate and ready determination

8  because they are standard documents.  These documents are judicially noticeable for the fact that

9  they exist, not whether, for example, the documents are valid or binding contracts.

10         Plaintiff argues that several issues relating to these documents are in dispute.  Although

11  Plaintiff argues that there has been no showing that the documents cover the entire relevant market,

12  Defendant has submitted a follow-up declaration from Patrick King attaching additional packaging

13  information since 2005, which resolves this issue.  See King Decl. Ex. 1-4.

14         Plaintiff also argues that the Terms of Use document is dated September 2008, so Defendant

15  cannot argue that it was provided to all Xbox customers during the relevant period since 2005.

16  Plaintiff's argument, however, goes to the weight of the evidence, not to whether the documents are

17  judicially noticeable.  See In re NVIDIA GPU Litig., 2009 WL 4020104 at *8 (N.D. Cal. Nov. 19,

18  2009) (taking judicial notice of certain documents (including web pages), even though the defendant

19  failed to demonstrate that the documents were the warranties that applied to all of the class

20  computers purchased during the class period or even whether the warranties comprised the full

21  extent of the applicable warranties).

22         **Necessarily relied on in complaint**

23         Defendant also argues that judicial notice is appropriate because Plaintiff's claim depends on

24  these documents.  See Knievel v. ESPN, Inc., 393 F.3d 1068, 1076 (9th Cir. 2005) (judicial notice

25  appropriate where the plaintiff's claim depends on  the contents of a document, stating: "We have

26  extended the 'incorporation by reference' doctrine to situations in which the plaintiff's claim

27  depends on the contents of a document, the defendant attaches the document to its motion to dismiss,

28  and the parties do not dispute the authenticity of the document, even though the plaintiff does not

United States District Court
For the Northern District of California

1   explicitly allege the contents of that document in the complaint."); see also Berenblat v. Apple, Inc.,

2   2009 WL 2591366 at *1, n.3 (N.D. Cal. Aug, 21, 2009) ("Apple's Request for Judicial Notice of the

3   terms of the express warranty is granted, as the FAC references the warranty and at least two of the

4   Berenblat Plaintiffs exercised their rights under the express warranty.").

5          Here, the complaint alleges that Defendant's market power does not derive from a

6   contractual right with its customers that was knowingly given at the time of purchase.  Compl. ¶ 31.

7   Therefore, judicial notice is appropriate because Plaintiff's complaint depends, at least in part, on the

8   contents of the documents.  See In re Samsung Elecs. Am., Inc. Blu-Ray Class Action Litig., 2008

9   WL 5451024, at *4 n. 2 (D. N.J. Dec. 31, 2008) ("In the Amended Complaint, Plaintiffs specifically

10  acknowledge the existence of warranty information in each Player's packaging.  Those documents

11  are integral to Plaintiffs' Amended Complaint, as the warranty language serves, as a matter or law, to

12  either support or erode Plaintiffs' claims. As a result, this Court will consider the warranty

13  information, without converting Defendant's motion to dismiss into one for summary judgment.").

14  The Court takes judicial notice of the existence and content of these documents, though not of their

15  legal effect.

16          **Plaintiff's conditional request for judicial notice**

17          Plaintiff filed a conditional request for judicial notice, seeking judicial notice of ten

18  documents.  The documents are: (1) a screen shot from the game "Mass Effect 2" showing an Xbox

19  update prompt (Exhibit A); (2) packaging for Horipad EX2 Turbo controller and a Wal-Mart

20  printout for sale of the controller (Exhibit B); (3) webpages for the game Battlefield: Bad Company

21  (Exhibit C); (4) printout of the website of IGN Entertainment (Exhibit D); (5) printout from

22  Defendant's website link to the IGN Entertainment webpage (Exhibit E); (6) game disc and screen

23  shots from game disc in  the March 2004 Official Xbox magazine (Exhibit F); (7) printout from

24  website showing a third party cable for transferring data between Xbox 360 memory unit and a

25  personal computer (Exhibit G); (8) printouts of tutorials on connecting third party accessories to the

26  Xbox (Exhibit H); (9) copy of Xbox 360 console packaging purchased in November 2009 (Exhibit

27  I); and (10) printout from website showing a news article entitled "Wii is for Babies" (Exhibit J).

28          Exhibits E and H are printouts from Defendant's own website, which are judicially

United States District Court
For the Northern District of California

noticeable.  See Blue Lake Rancheria v. United States, 2010 WL 144989 at *2 n.4 (N.D. Cal. Jan. 8, 2010) (taking judicial notice of printout from tribe's website in part because it was reliable since it was maintained by the tribe).  To the extent that the other printouts (exhibits B, C, D, G) are from third parties, they are judicially noticeable as described above.

Exhibit A is a screen shot from a game showing the requirement that a user update the game. This document is judicially noticeable because it is capable of accurate and ready determination using sources whose accuracy cannot reasonably be questioned.  See Fed. R. Evid. 201(b).  Plaintiff notes that the fact of the update cannot be reasonably disputed because inserting the Mass Effect 2 disc in any Xbox game player will show the update.

Exhibit F contains copies of and screens shots from a game disc distributed in Defendant's magazine as evidence of what was in the public domain at the time of the magazine in 2004.  The Court takes judicial notice of the existence of these documents that were in the public realm at that time.  See Von Saher v. Norton Simon Museum of Art at Pasadena, 2010 WL 114959, at *4 (9th Cir. Jan. 14, 2010) ("Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'") (internal citation omitted).

Exhibit I is the console packaging from an Xbox 360 console.  This is the same document submitted for judicial notice by Defendant, except Exhibit I contains the full text of the packaging. The Court takes judicial notice of this document for the same reasons that it took notice of Defendant's version of this packaging.

**Discussion**

**1.     First claim for violation of Sherman Act based on Aftermarket for Xbox 360 Accessories and Add-ons**

Plaintiff alleges that Defendant possesses substantial market power in the secondary Aftermarket, or that a dangerous probability exists that Defendant will gain such power, and that Defendant has deployed that power to charge customers supra-competitive prices in the Aftermarket. Compl. ¶ 48.  Specifically, Plaintiff alleges that Defendant "controls access to the Aftermarket for Xbox 360 Accessories and Add-ons by way of technological barriers and by way of its special access to customers arising from their purchase of the Xbox 360.  Microsoft can then leverage its

11

United States District Court
For the Northern District of California

control over the Xbox 360 console, and its power in the primary market, into monopoly power in the Aftermarket. . . ."  Compl. ¶ 49.  Plaintiff alleges that Defendant has committed exclusionary, predatory and anticompetitive acts with the specific intent to maintain monopoly power in the Aftermarket.  Compl. ¶ 51.  According to Plaintiff, maintaining a monopoly in the Aftermarket allows Defendant not only to charge supra-competitive prices for Xbox 360 accessories, but also to supply inferior Xbox 360 accessories and force customers to purchase and use those inferior accessories.  Compl. ¶ 55.  Further, Plaintiff alleges that Defendant's disabling of Plaintiff's DMMCs and the anticipated imposition of new technological barriers to block Plaintiff's accessories "reduces choices available to customers, bars access to high quality accessories for lower prices than those offered by Microsoft, and has no legitimate technological or business justification."  Compl. ¶ 52.

Defendant argues that Plaintiff's first claim should be dismissed on the ground that Plaintiff has failed to plead a legally cognizable Aftermarket because Plaintiff cannot pursue antitrust claims based on a single-brand market.  In general, single brand markets do not constitute a relevant market.  See, e.g., Green Country Food Mkt., Inc. v. Bottling Group, 371 F.3d 1275, 1282 (10th Cir. 2004).  However, there is an exception where aftermarket restrictions are not disclosed or agreed to by the customers at the time of purchase of a product or service from the primary market.  See Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451 (1992).

In Kodak, Eastman Kodak manufactured and sold photocopiers and micrographic equipment.  Kodak also sold service and replacement parts for the equipment.  The plaintiffs, a group of independent service organizations that serviced Kodak's equipment, challenged Kodak's policies that made it more difficult for them to compete with Kodak in servicing equipment, including Kodak's practice of limiting the availability of Kodak parts.  The plaintiffs alleged that Kodak unlawfully tied the sale of service for Kodak machines to the sale of Kodak-compatible parts, a market in which Kodak had a monopoly.  Kodak parts were not compatible with competitors' machines and vice versa.  The Court held that in certain circumstances, a single brand can constitute a separate market: "because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's

1   perspective is composed of only those companies that service Kodak machines." Eastman Kodak,

2   504 U.S. at 482.  The Court found that the single-brand aftermarket for parts and service for Kodak

3   equipment arose once customers had already purchased and were "locked in" to Kodak photocopiers

4   or equipment.

5          Defendant argues that the Kodak exception does not apply because purchasers of the Xbox

6   360 knew and agreed at the time they purchased their systems that they could only use Defendant's

7   authorized accessories with their systems.  Thus, Defendant argues that its power in the market

8   derives from contract, not from exclusionary conduct, so Eastman Kodak does not apply.  See

9   Newcal Indus. v. IKON Office Solution, 513 F.3d 1038, 1045 (9th Cir. 2008); id. at 1043 ("Second,

10  the law prohibits an antitrust claimant from resting on market power that arises solely from

11  contractual rights that consumers knowingly and voluntarily gave to the defendant.").  The

12  Newcal court stated:

13          The critical distinction between Eastman Kodak and the two circuit court opinions
            [Queen City Pizza and Forsyth] was that the Kodak customers did not knowingly
14          enter a contract that gave Kodak the exclusive right to provide parts and service for
            the life of the equipment.  In other words, the simple purchase of Kodak-brand
15          equipment (unlike the signing of a Domino's franchise agreement or the purchase of a
            Humana insurance policy) did not constitute a binding contractual agreement to
16          consume Kodak parts and services in the aftermarket.  Equally critically, the Supreme
            Court found that market imperfections, including information and switching costs,
17          prevented consumers from discovering, as they were shopping for equipment, that the
            Kodak brand would include a de facto commitment to consume only
18          supracompetitively priced Kodak-brand service contracts.

19  Newcal, 513 F.3d at 1045.

20          In Newcal, the court permitted a single-brand aftermarket because the defendant, which

21  leased office equipment, allegedly defrauded its customers by amending the lease agreements after

22  the customers had already signed up for service without disclosing that the amendments would

23  lengthen the service contract.  See id. at 1043; see also In re Apple and AT&TM Antitrust Litig., 596

24  F. Supp. 2d 1288 (N.D. Cal. 2008) (finding that there was an aftermarket for iPhone voice and data

25  services because the aftermarket restriction of iPhone users to AT&T services for five years was not

26  disclosed to customers; instead only a two year contract with AT&T was disclosed).  In In re Apple,

27  the court stated: "Ultimately, the dispositive issue is whether Plaintiffs knowingly placed Defendants

28  in a monopoly position in the alleged voice and data services aftermarket."  Id.  Therefore, to

United States District Court
For the Northern District of California

13

United States District Court
For the Northern District of California

1  establish a single-brand aftermarket under Kodak and Newcal, the restriction in the aftermarket must

2  not have been sufficiently disclosed to consumers in advance to enable them to bind themselves to

3  the restriction knowingly and voluntarily.

4         In Queen City Pizza v. Domino's Pizza, Inc., 124 F.3d 430 (3d Cir. 1997), the Third Circuit

5  rejected a single brand aftermarket relating to pizza making ingredients for Domino's franchisees,

6  where the restriction was disclosed and agreed to in advance.  There, franchisees signed an

7  agreement to operate a Domino's Pizza location, and under the agreement were required to purchase

8  pizza ingredients from Domino's or authorized vendors.  Distinguishing Kodak, the court noted that

9  the plaintiffs in Queen City Pizza did not need to become franchisees if they did not like the terms of

10  the franchise agreement, while the challenged restraint in Kodak was not authorized by the original

11  contract terms and the change in policy was not foreseen at the time of sale, so buyers had no ability

12  to calculate the risk.  Similarly, in Forsyth v. Humana, 114 F.3d 1467, 1476 (9th Cir. 1997), the

13  court rejected a claim for monopolization of the market for hospital services for a single company's

14  insureds because the purported restraint arose from contract provisions disclosed in advance in the

15  plaintiffs' insurance policies under which the insurance company realized discounts from medical

16  providers allegedly in the nature of kickbacks.  Further, in Apple v. Psystar, 586 F. Supp. 2d 1190,

17  1194-95 (N.D. Cal. 2008), the court held that the defendant had failed to plead a plausible

18  aftermarket for hardware that could be used with the Mac OS because through "its End User License

19  Agreement and other means, Apple specifically restricts the use of Mac OS to Apple-labeled

20  computer hardware systems," and "customers, therefore, knowingly agree to the challenged

21  restraint."  See Psystar, 586 F. Supp. 2d at 1201.  The Psystar court stressed that the restriction there

22  was unlike Kodak "where customers did not knowingly bind themselves to a single brand of the

23  aftermarket and market imperfections (information costs and switching cost) prohibited customers

24  from imposing market discipline in the aftermarket by switching among competitors in the primary

25  market," because "Apple asks its customers to purchase Mac OS knowing that it is to be used only

26  with Apple computers."  Id.

27         Defendant argues that this case is more like Queen City Pizza, Forsyth, and Psystar, than

28  Kodak, Newcal, and In re Apple, because Xbox purchasers knowingly gave Defendant the right to

14

prohibit the use of unauthorized accessories through the warranty and software license that is included in the Xbox 360 packaging, as well as through the Xbox Live Terms of Use.  The shrinkwrap license in the packaging states: "The software included in the Xbox product [Xbox 360 Video Game System or Xbox 360-compatible hardware accessories manufactured by or for Defendant whether included or purchased separately] is licensed to you, not sold.  You are licensed to use such software only in your Xbox product and you may not reverse engineer it, except as expressly permitted by applicable law notwithstanding this limitation."  Def's RJN Ex. A at 7.  This language, however, is arguably ambiguous.  Further, it may not be applicable to using external accessories to boost memory, which may not involve a prohibited use of the software and does not constitute reverse engineering.  Defendant also points to the Xbox Live Terms of Use presented to consumers when they sign up for the service, which requires customers to "agree that you are using only authorized software and hardware to access the Service."  Def.'s RJN Ex. B at 10.  But this language is also arguably ambiguous in that use of accessories such as a memory card is not necessarily "using . . . software and hardware" to *access* the service.  The Terms of Use also permit Defendant to, among other things, issue automatic software updates to prevent a customer from using unauthorized hardware peripheral devices.  See id. at 10-11.  However, this statement is somewhat ambiguous with respect to the meaning of peripheral device because the phrase is used earlier in the same paragraph to refer to devices used to log on to the Service, which may not include accessories such as memory cards.  Further, the Terms of Use could not have informed a customer's purchasing decision because the Xbox Live is a separate optional service that a user may join after purchasing the Xbox 360.  See Def.'s RJN Ex. C.

Plaintiff argues that customers did not knowingly agree at the time of purchase that their use of aftermarket accessories would be restricted.  Plaintiff alleges in the complaint that the monopolization of the Aftermarket "does not derive from contractual rights that consumers knowingly and voluntarily gave Microsoft at the time of purchase," and that "market imperfections have prevented customers from realizing the impact that their choice in the primary market would have on their freedom in the aftermarket."  Compl. ¶¶ 31-32.  In Newcal, the plaintiff made allegations to rebut a presumption that the equipment customers made a knowing choice to restrict

15

United States District Court
For the Northern District of California

1  their aftermarket options when they decided to purchase a product in the primary market.  The

2  Newcal court stated: "Competition in the initial market, therefore, does not necessarily suffice to

3  discipline anticompetitive practices in the aftermarket."  Newcal, 513 F.3d at 1050.  Here, Plaintiff

4  has made even stronger allegations insofar as it alleges that the primary market is also not very

5  competitive.  While Defendant would dismiss these allegations as conclusory, Plaintiff also includes

6  specific allegations that there are built-in USB ports that suggest that third party accessories may be

7  used (Compl. ¶ 32) and that Defendant's spokesperson noted the existence of many third party

8  alternatives for accessories (Compl. ¶¶ 33-34).

9      Plaintiff argues that the Warranty could not have been discovered by consumers until the box

10  was opened, and that therefore, a consumer could not have knowingly and voluntarily accepted it

11  prior to purchase.  See Opp. at 7.  The weight of authority, however, including in this district, is that

12  shrinkwrap licenses are enforceable.  See, e.g., ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1451-52

13  (7th Cir. 1996) (enforcing shrinkwrap license because "any buyer . . . can prevent formation of the

14  contract by returning the package, as can any consumer who concludes that the terms of the license

15  make the software worth less than the purchase price."); Novell, Inc. v. Unicom Sales, Inc., 2004

16  WL 1839117, at *11 (N.D. Cal. Aug. 17, 2004), but see, e.g., Klocek v. Gateway, Inc., 104 F. Supp.

17  2d 1332, 1341 (D. Kan. 2000) ("The Court finds that the act of keeping the computer past five days

18  was not sufficient to demonstrate that plaintiff expressly agreed to the Standard Terms.").

19      Plaintiff argues that Defendant's interpretation of the definition of "Xbox Product" in the

20  Warranty is not reasonable.  Xbox Product is defined as:

21      either (1) the Microsoft Xbox 360 Video Game System console including the
      Microsoft software stored on the separate Xbox 360 hard disk and/or embedded in the

22      microprocessors within the Xbox 360 console; or (2) Microsoft branded Xbox 360-
      compatible hardware accessories manufactured by or for Microsoft whether included

23      with the console or purchased separately.

24  Def.'s RJN Ex. A at 5.  According to Plaintiff, only by reading the definition in the conjunctive can

25  Defendant support the argument that the Warranty language prohibits unauthorized third party

26  accessories.  See Pl.'s Opp. to Def.'s Mot. to Dismiss at 8-9.  Defendant responds that the terms in

27  the definition are not mutually exclusive (see Federation of Fly Fishers v. Daley, 131 F. Supp. 2d

28  1158, 1164 (N.D. Cal. 2000) ("These factors are listed in the disjunctive; any one or a combination

16

can be sufficient.")), and that Plaintiff's reading of the definition is unreasonable.  For example, Defendant notes that reading the Warranty language where "Xbox Product" means only "Xbox 360 console" would implausibly disallow use of all accessories made by anyone.  Plaintiff counters that other inconsistencies would arise if the definition covered third party accessories.  For example, elsewhere in the Warranty, Defendant is obligated to repair or replace a defective "Xbox Product," so under Defendant's interpretation, Defendant would be obligated to repair an unauthorized third party accessory.  See Def.'s RJN Ex. A at 6.  Further, Plaintiff argues that adopting Defendant's interpretation of the language would implausibly make authorized accessories that are approved, but not manufactured, by Defendant improper for the Xbox 360 console.  Accordingly, Plaintiff argues that it is highly unlikely that a customer purchasing an Xbox 360 console would understand the contract as prohibiting unauthorized accessories.  At the very least, Plaintiff has shown an ambiguity in the relevant contract language which counsels against granting a motion to dismiss premised on Defendant's contested interpretation of the provision, which customers may not have understood.

Defendant further argues that this case is like Psystar because there, the defendant argued that the plaintiff erected technical barriers to prevent Mac OS from operating on non-Apple computers (Psystar, 586 F. Supp. 2d at 1194), similar to Plaintiff's allegations here that Xbox accessories are unique and that Defendant used an authentication technique to block the use of Plaintiff's products.  Further, Defendant argues that in Psystar, the defendant alleged that the Mac hardware aftermarket was a distinct aftermarket that was derivative from and dependent on the primary market for the Mac OS (Id. at 1202), and here, Plaintiff alleges that the accessories Aftermarket is derivative from and dependent on the primary market for the gaming system (Compl. ¶ 27).

In Psystar, however, unlike Kodak and its progeny, the plaintiff alleged "not a single-brand aftermarket dependent on and derivative of a specific company's primary product but instead that a single brand of primary product (Apple's operating system) constitutes an independent market."  Psystar, 586 F. Supp. 2d at 1197.  Further, the plaintiff's pleadings "do not suggest market imperfections such as switching costs and customer 'lock in.'"  Id. at 1197, n.3.  Finally, Psystar specifically alleged that Apple's End User License Agreement restricted use of the Mac operating

17

United States District Court
For the Northern District of California

system to Apple-labeled computer hardware systems.  Id. at 1201.  By contrast, in this case, Plaintiff alleges, as in Kodak, that there is a single-brand Aftermarket that is dependent on the primary market.  Further, Plaintiff here alleges market imperfections such as switching costs.  Finally, as described above, the license agreement in this case is not as clear as the license in Psystar.  Thus, the reasoning in Psystar is not applicable to this case as pled.

In the absence of a clearly binding contractual restriction on the market, Plaintiff points to the factors applied by the Newcal court to determine whether a consumer's selection of a brand in the market is the functional equivalent of a contractual commitment, or instead allows the plaintiff to pursue a claim based on a single-product aftermarket as in Kodak.  First, here, as in Newcal and Kodak, and unlike in Queen City Pizza, the Aftermarket is "wholly derivative and dependant on the primary market," (Newcal, 513 F.3d at 1049), so Defendant allegedly may exploit its unique position in the primary market to gain market power in the derivative market.  Second, however, in Newcal the flex agreements were only obtained after the initial contract, whereas here, the effect of the original contract is ambiguous.  Third, the complaint here, as in Newcal, alleges that the contractual relationship, rather than any contractual provision, gives Defendant special access to its customers.  Fourth, the complaint here, as in Newcal, alleges that Defendant's representations and market imperfections lead its customers to mistakenly believe that they will be free to shop in the Aftermarket despite their choice in the primary market.  On balance, the Newcal factors weigh in favor of denying the motion to dismiss this claim.  Viewing the allegations in the light most favorable to Plaintiff, and because contract ambiguities are interpreted against the drafter (see Cal.Civ. Code § 1654), shopping for competing products in the Aftermarket is not clearly precluded by any contractual provision into which customers knowingly and voluntarily entered.  Therefore, Defendant's motion to dismiss the first claim is denied.

**2.     Second claim for violation of Sherman Act based on Multiplayer Online Dedicated Gaming Systems Market**

Plaintiff argues that Defendant either has significant market power in the primary Online Market, or there is a dangerous probability that Defendant will obtain that market power.  Compl. ¶ 63, 65.  Plaintiff alleges that Defendant "has deployed this market power to control related and subsidiary markets," and "to impede the development of a vibrant competitive Aftermarket. . . ."

Compl. ¶ 62.  Plaintiff alleges that by using its power in the Online Market to curb competition and

innovation in the Aftermarket, Defendant is able to facilitate price discrimination, increase switching

costs and erect substantial barriers to potential entrants of the primary market.  Compl. ¶ 63.

Plaintiff alleges that Defendant committed these exclusionary, predatory or anticompetitive acts with

the specific intent to acquire or maintain monopoly power in the Online Market.  Compl. ¶ 66.

Further, Plaintiff alleges that Defendant has "intentionally impeded the development of a vibrant

competitive Aftermarket for Xbox 360 Accessories and Add-ons, removed functionality, reduced the

choices available to consumers, raised its competitors' costs and has raised barriers to entry in  the

Multiplayer Online Dedicated Gaming Systems, Market."  Compl. ¶ 67.

Defendant argues that this claim must be dismissed because: (1) Plaintiff lacks antitrust

injury and thus lacks standing to bring the claim because it is not a participant in the primary market;

(2) Plaintiff has not pled a legally tenable market because it has excluded certain products; and (3)

Plaintiff does not plead any exclusionary acts by Defendant in the online gaming systems market.

Because the Court concludes that Plaintiff has not adequately alleged standing, the Court need not

reach the remaining bases for Defendant's motion.

To establish standing under the federal antitrust laws, Plaintiff must have suffered an

antitrust injury, that is, "an injury of the type the antitrust laws were intended to prevent and that

flows from that which makes Defendant's acts unlawful."  Brunswick Corp. v. Pueblo Bowl-O-Mat,

Inc., 429 U.S. 477, 489 (1977); see also William C. Holmes, Antitrust Law Handbook, at p. 885

(West 2009) ("Implicit in this definition are two separate conceptual issues.  First, the claimed injury

must be of a type that the antitrust laws were meant to discourage (e.g., a business' lost profits from

a reduced ability to compete, as opposed to lost profits from increased competition in the market).

And second, the plaintiff's injury must have been proximately caused by the defendant's antitrust

violation, and not by some other act or event.").  In Associated General Contractors of America v.

California State Council of Carpenters, 459 U.S. 519 (1983), the Supreme Court set forth a multi-

factor test for analyzing antitrust standing, but the Court subsequently determined that the essential

element is antitrust injury: "a showing of antitrust injury is necessary, but not always sufficient, to

establish standing."  Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 110 n.5 (1986); see also

United States District Court
For the Northern District of California

1   Bhan v. NME Hosp., Inc., 772 F.2d 1467, 1470 n.3 (9th Cir. 1985)  ("Although the Supreme Court

2   did not explicitly state that a plaintiff must satisfy all of the Associated General Contractors factors

3   or, indeed, any particular factor, the inquiry whether the plaintiff has suffered an injury of the type

4   which the antitrust statute was intended to forestall is a factor of tremendous significance.").

5        "Antitrust injury requires the plaintiff to have suffered an injury in the market where

6   competition is being restrained.  Parties whose injuries, though flowing from that which makes the

7   defendant's conduct unlawful, are experienced in another market do not suffer an antitrust injury."

8   American Ad Mgmt., Inc. v. General Telephone Co. of Cal., 190 F.3d 1051, 1057 (9th Cir. 1999).

9   The parties do not dispute that there is no rigid "consumer or competitor" test for standing.  Rather,

10  "[w]hile consumers and competitors are most likely to suffer antitrust injury, there are situations in

11  which other market participants can suffer antitrust injury.  . . .  Further, it is not the status as a

12  consumer or competitor that confers antitrust standing, but the relationship between the defendant's

13  alleged unlawful conduct and the resulting harm to the plaintiff."  American Ad, 190 F.3d at 1057-

14  58 (rejecting Exhibitors' Serv., Inc. v. American Multi-Cinema, Inc., 788 F.2d 574 (9th Cir. 1986)

15  (which rejected the claim of a market participant simply because the plaintiff was not a consumer or

16  competitor of the defendant)).  Therefore, the fact that Plaintiff is not a consumer or competitor does

17  not resolve the issue.

18       Defendant argues that Plaintiff is not a market participant and so lacks standing.  Plaintiff

19  responds that even though it does not directly compete with Defendant, it participates in the Online

20  Market by "offering aftermarket products that have the capacity to lower barriers of entry and

21  switching costs in the relevant market."  Pl.'s Opp. to Def.'s Mot. to Dismiss at 22; see Novell, Inc.

22  v. Microsoft, Inc., 505 F.3d 302 (4th Cir. 2007) (finding that the plaintiff, a maker of software

23  applications to be used on a PC, had standing to assert monopolization claim against the defendant:

24  "Taking Novell's allegations as true, as we must, the injury that Novell alleges here is plainly an

25  injury to *competition* that the anti-trust laws were intended to forestall.  Microsoft's activities,

26  Novell claims, were intended to and did restrain competition in the PC operating-system market by

27  keeping the barriers to entry into that market high.") (emphasis in original).  Novell, however, is

28  from another circuit, and is factually distinguishable.  Unlike here, in Novell, the court found that

20

there was no better situated party to bring the antitrust claims because Novell was "one of the few private plaintiffs whose claims . . . are neither time-barred nor too tenuous to support antitrust standing." Novell, 505 F.3d at 319.

Defendant points out that Plaintiff has not suffered any injury in the Online Market because Plaintiff's allegations of harm regarding disablement of its memory cards and the technical barriers to Plaintiff's other products occurred in the secondary Aftermarket, not in the primary market. See Ticketmaster LLC v. Designer Tickets & Tours, 2008 WL 649804 at *3-4 (C.D. Cal. Mar. 10, 2008) (finding that the defendant, who bought tickets from the plaintiff in the primary market to be sold by the defendant in the secondary market, lacked standing because it did not have an antitrust injury, as the defendant did not allege that it participated in the primary ticket distribution market); R.C. Dick v. Geothermal Corp. v. Thermogenics, 890 F.2d 139 (9th Cir. 1989) (holding that the plaintiff lacked antitrust standing where it was not a participant in the primary market for geothermal steam, even though it participated in a closely related market of land leasing for geothermal steam production, which could affect the market for geothermal steam).

Plaintiff attempts to distinguish Ticketmaster on the grounds that there, the defendant advanced inconsistent claims, and conceded that the injury was in the secondary market. Here, by contrast, Plaintiff argues that it participates in the relevant market and was injured as a necessary step in Defendant's monopolization of that market. See Pl.'s Opp. to Def.'s Mot. to Dismiss at n. 19. Specifically, Plaintiff argues that even if it is not a participant in the primary market, its injury was the "necessary step" and "means" by which the anticompetitive conduct was carried out, relying on Blue Shield of Virginia v. McCready, 457 U.S. 465, 479, 483-84 (1982). In Blue Shield, the plaintiff, a member of a group health plan, sued the insurer for antitrust damages arising from the insurer's refusal to reimburse medical expenses for psychotherapy received from psychologists rather than psychiatrists. The plaintiff alleged that the insurer entered into a conspiracy with psychiatrists to restrain competition in the psychotherapy market. The Court rejected the argument that because the conspiracy was directed against psychologists instead of subscribers to the health plan like the plaintiff, the injury to the plaintiff was too remote. The Court reasoned that denial of reimbursement to patients of psychologists was "the very means by which it is alleged that Blue

21

United States District Court
For the Northern District of California

1   Shield sought to achieve its illegal ends.  The harm to McCready . . . was a necessary step in

2   effecting the ends of the alleged illegal conspiracy" and an "integral . . . aspect of the conspiracy

3   alleged."  Blue Shield, 457 U.S. at 479, 483-84 (holding that the plaintiff was entitled to sue because

4   the defendant was charged with a "purposefully anti-competitive scheme," and the injury the

5   plaintiff suffered "was inextricably intertwined with the injury the conspirators sought to inflict on

6   psychologists and the psychotherapy market.").[1]

7       The Ninth Circuit explained the limited scope of the Blue Shield exception in Exhibitors'

8   Service.  See Exhibitors' Serv., 788 F.2d at 580; see also American Ad., 190 F.3d at 1057, n.5

9   (recognizing that the Blue Shield exception was narrow).  In Exhibitors' Service, the plaintiff, a

10  motion picture licensing agent, sued two motion picture exhibitors that had entered into a splitting

11  agreement under which they allocated films between themselves, resulting in lower cost of films for

12  both exhibitors (to the detriment of film distributors), and terminated the plaintiff's services.  The

13  court determined that the plaintiff, a film licensing agent, did not come within the Blue Shield

14  exception because the plaintiff's injury was not inextricably intertwined with the injury inflicted

15  upon film distributors.  Although the conspirators terminated the plaintiff's services, its injury was

16  not necessary for the creation or implementation of the trade-restraining scheme, whose intended

17  victim was the film distributors.  The court determined that the plaintiff's interest was not in

18

19      [1]     Plaintiff's reliance on the Ninth Circuit's interpretation of Blue Shield in Ostrofe v. H.S.
    Crocker Co., 740 F.2d 739, 745 (9th Cir. 1984) is misplaced.  In Ostrofe, the court found that the
20  plaintiff, a former employee in  the paper lithograph label industry who alleged that he had been
    discharged and boycotted because of his refusal to participate in bid rigging scheme, had standing
21  because his discharge furthered the anticompetitive scheme in the labels market even though he was not
    a consumer or a competitor in the market.  Ostrofe stated:

22          As sales manager of one of the label manufacturers, Ostrofe was an essential participant
            in the scheme to eliminate competition in the marketing of labels by fixing prices and
23          allocating customers.  It could not succeed without his active cooperation.  When Ostrofe
            sold labels to customers not allocated to his employer and at prices below those agreed
24          upon, his discharge was a necessary means to achieve the conspirators' illegal end as
            well as an integral and inextricable part of the anticompetitive scheme.
25
    Ostrofe, 740 F.2d at 746.  Ostrofe, however, is limited to cases in which a dismissed employee is an
26  essential participant in the antitrust scheme and the dismissal is the necessary means to accomplish the
    anticompetitive scheme.  See Vinci v. Waste Management, Inc., 80 F.3d 1372, 1376 (9th Cir. 1996)
27  ("The exception recognized in Ostrofe II is limited to those cases in which a dismissed employee is an
    'essential participant' in an antitrust scheme, the dismissal is a 'necessary means' to accomplish the
28  scheme, and the employee has the greatest incentive to challenge the antitrust violation.").  Those
    circumstances are not present here.

United States District Court
For the Northern District of California

enhanced competition between exhibitors, but instead was in continuing to assist the conspiring exhibitors: "At best, [the plaintiff] was neutral on the question whether trade was restrained or not." Exhibitors Service, 788 F.2d at 580; see also Chelson v. Oregonian Publishing Co., 715 F.2d 1368, 1371 (9th Cir. 1983) (reversing summary judgment where there was a triable issue of fact as to whether a group of newsdealers had antitrust standing against the defendant, which was alleged to have interfered with the dealers' attempts to reach agreement with the defendant's competitor to distribute advertising circulars in the restrained market of advertising distribution, because there was a triable issue of fact as to whether their injury was inextricably intertwined: "although the dealers were neither consumers nor competitors in the relevant market, it is clear that their interests would directly be served by enhanced competition in the market.").  Further, like the plaintiff in Exhibitors' Service, Plaintiff here would not appear to have a stake in whether Defendant monopolizes the primary market for online gaming, because Plaintiff sells accessories that only function with the Xbox 360 system; increased market share for the Xbox 360 system would result in more sales of Plaintiff's accessories, other things being equal, as long as Defendant did not block Plaintiff's products in the Aftermarket.

        The allegations in the complaint do not support Plaintiff's argument that its injury was inextricably intertwined with Defendant's anticompetitive conduct in the primary market such that it comes within the Blue Shield exception.  Plaintiff's allegations center on its injury in the secondary market, even though Plaintiff attempts to convert spillover effects in the secondary market into an injury in the primary market.  Plaintiff alleges that Defendant profited from blocking Plaintiff's accessories, and that the extension of Defendant's proprietary interests in the secondary market served to "reinforce" Defendant's power in the Online Market.  Compl. ¶ 62.  Plaintiff alleges that by using this power, Defendant curbed competition in the Aftermarket and thereby erected substantial barriers to potential entrants to the primary Online Market.  Compl. ¶ 63.  These allegations are not sufficient to come within the narrow Blue Shield exception.  Further, it is questionable whether Plaintiff could allege in good faith that it was necessary for Defendant to exclude Plaintiff's unauthorized accessories from the Aftermarket in order to gain a monopoly in the Online Market, in light of other allegations in the complaint.  Specifically, Plaintiff alleges that there

United States District Court
For the Northern District of California

1  are other barriers to the Online Market, such as cost, other established libraries of games, and the

2  massive resources available to Defendant.  Compl. ¶ 45.  Further, Plaintiff introduced its memory

3  cards in May 2009, but alleges that Defendant dominated the market since 2006 (Compl. ¶ 13).

4  Thus, it does not appear that blocking Plaintiff's products in October 2009 (Compl. ¶ 20) was a

5  necessary step in Defendant's alleged market dominance, which is alleged to have started much

6  earlier.  Rather, Plaintiff alleges that Defendant possessed substantial power in the Online Market

7  and then "deployed" that power to control subsidiary markets.  Compl. ¶ 62.  Therefore, Plaintiff has

8  not adequately pled the narrow  Blue Shield  exception.

9        Accordingly, Defendant's motion to dismiss Plaintiff's second claim is granted for lack of

10  standing.  Plaintiff has stated that if the Court determined that Plaintiff lacked standing, Plaintiff

11  would seek to amend the complaint to allege a combined market consisting of the Online Market and

12  the Aftermarket in the alternative.  It is possible that if Plaintiff does so, it will undermine its other

13  claims, but that is a choice for Plaintiff to make.  The Court grants Plaintiff leave to amend the

14  complaint no later than May 14, 2010.

15  **3.        Third claim for violation of Sherman Act based on tying**

16        Plaintiff alleges that Defendant illegally "ties the sale of the Xbox 360 console to a separate

17  product or products, namely accessories and add-ons to sales of a separate product, including

18  memory cards."  Compl. ¶ 74.  Plaintiff alleges that by using a technological tie, such as the

19  dashboard update, Defendant sells the Xbox 360 console only on the condition that consumers

20  purchase memory cards solely from Defendant.  Id.

21        "A tying arrangement is 'an agreement by a party to sell one product but only on the

22  condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not

23  purchase that product from any other supplier.'"  Kodak, 504 U.S. at 461 (internal citation omitted).

24  "Not all tying arrangements are illegal.  Rather, ties are prohibited where a seller 'exploits,'

25  'controls,' 'forces,' or 'coerces' a buyer of a tying product into purchasing a tied product."  Rick-

26  Mik Enters., Inc. v. Equilon Enters., LLC, 532 F.3d 963, 972 (9th Cir. 2008).  "The essential

27  characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the

28  tying product to force the buyer into the purchase of a tied product that the buyer either did not want

United States District Court
For the Northern District of California

1    at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is

2    present, competition on the merits in the market for the tied item is restrained and the Sherman Act

3    is violated." <u>Jefferson Parish Hosp. Dist. No. 2 v. Hyde</u>, 466 U.S. 2, 12 (1984).  An essential element

4    of a tying claim is market power in the tying product -- the tying market.  <u>See Rick-Mik</u>, 532 F.3d at

5    972; <u>see also</u> <u>Illinois Tool Works Inc. v. Independent Ink, Inc.</u>, 547 U.S. 28, 36, 43 (2006) (tying

6    arrangements no longer viewed an inherently anticompetitive, but holding that tying "must be

7    supported by proof of power in the relevant market rather than by a presumption thereof.").  Failure

8    to allege power in the relevant market is a sufficient ground to dismiss an antitrust complaint.  <u>See</u>

9    <u>Rick-Mik</u>, 532 F.3d at 972.  Further, a tying claim generally requires that the defendant's economic

10   power be derived from the market, not from a voluntary contractual relationship.  <u>See Rick-Mik</u>, 532

11   F.3d at 973 ("While the allegation of a contractual relationship does not necessarily doom a tying

12   claim at the pleading stage, it also does not remedy a complaint's failure to properly plead market

13   power.").

14        Defendant argues that Plaintiff's tying claim fails because Plaintiff has failed to plead a

15   viable primary market and aftermarket.  In order to state a claim under the Sherman Act, Plaintiff

16   must allege that Defendant has market power in a "relevant market."  <u>Newcal</u>, 513 F.3d at 1044-45

17   ("An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the

18   face of the complaint that the alleged market suffers a fatal legal defect. And since the validity of the

19   'relevant market' is typically a factual element rather than a legal element, alleged markets may

20   survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial.").  A

21   relevant market must be a product market, and must encompass the product at issue as well as all

22   reasonable substitutes for the product.  <u>Newcal</u>, 513 F.3d at 1045 (citing <u>Brown Shoe v. United</u>

23   <u>States</u>, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the

24   reasonable interchangeability of use or the cross-elasticity of demand between the product itself and

25   substitutes for it.").  A relevant market can be based on a submarket, which must be economically

26   distinct from the general product market.  <u>Id.</u> (citing <u>Brown Shoe</u>).

27        In <u>Newcal</u>, the Ninth Circuit reversed the district court's decision that the plaintiff failed to

28   plead legally cognizable relevant markets for: "replacement copier equipment for IKON and GE

United States District Court
For the Northern District of California

customers with Flexed IKON contracts," and "copier service for IKON and GE customers with Flexed IKON contracts." The court noted that three principles emerged from the leading cases: (1) "the law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue;" (2) "the law prohibits a claimant from resting on market power that arises solely from contractual rights that consumers knowingly and voluntarily give to the defendant;" and (3) "in determining whether the defendant's market power falls within the . . . category of contractually-based market power or in  the . . . category of economic market power, the law permits an inquiry into whether a consumer's selection of a particular brand in the competitive market is the functional equivalent of a contractual commitment, giving that brand an agreed-upon right to monopolize its consumers in an aftermarket." Id. at 1048-49; cf., e.g., Apani Southwest v. Coa-Cola Enterprises, 300 F.3d 620 (5th Cir. 2002) (failure to allege a relevant geographical market, stating that an antitrust claim should be dismissed when market definition does not encompass all interchangeable substitutes even when all factual inferences are made in the plaintiff's favor); Tanaka v. Univ. of S. Cal., 252 F.3d 1059 (9th Cir. 2001) (failure to state a claim based on market of one university's athletic program for one sport); Hack v. President and Fellows of Yale College, 237 F.3d 81 (2d Cir. 2000) (failure to state a claim of relevant market because the market was actually a contractually-created class of consumers); Star Tobacco v. Darilek, 298 F. Supp 2d 436 (E.D. Tex. 2003) (failure to state a claim based on discount cigarettes market because of the high elasticity between discount and name-brand cigarettes).

Defendant first argues that Plaintiff has not adequately pled power in the tying market, here, the Online Market, because Plaintiff's allegation of a primary market limited to Multiplayer Online Dedicated Gaming Systems is impermissibly narrow. See, e.g., Rick-Mik Enters., Inc. v. Equilon Enters., LLC, 532 F.3d 963, 972 (9th Cir. 2008) (stating that: "If Equilon lacks market power in the gasoline-franchise market, there can be no cognizable tying claim," because Equilon would have no power to force, exploit or coerce a franchisee to purchase the tied product, credit-card processing services). Specifically, Defendant argues that the exclusion of other gaming systems such as the Wii, Playstation 2, handheld devices and personal computers, makes the Online Market legally untenable.

26

1    Defendant argues that the market must contain the product at issue and all economic

2    substitutes, which can be determined by the reasonable interchangeability of use or the cross-

3    elasticity of demand between the product and substitutes for it.  <u>Newcal</u>, 513 F.3d at 1045.

4    Reasonable interchangeability means all products which could be used for the same general purpose,

5    despite functional or price differences among them.  <u>United States v. E.I. du Pont Nemours & Co.</u>,

6    351 U.S. 377, 396 (1956).  Defendant argues that the only reasons for excluding the Wii, Playstation

7    2 and personal computers from the relevant market are price and quality, which are not proper bases

8    for their exclusion, and therefore, the market definition fails.  <u>See</u> <u>In re Super Premium Ice Cream</u>

9    <u>Distribution Antitrust Litig.</u>, 691 F.Supp. 1262, 1268 (N.D. Cal. 1988) ("Courts have repeatedly

10   rejected efforts to define markets by price variances or product quality variances.  Such distinctions

11   are economically meaningless where the differences are actually a *spectrum* of price and quality

12   differences.") (emphasis in original); <u>Psystar</u>, 586 F. Supp. 2d at 1199 ("The mere existence of a

13   price differential, however, does not necessarily mean that a product is unconstrained by competition

14   . . . .").

15   Plaintiff responds that the market is not defined solely by price and quality.  Instead, Plaintiff

16   points to the allegations that other products, such as the Wii and personal computers, have a distinct

17   core functionality (Compl. ¶ 38), distinct perceptions by consumers (Compl. ¶¶ 38, 39), distinct

18   customer targeting by manufacturers (Compl. ¶ 38), distinct analyses by industry analysts (Compl. ¶

19   39), and distinct pricing and pricing patterns (Compl. ¶ 39).  At least some of these allegations do

20   not relate to price and quality, and therefore, are appropriate differentiations at the pleading stage to

21   demonstrate that there is no reasonable interchangeability between the Xbox 360 and the Playstation

22   3 on the one hand, and the Wii, Playstation 2 and personal computers on the other hand.  Further,

23   Plaintiff alleges that Defendant itself "has measured the success of the Xbox 360 against the

24   Playstation 3, to the exclusion of other products or platforms."  Compl. ¶ 40.  Finally, the question of

25   whether the market should include other products is better resolved at the summary judgment stage,

26   rather than on a motion to dismiss.  <u>See</u> Pl.'s Opp. at 18, n.15; <u>Image Tech. Servs. v. Eastman</u>

27   <u>Kodak</u>, 125 F.3d 1195, 1203 (9th Cir. 1997) ("Ultimately what constitutes a relevant market is a

28   factual determination for the jury."); <u>Twin City Sportservice c. Charles O'Finley & Co</u>, 676 F.2d

United States District Court
For the Northern District of California

1291, 1299 (9th Cir. 1982) ("The definition of the relevant market is basically a fact question

dependent upon the special characteristics of the industry involved . . . ."); Thurman Indus., Inc. v.

Pay 'n Pak Stores, Inc., 875 F.2d 1369 (9th Cir. 1989) (stating that "For antitrust purposes, defining

the product market involves identification of the field of competition: the group or groups of sellers

or producers who have actual or potential ability to deprive each other of significant levels of

business. . . . This definitional process is a factual inquiry for the jury . . . .").

Viewing the allegations in the light most favorable to Plaintiff, the Court concludes that

Plaintiff has not improperly ignored products that may be reasonably interchangeable ones, but

instead has included two products in the alleged market and alleged differences regarding others that

plausibly exclude them from the relevant market.  See Newcal, 513 F.3d at 1045 (stating that there is

no requirement to plead with specificity the existence of market power in a relevant market); see

also Jamsports & Entm't, LLC v. Paradama Prods., Inc., 2003 WL 1873563, at *6 (N.D. Ill. Apr. 15,

2003) ("Market definition, however, involves a deeply fact-intensive inquiry, . . . and for this reason

a court must be hesitant to grant a motion to dismiss for failure to plead a relevant market.")

(internal citations omitted).  Moreover, as Plaintiff notes, the market power requirement for a tying

claim appears to be more lenient than for a monopolization claim:

> . . . the law of both tying and exclusive dealing was intended to apply to firms falling short of the § 2 market share requirements for monopolization.  Indeed, only recently have the courts put real teeth into the market power requirements for exclusive dealing and tying, and even today the minimum market share hovers in the range of 30-40%, which is roughly half of the amount needed for a § 2 violation.

Hoverkamp, Federal Antitrust Law, § 7.6c.

Here, Plaintiff alleges that Defendant's share of the Online Market was approximately 66%

as of July 2009.  Compl. ¶ 44.  Further, Plaintiff alleges that "in June 2009, the Xbox 360 outsold the

Playstation 3 by approximately 1.5 to 1, indicating that Defendant's market dominance is continuing

and stable."  Compl. ¶ 44.  Plaintiff also alleges that Defendant controls over 50% of both markets,

and has virtually complete control in the Aftermarket.  Compl. ¶ 73.  Defendant allegedly ties the

sale of Xbox 360 consoles to accessory products, including memory cards, by implementing the

dashboard update that conditioned use of the Xbox 360 system on purchasing memory cards solely

from Defendant.  Compl. ¶ 74.  Plaintiff alleges that the tying arrangement harms competition in the

United States District Court
For the Northern District of California

1    Aftermarket in many ways, including by "decreasing competitors' ability to compete in the

2    aftermarket;" "increasing the barriers to entry in the aftermarket;" "increasing the barriers to entry

3    on the market for Multiplayer Online Dedicated Gaming Systems;" "facilitating price discrimination

4    in the markets for Multiplayer Online Dedicated Gaming Systems and the Aftermarket for Xbox 360

5    Accessories and Add-ons by permitting Microsoft to extract a higher, supra-competitive price from

6    certain users;" "exploiting locked-in customers who are deprived of the benefits of competition in

7    the aftermarket;" and "forcing consumers, who would otherwise prefer third-party accessories and

8    add-ons for the Xbox 360, including the DMMCs and other Datel accessories, to nonetheless use

9    Microsoft's accessories and add-ons." Compl. ¶ 76. Plaintiff alleges that there are no

10   procompetitive benefits derived from Defendant's conduct. Compl. ¶ 77. Further, Plaintiff alleges

11   that the tying arrangement reinforces Defendant's market power and improperly prevents

12   competition. Compl. ¶ 78. In addition, Plaintiff alleges that the tying arrangement affects a

13   substantial volume of interstate commerce. Compl. ¶ 75. Accordingly, to the extent that there is a

14   lower threshold to support the market power requirement for purposes of a tying claim, Plaintiff has

15   met that threshold.

16        Plaintiff also argues that it has alleged a per se tying claim (Compl. ¶ 76), that affects a

17   substantial volume of commerce (Compl. ¶¶ 73, 75), and therefore, it is not necessary to rigorously

18   define a market for the product. See Fortner Enters. v. United States Steel Corp., 394 U.S. 495, 501

19   (1969) (stating that "the controlling consideration is simply whether a total amount of business,

20   substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to

21   competitors by the tie, for as we said in International Salt, it is 'unreasonable, per se, to foreclose

22   competitors from any substantial market' by a tying arrangement."); Kodak, 504 U.S. at 464 (finding

23   that there was a triable issue of fact as to the claim of market power where there was evidence that,

24   among other things, certain parts were available exclusively from Kodak, Kodak had control over

25   the availability of parts it did not manufacture, Kodak had prohibited independent manufacturers

26   from selling Kodak parts, and Kodak taken steps to restrict the availability of used machines);

27   Phillip Areeda & Herbert Hovencamp, Antitrust Law, § 1721 (2d ed. 2004) (stating that tying is

28   unlawful under a special per se rule that requires both power over the tying product and coverage of

United States District Court
For the Northern District of California

1  a "not insubstantial" volume of commerce in the tied product, and the volume of commerce is the

2  dollar value of tied sales rather than the share of any defined market.).  Further, in Jefferson Parish,

3  the Court determined that "per se condemnation -- condemnation without inquiry into actual market

4  conditions -- is only appropriate if the existence of forcing is probable." Id. at 15.  Specifically, the

5  application of the per se rule "focuses on the probability of anticompetitive consequences.  Of

6  course, as a threshold matter there must be a substantial potential for impact on competition in order

7  to justify per se condemnation. . . . It is for this reason that we have refused to condemn tying

8  arrangements unless a substantial volume of commerce if foreclosed thereby. . . . Once this threshold

9  is surmounted, per se prohibition is appropriate if anticompetitive forcing is likely." Id. at 16.

10  Viewing the allegations in the light most favorable to Plaintiff, Plaintiff has adequately pled

11  a per se tying claim.  For all of the reasons stated above, Defendant's motion to dismiss Plaintiff's

12  tying claim based on the viability of the primary market is denied.

13  Defendant also seeks dismissal of the tying claim on the ground that there is no legally

14  plausible definition of the tied product because the Aftermarket claim is legally improper.  See

15  Jefferson Parish Hosp., 466 U.S. at 20-21 (tying arrangement requires two separate product markets

16  that have been linked).  However, as set forth above, Plaintiff's Aftermarket claim is adequately

17  pled.

18  **4.      Fourth and Fifth claims for unfair competition**

19  Defendant argues that these claims fail because the antitrust claims fail.  See Formula One

20  Licensing v. Purple Interactive, 2001 WL 34792530, at *4 (N.D. Cal. Feb. 6, 2001) (" Where a

21  plaintiff fails to state an antitrust claim, and where an unfair competition claim is based upon the

22  same allegations, such state claims are properly dismissed.").  Because at least one of Plaintiff's

23  Sherman Act claims survive dismissal, Plaintiff's unfair competition claims also survive.

24  **Conclusion**

25  Defendant's motion to dismiss is granted in part with leave to amend and denied in part.  A

26  further case management conference is set for June 2, 2010 at 10:00 a.m.  As discussed at the motion

27  hearing, the parties shall meet and confer and file a joint case management conference statement on

28  later than May 25, 2010 with proposed agreed pretrial and trial dates.

30

**IT IS SO ORDERED.**

Dated: April 23, 2010

_Elizabeth D. Laporte_
ELIZABETH D. LAPORTE
United States Magistrate Judge