Pages 1 – 74

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ELIZABETH D. LAPORTE, MAGISTRATE

```
DATEL HOLDINGS LTD., and DATEL        )
DESIGN & DEVELOPMENT, INC.,           )
                                      )
            Plaintiffs,               )
                                      )
  vs.                                 )   NO. C 09-05535 EDL
                                      )
MICROSOFT CORPORATION,                )
                                      )   San Francisco, California
            Defendant.                )   Friday
                                      )   August 27, 2010
_____)   1:39 p.m.
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**        Howard Rice Nemerovski Canady
         Falk & Rabkin
        Three Embarcadero Center, 7th Floor
        San Francisco, CA  94111-4024
        (415) 434-1600
        (415) 217-5910 (fax)
     **BY:  DANIEL B. ASIMOW**
          **MARTIN R. GLICK**

**For Defendant:**      Munger, Tolles & Olson
        560 Mission Street, 27th Floor
        San Francisco, CA  94105-2907
        (415) 512-4009
        (415) 644-6909 (fax)
     **BY:  GREGORY P. STONE**
          **HOJOON HWANG**
          **ROHIT K. SINGLA**

**Reported By:**    **Lydia Zinn, CSR #9223, RPR**
            **Official Reporter – U.S. District Court**

 1              **THE CLERK:**  Calling Civil 09-5535, Datel Holdings,

 2  Limited, *et al.*, versus Microsoft Corporation.

 3              Counsel, please state your appearances for the

 4  record.

 5              **MR. ASIMOW:**  Daniel Asimow, for Datel.

 6              **MR. GLICK:**  And Marty Glick, also for Datel,

 7  your Honor.

 8              **THE COURT:**  Good afternoon.

 9              **MR. STONE:**  Good afternoon, your Honor.

10  Gregory Stone, along with Hojoon Hwang and Rohit Singla, on

11  behalf of Microsoft.

12              **THE COURT:**  Good afternoon.

13              All right.  I think we need to start with the motion

14  to bifurcate, since that will have a lot of impact on the

15  schedule and other case-management issues.  So it's your

16  motion.

17              **MR. STONE:**  Thank you, your Honor.

18              I think the critical question ultimately to ask

19  ourselves is whether the bifurcation that we have proposed will

20  bring about efficiency in the way in which the case is handled,

21  both in terms of conserving the Court's resources and in

22  conserving the parties' resources.

23              I think to do that, we need to look at if we

24  bifurcate the DMCA claim, what happens, in terms of discovery

25  and what happens in terms of issue resolution.

1          In terms of discovery, we have suggested that, at a

2    minimum -- at a maximum, five depositions are needed.  And

3    Datel has not opposed that.  They've not come forward and said,

4    "No.  We need to take a lot of other people," or any objection,

5    except to say, "Well, we think as to those five depositions, we

6    may want to ask them about antitrust-related issues at the same

7    time."And I think that's an issue we would deal with on an

8    individual-deposition-by-individual-deposition basis.

9          In other words, if it's somebody who -- it's

10   convenient to be deposed a second time, and no undue hardship,

11   it probably makes sense for efficiency to simply defer the

12   antitrust issues that they would ask about until a later

13   deposition, if one was necessary.

14         If there's somebody who, because of their particular

15   circumstances, they should only be deposed once, because of

16   travel or employment plans or a personal situation, then I

17   think that's one where the parties, without any need for the

18   Court to intervene, would undoubtedly be able to resolve the

19   scope of the questioning in there.

20         So it's clear that the scope of the discovery would

21   be much less on the DMCA claim.

22         So the second issue becomes, then:  Well, what

23   happens with the resolution of it?

24         Well, if the DMCA claim is one that is resolved in

25   favor of Microsoft, the whole structure of the case -- the

1  whole nature of the claims changes, because, first of all, the

2  claims about the memory units go away.  And that is the only

3  claim that Datel made any note of in their original complaint.

4          They have since tried to add some other devices, and

5  I'll touch on those for a moment, but the key aspect of the

6  case -- and you'll know this from the earliest conferences with

7  your Honor, as well as from the complaint -- was all about the

8  memory units.

9          If the memory units are an attempt to defeat

10  appropriate security provisions that are consistent with the

11  DMCA or are themselves a violation of the DMCA without regard

12  to any security issues at all, then the memory units cannot

13  give rise to an antitrust claim, because, just like if it's a

14  product that infringes a patent, just like if it's a contract

15  that would be violative of the law or would require

16  authorization by a government agency, here, they can't show any

17  injury.  They thus can't show antitrust injury, and they

18  wouldn't have a claim, so that memory units claim would be gone

19  if the DMCA provisions apply to the memory units.

20          **THE COURT:**  Now, I have looked at this in more detail

21  a number of days ago, and have been -- had a pretty hectic day,

22  so I haven't been able to go back and refresh myself, but it

23  seemed to me there was somewhat of a -- I guess you're not

24  supposed to say a "split" in the Ninth Circuit authority, but

25  arguably some inconsistent Ninth Circuit cases, in which -- I

1  know you put forward some cases that Judge Patel has decided,

2  but in which -- I think in a later case, she acknowledged there

3  was some inconsistency, but she didn't think she needed to

4  resolve it under those circumstances.  So that particular

5  issue, although it may be a legal issue, is a somewhat tricky

6  one, it struck me.

7          **MR. STONE:**  You know, I think Datel's counsel has

8  done a remarkable job in trying to make it into a tricky issue

9  that is not --

10          **THE COURT:**  Make sure you explain that to your

11  client.  Right?

12          **MR. STONE:**  So the client's here.  So I say that I

13  give them all of the compliments they can for their success in

14  that regard.

15          **THE COURT:**  All right.

16          **MR. STONE:**  But the *First Beverages* case -- Ninth

17  Circuit case following *Memorex* that we cite in our reply papers

18  clarified the scope of the *Memorex* decision, which is really

19  the case that Datel relies on to say, We're not going to allow

20  an *in pari delicto* or an unclean-hands defense to antitrust

21  claims, but it clearly said if you can show that the very act

22  you claim you would have engaged in but for the wrongful

23  conduct -- if the defendant can show that that act was itself

24  illegal, unauthorized, couldn't have happened for other

25  reasons, then you can't show antitrust injury.

1          And we see it today in a lot of patent cases.

2          And the *Hybritech* case that we cited, the *Abbott* case

3   in our papers from the Federal Circuit made it quite clear that

4   if you want to sell a product, and you claim you were prevented

5   from selling the product by improper conduct that rose to the

6   level of an antitrust violation, and if the company that sued

7   for supposedly having improperly kept you out of the market is

8   able to say you wouldn't have been able to come into the market

9   anyway because your product infringes our patents, then that

10  patent-infringement case is a defense to the antitrust case.

11         And many judges -- Judge White, for example, in a

12  case I have involving Rambus, as well as many other judges --

13  routinely bifurcate those cases and try the --

14      **THE COURT:**  Well, I'm aware of that, you know:  The

15  bifurcation in the patent situation.

16         I don't think that that's necessarily the reason that

17  those cases tend to be bifurcated, or that it necessarily is a

18  similar situation.  And it just --

19      **MR. STONE:**  Well, I --

20      **THE COURT:**  And I'm wondering, too.  I mean, there is

21  inherently -- and maybe none of the cases discuss this, but

22  inherently, of course, a patent is a grant of a monopoly,

23  essentially.  So it's a very fundamental relationship between

24  those two laws.  It is mutually exclusive, in a way.

25         I mean, either you have a patent, and you -- there

1    are a lot of monopolistic things you can do within the scope of

2    that patent.

3         MR. STONE:  Right.  And that's one of the reasons --

4    to address that concern -- that we cited both the *First*

5    *Beverages* case, and the *Modesto Irrigation* case, because in

6    those cases, there was no monopoly-right involved.

7         THE COURT:  Right.

8         MR. STONE:  No patent-right involved.  It was a

9    question of the government regulation that was required, or

10   approval that was necessary in order to allow something to

11   happen.

12        THE COURT:  Mm-hm.

13        MR. STONE:  So if there's a --

14        THE COURT:  I guess the electricity cases, in a way,

15   is a government monopoly, though, isn't it?

16        MR. STONE:  Electricity cases -- you know, I don't

17   know if you would you could think of it as a monopoly.  I don't

18   think it's so much that, as a requirement that there be

19   approval of a governmental body or some other entity, where you

20   have to get over one more hurdle, a superseding or intervening

21   cause.  You couldn't show but for injury, if there was an

22   impossibility defense.

23        It's fine for you to say that the -- it would be fine

24   for me to argue that the NBA's rules are restrictive and

25   constitute an antitrust violation that kept me from going into

1   the NBA, but the other side might successfully argue that,

2   well, there's other reasons why you would never be able to

3   prove your case, and we should dispose of the case on those

4   grounds.

5              THE COURT:  A higher and better use for you.

6              MR. STONE:  Or at least different.

7              But here we have -- here we have a case in which it

8   would have been impossible for them to lawfully have brought

9   the memory unit on to the product, if we're correct that the

10  memory unit was a violation of the DMCA.  So whether you think

11  of it as an intervening or a superseding cause or you think of

12  it as impossibility, in any event, it would be an argument

13  that, if we're successful, would mean they could not have

14  incurred antitrust injury.  They couldn't be awarded damages.

15  And, at the end of the day, they were not permitted to have

16  sold the product, in any event.

17             THE COURT:  Mm-hm.

18             MR. STONE:  An example that has come up in a couple

19  of cases that we didn't cite involve instances where the

20  product itself, for example, would be in violation of the

21  export or import regulations, so you couldn't lawfully bring

22  the product into the country or ship it out of the country.

23             THE COURT:  Mm-hm.

24             MR. STONE:  So if we're right about that, the case

25  really becomes reconfigured when the memory units drop out,

1   because then we have a case in which their only claim now is --

2   well, what they say is, "We were delayed about two months in

3   coming out with our controller products, which were not on the

4   market when the update -- the Dashboard update went into

5   effect."  We were not delayed in introducing those products.

6   And so they now have a claim for damages that they may or may

7   not be able to prove and get over summary judgment as to

8   damages for those other products, but the memory units are out

9   of the case.  So the scope of the discovery and the scope of

10  the issues is much narrower.

11          And their second argument is gone.  Their second

12  argument is:  Well, retailers heard that our memory units were

13  something we were not permitted to sell, and that an update --

14  a Dashboard security update by Microsoft made it so that users

15  of those products couldn't continue to use them.

16          Well, that would have been an entirely appropriate

17  conduct; that they couldn't sell those products.  Those

18  products couldn't be used by consumers because of the DMCA, so

19  there's not longer -- any longer a proximate-cause nexus

20  between those events and their antitrust injury claims.

21          And what they come down to is a claim that a two

22  months' delay of them -- two months it took them to reëngineer

23  their product and break the next level of security that

24  Microsoft introduced -- that those two months somehow give rise

25  to an antitrust claim.

1          I really question -- and I think discovery, which

2     we'll -- I know we'll talk about later -- discovery will show

3     that they don't have a legitimate claim at all for the two

4     months' delay, but even if they did -- and for purposes of the

5     bifurcation motion, I think we need to assume that they

6     would -- the case takes on an entirely different scope.

7          The trial is much shorter.  The amount of discovery

8     to be taken is much less.  The use of the Court's resources is

9     reduced.  And the parties' resources are much better conserved

10    than they would be otherwise, so efficiency is really served by

11    bifurcation.  And the ultimate resolution of the case is not

12    going to be delayed.

13         **THE COURT:**  Well, now, that's where, see, on the

14    other hand, if I bifurcate -- and this is really, I think, one

15    of the most important issues in my mind -- and for whatever

16    reason, the result was there was not a dramatic change in the

17    posture of the case, and the memory cards stayed in, then we

18    would just get going on the antitrust, and so there would have

19    been a delay.

20         **MR. STONE:**  You know, and that's --

21         **THE COURT:**  And that's what, you know, Courts really

22    don't like:  When you look up, and you now have this old case

23    that's been sitting around.  And what you thought was going to

24    be a good idea at the time turns out, in fact, to have delayed

25    everything.

1              MR. STONE:  Right.  And I understand that concern.

2    And let me --

3              THE COURT:  Mm-hm.

4              MR. STONE:  -- without necessarily having to cross

5    over a bit into the CMC discussion, let me cross over for just

6    a moment and talk about that.  I think there is a real question

7    as to whether there would be any significant delay, or maybe

8    any delay at all if you bifurcated, even if the DMCA claim was

9    resolved against Microsoft.  And here's why.

10             The schedule of a trial next June that is proposed by

11   Datel for all of the issues together --

12             THE COURT:  Mm-hm.

13             MR. STONE:  -- is not workable in the least.  And let

14   me just give you two reasons why not.  It's not workable

15   because they have not produced any document yet.

16             THE COURT:  Mm-hm.

17             MR. STONE:  They told us months ago they were ready.

18   They told your Honor the last time we were here they were days

19   away, but they haven't produced anything.

20             They have given us now the right to use their

21   production from the ITC --

22             THE COURT:  Mm-hm.

23             MR. STONE:  -- in this case.  And they've given us a

24   few financial documents, but on the core allegation of their

25   complaint -- the memory unit, which is not involved in the ITC

1  at all -- we have no documents whatsoever.

2          So their proposal that we would complete depositions

3  four months from today, and that we would complete, by their

4  count, between 80 and 100 depositions in four months -- well,

5  there's only, by my rough counting, 80 deposition days

6  between -- in four months, roughly 20 deposition days a month,

7  so there's 80 deposition days.

8          THE COURT:  I think it has been known to have double-

9  and triple-, et cetera, tracking.

10          MR. STONE:  It has been.

11          THE COURT:  But yes, I see.  And, by the way, so I

12  think each sides' proposals on the number of depositions was

13  per side, right?

14          MR. STONE:  Per side.  So there are 280 hours, if you

15  go seven hours with each one.  It's 40 depositions per side.

16          THE COURT:  Right, right.

17          MR. STONE:  So I just think if we step back and say,

18  "Okay.  So if the discovery is anything like what they propose,

19  how long will it take us to get to trial in the total case,"

20  and you look at a date, that, I think, looks much like the date

21  we proposed in ours, in any event, which is going to push it

22  out until sometime in 2012.  And I don't think it's viable to

23  think of the entirety of this case with all of the issues in it

24  being tried any time next year.

25          So I think if you accept that proposition -- a much

1  more reasonable schedule for the trial of all of the issues --

2  then you're asking yourself, "Well, why can't we get ready on

3  all of issues by doing one set of issues first, taking that

4  schedule, if need be, deposing those people on all issues, if

5  for some reason, they should be, deciding that issue promptly,

6  and then moving on to what other issues remain?"

7          I think you'll find that the parties will be much

8  more efficient in their discovery.  The likelihood of discovery

9  disputes brought to the Court will be reduced.  And I don't --

10         **THE COURT:**  You're playing on a vulnerable point.

11         **MR. STONE:**  And I don't mean to be doing that, so

12  even if you were to assign this out to somebody else for

13  that --

14         **THE COURT:**  I won't inflict that on anybody.

15         **MR. STONE:**  -- it would be true, but I still think

16  the trial date is not going to move that much, especially, you

17  know, we have to -- I know you will consider trial conflicts

18  that counsel have, which is also going to be an issue here.

19  And when we take all of that into account, I think we look at a

20  trial of the antitrust issues in 2012, regardless of whether we

21  get there everything full-speed ahead, or let's do this in a

22  phased way.

23         **THE COURT:**  Well, let me -- just skipping around a

24  little bit --

25         **MR. STONE:**  Mm-hm.

1          **THE COURT:**  I mean, now this is -- I noticed -- and

2     I'll be asking, of course, the same question of the other

3     side -- on sort of a very fundamental question on the DMCA,

4     there were no cases cited by the other side on this point that

5     I recall, but -- and, of course, this is not the time for me

6     deciding anything on the merits, but I do have to take a sort

7     of initial peek at them, to get some sense of just how likely

8     this is.

9          I mean, if it appears to me -- I would bifurcate

10    almost certainly if I thought it was absolutely clear-cut,

11    slam-dunk, you know, the kind of thing we hardly -- that hardly

12    needs saying.  And once in a while those kinds of defenses come

13    along.

14         This one strikes me as more complicated.

15         That doesn't mean you wouldn't necessarily prevail,

16    but on the most fundamental level, the one that's raised is:

17    Was this product -- and let's take the memory units -- directed

18    specifically at getting around an encryption type of protection

19    or, you know, a layer of protection, or was its main purpose

20    storage, but in order to preserve that purpose, by the way, you

21    had to do some reverse engineering --

22         **MR. STONE:**  Right.

23         **THE COURT:**  -- and a work-around?

24         And I was surprised to see no real citations on that

25    point, but it seemed -- and I -- again, I didn't do any

1   research on it or try to delve into it myself or read the

2   legislative history or anything else, all of which might be

3   very germane when we get to that question, because we'll get to

4   it whether we bifurcate or not, but it struck me as very

5   fundamental.

6           **MR. STONE:**  I think there's an answer that sort of

7   cuts through all of that, which is:  We can look to the

8   statements which are in our counterclaim.  We quote at some

9   length statements that Datel makes in marketing these products.

10  And their own statements about the use of the products cuts

11  through any legal issue that Datel tried to throw up, because

12  they make it clear.  And it begins at paragraph 39 of our

13  counterclaim, really, where they talk about, in their own

14  marketing statements, that you can make use of suitable game

15  saves and content downloaded from the Internet.  That's one of

16  the key sets of statements.  That's paragraph 42 of our

17  counterclaim.

18          And then they say the same thing, if I can put my

19  finger on it.  They say, "It's a way to enhance your games in

20  ways that Microsoft never intended."

21          So their own statements, more of which are quoted in

22  our counterclaim, make clear that the purpose of the way in

23  which they change the file structure, defeat the hashing,

24  defeat the other security measures, is intended to allow

25  somebody -- and the fact that they have, in theirs, an SD card

1  in the memory, which is easily removable and placed into the

2  computer to allow you to take the game off of your Xbox 360,

3  put it into your computer, and now download from the Datel site

4  the things that Microsoft never intended you to be able to do:

5  The game saves.  They tell you how to save them as if you were

6  the player, and then to reload them on your Xbox 360, so you

7  get the benefit of what they described on their website as some

8  of the best cheats in the business.  So, you now --

9           **THE COURT:**  Well, I guess in -- you know, in some

10  ways, it's almost a philosophical question.  I mean, what's the

11  real function?  What's the purpose, et cetera?

12           But -- but looking -- you know, you think of the very

13  sort of simple -- I think it's a DMCA kind of thing -- would

14  be:  You have a device that you -- and maybe it's not the DMCA,

15  but its sole purpose is to let you hook up two other devices

16  together.  And all it does is get you around the barrier.

17           So, I mean, you have -- I don't know -- something

18  that unscrambles the TV signals, you know, that are being sent

19  for pay-per-view only.  And it's just a pure, cheap device.  I

20  mean, its only intent -- now, that would be a very clear-cut

21  case.  And this would be something that has -- you know, has

22  that element, according to what you're saying.

23           **MR. STONE:**  Correct.

24           **THE COURT:**  And I think it's really not in dispute,

25  but it also has -- does other things, too.

1              **MR. STONE:**  I understand the Court's question,

2     perhaps, a little bit better than I did earlier.

3              **THE COURT:**  Maybe because it's misguided.

4              **MR. STONE:**  This is addressed by the *RealNetworks*

5     decision at <u>641 F. Supp. 2d. at 939</u>, and by the language of the

6     statute itself, because the statute itself has the -- and this

7     is 17 USC 1201 (a)(2)(C) and (b)(1)(C) -- provides that the

8     products are prohibited if they are marketed for use in

9     circumventing a technological measure and without any proof of

10    primary purpose.

11             So it's simply -- the test is not what was the

12    primary purpose or the sole purpose.  It's simply:  Can they be

13    used to circumvent?

14             So I think Congress, in its wisdom, understood the

15    trouble it would create if it said, "You have to show that this

16    is the only purpose for which the device could be used,"

17    because obviously, you could always tack on another purpose, so

18    you would have created a loophole through which the entire

19    statute could be gutted.

20             So I think the statutory language as well as

21    Judge Patel's decision make it clear that it's just if it can

22    be used that way.  You just look at whether it is capable of

23    that use, and you don't worry about whether it may be capable

24    of other uses.

25             A classic case, if we go back in time, would be the

1   early video recorders, and whether the -- whether that allowed

2   you -- one thing you could do was simply time shift your

3   watching of a show, but you also could do something which was a

4   violation.  And this, to some extent, predates the DMCA, but

5   was obviously one of the sources of concern that led to the

6   DMCA:  If you could do other things as well as one legitimate

7   thing.  That was what the courts were trying prevent and reach

8   out to.  And I think that's what the DMCA was specifically

9   intended to address.

10         **THE COURT:**  Okay.

11         **MR. STONE:**  So I think that's -- those are the

12   principal issue, is one of efficiency.  And I think in this

13   instance, there will be substantial efficiency benefits for

14   everybody if we phase the case or stage both discovery and

15   motions in connection with the DMCA claim.

16         **THE COURT:**  All right.  Thank you.

17         **MR. STONE:**  Thank you.

18         **THE COURT:**  And obviously, I'd like you to address

19   those questions from the other angle as well.

20         **MR. ASIMOW:**  Absolutely, your Honor.

21         If -- let me make a few introductory points, but I'll

22   certainly get to those issues, and start by noting that the

23   bifurcation is the exception; not the rule.

24         Usually, when a plaintiff pleads a case, defendant

25   pleads counterclaims, you get to try them together, and nobody

1  has to go to the back of the line and wait until the rest of

2  the case is decided.

3        And, indeed, what's being asked for here is not just

4  bifurcation for trial, but, as the Court's aware, a complete

5  stay of the antitrust case, putting the antitrust case in deep

6  freeze for as long as it takes to do all of the discovery in

7  the -- on the DMCA case, the experts on the DMCA, trial,

8  perhaps an appeal.

9        It seems to me that inevitably delays the antitrust

10 case by a very substantial amount of time.  And I'll get into

11 some of the specifics.

12        **THE COURT:**  All right.  And I have no intent of

13 addressing possible trial bifurcation if I don't bifurcate in

14 the manner that was requested now, because that would be, you

15 know, premature.

16        **MR. ASIMOW:**  And I agree that that's appropriate that

17 the Court should reserve that question, because it may be that

18 after discovery's complete, it would make sense to stage the

19 trial in some fashion, but that's clearly not --

20        **THE COURT:**  I feel the trial as having right now what

21 could be three different cases:  There's the patent case;

22 there's the -- you know, your antitrust case; and the

23 counterclaims.

24        **MR. ASIMOW:**  Yeah.  This case is a complete

25 intellectual-property textbook.

1          **THE COURT:**  That's great.

2          **MR. ASIMOW:**  Everything.

3          **THE COURT:**  We'll go down in infamy.

4          **MR. ASIMOW:**  It might.

5          So, with that as background, I would like to address,

6   I think, four points.  One is at least a preview of the merits

7   of the DMCA claim, and why we really disagree with defendants'

8   contentions.  And I think the Court puts its finger on it; that

9   this is not about a device for piracy.  This is about the

10  interoperable of an aftermarket accessory.

11         **THE COURT:**  But you know, I don't -- on the other

12  hand, there is at least the *RealNetworks* case.

13              (Reporter interruption)

14         **THE COURT:**  There was no intent element.  And he

15  makes an interesting point from a policy viewpoint that you

16  wouldn't want to create, you know, a hollow shell of

17  protection; at least, the Microsofts in the world would not.

18  And by just, you know, creating multipurpose devices, but --

19         **MR. ASIMOW:**  Sure.

20         **THE COURT:**  But it's one in which I don't know that,

21  you know, we're citing -- that the cases cited on this are

22  trial court.  And, of course, I have great respect for the

23  trial court.  Nonetheless, we don't get the last word.

24         **MR. ASIMOW:**  Let me go to that, because there are

25  appellate cases that I think are on point.

```
 1          And what it -- really, I think you'll see the DMCA
 2   claim is really a stretch.
 3          First of all, we need to know that it about five
 4   separate Datel products.  The memory card is one, but they're
 5   also attacking four other Datel products that go back to 2006:
 6   The Xport, the XSATA -- X-S-A-T-A -- the Transfer Cable, and
 7   then the newer product, called "Power Saves."
 8          The memory card is the only product that's common to
 9   both the DMCA claim and the antitrust claim.  And the antitrust
10   claim -- and I'll certainly get into this in more detail -- we
11   are seeking damages on five separate products that were blocked
12   by Microsofts Dashboard update.
13          THE COURT:  Right.  And I would -- I mean, their
14   argument is essentially:  This is kind of an afterthought
15   that's driven as a way of -- of making it look as if, even if
16   they prevail on the DMCA claim, it's really not going to change
17   the shape of the case dramatically.
18          MR. ASIMOW:  That's absolutely wrong.
19          In fact, in the current damages analysis, the memory
20   cards are only about 10 percent of our damages.
21          And I do want to address the merits of the DMCA, so
22   if I could perhaps do that first, and then I'll come back to
23   why, even if there's a problem with the memory card, it does
24   not affect the bulk of the antitrust case.
25          THE COURT:  Okay.
```

1         **MR. ASIMOW:**  On the merits of DMCA, all they're

2   relying on here is the memory card.  They're not contending

3   that the other Datel products -- that a DMCA finding there

4   would affect the antitrust case.  And, indeed, some of what

5   Mr. Stone addressed in his oral argument did concern the other

6   products, such as the Power Save product.  In their moving

7   papers, they've relied only on the memory card.  And --

8         **THE COURT:**  You have some show-and-tell.

9         **MR. ASIMOW:**  A little bit of show-and-tell.

10        **THE COURT:**  I have not done any of my own, I can tell

11  you.

12        **MR. ASIMOW:**  When -- for the Court, when you look at

13  the DMCA cases, what they're really about is piracy.  And the

14  Congress was concerned not only about copyright infringement,

15  but about devices that facilitated piracy.  An awful lot of

16  cases copying DVDs; unscrambling the encryption system on DVDs.

17        The cases, though, that talk about a useful

18  aftermarket product that competes with the DMCA plaintiffs'

19  product -- they really go the other way.

20        There are four cases that I think are important here.

21  There's the *Lexmark* case, which was about printer cartridges.

22        **THE COURT:**  Mm-hm.

23        **MR. ASIMOW:**  There's the *Chamberlin* case, about

24  garage-door openers.  In both of those cases the DMCA defendant

25  circumvented some measure in order to create a compatible

1  device.  And in both of those cases, the Courts expressed

2  enormous concern about the misuse of the DMCA to extend a

3  monopoly.

4         In *Lexmark* the Sixth Circuit said that the DMCA could

5  not be used to create monopolies in manufactured goods.  And

6  the Congress wanted to, quote, "ensure that the DMCA would not

7  diminish the benefit to consumers of interoperable devices in

8  the consumer electronics environment."

9         And then in *Chamberlin* -- that's a Federal Circuit

10  case -- the Court rejected a construction of the DMCA that

11  would allow a -- quote, "would allow virtually any company to

12  leverage its sales into aftermarket monopolies," a practice

13  that both the antitrust laws and the doctrine of copyright

14  misuse normally prohibit.

15         So the products at issue here, again, are memory

16  cards for users to store their data, so that when they turn off

17  the Xbox, they don't lose their data; they don't have to start

18  over.  Microsoft makes one.  Datel makes one.

19         Even the things that Mr. Stone was talking about --

20  if you -- the cards can be used for, if you look at the Datel

21  memory card, it says on the packaging,

22              "Take your data everywhere you go.

23         Back up game saves and profiles.  Perfect

24         for saving and transporting gamer tag and

25         gamer save data."

```
 1              Well, if you look at the (indicating) -- what theirs
 2     is good for -- it says,
 3                   "Take your games everywhere you go.
 4              You have save your game progress.  And
 5              transport your Xbox LIVE account.  Download
 6              content from Xbox LIVE.  Download kiosk
 7              content at all participating retailers."
 8              The uses of the devices are fundamentally the same.
 9              THE COURT:  What about the quotes from their
10     pleadings that your client is touting its use for getting
11     around restrictions?
12              MR. ASIMOW:  So a couple of things about that.  I
13     think some of what was being read was about the action replay
14     Power Saves product --
15              THE COURT:  Mm-hm.
16              MR. ASIMOW:  -- which is another product challenged
17     in their D.M.C.A. case, but it's not part of our antitrust
18     claim.  That was a product that was recently introduced.  It
19     has never been marketed in the United States.  A few hundred
20     units were, it turns out, sold in error in the United States,
21     but it's a very -- it's a very small volume of products.
22              THE COURT:  It's primarily in England; in the U.K.
23              MR. ASIMOW:  Exactly.  And we have -- there's a lot
24     to be said in defense of that product.  I'm by no means
25     conceding that that product is -- violative.
```

```
 1            THE COURT:  But if you're saying it's only one of
 2   many --
 3            MR. ASIMOW:  Right.
 4            Now it is --
 5            THE COURT:  -- and not of the memory cards.
 6            MR. ASIMOW:  I would also urge the Court to take to
 7   take marketing statements with a little bit of a grain of salt
 8   here, when you consider the customer base that we're trying to
 9   appeal to.
10            THE COURT:  Well, I do; but in my experience, juries
11   don't, necessarily.
12            MR. ASIMOW:  We may have that.
13            THE COURT:  If one gets to that stage.  I wasn't
14   trying to prejudge that, but just -- I see that those are
15   deemed as great evidence very frequently.
16            MR. ASIMOW:  It does appear that our adversary has
17   had that same thought here.
18            So I think the first real problem with the DMCA case
19   is it's just not a case about piracy.  It's a case about a
20   useful inoperable device.  And it's quite a stretch of the DMCA
21   to try to use it to prohibit a device of that nature.
22            If I get into the specifics of DMCA, a key issue here
23   is:  What exactly did Datel overcome?
24            The way that the authentication scheme works on the
25   Xbox is, when you first plug in a memory card or another
```

26

1   device, that's a series of authentication challenges.  And, in

2   order to pass those challenges and convince the Xbox that it

3   should continue to talk to you, you have to have a security

4   chip.  And both of the products have a security chip inside of

5   them, their version and our version, achieved through reverse

6   engineering; but what's interesting is that once the Xbox gets

7   past that step, there is no encryption of the data.  The data

8   that's stored on the memory card is not encrypted.  It is

9   freely -- it's on -- inside of there, there's a flash memory

10  card.  And it's freely readable.  It uses the same protocol as

11  any other USB memory device.

12         And that's very similar to the situation in both the

13  *Lexmark* and the *MGE* case that we cite from the Fifth Circuit.

14  In both of those cases, the underlying data was not encrypted;

15  was not protected.

16         It's deliberately not protected on here, because it

17  would slow it down the operation and reading and writing to the

18  memory card.  So what was circumvented here was a technique for

19  perpetuating monopoly; not a technique for preserving the

20  integrity of the data.

21         The -- you know, there are several other issues on

22  the DMCA that we think provide complete defenses that we would

23  vigorously assert and will vigorously assert.

24         The data that we're talking about, to the extent --

25  we don't actually know all of the data they're talking about.

1   We're still waiting for some interrogatory answers, because

2   remember, we don't control what data gets written to the memory

3   card; it's the Xbox that's doing that.

4          But, for instance, if it's game-save data, when a

5   player plays a game and saves where they are in the game and

6   the attributes of the game, we think that's a user file.  We

7   don't think it belongs to Microsoft.

8          So, just as when you create a spreadsheet with Excel

9   or a Word document with Word or a game-save file with a game,

10  we think that file belongs to the user.  And so if that user

11  wants to share it, the user should be permitted to do that; but

12  you don't really get to that issue with the memory cards,

13  because the memory cards are not designed to facilitate the

14  sharing of game saves.  That really goes to this other product

15  I mentioned that's only been offered for sale in Europe.

16         So we certainly do not think the DMCA case is --

17         **THE COURT:**  I take it Europe doesn't have a DMCA.

18         **MR. ASIMOW:**  Not a directly analogous law.  And I

19  don't believe, in any event, that it would be within the -- I

20  don't believe it would -- I don't believe foreign sales of

21  those products are challenged by Microsoft's counterclaim.  I'm

22  pretty sure there would be jurisdictional issues to doing so.

23  And I don't think they tried to do that.

24         **THE COURT:**  Mm-hm.

25         **MR. ASIMOW:**  So the DMCA claim is not a slam dunk.

1 We think it's just dead wrong on the merits.  And, at a

2 minimum, it's going to be vigorously contested, and it's not

3 going to be five depositions per side.  We're talking about,

4 again, five Datel products.  We're talking about complex

5 technological measures that they assert protect data.  We are

6 talking about a variety of different types of content that

7 might be saved on the memory cards or accessed by the other

8 devices.  Our --

9        **THE COURT:**  A lot of that is probably not really a

10 question of fact, discovery of facts that you can't access from

11 the public domain; but of investigation, experimentation, and

12 expert testimony, I would think.  You know, exactly what you

13 can do with a device, and how its techniques --

14        I mean, you don't have to ask the people who designed

15 it how it works, necessarily.  And Datel figured a lot out

16 about it without doing that.

17        **MR. ASIMOW:**  I think there's certainly some truth to

18 that, your Honor, but I will say we've -- as this Court's

19 aware, we've just settled the ITC matter that Microsoft

20 asserted against Datel.  And we got a little preview in that

21 case of how much discovery would be necessary to learn basic

22 facts.  And --

23        **THE COURT:**  Mm-hm.

24        **MR. ASIMOW:**  -- Microsoft is a large organization.

25        **THE COURT:**  Well, I think few would dispute that --

1          MR. ASIMOW:  And --

2          THE COURT:  -- probably.

3          MR. ASIMOW:  -- there are a lot of people with a hand

4  in these projects.  We don't want to waste anybody's time.  We

5  never want to take unnecessary discovery, but I'm persuaded

6  there would be a lot.

7          THE COURT:  Well, what about the other point, which

8  is that even if the cards were out, they really aren't -- their

9  view is:  Then everything else would be the tail wagging the

10 dog.

11         And you're saying:  Not so.

12         MR. ASIMOW:  That's, I think, a very important point.

13         THE COURT:  Mm-hm.

14         MR. ASIMOW:  We disagree.  The cases that, again,

15 Microsoft primarily relies on are cases like a *Walker Process*

16 counterclaim, where the disposition of the patent claim has the

17 potential to completely moot the *Walker Process* counterclaim.

18 If you find the patent's valid, there's no *Walker Process*

19 claim.

20         The update that they did in October 2009 had two

21 aspects.  And this is truly a critical point.  They made two

22 changes to the authentication scheme.

23         First, they imposed this hard limit of 512 megabytes

24 for memory cards, with the result that their 512-megabyte

25 memory card would work, and our -- this one is actually 2 gig.

1   We have a 2 gig and a 4 gig -- would not work.

2          But the second thing they did in that update is they

3   added an additional hurdle, an additional authentication step,

4   that controllers had to get past.  They didn't apply that step

5   to memory cards.  They applied it to controllers.

6          And what they had done is -- they're pretty good

7   reverse engineers themselves.  And they figured out a

8   difference between the way our security chip and their security

9   chip responded that had to do with whether a certain buffer was

10  cleared out, and the timing.  So, taking advantage of this,

11  they found a way that they -- that the Xbox could distinguish

12  between their security chip and our security chip.  Didn't

13  apply it to memory cards, I think, because they thought the

14  512-megabyte limit did the job for them.  They applied it to

15  controllers.

16         And we had at that time in development --

17  manufactured, reside to go -- a controller for the Xbox 360.

18         Well, when we saw this -- when the update happened,

19  the controllers stopped working, so Datel could not ship them

20  to --

21         **THE COURT:**  Right, but I think their assessment of

22  that was something along the lines of:  That caused a couple

23  months' delay and a trivial amount of financial impact.

24         **MR. ASIMOW:**  Well, I mean, I will tell you.  Missing

25  Christmas in 2009, in and of itself, is not trivial.

```
 1          We've been looking at the sales data for these
 2   things, and there's an enormous spike in Christmas.  I mean, I
 3   think it goes up -- depending on the accessory, it could go up
 4   10x, relative to the other months, but it was far more than a
 5   two-month delay.
 6          The problem was that Microsoft --
 7          THE COURT:  I think they have -- there was some term
 8   for when the Christmas shopping season begins.  Black
 9   something?
10          MR. ASIMOW:  Black Friday:  The day after
11   Thanksgiving.
12          THE COURT:  And I always thought, you know, my
13   connotation of that is, like, a day of mourning or something;
14   but apparently it's getting into the black financially.  I
15   never knew that until recently.
16          MR. ASIMOW:  I think that's for retailers and for
17   manufacturers like Datel.  I think for the rest of us, it's
18   really a nice day to stay home.
19          THE COURT:  No kidding.
20          MR. ASIMOW:  So the delay with the controllers was
21   far more than two months, and the reason is that Microsoft had
22   now demonstrated in the world that it would break Datel's
23   Accessories.  And it did it not just as to the memory cards,
24   but entirely separately as to the controllers.
25          THE COURT:  Well, let me ask one thing.  And this may
```

1  be not necessary to this motion, but in interest of the case as

2  a whole.  In any event, then, because you've informed me, I

3  think, in the case-management statement that since then, there

4  has been a major change by Microsoft in terms of these memory

5  ports having to be specialized and used, and they're not even

6  used anymore, and instead, anybody can use a normal flash

7  drive, or something to that effect.

8          MR. ASIMOW:  There's certainly an issue about that.

9  I think there are two aspects to it.

10          THE COURT:  But does that sort of mean that this

11  whole freeze-out issue has been changed for the future?

12          MR. ASIMOW:  No, no.

13          It does mean that there are going to be some issues

14  about the damages on memory cards, and how far into the future

15  those damages go.

16          THE COURT:  Right.

17          MR. ASIMOW:  They brought out a new version of the

18  Xbox called the 360S, or sometimes referred to as the "Slim."

19  It's a slightly narrower console, and it does not have the port

20  into which the memory cards plug in.

21          So, to extent that product becomes dominant, that

22  will reduce the market for memory cards.  And we think that our

23  damages expert will have to take that into account.

24          THE COURT:  And is that the intent:  To have that

25  product -- well, you may not know this, but -- replace the

1   other ones, or is it just sort of an alternative, just like you

2   can get a fatter Blackberry and a slimmer Blackberry, and so

3   forth?

4           **MR. ASIMOW:**  My assumption is they'll sell out their

5   existing inventory of the previous generation.  It's not a

6   previous version of the Xbox 360S.  And we saw this newer one.

7   You can recognize it because it's black, instead of this

8   off-white color that the previous ones have been.  Will --

9   they'll sell that in different versions by -- you know,

10  certainly by the end of this year.

11          But the other thing that they did that's quite

12  interesting is, in April this year, they did another Dashboard

13  update.  And what this Dashboard update did is it allowed you

14  to start saving game data through the regular USB port on the

15  Xbox.  So it kind of -- they dried up their market for memory

16  cards, and they dried up ours at the same time.

17          We're obviously going to have discovery into that.  I

18  think you may have seen from the papers that there's a

19  disagreement as to why they did that, and whether that was

20  retaliatory; whether that's a separate antitrust violation.  We

21  don't have all of the discovery we want about that yet, but we

22  think it's interesting that when they -- as soon as they had

23  competition, they decided that it would be better not to have a

24  market at all.

25          So again, that's -- memory cards are important, but

1  they're not --

2          **THE COURT:**  Not to have a market at all, or to have

3  the market be regular flash drives, I guess.  Isn't that --

4          **MR. ASIMOW:**  They have no advantage in selling

5  regular flash drives; neither do we.  Neither Microsoft nor

6  Datel's going to make any money off of that.

7          **THE COURT:**  Right.

8          **MR. ASIMOW:**  So again, memory cards are important,

9  but they're far from the whole case.  There really is --

10          **THE COURT:**  You were going to get to the damages, and

11  then we do need to wrap this part up.

12          **MR. ASIMOW:**  Sure.  So there are five products that

13  are at issue.  There are two versions of controllers:  A wired

14  and a wireless version.

15          In addition, I have a couple more visual aids.  There

16  are -- there's a headset.  And there's a wireless network

17  adapter.  Each of these devices has the same security chip in

18  them, so we couldn't make these devices until -- Datel couldn't

19  make them until it figured out the security chip.

20          And what Datel has been finding is that retailers are

21  enormously hesitant to carry them, because of the threat of a

22  further change to the Microsoft operating system to disable

23  them.

24          **THE COURT:**  Which has not been carried out.

25          **MR. ASIMOW:**  Not to date --

1              THE COURT:  Right.

2              MR. ASIMOW:  -- as there has not been an update that

3     affected the security since October.

4              And, you know, I suppose if Microsoft wanted to

5     stipulate to an injunction that it would not change the

6     security in a way to block these products, that would have an

7     effect.  I mean, we still would have certainly lost a lot of

8     sales up to this point.

9              THE COURT:  Mm-hm.

10             MR. ASIMOW:  That does have implications for future

11    sales.

12             And the other part of it is that you never really

13    catch up, because Datel had a roll-out plan to these products.

14    It had a lot of enthusiasm.

15             What we have now is confusion in the marketplace.  We

16    have people saying, "You know, Datel products don't work."  You

17    know, not everybody is following all of pleadings in this case

18    as closely as we are.

19             THE COURT:  Right, although that might -- you know,

20    at some point, you may be straying into what Microsoft would

21    argue is speculative damages.

22             MR. ASIMOW:  Well, I think there's an awful lot of

23    room here to project --

24             THE COURT:  Mm-hm.

25             MR. ASIMOW:  -- to project damages.  I mean, we're

1  not here right now to argue the damages case, of course.

2          **THE COURT:**  You said something like 80 percent, or

3  something like that?

4          **MR. ASIMOW:**  Well, I mean, our preliminary damages

5  analysis is that Datel's damages are quite -- are quite large.

6          We believe that Datel would have sold in the

7  neighborhood of these -- across these five products 10 million

8  accessories for the Xbox 360 over time.

9          That's not -- when you consider that Datel

10  reverse-engineered the security in the Playstation 2 memory

11  card, and then at least worldwide sold in excess of 2 million

12  of those memory cards, it's not -- it's not outrageous.

13          And the damages right now that we attribute to memory

14  cards are less than 10 percent of the total damages.

15          **THE COURT:**  But to the extent you're saying that the

16  chilling effect of disabling the memory cards is what caused

17  the other damages, then I think there I would say, "If you lose

18  on the DMCA, then you lose those damages," because it was

19  lawful for them to chill in that way.

20          **MR. ASIMOW:**  Well, the point I would make then,

21  though, is that they didn't just block the memory cards.  They

22  did this additional update that specifically blocked the

23  controllers, but also we don't have -- we haven't been through

24  all of their documents yet, but we do think there are

25  communications with retailers or some that have been brought to

1  our attention in which they specifically threatened to disable

2  the controller.

3       THE COURT:  And you're saying the controllers are not

4  subject to the DMCA claim?

5       MR. ASIMOW:  There's never been a claim that any of

6  these other products I just showed you -- the wireless

7  controllers, the headset, or the network adapter -- is subject

8  to the DMCA claim.

9       THE COURT:  Anything further?

10      MR. GLICK:  Your Honor, can I clarify on just one

11  point?

12      THE COURT:  Yes, yes.

13      MR. GLICK:  The antitrust violation claimed is -- is

14  the two changes that Mr. Asimow has explained, made

15  simultaneously and deliberately.  And I know already the

16  evidence is going to show that was the result of quite a bit of

17  thought about how they would shut down Datel particularly.  And

18  we have evidence that will show that at the same time in that

19  context, they communicated to retailers and indicated to those

20  retailers that if Datel engineers around it, they'll shut that

21  down, too.

22      So the violation is not simply connected to what they

23  did.  It's what they also indicated they would do to keep those

24  products forever off the market.

25      And we're going to present evidence regarding

```
 1   Best Buy and GameStop and Wal-Mart as to what the impact of
 2   what those witnesses did had as part of this whole antitrust
 3   scheme to shut out these products.  And it has worked.
 4           So it's -- there's quite a bit involved in it.
 5   It's -- we believe we're going to prove to any reasonable juror
 6   that this was an antitrust violation of that magnitude pursuant
 7   to a scheme that had many aspects to it, and that they
 8   deliberately targeted the controllers -- the change they made
 9   didn't do anything but affect controllers --
10           THE COURT:  Mm-hm.  Okay.  There --
11           MR. GLICK:  -- and that it's quite a bit larger case
12   than that.
13           THE COURT:  All right.  Thank you.
14           MR. GLICK:  The only other thing I beg your Honor is
15   to give Mr. Asimow one moment on the case regarding the --
16           MR. ASIMOW:  Memorex.
17           MR. GLICK:  Memorex.
18           MR. ASIMOW:  And, your Honor, I know we've taken a
19   lot of time already.  The things I would still briefly want to
20   tell you about are:  We do disagree on the illegality defense.
21   We think the Memorex case is applicable here.
22           What First Beverages, which they now rely on, is
23   about is a situation where the defendant said the ICC would put
24   a stop to these -- to paying these very low rates for trucking.
25   And that should be taking into account damages.
```

1          Even there, the Court was very concerned about

2    allowing a defendant in an antitrust case to argue -- to make

3    an argument of this nature, and said that the only reason it

4    was allowing it was because the defendant couldn't directly

5    make a counterclaim for the alleged wrongdoing by the

6    plaintiff.

7          But here, as in *Memorex*, the antitrust defendant can

8    and has made a counterclaim for the alleged wrongdoing.  Again,

9    *Memorex* -- they could have.

10         The other cases, such as *Modesto Irrigation District*,

11   the utility cases -- those are really ones about the antitrust

12   plaintiff couldn't enter the market at all because it needed

13   some kind of government permit, and so the damages were highly

14   speculative; but here, Datel was in the market.

15         Microsoft claims it had some actions it could have

16   taken about Datel's market presence, although it's notable that

17   they didn't do so until they retaliated in this case nearly a

18   year after those products went to the market.

19         The final thing, very quickly, is:  It is going to be

20   prejudicial to Datel to delay the trial of the antitrust

21   claims.  Datel is encountering resistance at retailers on a

22   constant basis.  The damages are compounding.  We think, as we

23   get into the case-management conference, it's -- we think we

24   can do the case quite quickly.

25         We pushed for an early trial date.  That's why we

1  didn't move for preliminary injunction.  We thought our

2  resources were better directed towards get getting the case

3  ready for trial.  We're pretty far along on getting it ready

4  for trial.

5          **THE COURT:**  What about this point:  That no documents

6  have been produced?

7          **MR. ASIMOW:**  We have produced to them about 40,000

8  pages.  It is the same production as we made in the ITC case,

9  but it has all sorts of documents that are pertinent to the

10  antitrust case.  It has our organizational documents.  It has

11  our financials.  It has business plans.

12          And we are rapidly moving through the review of the

13  remainder of our client documents.  We have completed our

14  collection.  If they weren't all sitting back here, they'd be

15  back at the office, reviewing the documents right now.

16          **THE COURT:**  Maybe a better use of their time.

17          **MR. ASIMOW:**  I think maybe we'll mention that to

18  them, your Honor.

19          **THE COURT:**  Now, if the Court were to need some use

20  once in a while, so --

21          **MR. ASIMOW:**  So we're moving through it quickly.  We

22  just received yesterday from Microsoft their initial production

23  in the antitrust case.  It looks like it was about 216,000

24  pages.  I haven't had time to read it since it came in

25  yesterday.

1          **THE COURT:**  Right.  All right.

2          **MR. ASIMOW:**  We're pretty far along on the written

3   discovery.

4          **THE COURT:**  We need to wrap this up.  I need to let

5   you respond briefly.

6          **MR. STONE:**  Thank you, your Honor.  I'll be brief.

7          Two points, if I might.

8          You were cited to *Lexmark* and *Chamberlin* cases.  And

9   I think those are great cases.  You should take a look at them,

10  because both cases stand for the proposition that if you're not

11  protecting copyrightable content, the DMCA won't apply.  And

12  the *Lexmark* court in particular said one of the essential

13  settings in which the DMCA applies is the code and visual or

14  audio manifestation of video games, which is exactly what we

15  have here.  So *Lexmark* and *Chamberlin* support us in terms of

16  the scope of the DMCA.

17         The second point I want to make is this.  As I

18  mentioned earlier, there's a different file structure for the

19  way the files are stored on the Xbox 360.  And you see it in

20  Mr. Connors' declaration.  And you see it in the brief that was

21  filed by Datel, where they say, Well, we were smart enough to

22  figure out that this file structure was a lot like the standard

23  Microsoft ones, so we know how to convert it.  So now you can

24  take this different file structure, convert it, and -- now the

25  key part -- save it to your P.C.

1          If you did it the Microsoft way, you wouldn't be able

2   to save it to your P.C., because it's saving it in a P.C. that

3   -- through that circumventing software that they provide that

4   allows you to then save somebody else's games and levels and

5   weapons and so on.  And it's that that facilitates it.

6          And so what they have done by defeating -- and, yes,

7   they're clearly smart enough to defeat it.  And they defeated

8   the security provisions.  By defeating the way in which the

9   file structure is differently formatted, they were able to save

10   it to the P.C.:  Exactly the issue that was raised by

11   *RealNetworks* in the case before Judge Patel, where the Court

12   there was faced with an argument, "Well, this is just a way to

13   save videos to your P.C. or to other things."

14          And she said there she dealt with the fact.  She

15   said, "Look.  As long as one purpose is circumventing, that's

16   enough."

17          Well, here it's not they're saving it as they read on

18   the pack to carry it along with them and plug it into somebody

19   else's Xbox 360.  By defeating the file structure differences,

20   they enable you to put it to your P.C. and download the cheats

21   that their people -- their game players are developing.

22          They also said, Well, we don't have any Second

23   Circuit case that is support or any Circuit cases that support

24   our position, but we do the *Universal Studios* case was decided

25   both in the Southern District of New York and in the Second

1  Circuit.  That's a 2001 decision.  I can give you the cite.

2           **THE COURT:**  Well, is it in your papers?

3           **MR. STONE:**  In our reply brief, yeah.  So there's

4  that case as well.

5           So I really think the legal arguments they made are

6  quite easily addressed by the cases we've cited.

7           The most recent factual argument --

8           **THE COURT:**  Well, easy, maybe, in the eyes of the

9  beholder.

10          **MR. STONE:**  The latest factual argument we heard --

11 this retailer threat issue is one that we pointed out through

12 objections and in our brief.  They put in a declaration from

13 one of their business people who said, "Well, unnamed companies

14 were, in some fashion, threatened."  We heard the same thing

15 repeated today by Mr. Glick.

16          If they have evidence, if they want to put in and

17 say, "This person on this date was told something," they know

18 how to do it.

19          **THE COURT:**  Mm-hm.  Mm-hm.

20          **MR. STONE:**  You can't base this motion -- and I don't

21 really think this threat issue has anything to do with

22 anything -- on innuendo, and that's the level where we are

23 now -- if they really think there's something that they want to

24 put forth, they go get a declaration.  They bring it in.  They

25 take a deposition.  They show the Court evidence that is

1   admissible.

2          They don't put in a declaration and then, through

3   attorney argument, something that is plainly inadmissible.

4          **THE COURT:**   All right.  Well, but on one point as to

5   there being two impacts on Datel from the update, and one of

6   them effecting only the controllers -- do you agree with that?

7          **MR. STONE:**   I think there is no question but that the

8   update to the security authentication code did have an impact

9   on controllers and other devices, none of which were then on

10  the market.  So the only impact to those products was, if we

11  believe their facts -- and I can't rebut them now, because we

12  don't have any discovery that would allow us to see anything

13  different -- was that they were delayed a bit while they

14  reverse-engineered or figured out how to hack through the

15  authentication code, delayed in the release of those products

16  no product that was on the market sold by Datel was interfered

17  with other than the memory units.

18          **THE COURT:**   Right.  Okay.

19          Well, I -- you know, these questions are always

20  difficult because, like I say, on the one hand, if I were sure

21  that this would achieve the efficiencies that you say, it would

22  be the right thing to bifurcate.  And, on the other hand, if I

23  bifurcate and it doesn't, I don't agree with the idea that that

24  wouldn't delay the case.  I think it inherently would.

25          I do think the case, in all likelihood, has to go to

1  2012, but I think it can probably go to January 2012.  And I

2  think bifurcating would create more of a delay than that.

3           And I -- you know, I don't know how I will come down

4  on this issue, but I just don't see it as so clear-cut, for the

5  many reasons that -- many of the reasons that have been stated.

6  And so I'm not inclined to stay discovery or really stay the

7  antitrust case pending resolution of this.

8           Now, it may be that all summary-judgment motions

9  don't need to be brought at the same time.  And what I

10 generally do is set a last day for summary-judgment motions,

11 but that doesn't mean that all of them should come in in a way

12 that the Court can do nothing else for the next six months

13 while deciding patent issues, DMCA issues, antitrust issues, et

14 cetera, et cetera.  So it may be that, you know, you should be

15 looking towards bringing summary judgment on this first.

16           **MR. STONE:**  Nods.

17           **THE COURT:**  And -- but meanwhile, other things would

18 be going on; but it might still result, if you're right, in a

19 savings, but it wouldn't prevent anything from being --

20 happening as we go forward.

21           So I am not able to refine this enough to set some

22 kind of staggered summary-judgment schedule yet, but I would

23 just -- so I'd be inclined to just set a last day now, but with

24 a strong urging to all of you to look at the fact the Court

25 probably can't handle getting, you know, a whole series of

1   extremely complicated summary-judgment motions, and having to

2   try to decide them all at once, anyway.  So, you know, you

3   should be meeting and conferring.  And we can hold further

4   case-management conferences such that -- you know, figuring out

5   what is the best way to sequence them.

6           And possibly, that -- the whole design patent

7   issue -- I don't know.  Maybe that's -- that should be

8   trailing.  I don't know, but if that -- and again, I don't have

9   an idea yet, but I mean in relative magnitude, if that's a

10  small number, which they're saying -- your side may well

11  disagree with that.  So I don't have any prejudgment on it, but

12  it -- you know, I'm just suggesting that -- think about, for

13  case-management points of view, how those should be sequenced,

14  to get the most bang for the buck; but I view that -- I think

15  that's a good idea.  I'm just very wary of staying all of the

16  discovery, even though I'm, of course, concerned about -- with

17  how expensive it is.

18          And I take the point that antitrust discovery is very

19  expensive and labor intensive, and so I recognize that's the

20  down side of this approach, but I'm more concerned that the --

21  that it could just result in delay, without, in fact, yielding

22  those kinds of benefits, possibly, or not nearly as much of

23  one; you know, some benefit, but not so much so that it really

24  outweighs the problems of delay.

25          So on case management, I guess we have a lot of

1 things to address there.  Maybe we should start with your

2 discovery issues.

3          I think a lot of -- you know, a lot of agreements

4 have been made, which I think is very good, but there are still

5 a number that require further addressing.  And I adopt all of

6 your agreements, and even where, for example, regarding

7 privilege logs, that is at variance with my normal standing

8 order, I think that's fine.

9          **MR. GLICK:**  Thank you.

10          **THE COURT:**  And I guess what I'm -- you know, I would

11 urge you to let the documents produced in the ITC case to use

12 here; I don't know why not, but maybe there's some reason.

13          **MR. HWANG:**  That has been resolved.

14          **THE COURT:**  All right.  So you're doing that.

15          Then, as to the scope for the search for documents, I

16 do think there should be a limit on custodians.  Now, what that

17 limit should be, does need to be set.  I mean, it -- you want

18 to have it be proportionate to the case, but I do not believe

19 that every single custodian who might possibly have even some

20 minimal involvement should be searched, because I just don't

21 think that you get the bang for the buck, or the

22 "proportionality," as we say.

23          And I think, you know, Judge Scheindlin's decision

24 has either been misread.  I think she's amended it since, but I

25 don't think she meant that everybody who ever had any

1  involvement, even though it may have been fairly minor, you

2  know, should be searched.  So I'm opposed to that.  So I tend

3  to think that there should be a limit.  And then, with -- along

4  the lines defendant proposed; but with the idea, you know,

5  always for good cause.

6         Now, on the one hand, I view those limits as pretty

7  strong.  I mean, it's not just a, "By the way, looks like it

8  might be good to add somebody else.  They might have

9  something," but you know, you come up with -- you realize

10  there's somebody who is important who isn't on the list.

11         So I think, you know, to some degree, I think that

12  the plaintiffs' idea that Microsoft should disclose who are the

13  custodians, but with, you know, some -- some recognition it's

14  not every single custodian, in the sense that anybody who ever

15  had anything to do with it; it's, you know, the important

16  custodians.  I mean, and that could be, you know, the leader of

17  a design team, but not, you know, the scores of people who

18  actually worked on it, for example.

19         So I don't know if you two want to address that.

20         **MR. ASIMOW:**  If we could briefly address that,

21  your Honor, the concern here really derives from our experience

22  in the ITC case, a much simpler case about design patents; you

23  know, really a fraction of the issues we have in this case.

24         And we believe that Microsoft collected from about 35

25  custodians in that case.  And when that case settled, I think

1  we had maybe 12 depositions scheduled, but we had discovered

2  numerous gaps; that they had not collected from important

3  designers, important management people, important people in

4  projecting accessories.

5          **THE COURT:**  Mm-hm.

6          **MR. ASIMOW:**  We -- and Microsoft was represented by a

7  different firm in that case.  And we were going very fast in

8  the ITC action.

9          **THE COURT:**  That's how they do it.

10          **MR. ASIMOW:**  Rocket docket.  I don't mean to cast any

11  aspersions on the work that anybody did, but we say in that

12  simple case, we continually had to go back to Microsoft and

13  say, "Well, why didn't you get this individual's documents?"

14          "Oh, okay.  We'll do that for you."

15          **THE COURT:**  Well, yes.

16          **MR. ASIMOW:**  I'm not opposed to a limit, but I think

17  it's a significantly higher limit than the 30 to 45 that's been

18  proposed, because again, the ITC case, which was -- I don't

19  know -- a tenth of the issues here -- we had 35 wasn't enough;

20  at least, as the documents were collected.

21          And it's also -- when you have a hard limit like

22  that, it's easy to kind of easy to fill it up on, you know,

23  collecting documents from minor people who don't have that

24  many, and turn out not to be that important.

25          **THE COURT:**  All right.  So I do think that they're

1  entitled to some disclosure before, you know, especially

2  selecting who they should be.

3          **MR. HWANG:**  Let me address --

4          **THE COURT:**  When I gave you the *NetApp* one that

5  wasn't meant to be the end-all-be-all.  And generally in patent

6  cases it's a little more obvious, probably, who should be in.

7          **MR. HWANG:**  As I say, right.  And our proposal had

8  increased the numbers from the *NetApp* proposals.

9          **THE COURT:**  Right.  It did.

10          **MR. HWANG:**  Let me address a couple of.

11          Things it is not the case that the ITC document

12  production -- the issues were so narrow.  One of the issues,

13  which we don't have here, now that the issue -- now that the

14  patent issues have been moved, here is whether there is a

15  domestic industry.

16          **THE COURT:**  Right.

17          **MR. HWANG:**  That's been protected.

18          Now, that means actually doing discovery about our

19  entire accessories business, and whether that rises to a level

20  of a domestic industry.

21          So when Counsel says 35 custodians for a tenth of the

22  issues, that's not the case.

23          What we're doing now -- and I think the events might

24  have somewhat overtaken us with respect to this stipulation

25  proposal, because we have given our initial document

1  production.

2          They will find -- because the parties have metadata

3  agreements, they will know exactly who the custodians are that

4  we have selected.

5          We are now bringing in the ITC production.  And those

6  custodians, as custodians in this case -- what we plan to do is

7  actually to go back to those custodians' documents to make sure

8  that we didn't miss any antitrust documents that might have

9  been not relevant in the ITC.

10          So at the end of the day we are going to end up with

11  a -- I cannot say what the number would be, but well above what

12  we had even originally proposed.

13          **THE COURT:**  Well, is this issue now no longer really

14  teed up?

15          **MR. GLICK:**  I think we can work on this, your Honor.

16          I think our biggest problem was this, "Here's a

17  number.  We're not going to tell you who they are."

18          And you can try and comment later --

19          **THE COURT:**  I do think you should tell them who they

20  are.

21          **MR. GLICK:**  We work really well, mostly, with -- and

22  we can sit in a room.  These are the issues.  Who are the

23  people?  Let's be transparent with each other.

24          **THE COURT:**  I would encourage and I'd prefer not to

25  have to micromanage this.  Okay.  Good.

1          **MR. HWANG:**  They also have our organizational charts.

2    They can see where our custodians fit in.  So we can continue

3    this discussion.

4          **THE COURT:**  Good.  In terms of back up tapes, I mean,

5    I think your suggestion that you address it with them when it

6    comes up seemed reasonable.

7          **MR. ASIMOW:**  That's fine.

8          **THE COURT:**  All right.  And regarding

9    interrogatories, I can tell you that if you really want to

10   press on my Achilles heel, ask me to count how many have been

11   asked for so far.

12         **MR. ASIMOW:**  We have a slight difference of opinion

13   on that, but I would say it's in the neighborhood of --

14         **THE COURT:**  I would not want to resolve that.

15         **MR. HWANG:**  -- forty-eight.

16         **MR. ASIMOW:**  Yeah.  And there are some subparts.

17         **THE COURT:**  Right.

18         **MR. ASIMOW:**  I actually think we're large.  I'm not

19   sure there's going to be a whole lot more interrogatories in

20   the case.  What I would anticipate are targeted

21   interrogatories --

22         **THE COURT:**  Mm-hm.

23         **MR. ASIMOW:**  -- as new things come up.  We did a set

24   recently just a couple of interrogatories, because we were

25   interested in something.  So --

 1           THE COURT:  Well, I mean, how do you want to resolve

 2  this?  Because you're both suggesting different numbers.

 3           MR. ASIMOW:  Well, I think our proposal --

 4           MR. GLICK:  Ours is a hundred.  Their's is 25, but

 5  they say --

 6           THE COURT:  How many more to you want to take,

 7  forgetting the dispute about how many you've already taken?

 8           MR. ASIMOW:  Yeah.  I think if we count the ones that

 9  are done as done, I think 25 additional interrogatories,

10  without, you know -- we could come back.  I can't imagine a

11  reason we would need more, but --

12           MR. STONE:  Go ahead.

13           MR. HWANG:  Go ahead.

14           MR. STONE:  I think that number, if you add it up, is

15  going to put them already at the 75 to a hundred.  I think

16  that's excessive.  I think you should give each side ten more,

17  and that should be enough.

18           THE COURT:  All right.  Well, I'm going to give each

19  side 20 more.

20           MR. HWANG:  Twenty more.

21           THE COURT:  And now let's talk about depositions.

22           I do like the hours per side, as opposed to how many.

23  And I don't want to get into dividing between how many party

24  witnesses and third-party witnesses.  I just think the more I

25  leave it up to you, but set an hour budget, is better.

```
 1              And I'm not -- you know, it's hard to know what the

 2    number should be.  I do view it, as I say, as kind of three

 3    cases; and three not-small cases, which -- you know, you might

 4    say, "Well, so, then 30 depositions at seven hours each --

 5    that's 210 per side."  That seems to be, you know, somewhat

 6    reasonable basis to look at this.

 7              You know, exactly what it should be, whether it

 8    should be 200, you know -- I'm -- so that's kind of where I'm

 9    leaning.

10              MR. GLICK:  Certainly urge more than that,

11    your Honor, with these three cases combined now.  We have --

12              THE COURT:  This is nonexpert, of course.

13              MR. GLICK:  Yes, but we had the 12 days or 14 days of

14    depositions.

15              THE COURT:  Right.  You said you had about 60 hours'

16    worth to take.

17              MR. GLICK:  Just there.  And now we have --

18              MR. ASIMOW:  I thought we could more than that,

19    likely.

20              THE COURT:  I think you said you had --

21              MR. GLICK:  It was 60 for the ITC depositions.

22              MR. HWANG:  On both sides.

23              THE COURT:  So 30 each?

24              MR. GLICK:  Well, they were all ours, virtually.

25              THE COURT:  They were all Microsoft witnesses?
```

1    **MR. ASIMOW:**  No.  Three were taken of our people.  We

2  had, I think, about 11 noticed.  So it's 14 depositions were,

3  roughly -- give or take one or two -- were on calendar when we

4  settled.  Only one deposition was actually taken, but you know,

5  the one that went, went all day.  So I think it's closer to --

6  14 times 7 would be 98; closer to a hundred hours between the

7  two sides had been scheduled when that case settled.

8    **MR. GLICK:**  Our client here will testify that he's

9  not interested in paying us to go do depositions that aren't

10  necessary.  And we're certainly going to work to take some of

11  those depositions in two hours or four hours, where that can be

12  done.

13    And I have six different patent designers that -- we

14  have the deal with each one of them.  And then there's the

15  antitrust depositions.  And then now there are the trademark

16  and trade-dress depositions.

17    And the way that -- I mean, unfortunately, the way

18  responsibility is divided and the number of people who are

19  making policy decisions on these things at Microsoft is quite

20  large.  So I just don't want us to have a limitation that

21  doesn't allow us to properly prepare our case.

22    Again, in good faith, we're not going to take any

23  deposition that is not needed.  The moment that they -- we talk

24  to each other.  They believe something is going on that's

25  improper.  You know, it will come to your Honor.

1        And I wouldn't like to be at the other end of that,

2   but I just don't see how we can do it in 210.  I'd at least

3   urge the 250 we talked about originally.  And actually, I think

4   when you add the patent depositions to it, the 280 that we

5   suggested is the right number.

6        **MR. HWANG:**  A couple of points, your Honor.

7        I don't doubt their good faith and desire not to be

8   wasteful, but if you set a bar at a high enough level, you have

9   a tendency to fill it up and not exercise judgment in the same

10  way that you might if you were living under a cap.

11       Now, I would respectfully disagree that we're dealing

12  with three separate cases, in terms of three -- cases of

13  three --

14       **THE COURT:**  Well, there's some overlap in the

15  products, of course, but --

16       **MR. HWANG:**  Certainly.

17       What I wanted to point out was that Datel was at 250

18  hours per side in our initial case management.

19       In the most recent case-management statement, after

20  the counterclaims and the design patent issues were raised,

21  they went up to 280.  And I think the 30 extra hours actually

22  is a pretty good estimate of what they will need in addition to

23  the antitrust case because of these "two other cases," as you

24  called it.

25       **MR. STONE:**  I think really that leads us to the issue

 1  of what is the right number of hours for the antitrust case.

 2  And I think 250 hours per side for an antitrust case is

 3  excessive, compared to almost any antitrust case we can think

 4  of.  It's just a very excessive number.

 5          **THE COURT:**  So what do you find is the usual number?

 6          **MR. STONE:**  Well, I really think something in the

 7  range of 150 hours per side in an antitrust case is a very good

 8  number to set, because that allows you a significant number of

 9  depositions, many of which will not need to be seven hours

10  long.  I think 150 plus the 30.  So I would have proposed 180

11  at this point, in light of the Court's reasoning, which is a

12  different number than we had proposed originally; but I would

13  have proposed a number like 180, as compared to, I think, the

14  Court's number of 210.

15          **THE COURT:**  Mm-hm.

16          **MR. STONE:**  And I think that's consistent with both

17  the 30 additional hours for the issues that were raised by the

18  counterclaim, and I think are much more reasonable and

19  appropriate number for the antitrust case.

20          **THE COURT:**  Mm-hm.  Well, I guess, you know, I don't

21  have a crystal ball, but I'm going to go with the 210.  And I

22  would urge you not use it up if there's no good reason.  There

23  is the valve of:  If there's good cause, then I would expect

24  you, obviously, first to meet and confer about it.  I mean, if

25  you haven't -- I would not want to get into a lot of time on

 1  this, but unless there's a very strong argument that you

 2  totally wasted a bunch of those hours, which I would not

 3  expect, then it's really going to find out about somebody else

 4  you otherwise can't depose.  You make a very good argument that

 5  you really need them, then I would expect you to agree to it;

 6  and -- but you know, so you've got to use your budget of hours

 7  prudently, obviously, because if it's really clear that, you

 8  know, you were running around getting nothing, taking people

 9  that weren't central, and then you asked for more, even if they

10  are central, you're in trouble; but that's unlikely, I think.

11          And so I hope that will be enough, but if it isn't,

12  and there's a very good reason, I'll expect you to agree on

13  that.  So that's for, you know, inside and out, witnesses,

14  party, non, et cetera.  You decide how to use them.

15          So, in terms of what I'm thinking about in terms of a

16  schedule, as I said, at this point I'm not going to bifurcate,

17  but I am very encouraging of figuring out what motions, you

18  know, when should be brought first; but my thought was -- well,

19  and actually, I may have misspoke when I said it would go into

20  early '12.

21          I think what I was looking at, actually, is a trial

22  date somewhere in between what you propose.  And let me make

23  sure this is still right.  It's a fairly complicated schedule

24  here.

25              **MR. STONE:**  Would you mind if I advise you of my

1  trial conflicts in advance, if I can?

2          **THE COURT:**  Right.  Go ahead.

3          **MR. STONE:**  I have two trials set in May of next

4  year.  I think that's too early to conflict with yours.  I have

5  a trial in July.  And then Judge Alsup just set a case for

6  trial in November of next year that I have.

7          **THE COURT:**  Mm-hm.

8          **MR. STONE:**  So given the overlap in my -- I'm sort of

9  booked in trials for next year through that -- the end of that

10  November trial --

11         **THE COURT:**  Mm-hm.

12         **MR. STONE:**  -- because I assume one of my main cases

13  is going to trail.

14         **THE COURT:**  So your November case is going to be

15  when?

16         **MR. STONE:**  It's November 14th.

17         **THE COURT:**  Mm-hm.  And how long is that anticipated?

18         **MR. STONE:**  You know, we're at an early stage.  It's

19  a legal-malpractice case that, in fact, Mr. Glick's partners

20  represent the other co-defendant in the case that I represent,

21  but I think at the moment we would guess that, since it may

22  turn out to be a trial within a trial, we may have to retry the

23  original case as part of the malpractice case, I would think

24  it's not unreasonable to think we're looking at a three- or

25  four-week trial.

1          **MR. ASIMOW:**  As I understand that case, it may well

2   be reassigned.  There's a request pending for that which likely

3   would affect the trial date.

4          **THE COURT:**  Oh.  Is this -- oh.  There's -- some

5   defendants have asked for the Judge to recuse himself, I guess.

6          **MR. ASIMOW:**  Apparently the case.  That's

7   interesting.

8          **THE COURT:**  I think I read about that in the legal

9   newspapers.

10          Well, okay.  And because that one of the -- one of

11   the schedules I was looking at would be October 31st, but that

12   would conflict with that --

13          **MR. STONE:**  It would for me, your Honor.

14          **THE COURT:**  -- of 2011.

15          **MR. GLICK:**  Your Honor, we'd want to be certainly

16   respectful of trial schedules, but that simply can't entirely

17   dominate.  I believe our client's waiting.  I had looked at a

18   compromise date, thinking there was every chance you were going

19   to do that, of September 13th as a date that, if we move fact

20   discovery to February 1st, which ought to be adequate here, and

21   then have the experts' schedule follow that, I think there's

22   every reason we can do this case at that point.

23          **THE COURT:**  Well, if you had fact discovery end

24   February 1st, then when would you do your -- would you -- I

25   mean, one question I always have is:  Do you need expert

 1 discovery to file your dispositive motions or not?

 2          MR. STONE:  Yes.

 3          MR. GLICK:  Yes.  We both said "Yes."

 4          THE COURT:  I think you both said "Yes" to that.

 5          MR. GLICK:  I had -- and again, it's a revision from

 6 what we've proposed.  I don't want to be in a position to

 7 negotiate from it, but I did anticipate --

 8          THE COURT:  Why don't you level with me, what it is?

 9          MR. GLICK:  I had expert on March 1, which is a

10 Tuesday --

11          THE COURT:  Let me just --

12          MR. GLICK:  -- which leaves a month.

13          THE COURT:  So that's initial expert disclosure of

14 March 1?

15          MR. GLICK:  Correct.  And then rebuttal reports on

16 April 4th, which is a Monday.

17          THE COURT:  Mm-hm.

18          MR. GLICK:  And then give us a month.  I had May 6th

19 to do the discovery of those experts.

20          Motions, then, by the end of May.  And again, that

21 being the last date for the motions.

22          THE COURT:  Mm-hm.

23          MR. GLICK:  And then a pretrial in the middle of

24 August -- August 15th -- because I think it does make sense.

25 And I think, even if in our original proposal we kind of had

1  the pretrial backing up to the experts, I'm sure it helps the

2  Court to --

3          **THE COURT:**  Last day to hear dispositive motions, the

4  end of May.  And then when you were saying the pretrial --

5          **MR. GLICK:**  I had moved it back to middle of August,

6  because that gives time for the Court to consider that as part

7  of the pretrial.  And then --

8          **THE COURT:**  Right.  No.  I would want to have plenty

9  of time to decide those motions before you were doing a

10 pretrial, or the pretrial papers will just be a mess,

11 potentially.

12         **MR. GLICK:**  Then a trial in September.  And then one

13 caveat, your Honor.  And I think we haven't met and conferred

14 on it, and I'd like to.

15         I don't know if there's going to be any expert -- I'm

16 sorry -- any survey evidence in this case.  I think we need to

17 meet and talk about that.  If there is, I think it has to be --

18         **THE COURT:**  Copyright dilution, or things like that?

19 Trademark dilution?

20         **MR. ASIMOW:**  Yeah.  The trademark.

21         **MR. GLICK:**  Those are possible survey situations.  I

22 think we need to meet and confer on that.  And if there's going

23 to be a dueling survey, then that's going to require a

24 separate -- somewhat separate expert schedule, which I'm sure

25 we can fit in.  I just want to --

```
 1          THE COURT:  Carve them out and put them on a
 2  different schedule.
 3          MR. GLICK:  Yeah.
 4          MR. STONE:  Two fundamental problems with their
 5  proposal, your Honor.  And the first is that the documents that
 6  they -- they have been telling us -- and I think telling the
 7  Court for months -- they're ready to produce 27,000 documents.
 8          We now understand, if we read their papers and their
 9  statements today correctly, what they mean is the patent
10  documents -- the design patent documents from the ITC are all
11  that they have ready to go.  We can't be ready to take
12  depositions on the antitrust cases until they produce antitrust
13  documents, and they don't.
14          THE COURT:  So when are you going to produce the
15  antitrust documents?
16          MR. GLICK:  Your Honor, we will warrant that, within
17  four weeks at the most -- and I think three -- they'll have
18  every document, or we give them absolute license to come back
19  to your Honor and say, "They didn't meet their obligations, and
20  we can't do this schedule," but we are very close --
21          THE COURT:  Mm-hm.
22          MR. GLICK:  -- to getting through the documents.  And
23  with that motivation, they'll have --
24          THE COURT:  And can you do a rolling production?
25          MR. ASIMOW:  We probably can.  We do have some
```

1   additional documents ready to go.  There's, you know, the

2   question of whether you sort of stop the one review and do the

3   quality control on the ones that are ready.  There are

4   actually -- I think, probably, we've produced about 27,000

5   documents.  And I believe there's something like 10,000 right

6   now that are we have coded to produce in the case.  So we're --

7   you know, we've gotten through it once in the ITC case.  We're

8   familiar with this fire drill.  And so, you know, I think it's

9   going to be -- there are going to be a lot of late nights and

10  weekends, but we can adhere to what Mr. Glick has just said.

11          I'd also like to make sure that the defendants -- I

12  know we did get a large production.  We haven't discussed with

13  them yet whether that's the first stage of a rolling production

14  or what the volume to come would be, so it would be helpful to

15  make sure that they're on that schedule as well, but we can get

16  the plaintiffs' documents out.

17          **THE COURT:**  I want to hear on your side, but while

18  I'm thinking of it, I don't know if we addressed this before.

19  Have you asked me to give you a Court order taking advantage of

20  Evidence Code 502, and clawback, and so forth?

21          **MR. STONE:**  We have not.  We probably should do that.

22          **THE COURT:**  You want that, I would think.  I think

23  that will give you a little more peace of I mind for ruling not

24  just in this case, but for any collateral litigation that might

25  happen.

1          **MR. GLICK:**  We did return some documents.

2          **THE COURT:**  Yeah, but it doesn't protect you against

3    third parties.  And that's what I'm referring to.

4          **MR. STONE:**  I appreciate that.  We will take

5    advantage of that, your Honor.  Let's play out that they'll

6    complete their document production in four weeks.  Let's assume

7    it now takes us a few weeks to review it.  Let's just say three

8    more weeks, I think, is pretty speedy.  That puts us well into

9    October before we're able to start taking the depositions.  And

10   they then propose that somehow those depositions -- 210 hours'

11   worth -- will be taken in three months -- three months and one

12   week.  And I think that portion of their schedule is

13   unworkable, especially when it includes the Thanksgiving

14   holiday, the Christmas holiday, and the New Year holiday,

15   during which time people will be hard to pin down to sit as

16   witnesses.

17         **THE COURT:**  Even if the lawyers are willing to do

18   anything --

19         **MR. STONE:**  You still have witness problems.  So I

20   think that's the first problem with their schedule.

21         I think they're cutting off fact discovery way too

22   soon, given, if they really wanted to move this case quickly to

23   trial, their documents would already have been completely

24   produced.

25         **MR. GLICK:**  Well --

1          **MR. STONE:**  They could have done that.  So to wait

2    and say, "Here are" -- after having told us the last time we

3    were here, "We'll be producing within three days," now to say,

4    "We'll be done producing and we'll give you our first hard copy

5    production of the ITC in three to four weeks."

6          **MR. GLICK:**  Can I just say --

7          **THE COURT:**  Just a minute.

8          Everybody's trial schedule I do want to respect, but

9    I would like to, if possible, within that constraint, get this

10   to trial before your November trial date, because otherwise, I

11   think you know we're -- at the very earliest, it would be

12   January, probably.

13          I forget when I'm on.  Am I on criminal duty next

14   December?

15          **THE CLERK:**  Of this year, your Honor?

16          **THE COURT:**  Or is it the year after?

17          **THE CLERK:**  It's 2011.

18          **THE COURT:**  2011.

19          So that means I couldn't hold a trial in December in

20   any event, even when you're done.

21          **MR. STONE:**  Oh.

22          **THE COURT:**  So it would either have to be before your

23   November trial, or am I talking about the wrong year?

24          **MR. STONE:**  Or I misunderstood your clerk,

25   your Honor, which might be -- if you're on criminal duty

1  January of 2011.

2  **THE COURT:**  No.  In December of 2011.

3  **MR. STONE:**  Oh, I see.

4  **THE COURT:**  So it either has to go to January, or we

5  need to get in there before you have your November trial with

6  Judge Alsup.  And I forget what your other trials were.

7  September?

8  **MR. STONE:**  I have one that is currently set for

9  July 19th.

10  **THE COURT:**  Okay.  So I think that I would like to

11  see a trial date that's in October or September.

12  And if -- you know, I think that perhaps you do need

13  a few more weeks, given the Christmas, et cetera, all those

14  holidays, Hanukkah, what have you; but you know, maybe mid

15  January or even beginning of February.  And maybe with those

16  guidelines, you can work that out, or otherwise, if you can't,

17  I'll have to go back and figure this all out; but what -- I

18  definitely want to have some time after the last

19  summary-judgment motion for me to rule.  And ideally, that's,

20  you know, probably a month; but because I think if you don't

21  have -- if it's a serious summary-judgment motion and you don't

22  have a ruling, I don't know how you're going to do your

23  pretrial papers.  So that does build in some delay.

24  And then I probably would want to have something like

25  three weeks between the pretrial conference and the trial.  So

1  if we -- you know, if the issues are complicated, which they

2  probably would be, we could always fit in another pretrial.  I

3  like to sort everything out as much as humanly possible before

4  we bring a jury in, if we get to that stage here.

5          So maybe you can take a look at that, and see if you

6  can narrow your differences, given the Court's indication of

7  preference; but alternatively, if we can't do it in November, I

8  can't do it in December, so then we would be into January.

9          **MR. GLICK:**  Your Honor, I think if you direct us to

10  come up with the end date in September or October, I'm

11  confident we will figure out how to make other dates work.

12          **MR. SINGLA:**  May I raise one more issue that's just

13  come up in the last few weeks, which is:  We've been trying to

14  meet and confer with the other side for many months now about

15  the scope of their document production.  And what's become

16  clear is that Datel's refusing to produce any documents related

17  to technical specifications about any of their products.

18          And in a case like this, like the DMCA claims, I'm

19  not trying to bring a motion to compel at this stage.  I'm

20  trying to reach an issue for planning.  Unless we can reach

21  compromise, we're very concerned that even the production we're

22  going to get in three to four weeks is going to be missing the

23  critical documents for depositions.

24          If we don't have the documents that tell us exactly

25  what -- how their products work, what the specifications are,

```
 1   what the software code is, I don't see how we're going to be
 2   ready in October or November to start taking those depositions
 3   of their witnesses.  Maybe that's an issue that we can resolve
 4   in the next couple of weeks.
 5           I worry.  What's going to happen in the next few
 6   weeks?  Significant motion to compel.  What we see as the most
 7   critical documents from their company.
 8           MR. GLICK:  I know a lot about that issue,
 9   your Honor.  I don't believe that -- I certainly know we don't
10   agree in how that issue was just framed.
11           THE COURT:  Mm-hm.
12           MR. GLICK:  We can continue to work on it.  We've
13   worked on it a number of times.  Really, the sole issue I think
14   we may have is that -- is the actual reverse engineering of the
15   security chip.  The mechanism for how that was done may be the
16   guts of this dispute.
17           There is no reason in the world for any production on
18   that.  We concede that that was done.  We concede that the chip
19   that was -- that's put in these new products that makes them
20   interoperable was done by reverse engineering.  It's on our
21   website.
22           THE COURT:  But what would be the reason not to tell
23   them?
24           MR. GLICK:  It's -- to go through it is an incredible
25   exercise.  That is true.  To actually go through and show how
```

1 we did what we concede we do, which has no bearing on any issue

2 in the case.

3       **THE COURT:**  Well, I don't -- I have no position on

4 whether it has a bearing or not.  I think how your stuff works

5 would seem to have a bearing.  How you got it to work, I don't

6 know.

7       **MR. GLICK:**  Exactly.  We'll give them all of the

8 specs.

9       **THE COURT:**  Why you can't tell them that, I'm not

10 sure, either.  Is it a competitive concern?  I think you

11 would -- consumption of time?  I mean, you could show me that.

12 And, of course, that would be highly relevant.  It would just

13 seem like you would have kept some documentation on that.

14       **MR. GLICK:**  Well, and let's continue to meet on it.

15 We're giving them all of the specifications of all of the

16 products.  It's this how did it piece -- and if we need to

17 bring it to you, we can bring it to you.

18       **THE COURT:**  Right.  Well, I think their point -- they

19 have some leverage here, right or wrong, because I don't know

20 if you're right or you're wrong or who is, but that -- the more

21 discovery disputes, if I end up saying go ahead and produce

22 something you didn't produce, that might turn into a reason why

23 the schedule needs to be delayed.

24       **MR. GLICK:**  Understood.

25       **THE COURT:**  I don't know.  I would think you need to

1   know how.  You need to know the product's design, but not

2   necessarily, you know, how they got to that point; but I'd be

3   open.  I'd rather not decide that motion now.  So that's just

4   off the top of my head responses.

5           MR. SINGLA:  Certainly, your Honor.  I'm not trying

6   to bring a motion.  I was only trying to raise an issue that

7   I'm worried.

8           THE COURT:  I think you might have made it.

9           MR. SINGLA:  I could maybe say why we think the house

10  is very important.

11          THE COURT:  I don't think now.  I'd rather you all

12  resolve it.  I think I've explained it's at their peril that

13  they don't produce something.  And if it turns out that I agree

14  with you, you may have an argument that's going to affect the

15  schedule.

16          MR. SINGLA:  Thank you, your Honor.

17          MR. STONE:  Your Honor, on the trial-date issue, if I

18  might, one more.  I know we're taking advantage of your

19  patience, and I appreciate that.

20          THE COURT:  It's just that other things call.

21          MR. STONE:  I know.  I do think when you -- if you

22  describe this case, not necessarily as you did, as three cases,

23  but just let's assume it's one antitrust case with some other

24  issues that are of significance tacked onto it.  To set an

25  antitrust case for trial within less than a year of the first

```
 1  production of documents is extraordinary.  And I think setting
 2  this trial in January or February of 2012 is not at all
 3  unreasonable, given the way that cases of this magnitude are
 4  handled.  And I think to push us into September/October not
 5  only is tough on my trial schedule, which I will deal with, but
 6  --
 7          THE COURT:  You're in demarnd.  That's the problem.
 8          MR. STONE:  It's very difficult to expect us to craft
 9  a viable schedule for both discovery and experts and motions
10  that fits within that time frame.  And I think it's -- I think
11  it's unnecessary to say we have to do it in September/October,
12  as opposed to January/February, given this is a case ultimately
13  about money from a defendant who has sufficient resources to
14  make good on any judgment.
15          And I think those few months will make a lot of
16  difference in terms of the way the case is ultimately --
17          THE COURT:  Well, I think what they're saying is it's
18  not just about money for them.  It's about reputation in the
19  marketplace.  And if they were to win this case, that would
20  reassure the market, from their point of view.  So even though
21  they might not get any money from that --
22          MR. GLICK:  Can I -- can I --
23          MR. STONE:  The difference in those few months seems
24  to me not to be impactful, in terms of that reputation.
25          THE COURT:  When was this a case filed?
```

1              **MR. ASIMOW:**  November.

2              **MR. GLICK:**  November, your Honor.

3              **MR. ASIMOW:**  Of '09.

4              **THE COURT:**  Of '09.  So, I mean, if we had -- so

5    that's two years.  Seems to me two years is pretty long.  Three

6    years is too long.  I'm not, you know --

7              **MR. GLICK:**  There's an equity issue here.  This

8    patent claim could have been brought as a counterclaim in this

9    case, and it wasn't.

10             The whole ITC exercise was not of my client's making.

11   It was incredible distraction.  We were forced to produce the

12   documents for that first.  In the course of it, we've gone

13   through virtually all of the documents, because we had to in

14   order to find the ones that are relevant for that case.

15             So we were plunged into Washington because of

16   Microsoft's decision to go there rather than here.  That's

17   consumed some time here.  Nevertheless, we've managed it.

18   We've managed now to settle it.

19             And now my client, having been delayed through that,

20   I think, is entitled to a reasonable trial date.

21             **THE COURT:**  I just looked at -- I did look at the

22   issue of:  What would that be?  And I was thinking about this

23   before.  And I was leaning towards, as I said, that October

24   31st date.  That's October 31st date, since I want to respect

25   your trial schedule, and since I can't do it in December,

1  that's why I'm looking at backing up somewhat.

2          I said to myself, "Two years."  Although that's not

3  short for a complex case, it is a complex case.  It's not a

4  rocket docket, by any means.  So that's where I'm intending.

5          Now, if -- obviously, if you have later legitimate

6  arguments -- and I hate to create any.  And I don't want to

7  encourage them, but -- that these were -- did truly become

8  overly ambitious, and in particular, from their side, I mean,

9  if they don't live up to the pace that's necessary to give you

10 what you need to start your depositions, et cetera, then I

11 would reconsider.

12          **MR. GLICK:**  Thank you, your Honor.

13          **MR. STONE:**  Thank you, your Honor.

14          **THE COURT:**  But -- and I would have given you more

15 time.  I can't help the fact that you're so popular in trying

16 these cases.  And maybe one of them willing away, as is not

17 uncommon, but all right.  So anything else?

18          **MR. GLICK:**  No, your Honor.

19          **MR. STONE:**  That's it, your Honor.

20          **THE COURT:**  Okay.  Thank you.

21          **MR. ASIMOW:**  Thank you very much, your Honor.

22          (At 3:13 p.m. the proceedings were adjourned)

23

24

25

## CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C. 09-5535 EDL, Datel Holdings, Ltd., et al. v. Microsoft Corporation, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Friday, September 3, 2010