IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DATEL HOLDINGS LTD, | No. C-09-05535 EDL |
| Plaintiff, | **ORDER DENYING DEFENDANT'S MOTION TO BIFURCATE** |
| v. | |
| MICROSOFT CORPORATION, | |
| Defendant. | |

Plaintiffs Datel Holdings Limited and Datel Design and Development filed this action against Defendant Microsoft for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14, alleging that Defendant unlawfully monopolized the relevant markets for the Xbox 360 online video game system and Xbox 360 accessories. Defendant filed an answer with counterclaims for, among other things, violation of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201, et seq., alleging that Plaintiffs' memory card, as well as other accessories manufactured by Plaintiffs, bypass various security features of the Xbox 360 that protect against unauthorized access to the video game content.

Defendant has filed a motion to bifurcate the DMCA claim from the rest of the counterclaims and the antitrust claim, and to try the DMCA claim with respect to the memory cards first, arguing that if the memory cards violate the DMCA, Plaintiff has suffered no antitrust injury, and thus, Plaintiffs' antitrust claims fail. Plaintiff opposes the motion. On August 27, 2010, the Court held a hearing on Defendant's motion. For the reasons stated at the hearing and in this Order, Defendant's Motion to Bifurcate is denied.

**Facts**

Plaintiffs, leading developers of video game enhancement products, develop and manufacture aftermarket products for the Xbox 360 video game system. Compl. ¶ 1. One of Plaintiffs' leading products is a memory card for the Xbox 360 known as the MAX Memory card. Id.

Defendant released the Xbox in 2001, and launched the second generation console, Xbox 360, in 2005. Compl. ¶ 11. The Xbox 360 is designed, among other things, to prevent ordinary consumers from copying copyrighted video game data to and from a personal computer to prevent not only the unauthorized modification and distribution of video game content but also to prevent arbitrary, unauthenticated data from being transferred to the Xbox 360. Answer/Counterclaims ¶¶ 28-31. The Xbox 360 console has layers of protection, including encryption, cryptographic algorithms, and unique, unpublished file formats to prevent copying. Id.

The Xbox 360 contains three interfaces to handle different types of external data storage: a Standard UBS port, a Memory Card port and a HDD Connection. Connors Decl. ¶ 3. Each interface accommodates a different type of removable memory device. Id. ¶ 4. The Memory Card port utilizes encryption intended to prevent third parties from selling competitive memory cards that will work in the Memory Card port. Id. ¶ 8. Defendant's version of the memory card contains a security chip that communicates with the Xbox 360, which will recognize the card if the chip responds in an expected way. Id. ¶ 8. The security chip is not used to encrypt data such as game saves, and is only accessed one time to authenticate the product. Id. Plaintiffs eventually reverse engineered this chip, which allowed Plaintiffs to offer a range of competitive accessories for the Xbox 360, such as memory cards, controllers, network adapters and headsets. Id. Unlike Defendant's memory cards, Plaintiffs' memory cards are sold with a transferable SD card reader, which allows users to transfer data to and from editable environments such as a PC, and to transfer and alter video game content. Answer/Counterclaim ¶ 42.

In October 2009, Defendant deployed an update to the operating system on the Xbox 360, which caused the Xbox 360 not to recognize memory cards over 512 MB (the largest size offered by Defendant, and smaller than Plaintiffs') and altered the authentication scheme specifically for

2

1 controllers. Connors Decl. ¶ 10.

**Legal Standard**

A court may order a separate trial "for convenience, or to expedite and economize." Fed. R. Civ. P. 42(b). Five issues for a court to consider when deciding whether to bifurcate are: (1) whether separate trials would be in furtherance of convenience; (2) whether separate trials would avoid prejudice; (3) whether separate trials would serve judicial economy; (4) whether separate trials would reduce the risk of jury confusion; and (5) whether the issues are clearly separable. See Schwarzer, et al., Federal Civil Procedure Before Trial, § 16:160.4 (Rutter Group 2010). Bifurcation should be ordered only when the separation will result in judicial economy and will not unduly prejudice any party. See Calmar, Inc. v. Emson Research, Inc., 850 F. Supp. 861, 865 (C.D. Cal. 1994); see also GEM Acquisitionco v. Sorenson Group Holdings, 2010 WL 1729400, at *3 (N.D. Cal. Apr. 27, 2010) ("In the Ninth Circuit, 'Bifurcation ... is the exception rather than the rule of normal trial procedure.'") (citations omitted). Whether and, if so, how to bifurcate trials is a matter left to the sound discretion of the district court. See Shum v. Intel Corp., 499 F.3d 1272, 1276 (Fed. Cir. 2007); Hirst v. Gertzen, 676 F.2d 1252, 1261 (9th Cir. 1982).

**Discussion**

The DMCA prohibits the trafficking of devices designed to circumvent a technological measure that effectively controls access to a copyrighted work as follows:

> (2) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that--
>
> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;
>
> (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or
>
> (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

17 U.S.C. § 1201(a)(2). Further, the DMCA also states:

> (b) Additional violations.--(1) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that--

3

> (A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof;
>
> (B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or
>
> (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof.

17 U.S.C. § 1201(b)(1). "Section 1201(b) is very similar to Section 1201(a)(2). But (a)(2) focuses on effectively controlling access and (b) focuses on effectively protecting a right of a copyright owner." Apple, Inc. v. Psystar Corp., 673 F. Supp. 2d 931, 939 (N.D. Cal. 2009).

Thus, the first inquiry under the DMCA will be whether Plaintiffs' products are designed or marketed to circumvent technology protection measures. Under the DMCA, "circumvention" has a broad definition: "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner," or "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure  17 U.S.C. § 1201(a)(3)(A); § 1201(b)(2)(A); see also Actuate Corp. v. Int'l Bus. Machines Corp., 2010 WL 1340519, at *9 (N.D. Cal. Apr. 5, 2010).

The second inquiry will be whether Defendant's security measures effectively protect against unauthorized access to copyrighted video game content. The terms used in connection with this inquiry are also broad. For example, "a technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B); see also Sony Computer Entertainment of Am. v. Divineo, Inc., 457 F. Supp. 2d 957, 965 (N.D. Cal. 2006).

Defendant argues that a ruling on its DMCA claim may entirely resolve or substantially narrow Plaintiffs' antitrust claims because a threshold issue for the antitrust claims is whether Plaintiffs can establish antitrust standing. See R.C. Dick Geothermal Corp. v. Thermogenics, 890 F.2d 139, 152 (9th Cir. 1989). Defendant argues that if the Court determines that Plaintiffs' memory cards are unlawful circumvention devices under the DMCA, Plaintiffs cannot claim any antitrust

4

1 injury from being restrained from distributing its illegal devices.  See Modesto Irrigation Dist. v.
2 Pac. Gas & Elec. Co., 309 F. Supp. 2d 1156, 1169-70 (N.D. Cal. 2004) (stating that "Courts have
3 long recognized that 'an action under the antitrust laws will not lie where the business conducted by
4 the plaintiff, and alleged to have been restrained by the defendant, was itself unlawful,'" and
5 determining that the plaintiff lacked antitrust standing in its case against PG&E where the plaintiff
6 unlawfully entered the market for electricity services) (citation omitted); RealNetworks, Inc. v. DVD
7 Copy Control Ass'n, 2010 WL 145098, at *6 (N.D. Cal. Jan. 8, 2010) ("Real's purported injury
8 stems from its own decision to manufacture and traffic in a device that is almost certainly illegal
9 under the DMCA. . . .  The court does not here hold that Real is barred from maintaining an antitrust
10 claim because it has engaged in illegal activity; rather, the court holds that Real has failed to allege a
11 plausible antitrust injury. Even if Real were free to circumvent CSS technology, RealDVD would
12 have been enjoined due to its circumvention of non-CSS encryption devices.  Real alleges no viable
13 antitrust injury and therefore does not have standing to bring a private claim under the Sherman
14 Act.").

15 Plaintiff, however, argues that even as to the memory cards, Defendant's DMCA claim, if
16 successful, cannot eliminate Plaintiff's antitrust claim and would only act as a setoff to Plaintiff's
17 antitrust recovery.  See Memorex Corp. v. IBM, 555 F.2d 1379, 1380 (9th Cir. 1977).  In Memorex,
18 the court rejected the argument that the plaintiff's illegal conduct foreclosed it from suffering an
19 antitrust injury. Id. at 1381-82 ("Memorex's own illegal conduct did not divest it of an antitrust
20 action" . . . . A defendant who violates the antitrust laws has committed a public wrong. A private
21 wrong done by a potential plaintiff should not prevent that party, who may be the only party with
22 standing to sue, from taking action under the antitrust laws.").  The Memorex court concluded:

> illegality is not to be recognized as a defense to an antitrust action when the illegal acts by the plaintiff are directed against the defendant.  A wrongful act committed against one who violates the antitrust laws must not become a shield in the violator's hands against operation of the antitrust laws.

Id. at 1382-83; id. at 1282, n.5 ("What we are holding today is that wrongs against the defendant, such as the theft of trade secrets, will not bar the plaintiff's antitrust action").

Memorex, however, is distinguishable insofar as here, Defendant is not arguing that Plaintiffs' claims are barred because it engaged in some wrongful conduct in developing its memory

5

1    card; instead, Defendant argues that if it prevails on the DMCA claim, then the memory card itself
2    should not have been sold as in RealNetworks.  Thus, to the extent that litigation of Defendant's
3    DMCA claim reveals that Plaintiffs' memory cards are unlawful circumvention devices, Modesto
4    and RealNetworks may bar Plaintiffs' antitrust claims at least as to the memory cards.  See First
5    Beverages Inc. of Las Vegas v. Royal Crown Cola, 612 F.2d 1164, 1173 (9th Cir. 1980) ("Unlike
6    Calnetics and Memorex defendants, Royal Crown introduced evidence of illegality not to prevent
7    the appellants from presenting any case at all, but to show that some or all of the alleged lost profits
8    would never have materialized.").

9    Although if Defendant prevails as to the DMCA, the scope of the case may be narrowed,
10   Plaintiff's antitrust claim goes beyond the memory cards.  See, e.g., Compl. ¶ 25 ("Microsoft has
11   modified the Xbox 360's authorization protocols and Security Integrated Circuit processes to
12   prevent the interoperability of other Datel accessories - including the announced but not yet released
13   Joypad [controller]. . . . Microsoft's intention is to block the use of competitive Datel devices."); ¶ 4
14   ("Microsoft's dashboard upgrade is also intended to foreclose competition from Datel in the sale of
15   other aftermarket Xbox accessories and add-ons, including gamepad controllers, through the
16   implementation of predatory technological barriers."); ¶ 76 (alleging that Defendant's tying
17   arrangement harms competition in several ways, including by "forcing customers, who would
18   otherwise prefer third-party accessories and add-ins for the Xbox 360, including the DMMCs
19   [memory cards] and other Datel accessories, to nonetheless use Microsoft's accessories and add-
20   ons.").  Further, Plaintiffs state that the October 2009 update locked out Plaintiffs' then-unreleased
21   controllers as well as its memory cards.  Connors Decl. ¶ 10.  In addition, Plaintiffs point to a threat
22   allegedly made by Defendant to at least one retailer warning it not to carry Plaintiffs' accessories,
23   including controllers, because Defendant intended to disable these products again.  Tarolla Decl. ¶ 7.
24   Thus, resolution of the DMCA claim as to the memory cards will not moot the entire antitrust claim
25   because other products are at issue.

26   Further, Plaintiffs' defenses to the DMCA claims raise complex factual and legal issues that
27   do not lend themselves to expedited adjudication.  For example, Plaintiffs' primary defense is that
28   there is no evidence that the primary purpose of the memory cards is to circumvent Defendant's

technological measure. See 17 U.S.C. § 1201(a)(2). Plaintiffs argue that the primary purpose of the card, which is also the primary purpose of Defendant's card, is to allow Xbox 360 users to store data that would otherwise be lost when the machine is turned off. Connors Decl. ¶ 11. Plaintiff argues that it markets its card consistent with that purpose. Defendant counters that Plaintiff's marketing materials specifically state that its memory cards are perfect for making use of game saves and content downloaded from the internet, which Defendant argues constitutes circumvention. See Reply at 12. The issues raised by this and other defenses appear to be difficult, fact-intensive questions that should be developed through full discovery.

Further, it appears that Plaintiffs may suffer prejudice through delay of the resolution of the antitrust claims. Specifically, Plaintiffs are experiencing lost sales and damages to their reputation through Defendant's disabling of Plaintiffs' competing products and threats to retailers. Tarolla Decl. ¶¶ 5-10. In addition, Plaintiffs persuasively argue that Defendant will suffer little prejudice if the DMCA claim is not bifurcated from the antitrust claim. Plaintiffs note that Defendant could have brought a DMCA claim against Plaintiffs at any time, yet failed to do so until Plaintiffs filed this lawsuit.

Finally, because there may be at least some overlap in factual and legal issues between the DMCA claim and the antitrust claim, bifurcation is not appropriate. See Performance Aftermarket Parts Group v. TI Group Automotive Systems, 2006 WL 2850061, at *2 (S.D. Tex. Oct. 3, 2006) (finding that there were many overlapping issues in case involving patent and antitrust issues, and so denied bifurcation). For example, it appears that there may be overlap in issues of corporate organization, the uses of Plaintiffs' products, sales of Plaintiffs' products, product design, marketing and damages. In addition, Plaintiffs argue that experts would be used for both the antitrust and DMCA claims.

//
//
//
//
//

**Conclusion**

On balance, the various factors weigh against exercising the Court's discretion to bifurcate. Defendant's Motion to Bifurcate is denied.

**IT IS SO ORDERED.**

Dated: October 4, 2010

ELIZABETH D. LAPORTE
United States Magistrate Judge