IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DATEL HOLDINGS LTD,<br><br>    Plaintiff,<br><br>  v.<br><br>MICROSOFT CORPORATION,<br><br>    Defendant.<br>_____/ | No. C-09-05535 EDL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO COMPEL** |

Before the Court is Plaintiff's Motion to Compel seeking production of six documents that Plaintiff argues are not privileged, and seeking an order that Defendant take certain steps to re-review its privilege log and provide additional information. Defendant has lodged the six documents for <u>in camera</u> review. Five of the six documents (Exhibits 165-167, 170, 173) are various abbreviated versions of a long email chain that began in July 2009 entitled "Re-auth test for hacked memory units." Defendant explains that there was a glitch in the document review software that caused these documents to be produced in truncated format. The sixth document (Exhibit 171) is an email entitled "auth data," which contains some of the contents of an earlier email from the "Re-auth" chain, and was not truncated. The parties refer to these documents as the "deposition documents" because the dispute over them arose during the deposition of Tracy Sharpe, a Distinguished Engineer on Defendant's Xbox Console Software Team, who authored or received some of the emails.

Defendant argues that the deposition documents are protected by the attorney-client privilege and/or the work product doctrine because the non-truncated portions show that the email chain was instigated by a request from in-house counsel, Shelley McKinley, to non-attorney Sebastian Lange, a

1 Principal Program Manager at Microsoft, to investigate whether Plaintiff had infringed Defendant's
2 intellectual property rights. Defendant also argues that the documents were inadvertently produced
3 to Plaintiff within the meaning of Federal Rule of Evidence 502(b), so there was no waiver of the
4 privilege or work product protection. Specifically, Defendant explains that after potentially
5 responsive documents were collected from custodians, they were loaded into a computerized
6 document processing system known as "Clearwell." Declaration of Hojoon Hwang ¶ 2. Clearwell
7 extracted metadata from each document and converted the documents into a format that allowed for
8 text searching. Id. Once the documents were processed through Clearwell, they were entered into
9 an online platform, where they were reviewed by attorneys. Id. For reasons still unknown to
10 Defendant, Clearwell truncated some "Re-auth" documents during processing. Id. ¶ 6.

11 Plaintiff counters that the documents are not privileged, and even if they were, any privilege
12 or protection has been waived. Plaintiff argues that Defendant did not take the steps necessary to
13 avoid waiver under Rule 502(b).

14 Defendant has agreed to produce all non-privileged portions of the documents. Declaration
15 of Rohit Singla ¶ 7. In particular, Defendant has agreed to produce some of the later portions of the
16 "Re-auth" email chain because they acknowledge that the discussions eventually shifted to business
17 topics. See Declaration of Tracy Sharpe ¶ 5.

18 **Discussion**

19 Plaintiff questioned Sharpe about the deposition documents at his January 18, 2011
20 deposition. See Declaration of Daniel Asimov Ex. A. Defendant did not immediately object to the
21 documents. At the deposition, in response to Plaintiff's counsel's request that an unredacted version
22 of one of the documents be produced, Defendant's counsel looked at the truncated documents and
23 stated: "I don't think there's a privilege assertion or redaction." Id. at 122. A few hours later,
24 however, after obtaining and reviewing the complete emails, Defendant's counsel asserted on the
25 record at the deposition that the documents were privileged:

26 So you asked for these truncated documents that were misproduced to you without --
in partial format. So I have obtained full copies of them, which we did not previously
27 have. I obtained them from the client today. And the full versions show that this
entire thread should be privileged. So I am going to send you an email now, I want to
28 put those on the record also that these documents are privileged I would like to pull
them out of the exhibit pack.

2

Id. at 220-21; see also id. at 232 ("I've looked at the full versions of all of these, and they are all truncated. I've gotten them from the client, had them preprocessed [sic] today, and they all are privileged. We claw these back we ask for them to be Claude [sic] back. This is inadvertent production av [sic] privileged document because by some technical glitch -- we ask that they be removed from the exhibits for this deposition."). Defendant did not specifically assert the work product protection.

Later in that deposition, Sharpe testified that he did not recall any discussions with lawyers in July 2009 when he was examining Plaintiff's memory unit and writing about it in the email chain. Id. at 236. He also testified that he was not aware of anyone else at Microsoft who had discussions with lawyers concerning the Datel memory units in July 2009. Id. at 237. During the July 2009 timeframe, he did not report any of his findings about the memory units to any lawyers, and he was not told that he could not discuss the Datel investigation with anyone. Id. However, in support of this motion, Sharpe states in his declaration that the initiating email, which had been invisible in the truncated form of the email chain discussed at the deposition, relayed a request from counsel for a factual investigation into Plaintiff's memory unit, and that at the time he originally reviewed the complete email when first sent from Lange to Sharpe and others, he understood that the purpose of the investigation was to help in-house counsel understand how Plaintiff's memory unit worked. Sharpe Decl. ¶ 2.

**Inadvertent production**

Under Federal Rule of Evidence 502(b), adopted in 2008, the disclosure of a privileged document does not waive the privilege if the disclosure was inadvertent, the holder of the privilege or protection took reasonable steps to prevent disclosure and the holder promptly took reasonable steps to rectify the error. Fed. R. Evid. 502(b); Conceptus, Inc. v. Hologic, Inc., 2010 WL 3911943, at *1 (N.D. Cal. Oct. 5, 2010) ("The disclosure of a privileged document normally operates as a waiver unless three conditions are satisfied: '(1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil

3

1 Procedure 26(b)(5)(B).'  These three requirements are separate and should not be conflated in the
2 analysis; in particular, inadvertence under the first prong does not turn on the reasonable steps taken
3 to prevent mistaken disclosure addressed in the second prong.  The burden of proving that the
4 attorney-client privilege applies rests not with the party contesting the privilege, but with the party
5 asserting it.") (internal citation omitted).  Under the circumstances here, the Court finds that
6 disclosure of the "Re-auth" emails was inadvertent and therefore did not result in waiver of the
7 attorney-client privilege or work product doctrine.

**1. Defendant's disclosure was inadvertent**

The first inquiry under Rule 502(b) -- whether disclosure was inadvertent -- is a simple one: did the disclosure occur by mistake or unintentionally?  This understanding of Rule 502(b)'s first requirement is reinforced by its juxtaposition with the proceeding subsection (a), which addresses disclosure of privileged information made on purpose or intentionally, such as disclosure of advice of counsel in support of a defense of good faith reliance on that advice.  See Amobi v. District of Columbia Dep't of Corrections, 262 F.R.D. 45, 53 (D. D.C. 2009) (finding that inadvertence was determined by "considering if the party intended to produce a privileged document or if the production was a mistake").

Plaintiff argues that because Defendant produced the truncated emails in the thread repeatedly, must necessarily have reviewed them again in preparation for recent depositions, and then initially allowed the truncated emails to be marked as exhibits to the Sharpe deposition, Defendant must have intended to produce them and therefore cannot qualify for the protection from waiver afforded by Rule 502(b).  Plaintiff contends that Rule 502(b) only protects "'unintended production,' not ill-considered production, or production made without bothering to acquire a complete understanding of the four corners of a particular document." Pl.'s Mot. at 14.  Plaintiff relies on Silverstein v. Federal Bureau of Prisons, 2009 WL 4949959, at *11 (D. Colo. Dec. 14, 2009), which stated that: "Based on all the commentary, the word 'inadvertent' from Rule 502 mandates a remedy for an unintended, rather than mistaken, disclosure." In Silverstein, a party intentionally disclosed a privileged document based on a mistaken understanding that the document was not privileged even though the document had been previously and correctly determined by other

4

lawyers to be privileged. See Silverstein, 2009 WL 4949959, at *11. Upon learning that the document had been misidentified and was actually privileged, counsel did not take reasonable steps to rectify the error. Id. Under those circumstances, the Silverstein court found that the production was not inadvertent under Rule 502(b), and the attorney-client privilege had been waived. The court in Silverstein addressed a very different set of circumstances, and concluded that the disclosure failed all three requirements of Rule 502(b). Further, in this Court's view, the "inadvertence" requirement of Rule 502(b) was not designed to turn on fine distinctions based on the nature of the mistake to determine whether the particular type of mistaken disclosure qualified for protection from waiver.

Here, although Defendant's team of lawyers carefully reviewed documents to identify privileged communications, a computer glitch truncated the documents, removing the portion conveying the request from counsel to conduct a factual investigation. The technical glitch was a mistake, which occurred accidentally and unintentionally, and prevented Defendant's team of lawyers from recognizing the privileged nature of the email chain. Mistaken production due to an unexpected software glitch that occurred despite the use of standard discovery software falls squarely on the inadvertent side of the divide between intentional disclosure under Rule 502(a) and unintentional disclosure under Rule 502(b).[1] Under these circumstances, production of these six documents was inadvertent.

**2. Defendant took reasonable steps to prevent disclosure**

Defendant adopted fairly robust measures to protect against inadvertent production. Defendant hired a group of contract lawyers to review the documents for privileged material. Hwang Decl. ¶ 2. A team of attorneys initially screened responsive documents and identified potentially privileged documents. Id. A quality control team then reviewed any documents marked potentially privileged. Id. A privilege team then reviewed any documents that were still designated as privileged after the second review, and privileged documents were entered into a privilege log. Id. Reviewing attorneys had specific instructions on how to identify documents that contain

---

[1] Plaintiff does not argue, for example, that the e-discovery product used by Defendant, Clearwell, was unreliable or below the industry standard for e-discovery technology.

1  attorney-client communications or work product. Id. In addition to providing written instructions,
2  Defendant's litigation counsel conducted a tutorial for the reviewers. Id. From time to time,
3  Defendant's litigation counsel also conducted its own quality control checks. Id. These measures
4  enabled Defendant to identify and withhold the non-truncated versions of the "Re-auth" email
5  thread.

6  Plaintiff criticizes this careful process as insufficient in that Defendant has not also said that
7  it gathered and coded all emails in an email string upon determining that any email in the string
8  contained privileged information. Plaintiff further argues that Defendant clawed back 177 other
9  document before the Sharpe deposition, and has recently asked for 44 more documents back,
10 showing that Defendant has not taken reasonable steps to prevent disclosure, citing Eden Isle Marina
11 Inc. v. United States, 89 Fed. Cl. 480, 510-11 (Fed. Cl. 2009) ("Because defendant disclosed the
12 pages to plaintiff more than once, and via more than one mechanism, the court concludes that
13 defendant's disclosure was so careless that it cannot be construed as inadvertent."). Defendant
14 responds that cross-checking would have required "Herculean efforts" that are not required under
15 the Rule, and would grind Defendant's document production to a halt. See Hynix Semiconductor
16 Inc. v. Rambus, Inc., 2008 WL 350641, at *1-2 (N.D. Cal. Feb. 2, 2008).

17 Inadvertent production of a relatively low proportion of documents in a large production
18 under a short timetable due to mistake should be and usually is excused. See, e.g., Kandel v.
19 Brother Int'l Corp., 683 F. Supp. 2d 1076, 1085-86 (C.D. Cal. 2010). Here, Plaintiff sought, and
20 obtained, an accelerated trial schedule, which included a shortened discovery period, and as of
21 February 4, 2011, Defendant had produced over 119,000 documents, or over 1.2 million pages, to
22 Plaintiff. See Hwang Decl. ¶ 4. Further, "[d]epending on the circumstances, a party that uses
23 advanced analytical software applications and linguistic tools in screening for privilege and work
24 product may be found to have taken 'reasonable steps' to prevent inadvertent disclosure." Fed. R.
25 Evid. 502 advisory committee's note. Here, Defendant used a computerized document processing
26 system to organize its documents which, unbeknownst to Defendant, suffered a software failure.
27 Moreover, "the rule does not require the producing party to engage in a post-production review to
28 determine whether any protected communication or information has been produced by mistake. But

6

1 the rule does require the producing party to follow up on any obvious indications that a protected
2 communication or information has been produced inadvertently." Id. Despite the fact that
3 Defendant produced the "Re-auth" emails at various times, post-production review is not required as
4 long as there was no obvious indication that protected information had been produced. Here, given
5 the scope of production and the unexpected nature of the software glitch, the fact that the format of
6 the deposition documents gave some indication that some content had been truncated was not a
7 sufficiently obvious clue that any missing material concerned privileged material, so no obligation
8 of post-production review was triggered prior to the deposition. Thus, Defendant took reasonable
9 steps to prevent disclosure. In relatively large productions of electronic information under a
10 relatively short time table, perfection or anything close based on the clairvoyance of hindsight
11 cannot be the standard; otherwise, the time and expense required to avoid mistakes to safeguard
12 against waiver would be exorbitant, and complex cases could take years to ready for trial.

### 3. Defendant took reasonable steps to rectify the error

14 Defendant first learned the nature of the truncated emails at the Sharpe deposition after
15 counsel looked at the complete documents during the deposition. Defendant did not appreciate the
16 true nature of the full text when Sharpe was testifying about the documents and when they were
17 marked at the deposition. As soon as Defendant obtained the entire text of the emails while the
18 deposition was still ongoing, Defendant interrupted the deposition to put its privilege assertion on
19 the record. Then, within a few days, Defendant reviewed its entire production to identify other
20 documents affected by the glitch. These steps constitute a prompt and immediate response to the
21 inadvertent production.

22 Plaintiff argues, however, that deposition testimony conclusively waives the privilege, citing
23 Brandon v. D.R. Horton, Inc., 2008 WL 2096883, at *3 (S.D. Cal. May 16, 2008) (holding that
24 "failure to assert the privilege at deposition is clear proof that, even if there was a privilege, it was
25 absolutely and irrevocably waived, regardless of the whether disclosure was inadvertent.").
26 Brandon, however, predated Rule 502(b), and involved a document that was not privileged in the
27 first place, but was created as a study tool for the plaintiff rather than a document for or by his
28 attorney. Another case cited by Plaintiff, Luna Gaming- San Diego v. Dorsey & Whitney, 2010 WL

7

1    275083 (S.D. Cal. Jan. 13, 2010), also does not support Plaintiff's argument. In Luna Gaming, the
2    court found that the plaintiff did not take reasonable steps to rectify the error in disclosure where the
3    defendant used the disputed document at a deposition. The defendant's counsel asked the witness to
4    review the document and asked three questions about it, all without objection by the plaintiff's
5    counsel. Here, by contrast, Defendant asserted privilege with respect to the "Re-Auth" emails on the
6    record at the Sharpe deposition as soon as counsel found out that the documents contained privileged
7    material, which satisfied Rule 502(b). See Luna Gaming, 2010 WL 275083, at *5 ("Rule 502(b)(3)
8    requires that the holder of the privilege 'promptly [take] reasonable steps to rectify the error ....'
9    When the privilege holder objects immediately upon discovery of the inadvertent disclosure,
10   502(b)(3) is satisfied.") (internal citation omitted). The use of the "Re-auth" emails at the Sharpe
11   deposition did not result in a waiver.
12       Accordingly, Defendant's production of the truncated "Re-auth" emails was inadvertent and
13   did not constitute a waiver of the attorney-client privilege or the work product doctrine.
14       **Attorney-client privilege**
15       Defendant argues that at least some of the "Re-auth" email chain is protected by the attorney-
16   client privilege, even though, as Plaintiff points out, none of the authors or recipients of the emails
17   are attorneys. The attorney-client privilege may attach to communications between nonlegal
18   employees where: (1) "the employees discuss or transmit legal advice given by counsel;" and (2) "an
19   employee discusses her intent to seek legal advice about a particular issue." US v. ChavrenTexaco
20   Corp., 241 F. Supp. 2d 1065, 1077 (N.D. Cal. 2002); see also McCook Metals LLC v. Alcoa, Inc.,
21   192 F.R.D. 242, 254 (N.D. Ill. 2000) ("Management should be able to discuss amongst themselves
22   the legal advice given to them as agents of the corporation with an expectation of privilege.").
23       Defendant argues that the original email on the "Re-auth" chain transmitted legal advice
24   under the first prong above, and therefore, the entire chain is privileged. The original email was sent
25   from Sebastian Lange, who is not an attorney and is a Principal Program Manager at Microsoft, and
26   is dated July 8, 2009 at 11:04 a.m. He had participated in a conference call with Shelley McKinley,
27   Microsoft's in-house counsel, on that morning concerning Microsoft's potential infringement claims
28   against Datel. McKinley Decl. ¶ 5. McKinley requested on that call that Lange conduct an

8

1  investigation into the potential claims and enlist other employees with relevant technical expertise.
2  Id. She communicated this request verbally, but understood that Lange could convey the request to
3  other employees, who would conduct an investigation and report back to Microsoft's legal
4  department. Id. Specifically, Defendant argues that in-house counsel "advised its client" that it was
5  necessary to conduct an investigation, and that advice was then "transmitted between nonlawyers"
6  and therefore was privileged.

7  Plaintiff points out that Defendant has not identified any transmission of legal advice
8  between nonlawyers in the "Re-auth" email chain other than the initial email from Lange to other
9  Microsoft employees. There are no communications with lawyers in the email chain, nor is there
10 any further reference to legal advice about Datel. Moreover, there has been no showing that the
11 results of the investigation were ever conveyed to counsel. Instead, the email chain contains
12 communications between employees about what the computer testing revealed, and does not relate
13 to transmission of legal advice. See Hynix Semiconductor Inc. v. Rambus Inc., 2008 WL 350641, at
14 *3 (N.D. Cal. Feb. 2, 2008) ("A vague declaration that states only that the document 'reflects' an
15 attorney's advice is insufficient to demonstrate that the document should be found privileged.").
16 Thus, the only portion of the "Re-auth" email chain that is protected by the attorney-client privilege
17 is the original email from Lange.

18 **Work product protection**

19 A document is eligible for work product protection under Rule 26(b)(3) if "'in light of the
20 nature of the document and the factual situation in the particular case, the document can be fairly
21 said to have been prepared or obtained *because of* the prospect of litigation.'" In re Grand Jury
22 Subpoena, 357 F.3d 900, 907 (9th Cir.2004) (emphasis added) (quoting Charles Alan Wright, Arthur
23 R. Miller, and Richard L. Marcus, 8 Federal Practice & Procedure § 2024 (2d ed. 1994)) ("The
24 'because of' standard does not consider whether litigation was a primary or secondary motive
25 behind the creation of a document. Rather, it considers the totality of the circumstances and affords
26 protection when it can fairly be said that the 'document was created because of anticipated litigation,
27 and would not have been created in substantially similar form but for the prospect of that
28 litigation.'"). The document need only be created because of the "prospect" of litigation. In re

1  Grand Jury Subpoena, 357 F.3d at 907. Further, factual investigations similar to that here have been
2  held to be protected by the work product doctrine. See, e.g., In re Grand Jury Subpoena, 357 F.3d at
3  905 (stating that investigation of environmental clean-up by environmental consultant hired by
4  lawyer was protected work product); Kandel, 683 F. Supp. 2d at 1084-85 (stating that documents
5  produced by corporate defendants to plaintiffs were subject to protection from disclosure under the
6  work product doctrine; documents, which were variations of stream e-mails to and from defendants'
7  employees, were initially generated by corporate deponent and another employee at the request of
8  defendants' counsel to gather needed information concerning technical aspects of defendants'
9  printers germane to the litigation and upcoming depositions); Bickler v. Senior Lifestyle Corp., 266
10 F.R.D. 379 (D. Ariz. 2010) (finding that investigation conducted by member of human resources
11 department, as well as executive director, of assisted living home and skilled nursing center into
12 injuries suffered by two residents was undertaken at direction of home's in-house counsel and in
13 anticipation of litigation, as required for work-product protection to apply; virtually from the
14 moment of the incident, members of the family of one injured resident raised the prospect of
15 litigation, and executive director feared that home would be sued).

16 Here, however, Defendant has not made a showing that the rest of the email chain after
17 Lange's initial email was prepared "because of" the prospect of litigation. First, although Defendant
18 argues that under the totality of the circumstances, the "Re-auth" emails were prepared to help
19 Defendant's in-house counsel develop a lawsuit against Plaintiff for violating Defendants'
20 intellectual property rights (McKinley Decl. ¶ 3; Sharpe Decl. ¶ 2), the email chain focuses on
21 exploring business and technological countermeasures to Plaintiff's memory unit rather than on
22 preparation for litigation. Further, only after Plaintiff filed this antitrust lawsuit in 2009 did
23 Defendant assert counterclaims against Plaintiff for, among other things, trademark infringement,
24 and file complaints against Plaintiff alleging design patent infringement in the Western District of
25 Washington and the International Trade Commission.

26 Even if the "Re-auth" emails are work product, they are not protected from disclosure
27 because Plaintiff has a substantial need for the materials to prepare its case, and cannot without
28 undue hardship obtain their substantial equivalent by other means. Fed. R. Civ. P. 26(b)(3).

10

1 Plaintiff argues that the "Re-auth" emails constitute material evidence of Defendant's plan to
2 monopolize the aftermarket for Xbox 360 accessories and its execution of that plan, which allegedly
3 began in the summer of 2009. Plaintiff's need to have these documents is substantial because
4 Plaintiff's theory in this case is that Defendant intended to block the operation of Plaintiff's
5 accessories through anticompetitive acts and took steps to do so.

6 Further, Plaintiff is incapable of obtaining the information elsewhere. It is unlikely that the
7 employees involved could remember all of the details of their technical activities in the summer of
8 2009, and Defendant has not made any showing that there are alternative means to obtain this
9 information with undue hardship. Cf. Kandel, 683 F. Supp. 2d at 1084 (finding that the plaintiffs did
10 not met their burden under to show "substantial need for the materials to prepare [their] case" and
11 that they "cannot, without undue hardship, obtain their substantial equivalent by other means,"
12 because the defendants provided plaintiffs with a summary chart of the factual information in the
13 disputed documents prior to the Rule 30(b)(6) deposition to facilitate plaintiffs' ability to fully
14 examined the 30(b)(6) deponent and plaintiffs did fully examine him). Indeed, Sharpe did not
15 remember the circumstances surrounding the email chain when he was deposed in January 2011.

16 Finally, Defendant did not expressly assert the work product protection for the deposition
17 documents at the deposition because Defendant's counsel asserted only that the documents were
18 "privileged" and technically the work product doctrine is not a privilege. See, e.g., Admiral Ins. Co.
19 v. U.S. Dist. Ct., 881 F.2d 1486, 1494 (9th Cir. 1989) ("The work-product rule is not a privilege . . .
20 ."). This failure to assert the work product protection might not by itself be sufficient to waive the
21 privilege, in light of the common, albeit imprecise, practice of using the term "privilege" as
22 shorthand for work product protection as well as the attorney-client privilege, but this failure
23 coupled with Plaintiff's showing under Rule 26(b)(3) justifies waiver of the work product protection
24 for the "Re-auth" email chain.

25 **Other relief sought by Plaintiff**

26 As stated at the hearing, with respect to identification of attorneys on Defendant's privilege
27 log, Defendant stated that it would provide a revised privilege log identifying all in-house and
28 outside counsel, and the Court ordered the parties to meet and confer regarding other persons of

interest on the privilege log for whom Plaintiff seeks identification of job title or capacity.

**Conclusion**

       Therefore, Plaintiff's Motion to Compel is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated: March 11, 2011

*Elizabeth D. Laporte*
ELIZABETH D. LAPORTE
United States Magistrate Judge