MARTIN R. GLICK (No. 40187)
mglick@howardrice.com
JEROME B. FALK, JR. (No. 39087)
jfalk@howardrice.com
DANIEL B. ASIMOW (No. 165661)
dasimow@howardrice.com
ROBERT D. HALLMAN (No. 239949)
rhallman@howardrice.com
SHAUDY DANAYE-ELMI (No. 242083)
sdanaye-elmi@howardrice.com
HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California 94111-4024
Telephone: 415/434-1600
Facsimile: 415/677-6262

Attorneys for Plaintiffs
DATEL HOLDINGS LTD. and DATEL DESIGN & DEVELOPMENT, INC.

HowardRice

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

DATEL HOLDINGS LTD. and DATEL DESIGN & DEVELOPMENT, INC.,

Plaintiffs,

v.

MICROSOFT CORPORATION,

Defendant.

No. 09-CV-05535 EDL

Action Filed: November 20, 2009

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DMCA COUNTERCLAIM)

Date: August 9, 2011
Time: 9:00 a.m.
Place: Courtroom E, 15th Floor
Judge: Hon. Elizabeth D. Laporte

**REDACTED**

**TABLE OF CONTENTS**


| | Page |
|---|---|
| MOTION AND NOTICE OF MOTION | 1 |
| INTRODUCTION | 2 |
| STATEMENT OF FACTS | 4 |
| A. The Parties. | 4 |
| B. The Xbox 360, Microsoft's Memory Cards, And Microsoft's Efforts To Exclude Third Party Competitors. | 5 |
| C. Datel Reverse Engineers Microsoft's Authentication Chip, And Creates A Memory Card With Greater Storage Capacity. | 6 |
| D. Microsoft Forces Players To Accept An Update That Breaks Datel's Memory Card. | 7 |
| E. In Response To The Antitrust Claim, Microsoft Contends—For The First Time—That Datel's Memory Units Violate The DMCA. | 7 |
| F. Prior To And During This Litigation, Microsoft Has Enabled And Assisted In The Very Conduct That It Complains Of In Its DMCA Claim. | 8 |
| KEY PROVISIONS OF THE DMCA | 9 |
| ARGUMENT | 9 |
| I. THE DMCA ANTICIRCUMVENTION PROVISIONS DO NOT APPLY TO THE MANUFACTURE AND SALE OF COMPETITIVE PRODUCTS THAT PERFORM THE SAME FUNCTION AS THE COMPLAINING PARTY'S PRODUCTS. | 9 |
| II. THE DATEL MEMORY CARD DOES NOT PROVIDE USERS WITH ANY ACCESS THEY DO NOT ALREADY HAVE. | 11 |
| A. The MAX Memory Card Does Not Provide Any Incremental Access To Xbox 360 Games. | 12 |
| B. An Xbox 360 Owner Has Access To And Can Copy Game Save Files Independent Of The MAX Memory Card. | 14 |
| III. DATEL'S MAX MEMORY CARD AND SOFTWARE DO NOT FACILITATE COPYRIGHT INFRINGEMENT. | 15 |
| A. The Game Owner Is Authorized Under The License From The Game's Copyright Holder To Store Game Data On The Xbox's Hard Disk Or On A Memory Card—Whether That Card Is Manufactured By Microsoft Or Datel. | 16 |




HowardRice

**TABLE OF CONTENTS**


| | | | | Page |
|---|---|---|---|---|
| | B. | In Addition, The Game Owner Has The Right Under Section 117 To Store An Archival Copy Of The Saved Game Data On The Xbox's Hard Disk Or On A Memory Card—Whether That Card Is Manufactured By Microsoft Or Datel. | | 17 |
| | C. | Saving A Game Ordinarily Does Not Entail Copying Elements Protected By Copyright. | | 18 |
| | D. | Use Of A Memory Card For Storage Of A Saved Game Is A Fair Use, And Manufacture Of A Memory Card For That Purpose Does Not Violate Section 1201(b)(1)(A) —Whether That Card Is Manufactured By Microsoft Or Datel. | | 18 |
| | | 1. | The Elements Of Fair Use Are Present. | 19 |
| | | 2. | Manufacture Of A Memory Card Used For Purposes Constituting A Fair Use Does Not Violate Section 1201(b)(1)(A). | 21 |
| IV. | BECAUSE THE PRIMARY PURPOSE, USE AND MARKETING OF THE MAX MEMORY CARD IS LEGITIMATE AND NON-INFRINGING, SALE OF THE DEVICE DOES NOT VIOLATE THE DMCA EVEN IF SOME OTHER POTENTIAL USES WOULD BE IMPERMISSIBLE. | | | 22 |
| | A. | Sections 1201(a)(2)(A)-(B) And 1201(b)(1)(A)-(B)—Which Prohibit Devices Which Are Primarily Designed To Circumvent Or Which Have Only Limited Commercial Uses Other Than To Circumvent—Do Not Apply. | | 22 |
| | B. | Sections 1201(a)(2)(C) and 1201(b)(1)(C)—Which Prohibit Devices Marketed For Impermissible Circumvention Purposes—Do Not Apply Because The MAX Memory Card Is Not Marketed As Suitable For Circumvention. | | 24 |
| V. | MICROSOFT CANNOT RELY ON THE STFS FILE SYSTEM AS AN EFFECTIVE TECHNOLOGICAL PROTECTION MEASURE UNDER THE DMCA. | | | 25 |
| | A. | STFS Is Not An Effective Technological Measure. | | 26 |
| | B. | The Datel Memory Card Software Does Not Circumvent STFS. | | 26 |
| | C. | Any Claim Based On STFS Is Barred By Laches. | | 27 |
| CONCLUSION | | | | 29 |


HowardRice

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085 (N.D. Cal. 2004) 10, 24

*Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748 (9th Cir. 2008) 16, 17

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) 19

*Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178 (Fed. Cir. 2004) 10

*Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001) 28, 29

*Effects Assos., Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) 16

*ExperExchange, Inc. v. Doculex, Inc.*, No. C-08-03875 JCS, 2009 WL 3837275 (N.D. Cal. Nov. 16, 2009) 29

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) 18

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002) 28

*Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 964 F.2d 965 (9th Cir. 1992) 19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004) 10, 11, 15

*MDY Industries, LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928 (9th Cir. 2010) 11, 12, 15, 16, 21

*Micro Star v. FormGen Inc.*, 154 F.3d 1107 (9th Cir. 1998) 18

*Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975 (9th Cir. 2006) 29

*Oddo v. Ries*, 743 F.2d 630 (9th Cir. 1984) 17

*RealNetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913 (N.D. Cal. 2009) 10, 21

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) 20

*Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) 19, 20, 21

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) 4, 19, 22, 24

*United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111 (N.D. Cal. 2002) 21, 22

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) 4

HowardRice

**Page(s)**

*Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294 (S.D.N.Y. 2000), *aff'd*, 273 F.3d 429 (2d Cir. 2001) 10

*Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255 (5th Cir. 1988) 17

**Statutes**

17 U.S.C.
§102(a) 18
§106 21
§107(1) 19
§107(2) 19
§107(3) 19, 20
§107(4) 19, 20
§§107-122 21, 22
§§117 17
§117(a)(2) 17
§507(b) 28
§1201(a) 3, 9, 11, 13, 14
§1201(a)(1) 9
§1201(a)(2) 9, 11, 12, 16, 17, 18, 23
§1201(a)(2)(A) 4, 22, 24
§1201(a)(2)(B) 4, 22, 24
§1201(a)(2)(C) 4, 24, 25
§1201(a)(3)(A) 26
§1201(b) 9, 17
§1201(b)(1) 4, 9, 15, 16, 18, 23
§1201(b)(1)(A) 4, 18, 21, 22, 24
§1201(b)(1)(B) 4, 22, 24
§1201(b)(1)(C) 4, 24, 25
§1201(b)(2)(A) 26

**Legislative Materials**

H.R. Rep. No. 105-551, pt. 1 (1998) 10, 23

H.R. Rep. No. 105-551, pt. 2 (1998) 23

S. Rep. No. 105-190 (1998) 10, 23

**Other Authorities**

3 M.B. Nimmer & D. Nimmer, *Nimmer on Copyright* (2010)
§12A.06[C][2][c] 10, 11
§12A.06[D][1] 21
§12A.06[D][2] 21

Nielsen Co., *State of the Media TV Usage Trends: Q3 and Q4 2010* (2011) 22




HowardRice

## MOTION AND NOTICE OF MOTION

PLEASE TAKE NOTICE that on August 9, 2011, at 9:00 a.m. or as soon thereafter as the matter can be heard, before the Honorable Elizabeth D. Laporte, United States District Court, San Francisco, California, Plaintiffs and Counterdefendants Datel Holdings Ltd. and Datel Design & Development, Inc. (collectively, "Datel") will and hereby do move the Court pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Datel seeks an Order from this Court granting partial summary judgment in favor of Datel and against Defendant and Counterclaimant Microsoft Corporation, finding that, as a matter of law, Datel does not violate 17 U.S.C. §§1201, *et seq.*, the Digital Millennium Copyright Act, by manufacturing, offering, importing, offering to the public, providing, or otherwise trafficking in, the MAX Memory product or any technology, service, device, component or part thereof, and that Microsoft shall take nothing by its First Cause of Action as that cause of action relates to the MAX Memory product or any technology, service, device, component or part thereof.

This Motion is based on this Notice of Motion and Motion; the supporting Memorandum of Points and Authorities; the supporting declarations of Michael Connors, Kenneth Tarolla, Chris Duppler, and Shaudy Danaye-Elmi; the two Motions for Administrative Relief filed by Datel on the same day as this Motion; all pleadings and papers filed herein; oral argument of counsel; and any other matter that may be submitted prior to or at the hearing.

## INTRODUCTION

This motion seeks partial summary judgment on Microsoft's First Counterclaim, which alleges that Datel's memory card violates the Digital Millennium Copyright Act ("DMCA").[1] Datel's memory card directly competes with Microsoft's memory card and offers the same essential functionality as Microsoft's memory card. It bears no resemblance to the types of circumvention devices that led Congress to enact the DMCA. Microsoft's attempt to shield itself from competition with the DMCA is a misuse of the statute and should be ended now.

From the introduction of the Xbox 360, Microsoft offered a memory card for use with the console. Like the familiar memory cards used in cameras, computers and phones, the Xbox 360 memory card will record whatever data the Xbox 360 chooses to write to it. In the videogame context, the most common use for memory cards is to allow a user to save a data file called a "game save." A game save contains a limited amount of data that the game developer has determined is necessary to reflect the user's position in a game. By storing this data on a memory card, a user is able to leave a game and pick up at a later time from where he or she left off. As Microsoft surely must acknowledge, Xbox 360 owners who use a Microsoft memory card in this manner in no way infringe the copyright of the game copyright owner.

While many videogame consoles (including the popular Wii) will accept the industry standard memory cards used by cameras, computers and phones, Microsoft attempted to engineer the Xbox 360 so that it alone could make and profit from memory cards for the device. In 2009, Datel became the first third party to develop the technology to manufacture a compatible memory card. Datel's product, the Datel MAX Memory Card for the Xbox 360, performs the same essential functions as the Microsoft memory card, yet allows the user to save at least four times more data (thereby avoiding the need for multiple Microsoft memory cards). In addition, the MAX Memory Card allows the user to harness the even greater storage power of his or her personal computer by

[1]Microsoft's DMCA claim also challenges four other Datel products. For simplicity, this motion addresses only the memory card. Datel expects that the Court's guidance on this motion may allow the parties to agree on the disposition of the claim as to the other products, but at a minimum summary judgment on the memory card—the only product that is common to both Datel's antitrust claim and Microsoft's DMCA claim—will greatly simplify the case.



HowardRice

including software that backs up data from the memory card to a computer. Not surprisingly, the entry of Datel's product into the marketplace introduced competition and resulted in lower prices and more choices for consumers. The entry of the product also sparked the predatory actions by Microsoft that are the subject of Datel's antitrust complaint.

[redacted] Microsoft has attempted to invoke the DMCA as a shield against antitrust liability and as a basis for imposing crushing statutory damages on Datel. This gambit misuses a statute that was enacted to protect copyrighted works, not to protect against the sale of competitive aftermarket devices. The DMCA protects the legitimate statutory rights of copyright owners against infringement made possible by sophisticated devices that defeat—"circumvent" in the Act's words—technological barriers to infringing conduct. No prior DMCA case has imposed liability on a defendant whose product performed the same function and was sold in competition with the plaintiff's product, and indeed the case law recognizes that the statute should not be used to restrict competition.

Because Microsoft attempts to stretch this statute to cover a competitive device that serves the same lawful purpose as Microsoft's own memory card, and is marketed for that same lawful purpose, it is no surprise that the DMCA does not fit the facts of this case. As we show below, Microsoft's DMCA claim as to the Datel memory card fails as a matter of law on multiple independent grounds. *First*, the DMCA was never intended, nor has it ever been successfully used, to eliminate a directly competitive product from the market. This Court should not be the first to hold that a party can use the DMCA to deprive customers of the option of purchasing a product *that does exactly the same thing* as a competing product marketed by the party claiming the DMCA violation. *See* Part I, *infra*.

*Second*, the Datel memory card does not provide users with access to content that they cannot already access by virtue of owning an Xbox 360 and lawfully acquiring games for that device. Thus, the technical measures relied upon by Microsoft do not effectively control access to a copyrighted work under Section 1201(a). *See* Part II, *infra*.

HowardRice

*Third*, the use of Datel's memory card in connection with playing games or storing game saves does not violate Section 1201(b)(1) because (for several independent reasons) it does not facilitate copyright infringement or the violation of any other right of a copyright holder. *See* Part III, *infra*.

*Fourth*, just as the Supreme Court limited contributory copyright infringement to devices that had no "commercially significant noninfringing uses" (*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)), Congress limited the new prohibitions of the DMCA to devices that are "primarily designed or produced" for an impermissible purpose (Sections 1201(a)(2)(A)-(B)), 1201(b)(1)(A)-(B)) or are marketed for such impermissible purposes (Sections 1201(a)(2)(C) and 1201(b)(1)(C)). Because the primary purpose of Datel's card—storing the data that the Xbox 360 chooses to write to it—is noninfringing and permissible, that should be the end of the inquiry even if, *arguendo*, some subsidiary impermissible use could be made of the Datel card. For this reason, arguments about copying saved games to the user's PC—which in any event is permissible—or exotic uses such as "resigning" of saved games are irrelevant. *See* Part IV, *infra*.

*Fifth*, to the extent Microsoft relies on the so-called STFS file system as a purportedly effective technological measure, its claims fail. STFS does not effectively regulate access to or the rights of a copyright holder in any work; it is not circumvented by the Datel memory card or its software; and in any event reliance on it is barred by the doctrine of laches. *See* Part V, *infra*.

## STATEMENT OF FACTS

### A. The Parties.

Defendant and Counterclaimant Microsoft Corporation ("Microsoft") is a Washington corporation. Amended Answer ¶9. Founded in 1975, Microsoft is a worldwide leader in computer software, services and solutions for businesses and consumers. *Id.* ¶10. Throughout this industry, Microsoft has been famously dominant and, in some cases, a known monopolist. *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 80 (D.C. Cir. 2001) (holding Microsoft liable for "unlawful actions undertaken to maintain its monopoly in the operating system market"). Microsoft released the original Xbox video game console in 2001, and the current version of that console that is at issue in this litigation—the Xbox 360—in 2005. *See* Amended Answer ¶16.



HowardRice

Plaintiffs and Counterdefendants Datel Holdings Ltd. and Datel Design and Development, Inc. (collectively, "Datel") create and sell after-market products for video game consoles, such as the Xbox 360, that offer consumers competitively priced alternatives and extend the functionality of game systems. Datel has been in this business for over 30 years.

**B. The Xbox 360, Microsoft's Memory Cards, And Microsoft's Efforts To Exclude Third Party Competitors.**

From its introduction in 2005, the Xbox 360 used a memory card as one of its primary means of external storage for game save data. The ability to save game data is important: without it a user would have to start his or her game over from scratch each time the Xbox 360 was turned off and on. Declaration of Michael Connors in Support of Motion for Partial Summary Judgment (DMCA Counterclaim) ("Connors Decl.") ¶7. While it is possible to store game saves on the Xbox 360's hard disk drive as well, Microsoft has sold many versions of the Xbox 360 without an included hard disk drive or with only a very small one. *Id.* ¶8. As users fill up their memory cards or hard drives, they find themselves needing to buy more memory or a larger hard drive—and paying a large premium to Microsoft for the privilege. [redacted] Until Datel brought out its MAX Memory Cards in 2009, Microsoft was the sole source for memory cards that worked with the Memory Card Port on the Xbox 360. Connors Decl. ¶6.

In an attempt to prevent others from manufacturing memory units and other products that would compete with accessories otherwise only offered by Microsoft, Microsoft deployed a sophisticated authentication or lockout system. Microsoft's version of the memory card—along with several other accessories, like controllers, network adapters, and headsets—contains an authentication chip, which Microsoft refers to internally as the "Maxwell chip." *Id.* ¶9. The Xbox 360 communicates with the authentication chip on the accessory, and unless the authentication

HowardRice

chip responds in an expected way to a series of challenges, the Xbox 360 will not recognize the accessory. *Id.*



**C. Datel Reverse Engineers Microsoft's Authentication Chip, And Creates A Memory Card With Greater Storage Capacity.**

After several years of research and investment, Datel successfully reverse-engineered the authentication chip in 2009. Connors Decl. ¶10. As a result, Datel was able to offer a range of competitive accessories for the Xbox 360: memory cards, controllers, network adapters, and headsets. *Id.* In May 2009, Datel introduced its 2GB and 4GB MAX Memory Cards—the first (and to date only) third party memory cards to work with the Xbox 360 Memory Card Port. *Id.* Datel intended to follow its memory card very quickly with the other accessories. *Id.* For instance, controllers were tested in June, 2009 and were in the process of manufacture in the early fall of 2009 so as to be available for sale by Thanksgiving of 2009. *Id.*

The MAX Memory Card functions in the same fashion as Microsoft's own memory cards, except that the Datel memory card uses a detachable SD card and can be read with a USB SD card reader. *Id.* ¶13. In addition, included with every memory card that Datel sells is a disc containing its MAX Memory Card Manager software. *Id*. ¶16. If the user is running low on storage space, this software allows a MAX Memory Card owner to transfer files from the memory card to the user's personal computer—just as a digital camera user can move photos off of the camera's memory card to a computer, freeing up room to take more pictures. *Id*. With the *de minimis* exception of a version of the software containing "resigning" capability that was briefly available for download on



HowardRice

Datel's website in the Fall of 2009,[2] the MAX Memory Card Manager software did not permit users to alter or modify files transferred to a PC.

### D. Microsoft Forces Players To Accept An Update That Breaks Datel's Memory Card.

In October 2009, Microsoft deployed an update to the operating system on the Xbox 360. *Id.* ¶11. [redacted] the effect of this was to disable all of the MAX Memory Cards Datel had already sold as well as those on the shelves at Best Buy stores across the country. *Id.* In addition, this update disabled Datel's wired controllers [redacted]

The result of Microsoft's update and its communications with key retailers was devastating to Datel. Declaration of Kenneth J. Tarolla in Support of Datel's Motion for Partial Summary Judgment (DMCA Counterclaim) ("Tarolla Decl.") ¶3. Retailers were forced to take back the now-dysfunctional memory cards for refund (and Datel in turn to take back the cards from the retailers). *Id.* [redacted]

After having invested millions to compete with Microsoft, Datel was being shut out by Microsoft's predatory and anti-competitive tactics. Datel commenced this action by filing its antitrust complaint on November 20, 2009. Dkt. No. 1.

### E. In Response To The Antitrust Claim, Microsoft Contends—For The First Time—That Datel's Memory Units Violate The DMCA.

On May 28, 2010, Microsoft filed its answer and counterclaims, including its DMCA counterclaim. Dkt. No. 37. The heart of that claim is that Datel devices, including the Datel

---

[2] A more detailed explanation of resigning and how it came to be briefly included in Datel's MAX Memory Software can be found in the accompanying declaration of Michael Connors. *See* Connors Decl. ¶¶16-24.

HowardRice

memory cards as well as Datel devices that had been on the market for four years and never even merited so much as a letter or call from Microsoft, violate the DMCA by connecting to the Xbox 360 and allowing users to store and back up data. *Id*. ¶¶42-43, at 23-24. Microsoft asserts that the Datel memory card circumvents three technological measures that allegedly protect access to or rights in copyrighted works. These measures are (1) the authentication chip that attempts to lock out all competitive devices; (2) the non-standard shape and voltage of the Memory Card Port on the console; and (3) the non-standard internal structure of files stored on the console's hard drive and memory cards (called "STFS"). *See* Danaye-Elmi Decl. Ex. 11 at Response No. 18.

**F. Prior To And During This Litigation, Microsoft Has Enabled And Assisted In The Very Conduct That It Complains Of In Its DMCA Claim.**

We expect that Microsoft may contend that the Datel memory card is capable of different functions than the Microsoft memory card because it can be connected to a PC without a cable and because it comes with software to backup files to PCs. In essence, this is the same function: storing the content that the Xbox 360 chooses to write to a memory device. Moreover, Microsoft itself has been distributing since 2007 (first giving away for free and now selling) a cable that allowed Xbox 360 owners to connect their hard drive to a personal computer or to another Xbox 360 hard drive via a USB port. Danaye-Elmi Decl. Ex. 12 ¶20, at 7. Because the Xbox 360 data that a user can store on a memory card can also be stored on the console's hard drive (*id.* ¶24, at 8), a user who wished to backup game save files from the console to a personal computer could just as easily use the Microsoft-provided transfer cable to perform that task as he or she could use Datel's MAX Memory Card.

Moreover, in April 2010, Microsoft made a radical change in the way it has accommodated memory cards in the Xbox 360. Connors Decl. ¶15. Four months after Datel brought this antitrust action, Microsoft announced a new dashboard update. *Id.* The new update permitted users to store game data on inexpensive over-the-counter memory sticks or thumb drives connected to the Standard USB Port. *E.g.*, Danaye-Elmi Decl. Ex. 6 (Moy Dep.) at 213:6-24. [redacted] This update also greatly simplified backing up data to a PC. No longer did a user need any sort of



HowardRice

transfer cable or USB flash drive reader. *Id.*; *see also* Danaye-Elmi Decl. Ex. 4 (Whitten Dep.) at 135:3-136:1. In short, *prior to filing its DMCA counterclaim,* Microsoft developed and permitted devices capable of the very same function as the MAX Memory Card it complains about in its DMCA counterclaim.

**KEY PROVISIONS OF THE DMCA**

We begin by briefly summarizing the provisions of the DMCA that are at issue in Microsoft's DMCA counterclaim and in this Motion:

***Circumvention of Measures That Effectively Control "Access" To Protected Works.*** Section 1201(a) of the DMCA addresses the circumvention of technological protection measures that effectively control *access* to a work protected by the Copyright Act. Section 1201(a)(1) prohibits the act of circumventing such a measure, while Section 1201(a)(2) prohibits the distribution of a tool that is either (1) primarily designed to circumvent such a measure; (2) has no commercially significant purpose other than circumventing such a measure; or (3) has been marketed for the purpose of circumventing such a measure.

***Circumvention of Measures That Effectively Protect A Right Of A Copyright Holder.*** Section 1201(b) addresses the circumvention of technological protection measures that effectively protect a *right* of a copyright holder (such as the right to control reproduction of a copyrighted work). Unlike Section 1201(a), there is no bar against the act of circumventing such a measure. Section 1201(b)(1) does, however, bar the distribution of a tool that is either (1) primarily designed to circumvent such a measure; (2) has no commercially significant purpose other than circumventing such a measure; or (3) is marketed for the purpose of circumventing such a measure.

**ARGUMENT**

**I. THE DMCA ANTICIRCUMVENTION PROVISIONS DO NOT APPLY TO THE MANUFACTURE AND SALE OF COMPETITIVE PRODUCTS THAT PERFORM THE SAME FUNCTION AS THE COMPLAINING PARTY'S PRODUCTS.**

No court has ever held that a product that performs the very same function as a competing product sold by the party invoking the DMCA violates the DMCA's anticircumvention provisions. This is unsurprising: Congress did not enact the DMCA in order to defeat or diminish competition. Quite the opposite. Both the House and Senate Judiciary Committee Reports explain that the



HowardRice

DMCA provisions are "drafted carefully to target 'black boxes' [designed to enable copyright infringement], *and to ensure that legitimate multipurpose devices can continue to be made and sold*." H.R. Rep. No. 105-551, pt. 1, at 18 (1998); S. Rep. No. 105-190, at 29 (1998) (emphasis added).

The paradigm "black box" targeted by Congress is a device that disables technological barriers to receiving pay television signals or copying motion pictures stored on tape or disc, enabling the user to view content or produce copies without payment of royalties to the copyright owner.[3] Use of the DMCA to attempt to preclude marketing of a competitive hardware product that does not facilitate copyright infringement or provide unauthorized access to copyrighted materials, let alone to destroy a legitimate competitor, is a far cry from Congress' intention to target "black boxes" used to facilitate copyright infringements. The only two decisions that have analyzed the DMCA in a case involving *competitors* have rejected the notion that the statute can be used to squelch competition. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 549 (6th Cir. 2004) (holding that the DMCA did not prohibit the manufacture of competitive printer cartridges and noting that "[n]owhere in its deliberations over the DMCA did Congress express an interest in creating liability for the circumvention of technological measures designed to prevent consumers from using consumer goods while leaving the copyrightable content of a work unprotected"); *Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1201 (Fed. Cir. 2004) (holding that the DMCA did not apply to competitive garage door openers and stating that it had "noted numerous times that as a matter of Federal Circuit law, '[i]ntellectual property rights do not confer a privilege to violate the antitrust laws'"). No court in this country has shown the slightest inclination to a contrary view. *See* 3 M.B. Nimmer & D. Nimmer, *Nimmer on Copyright* §12A.06[C][2][c], at 12A-

[3]The software program the court considered in *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294 (S.D.N.Y. 2000), *aff'd*, 273 F.3d 429 (2d Cir. 2001) is a good example. That program, DeCSS, was designed solely to remove the protective encryption that prevented the copying of DVDs. *Id.* at 318-19. The program had no other use. *Id.* Once the court determined that the encryption qualified as an effective technological protection measure, it found that the distribution of DeCSS violated Section 1201(a)(2)(A). *See also RealNetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913, 932-33 (N.D. Cal. 2009); *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1095 (N.D. Cal. 2004).



HowardRice

100.3 (2010) ("With two circuit courts of appeals stiff-arming the very notion that the Digital Millennium Copyright Act can apply to the electronics aftermarket in the absence of protecting traditional copyright interests, . . . it would seem an uphill battle to convince another circuit to rule to the contrary").

Indeed, while in the recently decided *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928 (9th Cir. 2010), the Ninth Circuit rejected some of the *Chamberlain* court's interpretation of the DMCA's anticircumvention provisions, the Ninth Circuit was careful to note that *MDY* did *not* involve a directly competitive product:

> *Chamberlain* feared that §1201(a) would allow companies to leverage their sales into aftermarket monopolies, in tension with antitrust law and the doctrine of copyright misuse. Concerning antitrust law, we note that there is no clear issue of anti-competitive behavior in this case because Blizzard does not seek to put a direct competitor who offers a competing role-playing game out of business and the parties have not argued this issue. If a §1201(a)(2) defendant in a future case claims that a plaintiff is attempting to enforce its DMCA anti-circumvention right in a manner that violates antitrust law, we will then consider the interplay between this new anti-circumvention right and antitrust law. (*Id.* at 951 (citations and footnote omitted))

This is that case. Microsoft seeks to use the DMCA to eliminate a direct competitor in the Xbox 360 aftermarket on grounds having nothing to do with preventing infringement of copyright. Datel's memory card offers superior storage at a cheaper price. It does not enable the infringement of any copyrighted material. Allowing Microsoft to use the DMCA in this manner would harm consumers, and is contrary to all existing precedent, the purpose of the DMCA and indeed the purpose of intellectual property law itself.[4]

Microsoft "cannot use the DMCA in conjunction with copyright law to create monopolies of manufactured goods for themselves" (*Lexmark*, 387 F.3d at 551 (Merritt, J., concurring)), and its DMCA claim as to the MAX Memory Card should be rejected on this basis alone.

## II. THE DATEL MEMORY CARD DOES NOT PROVIDE USERS WITH ANY ACCESS THEY DO NOT ALREADY HAVE.

At its core, a DMCA violation under Section 1201(a) requires both a "technological measure"

[4]Additionally, *MDY* indicates that antitrust law itself may place substantive limits on the anticircumvention rights delineated in Section 1201(a). 629 F.3d at 953.



HowardRice

that "effectively controls access to a [copyrighted] work" and a device[5] which "circumvents" that technological protection measure. Critically, the anticircumvention provisions do not apply where the user *already has* lawful access to the work or can legitimately access the work in other ways. *See, e.g., MDY*, 629 F.3d at 952-53; *Lexmark*, 387 F.3d at 546-47.

Accordingly, to the extent Microsoft relies on Section 1201(a), it must establish that the Datel devices, as a result of circumvention, permit a user to "access" a copyrighted work in a way the user otherwise could not. For instance, the content of a DVD movie is encrypted with CSS; the use of the proscribed DeCSS allows the user to view the unencrypted content (and thereby watch the movie on a computer or other unauthorized player). Similarly, a movie transmitted over a cable system may be scrambled; the use of a proscribed "black box" allows the user to view the unscrambled movie without paying the cable company. The Datel memory card does none of these things. Whatever "access" it provides is access that the user already has by virtue of having purchased an Xbox 360 and games for it.

### A. The MAX Memory Card Does Not Provide Any Incremental Access To Xbox 360 Games.

In its interrogatory responses, Microsoft identified three video game titles and suggested that the Datel memory card somehow provides improper access to these games. *See* Danaye-Elmi Decl. Ex. 11 at Response No. 15. In fact, the Datel memory card provides no access to any element of video games that a user does not already have, and Microsoft's claim based on access to game titles fails.

The Ninth Circuit's recent decision in *MDY* is illustrative. MDY sold a software program (or "bot") known as "Glider" that enabled users to automatically play Blizzard's game, World of Warcraft ("WoW"), even when they were away from their computers. Blizzard responded with a software program known as "Warden" that detected and prevented users of Glider from connecting to its game servers. MDY modified Glider to defeat Warden. Blizzard asserted that MDY was

[5]We use the term "device" as a shorthand for the statutory list: "technology, product, service, device, component or part thereof . . . ." 17 U.S.C. §1201(a)(2).



HowardRice

improperly accessing elements of WoW. The Court divided the copyrighted elements of a video game into three categories: "literal elements" (meaning the game's source code), "individual non-literal elements" (the image and sound files used by the game software), and "dynamic non-literal elements" (the real-time experience of playing the game itself). 629 F.3d at 942-43. It found no improper access to the first two elements, but held that Glider facilitated access to the dynamic non-literal elements in circumvention of the Warden software. *Id.* at 952-53.

In this case, an Xbox 360 owner, whether he or she uses Datel's MAX Memory Card or not, has no access to the literal elements or individual non-literal elements of a game title. These are stored in encrypted form on the game DVD. Danaye-Elmi Decl. Ex 12 ¶11, at 4. Accordingly, Microsoft's assertion that there has been improper access to game titles can only be based on the dynamic non-literal elements of the game.

A game owner acquires "access" to the dynamic non-literal elements of a copyrighted game by purchasing a copy of the game and loading it into the Xbox 360 console; without a copy of the game software, the game cannot be played—with or without a MAX Memory Card. In playing the game, the owner has access to all of the expressive elements of the game—the sounds, images, characters and story that are contained within the game software. This access to the copyrighted work is independent of the MAX Memory Card, and occurs before any use is made of it. The act of connecting a memory card and saving a played game by a user who has lawfully acquired the game software, and has played part of the game, does not increase or enhance the game player's pre-existing authorized "access" to the dynamic non-literal elements of the game (*i.e.*, the player's real-time experience of playing the game). Section 1201(a) is therefore inapplicable.

In contrast to *MDY*, a game player does not need to address Microsoft's "security measures" to access the dynamic non-literal game play. An Xbox 360 owner can play a game with Microsoft's memory card attached, with Datel's memory card attached, or with no memory card at all. Danaye-Elmi Decl. Ex. 12 ¶11, at 4. Indeed, even if the security measures succeeded in disabling Datel's memory card, the user could still play any game he or she owned. Therefore, while in *MDY* the security measure prevented one form of access to a game title, Microsoft's identified security measures do not effectively control any form of access to the game titles. A player using a Datel



HowardRice

memory card has exactly the same access to the game title that he or she has without it.

### B. An Xbox 360 Owner Has Access To And Can Copy Game Save Files Independent Of The MAX Memory Card.

The other potentially copyrightable element that Microsoft has identified are the game save files associated with the video games.[6] Like the Microsoft memory card, the Datel memory card will accept game save files that the Xbox 360 writes to it. In order to interface with the Xbox 360, Datel's memory card must physically connect to the Xbox 360's Memory Card Port and must use the authentication protocol Microsoft requires of any device that connects to the console. The memory card accepts only that data which the Xbox 360 chooses to write, and therefore provides no "access" to *anything*—copyrighted or otherwise—that the user does not already have.

Datel's memory card differs from Microsoft's only in that it includes a card reader that allows the user to connect Datel's card to their personal computer.[7] This is essentially the same function—storing data—but is at least arguably a difference between the Datel and Microsoft memory cards. Because archiving of game save files on a user's personal computer is not the primary purpose of Datel's memory card, it would not violate the DMCA even if that use were impermissible. *See* Part IV(A), *infra*. But in fact that secondary use of Datel's card is perfectly proper under Section 1201(a) because it provides no incremental access.

Datel's memory card is not the only available means of accessing and copying game save files to a personal computer. Microsoft itself has long distributed equipment that enables the exact same access and copying. In 2007, Microsoft began distributing a Transfer Cable that allows an Xbox 360 hard drive to be connected directly to the USB port on a personal computer (the same port Datel's card reader connects to). Danaye-Elmi Decl. Ex. 9 (Crane Report) ¶¶106-7; Ex. 12 (Crane Rebuttal Report) ¶¶19-26. Accordingly, any game save file that can be transferred to a personal computer using Datel's Memory Card can also be transferred using Microsoft's Transfer Cable. Under *Lexmark*, that fact is fatal to any DMCA claim based on storing game saves on a personal

---

[6] As explained in Part III below, these files are not, in fact, protected by copyright.

[7] The MAX Memory Card package also includes software that allows the user to read the data on the card. Connors Decl. ¶16.



HowardRice

computer.

In *Lexmark*, on which the Ninth Circuit relied in *MDY* (*see* 629 F.3d at 953), the plaintiff (Lexmark), a manufacturer of printers and print cartridges, began selling discount toner cartridges containing a microchip that prevented its printers from functioning with toner cartridges that it had not re-filled. Defendant SCC sold computer chips that mimicked Lexmark's microchip to companies that sought to compete with Lexmark's toner cartridge refills. Lexmark claimed that SCC's sale of the chip violated the DMCA by circumventing technological measures designed to prevent access to two of Lexmark's protected computer programs, one of which (the "Printer Engine Program") controlled printer functions on Lexmark printers. The Sixth Circuit rejected this argument, reasoning that "[a]nyone who buys a Lexmark printer may read the literal code of the Printer Engine Program directly from the printer memory, with or without the benefit of the authentication sequence . . . ." 387 F.3d at 546. The court concluded that "[b]ecause the statute refers to 'control[ling] access to a work protected under this title,' it does not naturally apply when the 'work protected under this title' is otherwise accessible." 387 F.3d at 547.

Here, an Xbox 360 owner can access the files much more easily than the printer owner in *Lexmark*. There is no need to physically disassemble the Xbox 360 console or Microsoft memory card to "read the literal code . . . from the memory." Instead, this can be accomplished using the cable provided by Microsoft itself. Danaye-Elmi Decl. Ex. 12 ¶¶19-26, at 7-9; *id*. Ex. 9 ¶¶106-107, at 22. The unencrypted data constituting the game save can also be read by directly probing a Microsoft memory card. *Id.* As a result, an Xbox 360 player already has access to the game save files of any game she owns with or without Datel's MAX Memory Card; he or she gains no incremental access as a result of purchasing a Datel memory card. In the terms of Section 1201(a), the Datel memory card does not circumvent any measure that effectively controls access to a copyrighted work.

## III. DATEL'S MAX MEMORY CARD AND SOFTWARE DO NOT FACILITATE COPYRIGHT INFRINGEMENT.

Section 1201(b)(1) prohibits manufacture or distribution of devices "primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that

effectively protects a right of a copyright owner[8] under this title in a work or a portion thereof . . . ." In short, this section is directed to devices that are aimed at enabling the user to infringe a copyright by defeating technological barriers designed to preclude such infringement. As we now show, for several reasons (any one of which would be dispositive) the Datel MAX Memory Card does not facilitate any form of infringement—period.

### A. The Game Owner Is Authorized Under The License From The Game's Copyright Holder To Store Game Data On The Xbox's Hard Disk Or On A Memory Card—Whether That Card Is Manufactured By Microsoft Or Datel.

The purchaser of an Xbox 360 game who loads the game into the console's RAM, plays the game, and thereafter stores game data on either the hard disk or a memory card is doing exactly what the designers of the Xbox 360 system, and the creators of the game, intended him or her to do. The Xbox 360 was designed so that game players could store their "game saves" in that way, for later resumption of play. Microsoft sells memory cards for exactly that purpose. The owners of the copyrighted game software intend that game players store their game saves in this manner. Without the ability to store such data on a memory card or hard drive, use of the system would be crippled. Many video games involve lengthy, complex stories that can take hundreds of hours of play to complete. Without the ability to save game progress, a user would have to play every game through in one sitting. Such a limitation would strip the system of most of its entertainment value—and, of course, would diminish the commercial value of the Xbox 360 system and copyrighted games designed for it. That is why Microsoft made provision for the storage of game saves.

In the absence of an express license to use a copyrighted work, a license can be implied when its absence would render a purchased work of significantly less value. In *Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990), the court held that a movie producer could use special effects footage he had purchased even though he had not obtained a license or transfer of the copyright. The court reasoned that, without such an implied license, the footage had only minimal value, and that was belied by the almost $56,000 purchase price. *Id*. at 558-59; *see also Asset Mktg. Sys., Inc.*

---

[8]Unlike Section 1201(a)(2), which is concerned with "*access* control measures," Section 1201(b)(1) is directed specifically to "devices that facilitate . . . *copyright infringement*." *MDY*, 629 F.3d at 944-45.

*v. Gagnon*, 542 F.3d 748, 757 (9th Cir. 2008); *Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir. 1984).

Here, if a Xbox 360 purchaser did not have the implied right to store game saves on a memory card, most of the advanced features of the purchased system would be unavailable. The game owner would be unable to save game progress or to compile a Gamerscore. Danaye-Elmi Decl. Ex. 9 ¶¶24, 154, at 6-7, 33. It would be absurd for Microsoft to contend that, even though it explicitly teaches people how to create game saves and encourages them to make them, people are in fact engaging in copyright infringement when they do so. Xbox 360 users are at least impliedly, if not explicitly, licensed to save game data on a memory card. They are never told that this license only permits the save to be made on a Microsoft memory card, which likely would constitute a misuse of copyright. Having granted a license, Microsoft cannot turn around and maintain an action under Section 1201(b)[9] to prevent the very conduct that it or the game software copyright owner have encouraged and allowed.

**B. In Addition, The Game Owner Has The Right Under Section 117 To Store An Archival Copy Of The Saved Game Data On The Xbox's Hard Disk Or On A Memory Card—Whether That Card Is Manufactured By Microsoft Or Datel.**

Copyright Act Section 117(a)(2) provides in material part:

> [I]t is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of [a] computer program provided . . . that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.

Even assuming, *arguendo*, that game saves are protected by copyright (an assumption we dispute in the next section), downloading game saves to a memory card falls squarely within Section 117(a)(2). Without a game save download, the players' positions and related data would be lost when the Xbox 360 is turned off; the game save preserves it for later use. Section 117(a)(2) permits the "owner of the [Xbox game] to copy . . . the software program for any reason so long as the owner uses the copy for archival purposes only and not for an unauthorized transfer." *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 266 (5th Cir. 1988) (footnote omitted).

---

[9]This argument applies with equal force to Microsoft's claims under Section 1201(a)(2), as users are implicitly authorized to save their game saves to memory cards, regardless of whether they are manufactured by Microsoft or Datel.



HowardRice

### C. Saving A Game Ordinarily Does Not Entail Copying Elements Protected By Copyright.

Copyright Act Section 102(a) provides that "[c]opyright protection subsists, in accordance with this title, in original works of authorship . . . ." "Originality is a constitutional requirement." *See, e.g., Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 346 (1991). Game saves on the Xbox 360 do not meet this requirement of originality. They are created automatically by the game software and are purely functional in nature. No individual author adds his or her creativity to the game save at the moment it is created. Rather, the game save merely records the player's position in the game, thereby enabling return to that position at a later time. Reduced to its essence, a game save is a bookmark. Danaye-Elmi Decl. Ex. 9 ¶¶154-58, at 33-34. *Cf. Micro Star v. FormGen Inc.*, 154 F.3d 1107, 1112 (9th Cir. 1998) (independently created new levels for Duke Nukem video game were a derivative work of the original because they were "surely sequels, telling new (though somewhat repetitive) tales of Duke's fabulous adventures"). Needless to say, the game saves stored on Microsoft's and Datel's memory cards do not contain new chapters or sequels to the original story; they merely mark a particular user's place in the original story.

Because the game saves stored on MAX Memory Cards are not protectable works under the Copyright Act, Datel's alleged circumvention of Microsoft's technological protection measures does not violate Section 1201(b)(1).[10]

### D. Use Of A Memory Card For Storage Of A Saved Game Is A Fair Use, And Manufacture Of A Memory Card For That Purpose Does Not Violate Section 1201(b)(1)(A) —Whether That Card Is Manufactured By Microsoft Or Datel.

The storage of a saved game does not violate Section 1201(b)(1)(A) for an additional reason: even assuming, *arguendo*, that the saved game data is subject to copyright protection, saving it is a fair use. As shown in the following discussion, making a device that overcomes a technological barrier to making a fair use copy does not violate Section 1201(b)(1)(A).

---

[10] Again, this fact is an additional ground for rejecting Microsoft's claims under Section 1201(a)(2), which only applies to technological protection measures that "effectively controls access to a work protected under this title."



HowardRice

**1. The Elements Of Fair Use Are Present.**

There can be no serious dispute that storing a saved game on a memory card is a fair use, whether the memory card is made by Microsoft or Datel. The basic facts are these: the game owner cannot use the stored game without the game software which he or she purchased; game saves therefore do not diminish the game copyright owner's opportunity to derive revenue from software sales. Indeed, the ability to store a partially played game *enhances* the utility of the game software and thereby expands the market for it.[11] Moreover, saving a game onto a memory card is part of the design of the Xbox 360 system, and operates in the same way and with the same consequences regardless of whether a Microsoft or Datel memory card is used.

The factors which bear on a determination of fair use (*see* 17 U.S.C. §107(1), (2), (3), (4)) strongly weigh in favor of a determination that a game owner who saves a game on a memory card—even if some of the data is subject to copyright protection—engages in a fair use:

- The character of the game owner's use (*id.* §107(1)) is noncommercial.[12]
- The nature of whatever portion of the data stored on the memory disk that is subject to copyright protection at all (*id.* §107(2)) is, for the most part, mechanical rather than expressive. If a game save file is protected by copyright in any manner, it is not close "to the core of intended copyright protection." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994). *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596, 603 (9th Cir. 2000) held that the software program running on Sony's BIOS chip, while protected by copyright, received a lower degree of protection than traditional literary works because of its functional nature. Because copying the creative elements of the program was necessary to access its unprotected

---

[11]Game saves could be viewed as a form of time shifting, similar to the recording of copyrighted television broadcasts on home VCRs held to be a fair use in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). The Supreme Court found that time-shifting results in an enlarged viewing audience and therefore higher viewer ratings which in turn benefit the broadcaster. *Id.* at 452-53.

[12]The proper focus, of course, is on the game owners' use, not Datel's admittedly commercial purposes in manufacturing memory cards. *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 964 F.2d 965, 970 (9th Cir. 1992).

functional elements, *Sony* held that the nature of the work weighed for a finding of fair use. *Id*. at 603-04; *see also Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1524 (9th Cir. 1992) (video game programs held to contain unprotected aspects and were therefore afforded a lower degree of protection than in more traditional literary works). The game saves stored on a memory card are even further from the creative core of copyright protection than the software at issue in *Sony* (or the object code in *Sega*). Sony's BIOS code was written by living software engineers who could imbue some degree of creativity to their largely functional work. Game save files on the other hand are generated automatically by game software. Their creation is wholly mechanical, and their purpose is purely functional: to mark a player's progress in a game. Per *Sony*, the question then becomes whether the copying involved in storing a game save on a memory card is necessary to gain access to the unprotected functional aspects of the work. 203 F.3d at 603. It is. If a user cannot store a game save on a memory card, the save cannot perform its functional purpose.

- The amount and substantiality of any copyrighted elements stored in relation to the copyrighted work as a whole (*id.* §107(3)) is slight. A game title is likely to be an elaborate work, with very large files containing object code, images, sounds, and more. The game save is a mere data file that allows the game to remember where a player left off.
- The effect upon the game copyright holder's potential market (§107(4)) is, if anything, beneficial. *See* p.19, *supra*. Of course, Microsoft's DMCA claim is not founded on concern for the revenue stream of third-party developers or even its game software revenues. Rather, it seeks to squash a competitive game hardware manufacturer. But "an intent to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting the invocation of the fair use doctrine." *Sega*, 977 F.2d at 1523-24; *see also Sony Computer*, 203 F.3d at 607 (copying, through reverse engineering, of Sony's copyrighted software



HowardRice

in order to create competing product that will diminish sales of Sony PlayStation is a fair use, and fourth factor favors the competitor: "Sony understandably seeks control over the market for devices that play games Sony produces or licenses. The copyright law, however, does not confer such a monopoly"); *MDY*, 629 F.3d at 951 (noting that different rules may apply if a competitor "is attempting to enforce its DMCA anti-circumvention right in a manner that violates antitrust law").

**2. Manufacture Of A Memory Card Used For Purposes Constituting A Fair Use Does Not Violate Section 1201(b)(1)(A).**

Section 1201(b)(1)(A) only applies to the manufacture of devices that circumvent "a technological measure that effectively protects *a right of a copyright owner*" under the Copyright Act. Because the Copyright Act does not confer upon copyright owners a right to preclude making a fair use copy, a device that is designed or produced to facilitate the making of fair use copies does not violate Section 1201(b)(1)(A). 3 M.B. Nimmer & D. Nimmer, *Nimmer on Copyright* §12A.06[D][1], [2], at 12A-100.4(10) to 12A-100.10 (2010).

The touchstone of Section 1201(b)(1)(A) is whether the device was primarily designed to circumvent measures that protect "a right of a copyright owner." As Nimmer explains:

> To evaluate 'a right of a copyright owner,' one cannot stop with section 106, whose own preamble instructs that the six-fold enumeration contained therein is '[s]ubject to sections 107 through 122 . . . .' It is erroneous to view Section 106 as cataloging all the rights of copyright owners and subsequent sections (culminating in Section 122) as enumerating the concomitant 'rights' of users. Instead, Congress delineated the rights of copyright owners in all of Sections 106 through 122 . . . . [¶] [O]ne charged with violating [Section 1201(b)] should be able to defeat liability to the extent that, for example, he provided a service to aid users to *reproduce* a copyrighted work within the bounds that fair use safeguards." (*Id.* §12A.06[D][2], at 12A-100.9 to 12A-100.10 (footnotes omitted))[13]

[13]The Nimmer treatise notes that *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111 (N.D. Cal. 2002) reached the opposite conclusion. (In addition, *RealNetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913, 942-43 (N.D. Cal. 2009) cited and followed *Elcom*. But the court's brief discussion on this point provides no new analysis beyond that in *Elcom*.) While expressing "tremendous respect for the craftsman of *Elcom*," the Nimmer treatise declares that *Elcom* was incorrectly decided on this issue. *Nimmer on Copyright*, *supra*, §12A.06[D][2], at 12A-100.9. Significantly, the analysis in the block quotation in the text above—which the treatise presents by way of explaining why *Elcom* misinterprets Section 1201(b)(1)(A)—was not considered in the *Elcom* opinion. Rather, that opinion assumes that the "right[s] of a copyright owner" are those enumerated in Section 106 without regard to the limitations and qualifications in Sections 107

*Continued . . .*



HowardRice

**IV. BECAUSE THE PRIMARY PURPOSE, USE AND MARKETING OF THE MAX MEMORY CARD IS LEGITIMATE AND NON-INFRINGING, SALE OF THE DEVICE DOES NOT VIOLATE THE DMCA EVEN IF SOME OTHER POTENTIAL USES WOULD BE IMPERMISSIBLE.**

We anticipate that Microsoft will argue that certain potential uses other than storage of game saves on Datel's memory card are impermissible and that it will assert a violation of the DMCA as a consequence of those potential uses. That will be an exercise in misdirection because the DMCA's prohibition against manufacture, distribution or marketing of devices is limited to those whose *primary* purpose is impermissible. Because, for each of the reasons discussed in Parts I, II and III, *supra*, the primary use of the Datel MAX Memory is permissible, and because the marketing of the card focused on that permissible use, exploration of the legality of every conceivable potential use of the card is unnecessary and irrelevant.

**A. Sections 1201(a)(2)(A)-(B) And 1201(b)(1)(A)-(B)—Which Prohibit Devices Which Are Primarily Designed To Circumvent Or Which Have Only Limited Commercial Uses Other Than To Circumvent—Do Not Apply.**

In *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)—cited frequently as both the prevailing law and good public policy by the authors of the DMCA—the Court noted that it "need not explore *all* the different potential uses" of the VCR so long as it "is capable of commercially significant noninfringing uses." *Id.* at 442.[14] Congress incorporated this principle in Sections 1201(a)(2)(A)-(B) and 1201(b)(1)(A)-(B), which only prohibit the manufacture or distribution of a device that is "primarily designed or produced for the purpose of circumventing a technological measure" that protects access to a copyrighted work or the rights of a copyright owner or that has limited commercially significant uses other than such circumvention.

As demonstrated above, Datel's MAX Memory Card's primary purpose is exactly the same as that of Microsoft's own memory card: it allows players to store game data on a portable medium—

---

through 122. The Nimmer analysis is correct, and *Elcom* should not be followed on this issue.

[14]Of course, unlike Datel's Memory Card software, whose resigning capability had to be actively sought out and downloaded, VCRs—being designed to make copies—could inherently be used for a number of purposes, including those that may infringe. But video recorders were, and most certainly are today, sold without restriction to consumers. *See* Nielsen Co., *State of the Media TV Usage Trends: Q3 and Q4 2010*, at 2 (2011) (estimating that 118 million people in U.S. have a DVR in their home).



HowardRice

HowardRice

an entirely lawful purpose. We need look no further than Microsoft's own memory cards to see that a player's storage of his or her own game saves is a commercially significant use of memory units. [redacted] (Moreover, for all of the reasons discussed in Part III, *supra*, the secondary purpose of Datel's card of backing game saves up onto a personal computer—to the extent it is even considered a different purpose—is also lawful under both the DMCA and copyright law.)

Congress never intended for the DMCA to prohibit the sale of devices with such legitimate functions. *See* H.R. Rep. No. 105-551, pt. 2, at 39-40 (1998) ("This provision is not aimed at products that are . . . used by businesses and consumers for perfectly legitimate purposes"). Rather, the legislative history of the DMCA reveals that Congress repeatedly emphasized that the purpose of both Sections 1201(a)(2) and 1201(b)(1) was "to target 'black boxes,' and to ensure that legitimate multipurpose devices can continue to be made and sold." H.R. Rep. No. 105-551, pt. 1, at 18 (1998); S. Rep. No. 105-190, at 29 (1998). The same point was repeatedly emphasized in the debate on the bill. Representative Billey explained that the DMCA provisions were not "aimed at widely used staple articles of commerce, such as the consumer electronics, telecommunications, and computer products—including videocassette recorders, telecommunications switches, personal computers, and servers—used by businesses and consumers everyday for perfectly legitimate purposes."[15]

---

[15]Microsoft may attempt to stave off summary judgment on its DMCA claims by arguing that the tenuous connection between game save "resigning"(*see* p.7 & note 2, *supra*) and the Datel MAX Memory Card raises disputed issues of fact regarding the purpose of the Memory Card. It does not.

Resigning capability was never included in the software distributed on disks with the MAX Memory Card. Datel made a strategic decision to separate resigning into another product (this product was dubbed "Power Saves" and was only marketed for sale in Europe) and sell the memory card based upon its superior size and price and upon its backup capability. The evidence suggests, however, that one version of the Memory Card software that included a resigning feature was posted and available for download on Datel's website for a brief period in the Fall of 2009, and that no more than a few hundred people, almost all of whom were likely located in South Korea, ever activated the feature. Connors Decl. ¶¶20-23.

Even assuming, *arguendo*, that the act of resigning constitutes a circumvention of a

*Continued . . .*

**B. Sections 1201(a)(2)(C) and 1201(b)(1)(C)—Which Prohibit Devices Marketed For Impermissible Circumvention Purposes—Do Not Apply Because The MAX Memory Card Is Not Marketed As Suitable For Circumvention.**

Sections 1201(a)(2)(C) and (b)(1)(C) bar the distribution of a device that "is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure." Consequently, the *sine qua non* of a subsection (C) "marketing" violation is explicitly promoting a device "for use in circumventing protection afforded by a technological measure" that controls access to a copyrighted work or guards against infringement. Datel has not done that.

Preliminarily, we note that no court has ever found DMCA liability on the basis of a marketing violation alone.[16] This is not surprising. It is difficult to imagine how marketing a device that is *not* primarily designed for circumvention, and which *does* have a significant commercial use other than circumvention, could pose a problem. The outlier case—the rare case that to our knowledge has never arisen—in which a court finds a marketing violation *alone*, would be one in which a manufacturer of a tool with legitimate uses nevertheless focuses its overall marketing approach to feature and extol the tool's illegitimate capabilities. Like a manufacturer of screwdrivers who uses a marketing campaign that ignores the use of that tool to facilitate fastening and instead advertises its screwdriver as a device handy to pick locks, or a seller of fertilizer whose marketing consists of internet instructions for use of it as an ingredient for explosives, one can hypothesize a maker of a legitimate device that is capable of circumvention who takes an overall

---

"technological measure" under the DMCA—an assumption Datel disputes—the fact remains that the potential availability of that minor, and likely unused, feature of the MAX Memory Card software did not violate the statute.

Microsoft can make no reasonable argument that Datel's Memory Card was "primarily designed or produced" for the purpose of resigning, or that resigning was its only "commercially significant purpose." *See* §1201(a)(2)(A)-(B), (b)(1)(A)-(B). Just as the movie studios could not seize on a potentially infringing but tangential use of VCRs in *Sony Corp.* to keep a useful and legitimate product out of the market, Microsoft cannot use the DMCA to eliminate a product whose primary purpose is the same as one of Microsoft's own accessories.

[16]Where courts have found marketing violations—again always in addition to findings that a device is primarily designed for circumvention or has limited commercial significance other than circumvention—marketing for use in circumvention has been the overarching theme of the DMCA violator's marketing strategy. *See, e.g., 321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1095 (N.D. Cal. 2004).



HowardRice

marketing approach that highlights the illegitimate, circumventing use of that device. That is not this case.

Datel's marketing message for the MAX Memory Card was all about capacity: that it was "32 Times bigger than a basic Xbox360 Memory Card" (Tarolla Decl. Ex. A), and that its already "massive" storage capacity was "fully expandable up to 16 GB!" *Id.* On the packaging itself, after the "MAX Memory" logo, by far the largest fonts were reserved for the "32x" and the "2 GIGABYTE" text. *Id.* Secondary messaging noted that the card is "Perfect for saving and transporting gamertag and gamesave data," allows you to "Back up gamesaves and profiles to your PC in seconds," and "Restore back-ups at the click of a button—total peace-of-mind for your precious gamesaves and profile data." *Id.* Backing up data on a PC meant suitable content could be shared, but Datel never advertised or promoted resigning capability in connection with the Memory Card software, which would be necessary to achieve any sort of sharing that could not be accomplished with the Microsoft memory card. Connors Decl. ¶24. This is consistent with the examples of Datel's marketing that Microsoft *had in its possession* when it decided to disable Datel's product, and it is consistent with the marketing employed by Microsoft itself in promoting its own memory card. *Compare* Danaye-Elmi Decl. Exs. 14 & 15 [REDACTED] *with id.* Ex. 16 (MS memory card packaging advertising that it functions to "save your game progress" and allows you to "Take your games everywhere you go").

Therefore, because Datel's marketing strategy and material was consistent with the legitimate primary purpose of the memory card, it did not violate Sections 1201(a)(2)(C) and 1201(b)(1)(C).

## V. MICROSOFT CANNOT RELY ON THE STFS FILE SYSTEM AS AN EFFECTIVE TECHNOLOGICAL PROTECTION MEASURE UNDER THE DMCA.

Another dispositive flaw in Microsoft's DMCA case concerns its reliance on the STFS file system as a technological protection measure. Microsoft alleges that the software distributed with the Datel memory card circumvents this system by allowing users to copy a STFS file onto a PC. *See* Danaye-Elmi Decl. Ex. 11 at Response No. 17. STFS refers to the internal structure the Xbox

360 uses for the storage of data files. [REDACTED] However, STFS does not control access or prevent copying, period; it is not circumvented by the Datel MAX Memory software; and any reliance on it would be barred by laches.

**A. STFS Is Not An Effective Technological Measure.**

The DMCA is only concerned with the circumvention of effective technological protection measures. STFS is not an effective technological protection measure as a matter of law. [REDACTED] Microsoft's contention is the equivalent of saying that the size of the pages of a book or the language in which it is published dictates who may read the book or transcribe its contents. These features may describe what the book looks like, but they do not prevent or regulate access or stop copying.

**B. The Datel Memory Card Software Does Not Circumvent STFS.**

In addition, even if STFS were an effective technological protection measure, Datel's software does not, by reading and copying files stored in STFS, "do" anything that would constitute circumvention. *Id.* That is, Datel's software does not "avoid, bypass, remove, deactivate, or impair" the STFS file system within the meaning of the DCMA. *See* §1201(a)(3)(A), (b)(2)(A). Rather, the software simply copies wholesale (bit-for-bit) files stored in an STFS format from one location (*i.e.*, the MAX Memory Card) to another (*i.e.*, the PC). Nothing about the STFS format is changed in any

HowardRice

way. Datel did not need to understand STFS to make the memory card, and the memory card would work just as well with Xbox 360 files whether they were in STFS or some other format. As a result, because STFS does not impose any barriers that must be removed or avoided by Datel's software, the software does not circumvent a technological protection measure under the DMCA.

**C. Any Claim Based On STFS Is Barred By Laches.**

In the unlikely event that Microsoft's DMCA claim based on circumvention of the STFS file structure through Datel's file management software is not disposed of by either or both of the foregoing points, it would in any event be barred by laches. Datel distributed functionally equivalent file management software with its Transfer Kit, Xport and Xsata products starting in early 2006. [redacted] But Datel relied on more than Microsoft's silence: Microsoft *had* reached out to Datel with an entirely different concern about Datel's data transfer products, asking Datel in February 2006 to remove one line from its marketing materials.[17] Datel obliged. Datel had every reason to believe that Microsoft was communicating all of its concerns about Datel's data transfer products and software and, relying on these signals from Microsoft, it continued to develop the file management software and to build a product line around that software. In fact, a Microsoft employee informally told a Datel employee that the "data transfer stuff seems pretty cool." Declaration of Chris Duppler in Support of Datel's Motion for Partial Summary Judgment (DMCA Counterclaim) Ex. A. Now—years later—when (presumably on the theory that the best defense is a good offense) Microsoft seeks to assert every counterclaim it can muster, it attempts to complain of a product it knew about but did not challenge.

It is undisputed that Datel's file management software—the sort released in 2006 and, equally, the sort shipped with its MAX memory card in 2009—was capable of reading and writing data files

---

[17]Microsoft asked Datel to remove the line "unlimited memory capacity based only on the limits of your PC," because it gave the impression an Xbox 360 console could be connected directly to a PC. Tarolla Decl. Ex. B; Danaye-Elmi Decl. Ex. 19. Datel did so.



HowardRice

in the STFS format. [REDACTED] As far as it pertains to the DMCA allegations presented here, the functionality of the file management software included with Datel's MAX Memory Card is no different from the earlier versions of that software that Microsoft knew of, and raised no objections to, for at least four years. [REDACTED]

Under these circumstances, the equitable defense of laches bars Microsoft's counterclaim to the extent it depends on the operation of Datel's file management software. "To demonstrate laches, the defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001) (internal quotation marks and citation omitted). Both are present here. Measuring the delay "from when the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit in which the defendant seeks to counterpose the laches defense" (*id*. at 952), [REDACTED] Microsoft's delay well exceeds the applicable 3-year statute of limitations,[18] establishing a presumption of laches. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838-39 (9th Cir. 2002). And it was not reasonable—Microsoft did not spend four years devising its legal theory or measuring the scope of a purported violation; and its witnesses have offered no explanation why it failed to act until the deadline for mustering counterclaims to Datel's antitrust action arrived.

Microsoft's unreasonable delay prejudiced Datel. Datel has invested substantial resources into the ongoing development of its file management software, and has incorporated it into the operation of a whole line of products, including the MAX Memory Card. Although Datel had design flexibility in early 2009 when it was working on its MAX Memory Card—it could have offered

---

[18] A three-year statute of limitations governs claims brought under the Copyright Act. 17 U.S.C. §507(b).

different file management tools, or none at all—it would be impractical and highly burdensome for Datel to try to extricate such functionality now. That is the very sort of prejudice that supports a finding of laches. *ExperExchange, Inc. v. Doculex, Inc.*, No. C-08-03875 JCS, 2009 WL 3837275, at *23 (N.D. Cal. Nov. 16, 2009); *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 999 (9th Cir. 2006) ("A defendant may establish prejudice by showing that during the delay, it invested money to expand its business or entered into business transactions based on his presumed rights"); *Danjaq*, 263 F.3d at 955. Laches therefore bars Microsoft's DMCA counterclaim to the extent it relies on allegations that Datel "circumvented" its internal file structure in enabling the transfer of game save or other files to a PC.

**CONCLUSION**

For the foregoing reasons, the motion for partial summary judgment should be granted on Microsoft's DMCA claim, as that claim relates to the MAX Memory Card.

DATED: June 3, 2011.

Respectfully,

MARTIN R. GLICK
JEROME B. FALK, JR.
DANIEL B. ASIMOW
ROBERT D. HALLMAN
SHAUDY DANAYE-ELMI
HOWARD RICE NEMEROVSKI CANADY
FALK & RABKIN
A Professional Corporation

By /s/ *Jerome B. Falk, Jr.*
JEROME B. FALK, JR.

Attorneys for Plaintiffs DATEL HOLDINGS LTD. and DATEL DESIGN & DEVELOPMENT, INC.



HowardRice