1   Corynne McSherry (CA SBN 221504)
    corynne@eff.org
2   Marcia Hofmann (CA SBN 250087)
    marcia@eff.org
3   ELECTRONIC FRONTIER
    FOUNDATION
4   454 Shotwell Street
    San Francisco, CA 94110
5   Telephone: (415) 436-9333
    Facsimile: (415) 436-9993
6

7
    Jason M. Schultz (CA SBN 212600)
8   jschultz@law.berkeley.edu
    SAMUELSON LAW, TECHNOLOGY &        Sherwin Siy (DC SBN 501024)
9   PUBLIC POLICY CLINIC               ssiy@publicknowledge.org
    U.C. Berkeley School of Law        PUBLIC KNOWLEDGE
10  396 Simon Hall                     1818 N Street, NW, Suite 410
    Berkeley, CA 94720-7200            Washington, DC 20036
11  Telephone: (510) 642-0499          Telephone: (202) 861-0020
    Facsimile: (510) 643-4625          Facsimile: (202) 861-0040
12

13
    Attorneys for Amicus Curiae        Attorneys for Amicus Curiae
14  ELECTRONIC FRONTIER                PUBLIC KNOWLEDGE
    FOUNDATION
15

16              **UNITED STATES DISTRICT COURT**

17            **NORTHERN DISTRICT OF CALIFORNIA**

18              **SAN FRANCISCO DIVISION**

19

20  DATEL HOLDINGS LTD. And DATEL   )   CASE NO. 09-cv-5535 EDL
    DESIGN & DEVELOPMENT, INC.,      )
21                                   )   **BRIEF OF AMICI CURIAE ELECTRONIC**
                                     )   **FRONTIER FOUNDATION AND PUBLIC**
22          Plaintiffs,              )   **KNOWLEDGE IN SUPPORT OF DATEL'S**
                                     )   **MOTION FOR SUMMARY JUDGMENT**
23  v.                               )
                                     )
24  MICROSOFT CORPORATION,           )
                                     )
25                                   )
            Defendant.               )
26  _____     )

27

28

# **TABLE OF CONTENTS**

INTEREST OF AMICI ...................................................................................................1

SUMMARY OF ARGUMENT .......................................................................................1

ARGUMENT ..................................................................................................................3

I.   Imposing DMCA Liability in This Case Would Hobble Competition, After-Market Innovation, and Consumer Choice...............................................................3

II.   Section 1201(a) Does not Apply Where Microsoft Authorized Its Users to Circumvent Its Access Controls......................................................................5

    A.   The Court Must Look to the Meaning of "Authority" in the Context of Section 1201(a)(1) to Inform Its Interpretation of Section 1201(a)(2)................5

        1.   The Phrase "Circumvent Without Authority" Indicates that Section 1201(a)(2) Serves as an Indirect Liability Scheme to Supplement Section 1201(a)(1). ........................................................6

        2.   The Phrase "Circumvent Without Authority" Indicates that Section 1201(a)(2) Serves as an Indirect Liability Scheme to Supplement Section 1201(a)(1). ........................................................7

    B.   The Authority to Circumvent the Authentication Sequence Is Implied from the Authorized Sale of Xbox 360 Consoles and Games. ...................................8

        1.   Congress Intended for the Buyer of an Access-Controlled Product to Receive the Authority to Circumvent. ....................................8

        2.   Exhaustion Principles Dictate that a Customer Has Implied Authority .9

        3.   Consumers Who Buy Xbox 360 Consoles and Games Receive the Authority to Circumvent the Access Controls and Microsoft's Anti-Circumvention Rights Are Exhausted by the Sale................................11

III.   Microsoft's Section 1201 Claims Are a Misuse of Copyright.................................13

    A.   Application of the Misuse Defense to Section 1201 of the Copyright Act is Consistent with the History of the Doctrine and its Equitable Origins.........................13

    B.   Microsoft's Attempt to Obtain Patent-like Protection of its Hardware and Software Through DMCA Enforcement of its Technological Protection Measures Constitutes Misuse. ........................................................................................15

C.    Microsoft's Attempt to Exercise Anticompetitive Control over a Secondary Market Through Enforcement of its Section 1201 Claims Is a Misuse of the Law. .................17

D.    Microsoft's Attempt to Expand the Scope of its Copyright Monopoly Through the Application of Anticompetitive TPMs is a Misuse of the DMCA. ............................19

CONCLUSION.................................................................................................................21

BRIEF OF AMICI CURIAE ELECTRONIC FRONTIER
FOUNDATION AND PUBLIC KNOWLEDGE        CASE NO. 09-cv-5535 EDL

# **TABLE OF AUTHORITIES**

## **Federal Cases**

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*,
  307 F. Supp. 2d 1085 (N.D. Cal. 2004)...................................................................11, 15

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001)..................................................................................6, 14

*Actuate Corp. v. IBM Corp.*,
  2010 WL 1340519 (N.D. Cal., Apr. 5, 2010) ................................................................11

*Alcatel USA, Inc. v. DGI Technologies, Inc.*,
  166 F.3d 772 (5th Cir. 1999) ........................................................................16, 17, 18

*Allison v. Vintage Sports Plaques*,
  136 F.3d 1443 (11th Cir. 1998) ....................................................................................10

*Altera Corp. v. Clear Logic, Inc.*,
  424 F.3d 1079 (9th Cir. 2005) ......................................................................................14

*Apple, Inc. v. Psystar Corp.*,
  673 F. Supp. 2d 931 (N.D. Cal. 2009) ..........................................................................15

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
  365 U.S. 336 (1961)...................................................................................................6, 13

*Baker v. Selden*,
  101 U.S. 99 (1879)..........................................................................................................16

*Bloomer v. McQuewan*,
  55 U.S. (14 How.) 539 (1852) .......................................................................................10

*Bobbs-Merrill Co. v. Straus*,
  210 U.S. 339 (1908).......................................................................................................10

*Bottom Line Mgmt., Inc. v. Pan Man, Inc.*,
  228 F.3d 1352 (Fed. Cir. 2000).....................................................................................11

*Chamberlain Group, Inc. v. Skylink Techs., Inc.*,
  381 F.3d 1178 (Fed. Cir. 2004)...................................................................................3, 9

*Community for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989).........................................................................................................8

*Dow Jones & Co. v. Int'l Secs. Exch., Inc.*,
  451 F.3d 295 (2d Cir. 2006) ................................................................10

*Green v. Bock Laundry Mach. Co.*,
  490 U.S. 504 (1989) ................................................................10

*Griffin v. Oceanic Contractors, Inc.*,
  458 U.S. 564 (1982) ................................................................8

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*,
  123 F.3d 1445 (Fed. Cir. 1997) ................................................................10, 11

*Keeler v. Standard Folding-Bed Co.*,
  157 U.S. 659 (1895) ................................................................13

*Lasercomb America, Inc. v. Reynolds*,
  911 F.2d 970 (4th Cir. 1990) ................................................................14, 17, 18

*Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*,
  964 F.2d 965 (9th Cir. 1992) ................................................................20, 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  387 F.3d 522 (6th Cir. 2004) ................................................................ *passim*

*MDY Indus. v. Blizzard Entm't, Inc.*,
  629 F.3d 928 (9th Cir. 2010) ................................................................1, 5, 8, 9

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ................................................................6

*Morton Salt Co. v. G.S. Suppiger Co.*,
  314 U.S. 488 (1942) ................................................................14, 17, 18

*Nw. Corp. v. Gabriel Mfg. Co.*,
  1998 WL 525431 (N.D. Ill. Aug. 19, 1998) ................................................................14

*Practice Management Information Corp. v. American Medical Association*,
  121 F.3d 516 (9th Cir. 1997) ................................................................14, 15, 18

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
  553 U.S. 617 (2008) ................................................................10, 12, 13

*Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*,
  53 F.3d 1073 (9th Cir. 1995) ................................................................10

*Sega Enterprises Ltd. v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992) ................................................................17, 21

iv

*Sony Computer Entertainment America, Inc. v. Gamemasters,*
   87 F. Supp. 2d 976 (N.D. Cal. 1999) ...................................................................15

*Sony Computer Entm't, Inc. v. Connectix Corp.,*
   203 F.3d 596 (9th Cir. 2000) ...........................................................................21

*Sullivan v. Stroop,*
   496 U.S. 478 (1990).............................................................................................7

*Twentieth Century Music Corp. v. Aiken,*
   422 U.S. 151 (1975)......................................................................................3, 20

*UMG Recordings, Inc. v. Augusto,*
   628 F.3d 1175 (9th Cir. 2011) .........................................................................12

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.,*
   484 U.S. 365 (1988).............................................................................................6

*United States v. Paramount Pictures, Inc.,*
   334 U.S. 131 (1948)....................................................................................14, 20

*United States v. Univis Lens Co.,*
   316 U.S. 241 (1942)....................................................................................10, 12

*Universal City Studios v. Corley,*
   273 F.3d 429 (2d Cir. 2001)................................................................................7

*Vernor v. Autodesk, Inc.,*
   621 F.3d 1102 (9th Cir. 2010) .....................................................................12, 13

### Federal Statutes

17 U.S.C. § 106..................................................................................................15, 18

17 U.S.C. § 102(b) .................................................................................................16

17 U.S.C. § 1201 ............................................................................................. *passim*

17 U.S.C. §§ 1203–4 ................................................................................................7

35 U.S.C. § 271 .......................................................................................................6

v

**Other Authorities**

Aaron Perzanowski & Jason Schultz, *Digital Exhaustion*, 58 UCLA L. Rev. 889 (2011) .................... 10

Dan Goodin, *Texas Instruments Aims Lawyers at Calculator Hackers*, The Register, Sept. 23, 2009 .. 4

David Kravets, *Apple v. EFF: The iPhone Jailbreaking Showdown*, Wired, May 2, 2009..................... 3

David Labrador, *Teaching Robot Dogs New Tricks*, Scientific American, Jan. 21, 2002 ................... 4

Declan McCullagh, *Nikon's Photo Encryption Reported Broken*, CNET, Apr. 21, 2005........................ 4

Joseph Farrell and Paul Klemperer, *Coordination and Lock-In: Competition with Switching Costs and Network Effects, in* 3 Handbook of Industrial Organization 1967, 1971–78 (M. Armstrong & R. Porter, eds., 2007) ............................................................. 19

Seth Schiesel, *O Brave New World That Has Such Gamers in It*, NY Times, Jan. 19, 2007 ................. 19

*Unintended Consequences: Twelve Years under the DMCA* (2010), Electronic Frontier Foundation, *available at* https://www.eff.org/wp/unintended-consequences-under-dmca ............. 15

**Treatises**

Dan L. Burk, *Anti-circumvention Misuse*, 50 UCLA L. Rev. 1095, 1139 (2003) ................................. 15

David Nimmer & Melville B. Nimmer, Nimmer on Copyright § 12A.06 ........................................... 7

**Legislative Materials**

144 Cong. Rec. H10615 (1998) (statement of Rep. Coble)..................................................... 5

H.R. Rep. No. 105-551, pt. 1, at 17 (1998).............................................................*passim*

Restatement (Second) of Agency §§ 26, 35 (1958) ...................................................... 8, 11

S. Rep. No. 105-190, at 11 (1998) ................................................................... 3, 5, 6, 7

### INTEREST OF AMICI

The Electronic Frontier Foundation (EFF) is a membership-supported, nonprofit public interest organization dedicated to protecting digital civil liberties and promoting online innovation and creativity.[1]  For over twenty years, EFF has represented the interests of technology users in both court cases and in broader policy debates surrounding the application of law in the digital age.  As such, EFF offers a perspective that is distinct from that of the parties to this case.

Public Knowledge is a non-profit public interest 501(c)(3) corporation, working to defend citizens' rights in the emerging digital culture. Its primary mission is to promote innovation, protect the legal rights of all users of copyrighted works, and ensure that copyright law remains balanced and does not slow technology innovation, unduly burden free speech, shrink the public domain, or prevent fair use.

Amici file this brief because the ramifications of this Court's decision may reach far beyond this case.  The case law on anti-circumvention is still in the early stages, and the Ninth Circuit has recently issued a detailed opinion interpreting the Digital Millennium Copyright Act's provisions, *MDY v. Blizzard*.  This Court may be the first to interpret that opinion in a case involving competitors that market consumer products and, as such, its ruling may significantly impact both the everyday casual users of technology as well as the future developers of consumer electronics and compatible third-party accessories.  Tens of thousands of legitimate consumers who purchase third-party accessories to use with their Xbox 360 consoles and video games depend on the proper interpretation of section 1201(a) to ensure they are not threatened with violations of federal law.  Entities in this and other technological markets that offer non-infringing products and services that interact with products made by Microsoft and other dominant market players similarly depend on the courts to interpret the DMCA properly in order to prevent overreaching and anticompetitive uses of lawsuits.

### SUMMARY OF ARGUMENT

As electronic devices play an ever-larger part in our everyday lives, there is a heightened risk

---

[1]  EFF was assisted in this matter by co-counsel Jason Schultz of the Samuelson Law, Technology & Public Policy Clinic working with clinical students Joseph Martin, Sam Edwards and Kevin Krisiloff.

1    that overbroad applications of copyright law will inhibit add-on innovation and restrict lawful uses of

2    legitimately purchased products. The Digital Millennium Copyright Act (DMCA)'s circumvention

3    provisions were intended to buttress technological protection measures (TPMs) that protect

4    copyrighted works, but copyright owners may abuse the law and attempt to enforce TPMs that are

5    primarily designed to limit consumer choice and prevent outside competition.

6          That appears to be the case here.  Microsoft's interpretation of section 1201(a)(2) rests on the

7    flawed premise that users who lawfully purchased Xbox 360 consoles and games violate section

8    1201(a)(1) when using third-party memory cards.  Although Microsoft attempts to obscure the effect

9    of this interpretation by characterizing such users as "cheaters," Microsoft's section 1201(a) claim

10   against Datel amounts to nothing more than an attack on its own paying customers.  Not only is this

11   interpretation inequitable, it contravenes the plain meaning of section 1201(a), ignores Congress's

12   expressed intent, and runs counter to the long-standing doctrine of intellectual property exhaustion.

13         When correctly interpreted, section 1201(a) prohibits something else altogether: digital

14   *trespass* upon intellectual property by *outsiders* who have no authority to "unlock" a copyrighted work

15   without "breaking into" the work through circumvention.  In other words, section 1201(a) protects

16   copyright owners' ability to demand and receive payment before granting the authority to decrypt,

17   descramble, or otherwise circumvent the technological protection measures preventing access to their

18   works.  The DMCA did not empower copyright owners to prevent individuals who have legitimately

19   purchased the authority to unlock their works from doing so, even when the copyright owner contends

20   that such activity constitutes a breach of contract.

21         In addition, Microsoft's section 1201(a) claim is a species of copyright misuse.  Microsoft

22   effectively asks the Court to grant it exclusive rights to sell any and all Xbox-360-compatible memory

23   cards, controllers, and headsets. The doctrine of misuse has long prevented intellectual property

24   owners from suppressing competition and impermissibly expanding the scope of their statutory rights.

25   Copyright misuse, in particular, prevents copyright owners from doing exactly what Microsoft seeks to

26   do here—leverage its copyrights to achieve patent-like protection, contrary to constitutionally

27   mandated public policy.

28         For these reasons, amici urge the Court to grant summary judgment in favor of Datel on

2

1   Microsoft's DMCA section 1201(a) claims.

2   **ARGUMENT**

3   I.   **Imposing DMCA Liability in This Case Would Hobble Competition, After-Market**
4        **Innovation, and Consumer Choice.**

5   No court has imposed DMCA liability based on the sale of a competing durable good, and with

6   good reason—the DMCA was intended to protect healthy competition, not to inhibit it.  *See*

7   *Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1193 (Fed. Cir. 2004); *Lexmark Int'l,*

8   *Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 552–53 (6th Cir. 2004) (Merritt, J.,

9   concurring).[2]  Increasingly in recent years, manufacturers of ordinary consumer products have urged

10  courts to extend the DMCA well beyond its purpose, to suppress legitimate competing products and

11  police any consumer behavior that is contrary to their preferences.

12  The crux of the problem is this: By arguing unauthorized access, manufacturers can use the

13  DMCA to assert exclusive control over the market for accessories to their primary products. The

14  detrimental effects on consumers are well documented.  For instance, cell phone manufacturers

15  increasingly sell phones equipped with technological protection measures that lock consumers to a

16  particular service provider, forcing them to pay artificially inflated service charges and crippling the

17  market for used phones.  David Kravets, *Apple v. EFF: The iPhone Jailbreaking Showdown*, WIRED,

18  May 2, 2009.[3]  Camera makers have similarly installed technological protection measures that render

19  pictures unreadable in competitors' photo-editing programs, preventing consumers from editing their

20  own pictures with their preferred software.  Declan McCullagh, *Nikon's Photo Encryption Reported*

21  _____

22  [2]  The DMCA gives legal force to copyright owners' efforts to "lock" their works through prohibitions
     that are "analogous to making it illegal to break into a house using a tool, the primary purpose of
23   which is to break into houses."  S. REP. NO. 105-190, at 11 (1998).  In enacting the DMCA, Congress
     envisioned that "copyrighted works will most likely be encrypted and *made available to consumers*
24   *once payment is made for access to a copy* of the work."  H.R. REP. NO. 105-551, pt. 1, at 17 (1998)
     (emphasis added).  Seen this way, the DMCA—by permitting copyright owners to prevent members
25   of the public from viewing, hearing, or otherwise accessing a copyrighted work without first paying
     for the ability to do so—is consistent with copyright law's underlying purpose of "secur[ing] a fair
26   return for an 'author's' creative labor" by providing an economic "incentive [ ] to stimulate artistic
     creativity for the general public good."  *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156
27   (1975).

28  [3]  Available at http://www.wired.com/threatlevel/2009/05/apple-v-eff-the-iphone-jailbreaking-
     showdown.

*Broken*, CNET, Apr. 21, 2005.[4]  In all of these cases, manufacturers wield the DMCA to control the behavior of lawful buyers, not to control any substantial risk of infringement.

This vision of the DMCA also directly limits Americans' time-honored "freedom to tinker." Traditionally, legitimate consumers have been free to customize their products to better fit their needs; just as car enthusiasts might wish to soup up their engines, consumers may wish to write their own software for their robot pets,[5] install larger hard drives on their computers, etc.  But manufacturers have tried to use the DMCA to prevent such customization and dictate how a consumer can use his or her own property. For example, calculator manufacturers have brought circumvention claims against hobbyists who reverse-engineered their personal graphing calculators to develop alternative operating systems for personal use.  Dan Goodin, *Texas Instruments Aims Lawyers at Calculator Hackers*, THE REGISTER, Sept. 23, 2009.[6]

Microsoft's claims against Datel similarly illustrate the DMCA's potential perverse effects on competition and consumer choice. Datel manufactures a line of memory cards that perform functions essentially identical to Microsoft's competing memory cards: they allow users to save their game play. Microsoft essentially argues that the DMCA prohibits anyone (other than Microsoft) from making accessories that are compatible with Xbox 360 consoles and games.  If that were true, Microsoft would be able to maintain exclusive control of the Xbox 360 aftermarket, eliminating both competition and the ability of its customers to tinker with their legally purchased game-files, even where such tinkering does not implicate copyright infringement.

Consumers paid Microsoft and its affiliates for the devices and games in question, and the Court should not allow Microsoft to unfairly restrict the full use of these products, even if the use falls outside of Microsoft's vision. In order to protect consumers and preserve healthy competition and innovation, the Court should construe section 1201 in accordance with its true purpose: curbing

---

[4]  Available at http://news.cnet.com/Nikons-photo-encryption-reported-broken/2100-1030_3-5679848.html.

[5]  David Labrador, *Teaching Robot Dogs New Tricks*, SCIENTIFIC AMERICAN, Jan. 21, 2002, http://www.scientificamerican.com/article.cfm?id=teaching-robot-dogs-new-t (computer manufacturer threatened to sue an enthusiast who programmed custom "dance moves" for his robotic dog).

[6]  Available at http://www.theregister.co.uk/2009/09/23/texas_instruments_calculator_hacking.

4

1    copyright infringement by punishing those who manufacture and use tools designed to facilitate it.  *See*

2    H.R. REP. NO. 105-551, pt. 1, at 9-10 (1998); S. REP NO. 105-190, at 11-12 (1998); 144 CONG. REC.

3    H10615 (1998) (statement of Rep. Coble).

### II.    Section 1201(a) Does not Apply Where Microsoft Authorized Its Users to Circumvent Its Access Controls.

As the Ninth Circuit's most recent DMCA opinion stresses, section 1201(a) only prohibits

*unauthorized* circumvention, and 1201 claimants bear the burden of proving that the alleged

circumvention occurred *without authority*.  *MDY Indus. v. Blizzard Entm't, Inc.*, 629 F.3d 928, 953

n.16 (9th Cir. 2010); 17 U.S.C. § 1201(a)(3)(A).  While the *MDY* opinion reinforces the importance of

the "without authority" requirement, however, it provides little guidance on its proper interpretation

and how courts should determine whether authority has been granted or withdrawn.

This case requires the Court to fill that gap. Microsoft's allegations rest on the flawed premise

that consumers who lawfully purchased Xbox 360 consoles and video games nonetheless violated

federal law by using aftermarket accessories manufactured by an "unauthorized" competitor.  In fact,

as explained below, consumers receive the "authority" to circumvent (*e.g.*, unlock) the products to the

extent necessary to use them for their intended purpose when they purchase the products, even when

that use involves "unauthorized" competing accessories.

### A.    The Court Must Look to the Meaning of "Authority" in the Context of Section 1201(a)(1) to Inform Its Interpretation of Section 1201(a)(2).

Congress deliberately incorporated the same statutory definition of "circumvent," and thus the

element of authority, into both section 1201(a)(1) and section 1201(a)(2).  *Cf.* 17 U.S.C.

§ 1201(a)(3)(A). The absence of authority serves crucial and related limiting functions in each

provision.  In the context of section 1201(a)(1), the absence of authority distinguishes "breaking and

entering" from innocuous and commonplace conduct.  H.R. REP. NO. 105-551, pt. 1, at 9–10, 18

(1998).  In the context of section 1201(a)(2), the absence of authority separates "burglars tools" from

legitimate multipurpose devices by imposing indirect liability on those who bring about violations of

section 1201(a)(1).  *Id.*  The court must construe these two sections together and give the common

terms a consistent meaning that makes the statute internally coherent.  *United Sav. Ass'n of Texas v.*

*Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous

5

1   in isolation is often clarified by the remainder of the statutory scheme—because the same terminology

2   is used elsewhere in a context that makes its meaning clear, or because only one of the permissible

3   meanings produces a substantive effect that is compatible with the rest of the law.") (internal citations

4   omitted).

5       **1.      The Phrase "Circumvent Without Authority" Indicates that**
        **Section 1201(a)(2) Serves as an Indirect Liability Scheme to Supplement**
6       **Section 1201(a)(1).**

7          As the Senate Judiciary Committee noted, section 1201(a) is a composite prohibition

8   "analogous to making it illegal to break into a house using a tool, the primary purpose of which is to

9   break into houses." S. REP. NO. 105-190 at 11 (1998). The conduct prohibited by section 1201(a)(1)—

10  circumventing without authority—describes the distinguishing characteristic of devices prohibited by

11  section 1201(a)(2).  Congress thus intended for section 1201(a)(2) to prohibit devices that are designed

12  or marketed for violating section 1201(a)(1), or that have no commercial significance other than

13  violating section 1201(a)(1). In this respect, the anti-trafficking provisions bear striking resemblance to

14  familiar indirect liability standards in other statutes.[7]

15         Like all indirect liability regimes, section 1201(a)(2) requires proof of direct liability.  *Cf. A&M*

16  *Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001).  Datel's trafficking liability is

17  therefore inextricably linked to consumers' circumvention liability.  To the extent that Microsoft

18  granted its customers the authority to unlock its content, Datel cannot be liable for trafficking in

19  devices used by Microsoft's customers to access that content.  *Cf. Lexmark*, 387 F.3d at 564 (Feikens,

20  J., concurring in part).  The Court must not interpret the phrase "without authority" in the context of

21  section 1201(a)(2) without considering the effect of its interpretation on the scope of section

22  ────────────────

23  [7]  This is especially true with regard to the standards for indirect liability set forth in 35 U.S.C.
    § 271.  A device that is "primarily designed" for circumvention is also "especially made or
24  adapted" for circumvention, just as a device with "limited significant commercial purpose
    other than" circumvention is one that is "not a staple article or commodity of commerce
25  suitable for" non-circumventing use.  *Compare* 17 U.S.C. § 1201(a)(2)(B)–(C) *with* 35 U.S.C.
    § 271(b); *cf. Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336 (1961).
26  Moreover, marketing a device for use in unlawful conduct is the prototypical case of active
    inducement.  *Cf. Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005).
27  The common denominator among the anti-trafficking provisions is that each describes a set of
    circumstances in which it is fair to impute to a defendant an intent to encourage violations of
28  section 1201(a)(1).  *Cf. Lexmark,* 387 F.3d at 551–52 (Merritt, J., concurring).

1201(a)(1).  *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) ("[I]dentical words used in different parts of the same act are intended to have the same meaning.").

### 2.    Congress Must Have Intended "Without Authority" as a Limiting Construction.

In theory, "circumvention" includes conduct that the vast majority of Americans undertake nearly every day.  *See* 17 U.S.C. § 1201(a)(3)(A). Movie watchers "decrypt an encrypted work" whenever they watch a DVD at home; internet users "deactivate" password protection each time they log into their email or Facebook accounts; software purchasers often must enter a CD key or serial number to "deactivate" or "remove" access controls upon installation.[8]

Congress, of course, did not intend to punish such innocuous conduct with statutory damages, injunctions, and even criminal penalties.  *See* 17 U.S.C. §§ 1203–4. To the contrary, Congress understood section 1201(a) as limited to inherently culpable conduct akin to common law property crimes, the "electronic equivalent of breaking into a locked room in order to obtain a copy of a book." H.R. REP. NO. 105-551, pt. 1, at 17; *see also* S. REP. NO. 105-190, at 11 (1998) (likening section 1201(a) to "making it illegal to break into a house"); David Nimmer & Melville B. Nimmer, NIMMER ON COPYRIGHT § 12A.06 at 17 (stating that section 1201(a) is an aggravated form of burglary).  The absence of authority is the only element that makes the conduct of circumventing deserving of the harsh penalties that flow from section 1201(a) violations.  *Cf. Universal City Studios v. Corley*, 273 F.3d 429, 444 (2d Cir. 2001) (finding that section 1201(a)(3)(A) excludes from the scope of section 1201(a) "those who would 'decrypt' an encrypted DVD with the authority of a copyright owner").  Unless the Court interprets the phrase "without authority" in a way that serves the limiting purpose Congress intended, the DMCA threatens to prohibit the very acts that permit consumer participation in the digital economy.  *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575

---

[8]  In each of these examples, the access control requires "the application of information," such as a password or encryption key, "or a process" such as decrypting or descrambling, in order to "gain access to the work."  *See* 17 U.S.C. § 1201(a)(3)(B).  The two definitional provisions, viewed together, indicate that "to circumvent" means to perform the act required in order to access a work notwithstanding a technological measure that prevents access. The access control "locks" the work, and the circumventor either unlocks the work or breaks the lock to it.

BRIEF OF AMICI CURIAE ELECTRONIC FRONTIER
FOUNDATION AND PUBLIC KNOWLEDGE        CASE NO. 09-cv-5535 EDL

(1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.")

**B.   The Authority to Circumvent the Authentication Sequence Is Implied from the Authorized Sale of Xbox 360 Consoles and Games.**

The DMCA's text is ambiguous regarding whether authority to circumvent must be granted expressly or may be implied from the nature of a transaction.  The common law, however, has long recognized implied "authority" to perform a certain act, as well as any other acts which "usually accompany it[ ] or are reasonably necessary to accomplish it." RESTATEMENT (SECOND) OF AGENCY §§ 26, 35 (1958); *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 739–40 (1989) (according terms in the Copyright Act their established meaning under the common law of agency because "a court must infer . . . that Congress means to incorporate the established meaning of these terms") (citation omitted).  Moreover, the expansive range of activities that "circumvent" access controls suggests that such implied authority must exist.

**1.   Congress Intended for the Buyer of an Access-Controlled Product to Receive the Authority to Circumvent.**

Consistent with the established meaning of "authority," Congress expressly contemplated that the sale of an access-controlled product granted the buyer the authority that is reasonably necessary to accomplish the purpose of the transaction.  Congress envisioned that "copyrighted works will most likely be encrypted and *made available to consumers once payment is made*." H.R. REP. NO. 105-551, pt. 1, at 17 (emphasis added).  Thus, section 1201(a) only "applies when a person *has not* obtained unauthorized access," and "does not apply . . . once he or she *has obtained authorized access* to a copy of a work." *Id.* at 17–18 (emphasis added).  The buyer receives authority to circumvent once the seller is "compensated for valuable non-infringing access." *MDY*, 629 F.3d at 950.  Congress's repeated analogy to property offenses supports this understanding: consumers who purchase a right of entry are neither trespassers nor burglars.

At least two judges have acknowledged Congress's intent on this point.  The district court in *Chamberlain* held that a homeowner who purchases a garage door opener has a right to access that system in order to gain entry into his or her own garage.  *Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 292 F. Supp. 2d 1023, 1038–40 (N.D. Ill. 2003).  In his opinion in *Lexmark*, Judge Feikens

8

concluded that the interpretation of "effectively controls access" should be grounded in principles of implied authority.  *See* 387 F.3d at 563 (concurring in part and dissenting in part) ("Though the words are never used," the concept of implied license "is present in my colleagues' opinion."); *compare id.* at 547 ("[O]ne would not say that a lock on any door of a house 'controls access' to the house after its purchaser receives the key to the lock.").  Judge Feikens would have decided the case on the basis of the implied authority accompanying the sale of a Lexmark printer.  *Id.* at 564.  Under the "the plain meaning of the law," because Lexmark granted its customers authority to circumvent the authentication sequence, defendant Static Control could not be liable for "design[ing] a chip with that as its main purpose."  *Id.* at 564.

Although it rejected the "nexus" line of reasoning in *Chamberlain,* the *MDY* court did nothing to disapprove of its result.  Nor did it imply that courts within the Ninth Circuit would decide *Lexmark* differently if a manufacturer "tweaked" the facts of that case "simply by using similar, but more creative, lock-out codes." 387 F.3d at 552 (Merritt, J., concurring).[9]  Rather, *MDY* simply rejected the Federal Circuit's attempt to rewrite the statute to include a "nexus" requirement between circumvention and infringement.

### 2.    Exhaustion Principles Dictate that a Customer Has Implied Authority.

The doctrine of exhaustion provides the proper framework for determining the scope of authority granted when a durable goods manufacturer sells an access-controlled product.  Although the district court's decision in *Chamberlain* and Judge Feikens' opinion in *Lexmark* treat implied authority as deriving from theories of implied license, the Supreme Court has since made clear that, notwithstanding any implied license, exhaustion applies when the buyer receives title to a product that embodies the seller's intellectual property rights.  *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 637 (2008).

Courts developed the common law doctrine of exhaustion, or "first sale," to address the very issue involved in this case—the implied authority that necessarily accompanies the sale of a product

---

[9]  If anything, the court's decision to leave open the possibility of misuse and fair use as defenses to section 1201(a) indicates the court's recognition that interpretive steps may be needed to prevent the DMCA from being used anti-competitively and as an end-run around longstanding limitations on intellectual property rights.  *MDY*, 629 F.3d at 950 n.12, 951 n.13.

1    embodying intellectual property rights.  Courts have long extended it to all types of intellectual

2    property, flexibly tailoring its application to account for differences in the nature of the rights

3    involved.  *See, e.g., Bloomer v. McQuewan*, 55 U.S. (14 How.) 539 (1852) (patent exhaustion); *Bobbs-*

4    *Merrill Co. v. Straus*, 210 U.S. 339 (1908) (copyright first sale); *Sebastian Int'l, Inc. v. Longs Drug*

5    *Stores Corp.*, 53 F.3d 1073 (9th Cir. 1995) (trademark); *Allison v. Vintage Sports Plaques*, 136 F.3d

6    1443 (11th Cir. 1998) (right of publicity); *Dow Jones & Co. v. Int'l Secs. Exch., Inc.*, 451 F.3d 295,

7    302–03 (2d Cir. 2006) (state law misappropriation). *See also generally* Aaron Perzanowski & Jason

8    Schultz, *Digital Exhaustion*, 58 UCLA L. REV. 889 (2011). While its application varies according to

9    context, the underlying principle is the same: the seller's rights are diminished in order to

10   accommodate reasonable consumer expectations and to avoid restraints on downstream markets.  *See*

11   *Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.,* 123 F.3d 1445 (Fed. Cir. 1997) (holding

12   that sale of a patented product impliedly authorizes "any uses . . . to which the parties might

13   reasonably contemplate the product will be put").

14        Nothing in the DMCA's text or legislative history indicates that Congress intended to exempt

15   the newly created anti-circumvention right from the fundamental limiting principle of exhaustion.  *Cf.*

16   *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 521–22 (1989) ("A party contending that legislative

17   action changed settled law has the burden of showing" that Congress intended to "silently overhaul the

18   law.").  Quite the contrary: the DMCA gave legal force to measures that prevent users from gaining

19   access without first paying for the authority to do so.  H.R. REP. NO. 105-551, pt. 1, at 18 (stating that

20   section 1201(a) "establishe[d] a general prohibition against *gaining unauthorized access*" by

21   circumventing an access-control) (emphasis added).  Once copyright owners accept payment for the

22   authority to access their works, they cannot use the DMCA to punish those to whom that authority has

23   been granted.  *Cf. United States v. Univis Lens Co.*, 316 U.S. 241, 251 (1942) ("[T]he purpose of the

24   patent law is fulfilled . . . when the patentee has received his reward for the use of his invention. . . .

25   [O]nce that purpose is realized the patent law affords no basis for restraining the use and enjoyment of

26   the thing sold.").

27        Congress's express purpose for enacting section 1201(b), by contrast, was to provide the seller

28   with protection that extended beyond the first sale.  Thus, section 1201(a) "does not apply to the

BRIEF OF AMICI CURIAE ELECTRONIC FRONTIER
FOUNDATION AND PUBLIC KNOWLEDGE        CASE NO. 09-cv-5535 EDL

actions of a person once he or she has obtained authorized access . . . even if such actions involve circumvention of additional forms of technological protection measures." H.R. REP. NO. 105-551, pt. 1, at 18. After the authorized sale of an access-controlled product, however, copyright owners may resort to section 1201(b)—which does not require the absence of authority. Nevertheless, the authority implied by the sale of their product limits their ability to maintain section 1201(a) claims.

Exhaustion does not authorize all acts of circumvention, of course. The scope of implied authority ultimately conforms to the parties' intent. *Hewlett-Packard Co.*, 123 F.3d at 1451 (Fed. Cir. 1997) (holding that exhaustion authorizes "any uses . . . to which the parties might reasonably contemplate the product will be put"). Thus, the implied authority conferred by the sale is limited to acts of circumvention that are reasonably necessary to accomplish the purpose of the transaction. *Cf.* RESTATEMENT (SECOND) OF AGENCY § 35 (1958). The determination of whether the alleged acts of circumvention fall within the scope of implied authority created by the sale is based on the totality of the circumstances surrounding the transaction. *Bottom Line Mgmt., Inc. v. Pan Man, Inc.*, 228 F.3d 1352, 1355 (Fed. Cir. 2000).

The nature of the product sold as well as the nature of the access control are the primary indicia of the parties' intent. For example, the use of "skeleton keys" is unlikely to be shielded by implied authority where the purpose of these devices is to enable anyone to obtain access without first purchasing the authority to do so. *See id.* at 453; *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1095, 1100 (N.D. Cal. 2004); *Actuate Corp. v. IBM Corp.*, 2010 WL 1340519, at *9 (N.D. Cal., Apr. 5, 2010).

### 3. Consumers Who Buy Xbox 360 Consoles and Games Receive the Authority to Circumvent the Access Controls and Microsoft's Anti-Circumvention Rights Are Exhausted by the Sale.

Every single buyer of the Datel memory card has previously purchased an Xbox 360 console and video games and is therefore authorized to circumvent the authentication sequence when using the Datel (or any other) memory card in conjunction with Microsoft's (or any other publisher's) games.

First, the transfer of ownership in an Xbox 360 console from Microsoft to each of its customers constituted a *sale*. Microsoft did not license the console to its customers; it transferred title. *Cf. Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1108–12 (9th Cir. 2010). Although the Xbox 360 warranty

11

purports to create a "software license" to the Xbox 360 operating system, it contains no language stating that Microsoft retains title in the physical console. *Cf. id.* at 1111. Nor would such a purported contract constitute a license. *Id.* Nothing in the warranty requires the return of the console or imposes any restriction on the buyer's ability to transfer or resell the console. *Cf. id.* Although consumers must "accept the terms and conditions . . . in order to use [the] Xbox 360," failure to comply with its provisions does not result in termination of the "license," it merely voids the warranty and makes the consumer's Xbox 360 "ineligible for authorized repair." *Cf. id.* at 1112. Microsoft makes no attempt to keep track of where particular consoles are or what use is made of them.[10] *Cf. UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1180 (9th Cir. 2011).

Second, the reasonable and intended use of the console to play games requires the buyer to circumvent the authentication sequence—that is, it requires the exercise of an exclusive right. *See Quanta*, 553 U.S. at 631 (citing *Univis*, 316 U.S. at 249–51). The console is useless for game play unless the buyer "deactivates" the authentication sequence and unlocks purchased content in order to enjoy it. *Cf. Lexmark*, 387 F.3d at 563–64 (concluding that the sale of an access-controlled product granted implied authority because otherwise "it would be impossible" to use the product without impermissibly circumventing). Consumers must circumvent the authentication sequence in order to allow their consoles to interoperate with game controllers, *i.e.*, obtain the access the consumers purchased.

Thus, Microsoft obviously grants its customers the authority to circumvent the authentication sequence in order to unlock the functionality they have purchased for play. Xbox 360 consumers therefore did not violate section 1201(a)(1) by circumventing the authentication sequence. For the same reason, Datel did not violate section 1201(a)(2) by selling memory cards to these customers. *See Aro Mfg.*, 377 U.S. at 482 (implied authority created by exhaustion not only bars claims against the buyer, but also against third-party suppliers of repair services and replacement parts); *cf. Lexmark*, 387

---

[10]   A quick search on eBay reveals that over 1,500 used Xbox consoles are available for sale, suggesting that Microsoft itself regarded the transfer as a sale that exhausted whatever distribution rights it holds in the copyrighted software. Used and refurbished Xbox consoles are also available through a number of reputable retailers sell used and refurbished Xbox consoles, including Best Buy, EB Games, and GameStop.

1    F.3d at 564.

2        Finally, the fact that Microsoft purports to include a prohibition on "unauthorized devices" in

3    its warranty is of no consequence.  Where the buyer receives implied authority through a sale that

4    triggers exhaustion, any contractual restrictions on the use of the product are "enforceable only as a

5    question of contract, and not as one under" intellectual property law.  *Keeler v. Standard Folding-Bed*

6    *Co.*, 157 U.S. 659, 666 (1895); *accord Quanta*, 553 U.S. at 637 n.7; *Vernor*, 621 F.3d at 1107 n.6.

7    Microsoft cannot rely on contractual provisions to enforce the DMCA—rather than enforcing the

8    provisions themselves—in order to obtain remedies that contract law would deny them.

9    **III.    Microsoft's Section 1201 Claims Are a Misuse of Copyright**

10       Even if Microsoft can show that Datel's products otherwise qualify as circumvention devices

11   under section 1201 and that Xbox 360 console and game purchasers lacked authority to access

12   Microsoft Xbox 360 game content, the Court should use its equitable discretion to recognize

13   Microsoft's practices as misuse of the DMCA that prevent the distribution of competing third-party

14   accessories and thwart the purpose and policies behind the Copyright Act.

15       **A.    Application of the Misuse Defense to Section 1201 of the Copyright Act is**
         **Consistent with the History of the Doctrine and its Equitable Origins.**

16       Despite Microsoft's protestations, the misuse defense can and should apply to all federal

17   intellectual property doctrines, including section 1201. MS Motion to Bifurcate P&A at 15:24.  For

18   over 60 years, federal courts have recognized "misuse" as an equitable and necessary defense to

19   intellectual property claims, rendering the rights of intellectual property owners unenforceable when

20   they attempt "to secure an exclusive right or limited monopoly not granted by [Congress] and which it

21   is contrary to public policy to grant." *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 492 (1942).

22   Courts have consistently invoked misuse in all three federal intellectual property regimes—patents,

23   copyrights, and trademarks—to protect legitimate products from bad faith anticompetitive

24   infringement claims. *See United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948) (holding that

25   principles of patent misuse also forbid the tying of copyrighted works); *see also Nw. Corp. v. Gabriel*

26   *Mfg. Co.*, 1998 WL 525431 (N.D. Ill. Aug. 19, 1998) (holding that trademark misuse permits the court

27   to deny enforcement of a trademark when the plaintiff violates public policy by providing consumers

28

with deceptive product identifiers).

Courts have stressed that misuse doctrines support the public policy behind the federal intellectual property law. *See, e.g., Altera Corp. v. Clear Logic, Inc.,* 424 F.3d 1079, 1090 (9th Cir. 2005) (holding that the misuse doctrine "forbids the use of the [copyright] to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which is contrary to public policy to grant"); *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1026 (9th Cir. 2001) ("The misuse defense prevents copyright holders from leveraging their limited monopoly to allow them control of areas outside the monopoly."); *accord Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 977 (4th Cir. 1990). Thus, in *Practice Management Information Corp. v. American Medical Association*, 121 F.3d 516 (9th Cir. 1997), the Ninth Circuit found copyright misuse where the licensing agreement for a copyrighted coding system was conditioned on its exclusive use "in programs administered by [the licensee], by its agents, and by other agencies whenever possible." *Id.* at 517–18. The Ninth Circuit held that "[c]onditioning the license on [the licensee's] promise not to use competitors' products" gave the licensor "substantial and unfair advantage" in the marketplace. *Id.* at 521. The improper use of the coding system's copyright as leverage to gain this advantage was sufficient evidence to hold that "Practice Management established its misuse defense as a matter of law. . . ." *Id.*

That same policy concern applies to section 1201 claims. As the cases above note, misuse is not limited to a specific statutory regime in copyright law or even a specific set of facts; rather, it is a broad policy-based equitable doctrine that applies to copyright law as a whole and is meant to address any misuse of the rights granted under Title 17. Moreover, while section 1201's methods of enforcement differ from traditional copyright infringement claims, the harms it can inflict on competition and other core copyright policy objectives are identical to those identified in the case law as the basis for the misuse defense.[11]

---

[11]  *See* Dan L. Burk, *Anti-circumvention Misuse*, 50 UCLA L. REV. 1095, 1139 (2003) ("The ability to police and control technical standards for content management holds the potential to concentrate enormous market power in the hands of a small number of companies. . . . Such control over technical compatibility could be used to curtail innovation and deter the development of alternative technologies. To the extent that manufacturers with a large installed user base can use anti-circumvention rights to prevent reverse engineering, and maintain licensing exclusivity to their products, the DMCA represents an enormous advantage in maintaining their current position."); *see*

14

Microsoft offers no persuasive authority to the contrary.  For example, Microsoft incorrectly claims that the court in *Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 931, 939 (N.D. Cal. 2009), "reject[ed a] misuse defense to [a] valid DMCA claim." MS Motion to Bifurcate P&A at 15:24. While addressing both copyright infringement and DMCA claims, the Court never rejected misuse as a viable defense to section 1201 violations as a doctrinal matter; it simply found that, on the evidence before it, there was no proof of anticompetitive behavior or other evidence that violated the underlying public policies of copyright law. *See* 673 F. Supp. 2d at 940 ("Apple's licensing agreement is not unduly restrictive. . . . [T]he egregious examples of copyright misuse in the decisions cited by Psystar provide further support . . . that Apple has not engaged in copyright misuse.").  And in *Sony Computer Entertainment America, Inc. v. Gamemasters*, 87 F. Supp. 2d 976, 988 (N.D. Cal. 1999), the court recognized the legal validity of the misuse defense but found insufficient evidence to prove anticompetitive behavior. *Id.*

Microsoft is left only with the thin reed of *321 Studios v. Metro Goldwyn Mayer Studios*, 307 F. Supp. 2d 1085, 1107 (N.D. Cal 2004).  The court in that case denied a motion to amend the answer to add a misuse defense but offered no discussion, analysis, or citation to authority. Amici respectfully suggest that such a holding should not be viewed as precedential, especially in light of the Ninth Circuit's subsequent decision in *Practice Management* and the similarity between the harms that abuses of sections 1201 and 106 of Title 17 can inflict on the overall public policies embedded in the Copyright Act.

**B.    Microsoft's Attempt to Obtain Patent-like Protection of its Hardware and Software Through DMCA Enforcement of its Technological Protection Measures Constitutes Misuse.**

The evidence suggests that Microsoft is attempting to gain patent-like protection of its hardware and software by asserting section 1201 claims to prevent the development of competing products. The Fifth Circuit provided guidance in *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772 (5th Cir. 1999), finding that a copyright licensing agreement requiring use of Alcatel's software only in conjunction with Alcatel's DSC-manufactured expansion cards was a misuse of Alcatel's

*also Unintended Consequences: Twelve Years under the DMCA* (2010), Electronic Frontier Foundation, *available at* https://www.eff.org/wp/unintended-consequences-under-dmca.

15

1   operating system copyright because it prevented competing manufacturers from developing competing

2   cards. *Id.* at 793. The court held that because Alcatel indirectly sought to obtain "patent-like protection

3   of its hardware" through the enforcement of its software licensing agreement, Alcatel was misusing its

4   copyright to indirectly gain commercial control over products that were otherwise not patented or

5   copyrighted. *Id.* at 793–94.

6       The parallels between Alcatel's and Microsoft's respective practices are striking. Alcatel's

7   license prohibited the use of compatible third-party expansion cards; Microsoft's Terms of Use and

8   technological protection measures (TPMs) prevent the use of compatible third-party hard drives,

9   memory units and controllers. *See* MS Motion to Dismiss, RJN Ex. B at 11 ("The Service may only be

10  accessed with . . . device[s] authorized by us . . . You agree that you are using only authorized software

11  and hardware to access the Service"); *see also* MS Motion to Bifurcate, P&A at 7:10 (stating that

12  circumventing Microsoft's TPMs has allowed Datel to "sell unauthorized Xbox 360 accessories").

13  And just as the Fifth Circuit found that Alcatel's attempt to restrict its licensees to its own accessories

14  was misuse because it "prevent[s] anyone from developing a competing [accessory], even [if the

15  accessory] has not [been] patented," *id.* at 794, Microsoft's attempt to restrict its licensees (both

16  through its Terms of Use and TPMs) to its own products is equally anticompetitive—an attempt to

17  gain patent-like protection—and undermines copyright law's core public policy that copyright only

18  controls a particular expression of an idea and not the idea itself. *See* 17 U.S.C. § 102(b); *Baker v.*

19  *Selden*, 101 U.S. 99, 105 (1879) (finding that the *expression* of an idea, "though entitled to the benefit

20  of copyright," lays no foundation for an "exclusive claim" to use of the idea); *see also Sega Enters.*

21  *Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) (finding defendant's copying of computer code to

22  be fair use because it enabled defendant to access the functionality and ideas behind the code, which

23  are unprotected by copyright law, in order to create competing aftermarket computer programs).

24      In *Lexmark International, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir.

25  2004), Judge Merritt of the Sixth Circuit noted the potential for section 1201 to be used anti-

26  competitively in exactly this manner to restrict competition:

27      If we were to adopt Lexmark's reading of the statute [allowing section 1201 to grant
        patent-like protection], manufacturers could potentially create monopolies for
28      replacement parts simply by using []lock-out codes. Automobile manufacturers, for

BRIEF OF AMICI CURIAE ELECTRONIC FRONTIER
FOUNDATION AND PUBLIC KNOWLEDGE      CASE NO. 09-cv-5535 EDL

1
2
3

example, could control the entire market of replacement parts for their vehicles by including lock-out chips. Congress did not intend to allow the DMCA to be used offensively in this manner, but rather only sought to reach those who circumvented protective measures 'for the purpose' of pirating works protected by the copyright statute.

4  *Id.* at 552, (Merritt, J., concurring).  Judge Merritt further emphasizes that even if Lexmark's TPMs

5  effectively controlled access to a copyrighted work, "the proof so far shows that [Static Control

6  Components] had no interest in [accessing the copyrighted software] other than ensuring that their own

7  cartridges would work with Lexmark's printers." *Id.* at 553.

8  As in *Lexmark*, the evidence suggests that Datel has no copyright-related interest in accessing

9  game content nor any purpose in circumventing the Xbox 360 console authentication sequence other

10 than ensuring full compatibility between its devices and the Xbox 360 console. Allowing Microsoft to

11 use the DMCA to gain patent-like control over all Xbox-compatible devices would achieve exactly

12 what Judge Merritt feared and the *Alcatel* court sought to prevent with the application of the misuse

13 defense.

14  **C.    Microsoft's Attempt to Exercise Anticompetitive Control over a Secondary Market Through Enforcement of its Section 1201 Claims Is a Misuse of the Law.**

15

16  Microsoft also appears to be using its section 1201 claims to exercise anticompetitive control

17 over a secondary market outside the scope of its copyright.  *See generally Lasercomb America, Inc. v.*

18 *Reynolds*, 911 F.2d at 978.  In *Morton Salt*, for example, the licensing agreement "restrain[ed]

19 competition" by locking the licensee into purchasing the patent owner's "unpatented [salt] tablets"

20 instead of competitors' salt tablets. 314 U.S. at 490. In *Practice Management*, the Ninth Circuit found

21 copyright misuse where a copyright licensing agreement required licensees to "promise not to use

22 competitors' products" and gave the copyright owner a "substantial and unfair advantage" in the

23 marketplace. 121 F.3d at 521.

24  In this case, Microsoft alleges that every Xbox 360 owner "agreed to contractual terms

25 prohibiting the use of unauthorized accessories." MS Answer & Counterclaims, ¶ 22.  Unauthorized

26 accessories include any number of competing products, including Datel's. In addition, the warranty

27 included with every Xbox 360 specifically states: "the software included in the Xbox Product is

28 licensed to you, not sold. You are licensed to use such software [including saved game data] only in

17

1    your Xbox Product . . ." MS Motion to Dismiss, RJN Ex. A. Thus, according to Microsoft's licensing

2    agreement, Xbox 360 users are prohibited from using competing products generally and specifically

3    prohibited from storing their saved games or other user data on a competitor's memory card or other

4    device.  Furthermore, Microsoft claims that once a user violates the Xbox 360 Terms of Use by using a

5    competitor's product, that user is no longer authorized to use the "included" software and then both

6    infringes Microsoft's copyrights and violates section 1201(a)(1) every time he or she stores or accesses

7    data on a compatible competitor's product.

8         Such restrictions are nearly identical to those found to constitute misuse in *Morton Salt*,

9    *Practice Management*, *Lasercomb*, and *Alcatel. See Morton Salt,* 314 U.S. at 491 (finding misuse

10   where license to use machines was conditioned upon an agreement to only use "the subsidiary's salt

11   tablets"); *Practice Management,* 121 F.3d at 517 (finding misuse where defendant agreed "not to use

12   any other system of procedure . . . for reporting physicians' services" and was required to use the

13   plaintiff's system whenever possible); *Lasercomb*, 911 F.2d at 973 (finding misuse where licensee was

14   not permitted to write, develop, produce or sell competing software for a term of "ninety-nine years");

15   *Alcatel* 166 F.3d at 793 (finding misuse where customers are authorized to use the software "only in

16   conjunction with DSC-manufactured equipment," locking customers into DSC "in the aftermarket").

17   The right of users to save games and data that they created (and likely own the copyright to) is not a

18   right granted to Microsoft under either section 106 or section 1201. In bringing its 1201 claims,

19   Microsoft is attempting to expand the scope of its copyrights to include exclusive control over these

20   uses.

21        Moreover, Microsoft's restrictions on saving game data may have powerful anticompetitive

22   effects. For the past several decades and across seven generations of game consoles, video games have

23   grown in their complexity, difficulty and in the amount of time required to fully explore their content.

24   Users are now investing more and more of their free time in their video games, making this content

25   more and more valuable to them as consumers.[12] Thus, the data that save their progress become

---

[12] Seth Schiesel, *O Brave New World That Has Such Gamers in It*, NY TIMES, Jan. 19, 2007 ("World
of Warcraft . . . delivers an overall entertainment experience that goes far beyond what one might
expect from a mere game." Players are part of "a much larger, more important story," and in order
to advance, players must invest thousand of hours "leveling up" and "accessorizing" their

18

increasingly important.  Game companies like Microsoft and Sony have developed large secondary

markets for accessories whose sole purpose is to store and backup a gamer's data.  While each

company offers a unique set of devices, the large "switching costs" associated with gaming consoles

essentially lock gamers into purchasing only the accessories that are compatible with their system—

even if those products are inferior.[13]

Because storing game data is such a fundamental part of playing video games, gamers

generally make archival copies of their data on many different storage devices.  At a minimum, Xbox

360 gamers will likely use one or two external storage devices to backup their data. Datel effectively

expanded this secondary market by releasing low-cost alternatives that directly compete with

Microsoft's products. *See* Datel Opposition to Motion to Bifurcate, at 7 (Microsoft "was the sole

source of such cards before Datel entered the market, and had become the only player once again after

it had shut down Datel's Memory cards.").

Prohibiting purchasers of Xbox 360 hardware and software from using a competitor's products

is not within the scope of Microsoft's copyright monopoly.  Microsoft's attempt to use the DMCA to

gain exclusive rights to the secondary market for user data storage, archiving, and portability is a

misuse under the law.

### D.  Microsoft's Attempt to Expand the Scope of its Copyright Monopoly Through the Application of Anticompetitive TPMs is a Misuse of the DMCA.

Finally, any attempt to use a lawsuit based on copyright to "enlarge" its copyright monopoly is

a species of misuse. *Paramount Pictures*, 334 U.S. at 157–58.  That is precisely what is occurring

here.  In support of its section 1201 claim, Microsoft has stated that the Xbox 360 has "a number of

technological security layers to prevent against cheating, hacking, and piracy." MS Motion to

---

characters.).

[13] *See* Joseph Farrell and Paul Klemperer, *Coordination and Lock-In: Competition with Switching Costs and Network Effects, in* 3 HANDBOOK OF INDUSTRIAL ORGANIZATION 1967, 1971–78 (M. Armstrong & R. Porter, eds., 2007) (The economics of switching costs are "central to the 'new economy' information technology industries." Important examples involve aftermarket "follow on" goods, such as spare parts and repair services. Buyers can face additional switching costs "if follow-on goods are not compatible with the original purchase," as may be the case if they are manufactured by a different firm.).

BRIEF OF AMICI CURIAE ELECTRONIC FRONTIER
FOUNDATION AND PUBLIC KNOWLEDGE        CASE NO. 09-cv-5535 EDL

1  Bifurcate P&A at 5.  While Microsoft's copyrights clearly allow them legal control over attempts at

2  infringement (often called "piracy"), they do not grant Microsoft control over "cheating" and

3  "hacking" unless such actions also infringe on Microsoft's rights as a copyright holder. *See Twentieth*

4  *Century Music Corp. v. Aiken*, 422 U.S. 151, 155 (1975) (noting that copyright holders are not allowed

5  control over uses of their works that fall outside the scope of the exclusive rights explicitly enumerated

6  in 17 U.S.C. § 106).

7        The Ninth Circuit has consistently found that so-called "cheats" and "hacks" of copyrighted

8  software can constitute non-infringing fair uses of copyrighted works. In *Lewis Galoob Toys, Inc. v.*

9  *Nintendo of America, Inc.*, 964 F.2d 965, 968 (9th Cir. 1992), the court found that Galoob's Game

10  Genie "hacking" device "merely enhances the audiovisual displays (or underlying data bytes) that

11  originate in Nintendo game cartridges." The court held that such "hacks" were fair use under the

12  Copyright Act because "[t]he altered displays do not incorporate a portion of a copyrighted work in

13  some concrete or permanent *form*" because the Game Genie by itself "cannot produce an audiovisual

14  display . . . [T]he underlying display must be produced by a Nintendo Entertainment System and game

15  cartridge." *Id.*

16        In the present case, the alleged "cheats" and "hacks" performed by Xbox 360 gamers appear

17  only to enhance the underlying game data and, just like the Game Genie, still require an authentic

18  Xbox 360 and game disc in order to produce an audiovisual display. Thus, these acts do not infringe

19  Microsoft's copyrights. *Id.; see also Sega Enters. Ltd.*, 977 F.2d at 1517, 1523 ("hacking" into the

20  Sega Genesis game console to disassemble its object code to study "the functional requirements for

21  [Sega] Genesis compatibility" was a "non-exploitive" fair use of copyrighted code that enabled

22  Accolade to offer "independently designed video games programs" for the Sega Genesis, thus serving

23  copyright's public policy of promoting creative expression through the "dissemination of other

24  creative works and the unprotected ideas contained in those works"); *Sony Computer Entm't, Inc. v.*

25  *Connectix Corp.*, 203 F.3d 596, 603 (9th Cir. 2000) (finding competitor's practice of "hacking" into

26  the operating system of plaintiff's video game console and making and modifying hundreds of copies

27

28

BRIEF OF AMICI CURIAE ELECTRONIC FRONTIER
FOUNDATION AND PUBLIC KNOWLEDGE        CASE NO. 09-cv-5535 EDL

of plaintiff's code to be fair use when done to create and support an alternative platform for playing the games).[14]

Thus, in order to preserve the sound law and policy in the Ninth Circuit's *Galoob, Sega*, and *Connectix* cases, this Court should not assist the enforcement of Microsoft's 1201 claims, to the extent they attempt to prohibit any "cheats" or "hacks" that do not constitute copyright infringement. To allow such claims would be a misuse of section 1201.

## CONCLUSION

For the foregoing reasons, amici respectfully request that this Court find in favor of Datel on Microsoft's DMCA section 1201(a) claims.

Dated:    June 15, 2011                     ELECTRONIC FRONTIER FOUNDATION

                                            By:      /s/ Corynne McSherry

                                            Corynne McSherry, Esq.
                                            Abigail Phillips, Esq.
                                            Marcia Hofmann, Esq.
                                            ELECTRONIC FRONTIER FOUNDATION

                                            Jason M. Schultz, Esq.
                                            SAMUELSON LAW, TECHNOLOGY &
                                            PUBLIC POLICY CLINIC

                                            Attorneys for Amicus Curiae
                                            ELECTRONIC FRONTIER
                                            FOUNDATION

                                            Sherwin Siy, Esq.
                                            PUBLIC KNOWLEDGE

                                            Attorneys for Amicus Curiae
                                            PUBLIC KNOWLEDGE

---

[14]   In defense of its attempt to use section 1201 to control "cheats" and "hacks," amici anticipate that Microsoft will cite *MDY Industries, LLC v. Blizzard Entm't, Inc.*, 2008 WL 2757357 (D. Ariz. 2008). In that case, however, the Court denied Blizzard's section 1201(b) claim because the software company had failed to show that its TPM (the "Warden" program) prohibited "cheats" or "hacks" that constituted copyright infringement. *Id.*