GREGORY P. STONE (SBN 078329)
Gregory.Stone@mto.com
PETER E. GRATZINGER (SBN 228764)
Peter.Gratzinger@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

HOJOON HWANG (SBN 184950)
Hojoon.Hwang@mto.com
ROHIT K. SINGLA (SBN 213057)
Rohit.Singla@mto.com
JONATHAN H. BLAVIN (SBN 230269)
Jonathan.Blavin@mto.com
MICHAEL J. MONGAN (SBN 250374)
Michael.Mongan@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street,
Twenty-Seventh Floor
San Francisco, CA 94105-2907
Telephone: (415) 512-4032
Facsimile: (415) 512-4077

Attorneys for Defendant
MICROSOFT CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DATEL HOLDINGS LTD. and DATEL DESIGN & DEVELOPMENT, INC.,<br><br>Plaintiffs and Counterclaimant Defendants,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant and Counterclaimant. | CASE NO.  CV 09-5535 EDL<br><br>**DEFENDANT MICROSOFT CORPORATION'S RESPONSE TO BRIEF OF AMICI CURIAE ELECTRONIC FRONTIER FOUNDATION AND PUBLIC KNOWLEDGE IN SUPPORT OF DATEL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:      August 10. 2011<br>Time:      9:30 a.m.<br>Courtroom: E, 15th Floor<br>Judge:     Mag. Judge Elizabeth D. Laporte<br><br>**PUBLIC REDACTED VERSION** |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ..................................................................................................................1

II. MICROSOFT'S SECTION 1201(A) CLAIM DOES NOT HINDER
"COMPETITION" AND THERE IS NO "MISUSE" DEFENSE TO
THE CLAIM..........................................................................................................................2

    A.    Amici's Proposed "Copyright Misuse" Defense Has No Legal Basis ...............................2

    B.    Microsoft's DMCA Claim Is Focused Specifically On MAX Memory's Unlawful
Circumventing Features...................................................................................................3

    C.    Microsoft's DMCA Claim Focuses on Maxwell's Protection of Content at the
Core of Copyright Protection, Not Lock-Out Code.........................................................5

III. NEITHER MICROSOFT NOR ANY GAME DEVELOPERS AUTHORIZED
CIRCUMVENTION UNDER SECTION 1201(A)................................................................6

    A.    Datel Has No Authorization To Traffic in Circumvention Devices.................................6

    B.    Game Developers Have Not Granted Consumers Authority To Circumvent
Maxwell To Copy, Transfer, and Modify Game Content on a PC...................................7

    C.    The First Sale/Exhaustion Doctrine Is Irrelevant ............................................................10

IV. CONCLUSION ...................................................................................................................10

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*321 Studios v. Meto Goldwyn Mayer Studios, Inc.*,
   307 F. Supp. 2d 1085 (N.D. Cal. 2004) ................................................................. 3, 7, 8

*Apple, Inc. v. Psystar Corp.*,
   673 F. Supp. 2d 931 (N.D. Cal. 2009) ................................................................... 5, 10

*Chamberlain Group, Inc. v. Skylink Technologies, Inc.*,
   381 F.3d 1178 (Fed. Cir. 2004) ......................................................................... 2, 5, 6, 7

*Dish Network, L.L.C. v. SatFTA*,
   2011 WL 856268 (N.D. Cal. Mar. 9, 2011) .................................................................. 4

*Lexmark International, Inc. v. Static Control Components, Inc.*,
   387 F.3d 522 (6th Cir. 2004) ....................................................................................... 5, 6

*MDY Industries, LLC v. Blizzard Entertainment, Inc.*,
   629 F.3d 928 (9th Cir. 2010) ................................................................................. passim

*Realnetworks, Inc. v. DVD Copy Control Ass'n*,
   641 F. Supp. 2d 913 (N.D. Cal. 2009) ................................................................. passim

*Sony Computer Entertainment America, Inc. v. Divineo, Inc.*,
   457 F. Supp. 2d 957 (N.D. Cal. 2006) ............................................................................ 7

*Sony Computer Entertainment America, Inc. v. Gamemasters*,
   87 F. Supp. 2d 976 (N.D. Cal. 1999) ........................................................................ 4, 5

*U2 Home Entm't, Inc. v. Hong Wei Int'l Trading, Inc.*,
   2008 WL 3906889 (S.D.N.Y. Aug. 21, 2008) ............................................................. 10

*Universal City Studios Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001) ........................................................................................... 8

*Universal City Studios, Inc. v. Reimerdes*,
   111 F. Supp. 2d 294 (S.D.N.Y. 2000) ......................................................................... 10

*Universal City Studios, Inc. v. Reimerdes*,
   2000 WL 995494 (S.D.N.Y. July 20, 2000) .................................................................. 3

**STATUTES AND RULES**

17 U.S.C. § 109(a) ............................................................................................................. 10

**TABLE OF AUTHORITIES**
**(continued)**

Page

17 U.S.C. § 1201
   (a) ................................................................................................................................. passim
   (a)(2) ................................................................................................................................. 2, 7
   (a)(3)(A) ............................................................................................................................ 6, 7
   (b) ........................................................................................................................................... 2

**OTHER AUTHORITIES**

http://www.xbox.com/en-US/Legal/LiveTOU. ............................................................................. 9

## I. INTRODUCTION

The fundamental legal and factual premises of the amicus brief submitted by Electronic Frontier Foundation and Public Knowledge ("Amici") are wrong. They simply misunderstand the facts and procedural posture of this case (not to mention the law underlying the DMCA).

Most of the amicus brief is based on the idea that Microsoft is seeking with its DMCA claim to obtain "exclusive rights to sell any and all Xbox-360-compatible memory cards, controllers, and headsets." Br. at 2. But Microsoft's claim *only* challenges Datel's MAX Memory device ("MAX Memory") and related hacking tools, and not any other Datel products that compete with Microsoft products. Microsoft's DMCA claim is not targeted at Datel's ability to sell competing controllers or headsets. It is not even directed at memory cards *that do no more than what Microsoft's memory cards permit*. Amici contend that Microsoft's DMCA claim challenges a product that is "essentially *identical* to Microsoft's competing memory card[]." Br. at 4 (emphasis added). But Amici ignore that MAX Memory, unlike Microsoft's Memory Unit ("MU"), allows users to copy copyrighted game content to a PC and access that content at the individual file level, so that it can be modified and shared over the Internet. It is the differences between Microsoft's MU and Datel's MAX Memory that are the basis of Microsoft's claim. Microsoft challenges MAX Memory under Section 1201(a) not to hinder competition,[1] but because its *distinguishing* features give unauthorized access to game content, threatening rampant cheating in online play, piracy of virtual goods and games, and security breaches to the Xbox 360 console and LIVE network. This is not, thus, the "test case" that Amici are looking for to develop novel theories on how the DMCA should be limited on policy grounds.

In addition to these factual inaccuracies, Amici's arguments rest on several misstatements of law. Amici argue that "public policy" supports a "copyright misuse" defense to a Section 1201(a) claim. Br. at 2. But in *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928, 951 & n.13 (9th Cir. 2010), the Ninth Circuit expressly held that policy concerns "cannot trump the statute's plain text and structure," and that copyright misuse is *irrelevant* to Section

---

[1] Indeed, Microsoft began supporting generic USB memory devices on the Xbox 360 - facilitating much broader competition than just from MAX Memory - *before* it filed its DMCA claim here.

- 1 -  DEF.'S RESPONSE TO AMICI BRIEF
CASE NO. CV 09-5535 EDL

1201(a), which establishes a "right distinct from copyright infringement." And while Amici spend several pages on whether Xbox 360 *consumers* have the "implied authority" from copyright owners to circumvent the Maxwell authentication system, they ignore that *MDY* held that the relevant "authority" under 1201(a) must be authority given to the *trafficker* (here Datel), not the end user. Neither Microsoft nor any game developer gave Datel (or for that matter any consumer) the authority to sell or use circumvention devices to copy game content to a PC where it can be modified and shared. Indeed, that is directly contrary to the design and intended use of the Xbox 360 console and LIVE network, in addition to the express prohibitions of game license agreements. Amici's suggestion that the mere purchase and use of an Xbox 360 gives users the unfettered right to circumvent the console's protection measures turns the DMCA on its head.

Finally, apart from these factual and legal inaccuracies, the scope of Amici's arguments is narrow. Amici focus solely on "Microsoft's interpretation of section 1201(a)(2)," (Br. at 2), but say nothing about its Section 1201(b) claim. And even with respect to Microsoft's 1201(a) claim, Amici discuss only *one* of the Xbox 360's several protection layers, the Maxwell authentication system. Thus, even if the Court accepted Amici's arguments in full, they would do nothing to limit Datel's liability under 1201(b) or under 1201(a) for MAX Memory's circumvention of the Xbox 360's *other* protections, such as its unique ports and connectors and the FatX file system.

## II. MICROSOFT'S SECTION 1201(A) CLAIM DOES NOT HINDER "COMPETITION" AND THERE IS NO "MISUSE" DEFENSE TO THE CLAIM

Amici contend that Microsoft's Section 1201(a) hinders competition and is a "species of copyright misuse" (Br. at 2). This claim is inconsistent with the clear language of the DMCA, dispositive Ninth Circuit precedent, and the very cases Amici rely upon.

### A. Amici's Proposed "Copyright Misuse" Defense Has No Legal Basis

In *MDY*, the Ninth Circuit considered and rejected the defense of copyright misuse to a Section 1201(a) claim. The Ninth Circuit noted that in *Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178 (Fed. Cir. 2004), the Federal Circuit "feared that § 1201(a) would allow companies to leverage their sales into aftermarket monopolies, in potential violation of antitrust law and the doctrine of copyright misuse." *MDY*, 629 F.3d at 949. In rejecting *Chamberlain's* interpretation of Section 1201(a), the Ninth Circuit emphasized that such "policy

concerns" are "best directed to Congress in the first instance," and "*cannot trump the statute's plain text and structure*." *Id.* at 950, 951 (emphasis added). As Judge Patel similarly held in *Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913 (N.D. Cal. 2009), "the reach of the DMCA is vast and it does not allow courts the discretion" to "render a value judgment untethered from the language of the statute." *Id.* at 944.

> In considering the defendant's copyright misuse defense, the Ninth Circuit held:
>
> Copyright misuse is an equitable defense to *copyright infringement* that denies the copyright holder the right to enforce its copyright during the period of misuse. . . . Since we have held that § 1201(a) *creates a right distinct from copyright infringement*, we conclude that we need not address copyright misuse in this case.

*MDY*, 629 F.3d at 951 n.13 (emphases added). *See also 321 Studios v. Meto Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1107 (N.D. Cal. 2004) (Illston, J.) ("misuse" is a "defense[] only to copyright infringement claims, which are not at issue" in DMCA action).

While the Ninth Circuit declined to determine the precise "interplay between this new anti-circumvention right and antitrust law," noting that Blizzard did "not seek to put a direct competitor who offers a competing role-playing game out of business," the court made clear that policy considerations cannot displace the plain language of the statute. *MDY*, 629 F.3d at 951. Indeed, courts have held that "no Act of Congress can violate the antitrust laws" in rejecting similar challenges to DMCA claims. *Universal City Studios, Inc. v. Reimerdes*, 2000 WL 995494, at *2 (S.D.N.Y. July 20, 2000) ("it is arguable that the DMCA, if it were inconsistent with the antitrust laws, which were enacted years earlier, would have resulted in a repeal of the antitrust laws to the extent of the inconsistency"). And as discussed further below, Datel's MAX Memory and Microsoft's MU are fundamentally *distinct* products, and Microsoft's DMCA claim is based solely on those differences. Thus, like *MDY*, this is not a case in which the DMCA is being used "to put a direct competitor who offers a competing [product] out of business."

Amici advocate precisely what the Ninth Circuit (and the Northern District of California) forbid: resorting to claims of "public policy" (Br. at 2) to trump the statute's plain language.

**B. Microsoft's DMCA Claim Is Focused Specifically on MAX Memory's Unlawful Circumventing Features**

Beyond the fact that there is no "misuse" defense to a Section 1201(a) claim, the Court

- 3 -

DEF.'S RESPONSE TO AMICI BRIEF
CASE NO. CV 09-5535 EDL

1  need not and should not consider Amici's argument because it fundamentally misconstrues
2  Microsoft's claim and the MAX Memory product. It attacks a straw man.
3        Amici assert that Microsoft's DMCA claim challenges a product that is "essentially
4  *identical* to Microsoft's competing memory card[]." Br. at 3 (emphasis added). Not so. As
5  described in Microsoft's Opposition ("Opp."), MAX Memory is critically different than
6  Microsoft's MU, and Microsoft's DMCA claim is focused entirely on the *distinguishing features*
7  of MAX Memory — *e.g.*, by circumventing the Maxwell authentication system and other Xbox
8  360 protections, MAX Memory allows users to copy copyrighted game content onto a PC, access
9  it at the individual file level, and as Datel admits, "use other player's game saves shared over the
10 Internet and even modify the content of specific files." Blavin Decl.,[2] Ex. 1 at 4. These
11 distinguishing features cause disastrous cheating in online competitive play, piracy, and serious
12 threats to the security of the console and LIVE network. Opp. at 12-15.[3] Microsoft would not be
13 asserting a DMCA claim here if MAX Memory operated exactly like Microsoft's MU.
14       In *Sony Computer Entertainment America, Inc. v. Gamemasters,* 87 F. Supp. 2d 976 (N.D.
15 Cal. 1999) (Henderson, J.), the defendant sold a product called the "Game Enhancer" for the Sony
16 PlayStation, which had "similar" functionality to the "Game Shark" made by Sony, but "unlike"
17 the "Game Shark" product "enable[d] users to play imported, i.e., non-territory games." *Id.* at
18 982. Judge Henderson held that the defendant's distribution of the product likely violated the
19 DMCA and granted Sony a preliminary injunction. *Id.* at 989-90. Without reaching the question
20 of whether there can be a misuse defense to a 1201(a) claim (which *MDY* has since foreclosed),
21 he rejected the defendant's "misuse" claim that the "plaintiff is actually seeking to enjoin sales of

---

[2] All citations to "Blavin Decl." refer to the July 1, 2011 Declaration of Jonathan H. Blavin.

[3] Datel's own proposed expert, Mr. Crane, testified ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Amici ▓▓▓▓ suggest that MAX Memory only enables "cheating," which Amici contend is "fair use." Br. at 19-21. Again, Amici ignore *MDY,* where the Ninth Circuit affirmed a Section 1201(a) claim based upon a device's enabling of unauthorized *cheating* in an online game. 629 F.3d at 941-42. At any rate, even if *some* cheating were fair use (which Microsoft disputes), the courts to consider the issue unanimously have held that there is no fair use defense to a trafficking claim. *See* Opp. at 26-28; *Dish Network, L.L.C. v. SatFTA*, 2011 WL 856268, at *4 (N.D. Cal. Mar. 9, 2011) (Fogel, J.) ("fair use" does "not apply" to "traffickers of the devices prohibited").

the Game Enhancer because it competes with a similar product manufactured by [Sony], the Game Shark." *Id*. As the court held, the "GameShark and the Game Enhancer *are not the same product* as only the Game Enhancer allows users to play non-authorized, non-territory video games by circumventing the PlayStation's built in controls," which is its "*distinguishing feature*." *Id*. at 987, 989 (emphases added). Likewise here, the "distinguishing feature" of MAX Memory — its ability to circumvent Maxwell and other protections and copy game content to a PC where it can be modified and shared — is the focal point of Microsoft's DMCA claim.[4]

### C. Microsoft's DMCA Claim Focuses on Maxwell's Protection of Content at the Core of Copyright Protection, Not Lock-Out Code

Amici further distort the facts by comparing the Maxwell authentication system to a "technological protection measure[]" whose sole purpose is to "lock consumers to a particular service provider." Br. at 3. The Maxwell component of Microsoft's DMCA claim, however, is based upon its protection of copyrighted *game content*. MAX Memory violates the DMCA by circumventing Maxwell not because it allows Datel to access interoperability code, but because Maxwell protects copyrighted game content from unauthorized copying, distribution, and modification. *See* Opp. at 5-8 & n.6. As Datel's own proposed expert, Janet Netz, states in her report, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Maxwell's protection of copyrighted game content on memory devices renders this case entirely distinguishable from the "aftermarket" concerns raised by the Federal Circuit in *Chamberlain* and the Sixth Circuit in *Lexmark International, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004) (cited in Br. at 3). In *Chamberlain*, a garage door manufacturer brought a DMCA claim against a party who had created interoperable door openers. In *Lexmark*, a printer manufacturer brought a DMCA claim against a party who had created microchips for use

---

[4] Amici's contention that "[n]o court has imposed DMCA liability based on the sale of a competing durable good" (Br. at 3) is thus both misplaced, and at any rate, inaccurate, as courts have imposed DMCA liability for competing products, even those with near identical functionality. *See also, e.g., Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 931, 941-42 (N.D. Cal. 2009) (Alsup, J.) (competing computers running Apple operating software violated DMCA); *Realnetworks,* 641 F. Supp. 2d 936-40 (competing DVD player/copier software violated DMCA).

1  in interoperable toner cartridges. The only supposedly unauthorized access or use of the
2  copyrighted code in these cases was their execution in devices in precisely the manner in which
3  they were intended to be used. The courts thus questioned whether a manufacturer could simply
4  "add a single copyrighted sentence or software fragment to its product, wrap the copyrighted
5  material in a trivial 'encryption' scheme, and thereby gain the right to restrict consumers' rights
6  to use its products in conjunction with competing products." *Chamberlain,* 381 F.3d at 1201; *see*
7  *Lexmark*, 387 F.3d at 552 (Merritt, J., concurring) ("manufacturers could potentially create
8  monopolies for replacement parts simply by using similar, but more creative, lock-out codes.").
9  But that is nothing like Microsoft's DMCA claim. Maxwell is protecting content at the
10 core of copyright protection, not some *de minimus* lock-out code. If Microsoft were (like
11 *Chamberlain* and *Lexmark*) claiming that the mere circumvention of an authentication system to
12 gain access to interoperability code violated the DMCA, Microsoft would have asserted a DMCA
13 claim against Datel's *other* products, such as its controllers, headsets, or networking adapters.
14 But Microsoft's DMCA claim is limited to those Datel products that enable the unauthorized
15 copying, modification, and sharing of independent copyrighted content. As *Lexmark* itself noted,
16 an "essential setting where the DMCA applies" includes "program commands in software for
17 video games" that "translate into some other visual and audio manifestation." *Id*. at 548. That is
18 precisely the kind of data stored on game saves that is protected by Maxwell. *See* Opp. at 6-7.

### III. NEITHER MICROSOFT NOR ANY GAME DEVELOPERS AUTHORIZED CIRCUMVENTION UNDER SECTION 1201(A)

20 Under Section 1201(a), "to circumvent a technological protection measure" is defined as
21 occurring "without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). Amici
22 argue that "customers" have "implied authority" to circumvent the "authentication sequence"
23 from the sale of the "Xbox 360 console and video games" and so consumers have the right to do
24 whatever they want with content saved on memory cards. Br. at 11-12. This claim has no merit.

25 **A.  *Datel* Has No Authorization To Traffic in Circumvention Devices**

26 Amici focus on whether Xbox 360 *customers* have authority from copyright owners to
27 circumvent (Br. at 6-9). But as the Ninth Circuit made clear in *MDY*, the relevant authorization
28 under Section 1201(a) for anti-trafficking claims must be *to the trafficker*, not the end user. The

- 6 -  DEF.'S RESPONSE TO AMICI BRIEF
CASE NO. CV 09-5535 EDL

Ninth Circuit rejected the Federal Circuit's holding in *Chamberlain* that the plaintiff must "show that the defendant's circumventing device enables *third parties* to access the copyrighted work without the copyright owner's authorization," and following the Second Circuit, analyzed whether there was any license to the *trafficker*, MDY, to justify its conduct: "Blizzard has satisfied the 'circumvention' element of a § 1201(a)(2) claim, because Blizzard has demonstrated that it did not *authorize MDY to circumvent Warden*." 629 F.3d at 954 n.16 (emphases added).

Amici disregard this rule and focus on end users' purportedly "lawful" or "authorized" uses of MAX Memory. Br. at 2, 11. But for a DMCA trafficking claim, "[i]t is the technology itself at issue, not the uses to which the copyrighted material may be put.'" *Realnetworks*, 641 F. Supp. 2d at 943. In *Sony Computer Entertainment America, Inc. v. Divineo, Inc.*, 457 F. Supp. 2d 957, 965 (N.D. Cal. 2006), Judge Wilken accepted as true at summary judgment that "mod chips" that circumvented the "PlayStation authentication system" both "ensure[d] the interoperability" of "independently created computer program[s]" and were the "only way to play legally purchased, imported games." *Id*. Nonetheless, the court held that "downstream customers' lawful" use of "circumvention devices does not relieve [a defendant] from liability for trafficking" in them. *Id*.

Amici do not even attempt to argue that Microsoft or any other game developer authorized *Datel* to circumvent Maxwell. And of course, Datel has no authority to circumvent Maxwell and therefore can claim no protection under Section 1201(a)(3)(A). Unlike licensed peripheral manufacturers, who receive authorized keys to decrypt Maxwell and in turn agree not to make devices that allow users to copy game content to a PC where it can be shared and modified, Datel hacked Maxwell without any authorization from Microsoft or any other game developers and created a product touting that prohibited functionality. *See, e.g., 321 Studios*, 307 F. Supp. 2d at 1096 ("[l]icensed DVD players have been issued a key to decrypt CSS, and in exchange must adhere to strict prohibitions on copying of the decrypted DVD; *321's software does not have such a license, and therefore does not have the authority of the copyright owner*." (emphasis added)).

**B. Game Developers Have Not Granted Consumers Authority To Circumvent Maxwell To Copy, Transfer, and Modify Game Content on a PC**

Even if the Court were to focus on end users, neither Microsoft nor any Xbox 360 game

DEF.'S RESPONSE TO AMICI BRIEF
CASE NO. CV 09-5535 EDL

1  developer gave explicit or implied authorization to any consumer to circumvent Maxwell to copy
2  copyrighted game content to a PC where it can be shared and modified.
3        Amici argue that because "[c]onsumers must circumvent the authentication sequence in
4  order to allow their consoles to interoperate" with approved accessories, Br. at 12, this gives them
5  the unfettered right to circumvent using MAX Memory or other devices, regardless of their uses
6  or what their effect on the console, the LIVE network, and other users might be.
7        This argument turns the DMCA on its head.  If the authority to authenticate technological
8  protection measures for *authorized* uses somehow gave users a green light to circumvent those
9  measures for unauthorized uses, the DMCA would be meaningless.  Unsurprisingly, courts have
10 rejected the very argument Amici are making.  In *Universal City Studios Inc. v. Corley*, 273 F.3d
11 429, 444 (2d Cir. 2001), the defendants similarly argued "that an individual who buys a DVD has
12 the 'authority of the copyright owner' to view the DVD, and therefore is exempted from the
13 DMCA pursuant to subsection 1201(a)(3)(A) when the buyer circumvents an encryption
14 technology in order to view the DVD on a competing platform."  *Id*. at 444.  The Second Circuit
15 rejected this argument outright, holding that its "basic flaw" was that the authority to "view" a
16 DVD from a copyright owner is not the same as the authority to "'decrypt' an encrypted DVD."
17 *Id*.  Judge Illson in *321 Studios* rejected the same argument, stating that the "purchase of a DVD
18 does not give to the purchaser the authority of the copyright holder to decrypt CSS" and copy
19 DVDs.  307 F. Supp. 2d at 1096.  Taken to its logical end, Amici's claim would broadly
20 immunize any unauthorized circumvention, even if, for example, it resulted in the insertion of
21 malicious hacker code on a console enabling game piracy.  As Judge Patel held in *RealNetworks,*
22 the DMCA "provides broad statutory protection against circumvention of technological measures
23 . . . . This includes *any form of unauthorized use*."  641 F. Supp. 2d at 934 (emphasis added).
24       Amici nonetheless insist that implied authorization exists because the "reasonable and
25 intended use of the console to play games requires the buyer to circumvent the authentication
26 sequence."  Br. at 12.  But as discussed in Microsoft's Opposition, the circumvention of the Xbox
27 360's protection layers to copy game save content to a PC where it can be shared and modified is
28 not only wholly unnecessary to play Xbox 360 games, but is directly contrary to the "reasonable

- 8 -

DEF.'S RESPONSE TO AMICI BRIEF
CASE NO. CV 09-5535 EDL

and intended" use of games. This conduct causes rampant cheating that destroys competitive online play, enables piracy, and creates serious threats to the security of the Xbox 360 and LIVE network. *See* Opp. at 12-15. Indeed, Datel advertises MAX Memory on its website as "the perfect Xbox 360 memory card if you want to make use of suitable *game saves and content downloaded from the internet too*." Blavin Decl. Ex. 2 (emphasis added); *id.*, Ex. 31. The euphemistic reference to "suitable" game saves "downloaded from the internet" means unauthorized modified game saves copied from other people and used for cheating and hacking.

Game developers, the relevant copyright owners of game content whose "authorization" is required under Section 1201(a), have not granted consumers any authorization to circumvent Maxwell for such uses. Xbox 360 games are licensed, not sold, and it is settled law that such "licenses are assumed to prohibit any use not authorized.'" *Realnetworks,* 641 F. Supp. 2d at 944 (quoting *S.O.S., Inc. v. Payday, Inc*., 886 F.2d 1081, 1088 (9th Cir. 1989)). Amici cannot, and do not, point to any affirmative authorization to users in any game license to circumvent Xbox 360 protection measures for the purpose of copying game content to a PC, where it can be shared and modified. Without such authorization, circumvention is presumed prohibited. And in fact, game developers *expressly prohibit* users from modifying game content and from engaging in any conduct that gives them an unfair advantage. For example, the Activision license for the game Wolfenstein states that users may not "make any use of any software program or any modification to the Software ('Cheat Program') itself that enables or allows the user thereof to obtain an advantage or otherwise exploit another Software player or user when playing the Software against other players" online. Blavin Decl., Ex. 34 at 14. Similarly, the Xbox LIVE Terms of Use provide that for Microsoft games played on LIVE, users may not "use or distribute unauthorized cheats" or "make an unauthorized modification, to any software or data to gain unfair advantage in a game, contest, or promotion." http://www.xbox.com/en-US/Legal/LiveTOU.[5]

---

[5] Amici's claim that these "restrictions" are "'enforceable only as a question of contract" (Br. at 13) misses the point. The question here is not whether Microsoft has contractual remedies, but whether Datel has any license to circumvent. Even if end user agreements provide some limited license to Datel (which they do not), Datel is clearly acting "outside" their "scope" by engaging in unauthorized circumvention. *RealNetworks*, 641 F. Supp. 2d at 933. Microsoft is "not limited to breach of contract claims" and is "well within [its] rights to bring circumvention claims." *Id*.

- 9 - DEF.'S RESPONSE TO AMICI BRIEF
CASE NO. CV 09-5535 EDL

MAX Memory is designed and marketed to enable users to engage in this very prohibited conduct. Consumers obviously cannot have any "implied" authority to engage in conduct that is expressly prohibited by the design of the Xbox 360 and game license agreements. *See, e.g., U2 Home Entm't, Inc. v. Hong Wei Int'l Trading, Inc*., 2008 WL 3906889, at *11 (S.D.N.Y. Aug. 21, 2008) (rejecting claim that defendants given "implicit approval to copy the DVDs" where they "were expressly prohibited" from doing so). As Amici themselves state, the scope of any "implied authority" must "conform[] to the parties' intent." Br. at 11. Here, copyright owners' intent *against* MAX Memory's circumvention of Maxwell is indisputably clear.

### C. The First Sale/Exhaustion Doctrine Is Irrelevant

Amici suggest that circumvention is permitted under the "first sale" or "exhaustion" doctrine. Br. at 9-11. This argument has no grounding in law. The first sale doctrine, codified at 17 U.S.C. § 109(a), by its express terms only limits a copyright owners' *distribution* right. *Id.* It does not allow users to do anything they want with a copy of a work. They cannot, for example, make copies of a work, nor can they publicly perform it. *See, e.g., Apple, Inc.*, 673 F. Supp. 2d at 937 ("first-sale defense does not apply to those unauthorized copies").

The first sale doctrine has nothing to do with the DMCA. Indeed, Amici's argument would render the DMCA's anti-circumvention provisions a dead letter, as users would have the right to circumvent a product's technological protection measures simply because they bought it. Again, courts have rejected the very argument Amici are advancing. In *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294 (S.D.N.Y. 2000), the defendants similarly contended that "purchasers of a DVD acquire the right 'to perform all acts with it that are not exclusively granted to the copyright holder.'" *Id*. at 317 n.137. The court described this argument as "pure sophistry" and a "corruption of the first sale doctrine." *Id*. The court stressed that the "DMCA proscribes trafficking in technology that decrypts or avoids an access control measure without the copyright holder consenting to the decryption or avoidance." *Id*. As established, no such consent can be found here, and it surely cannot be inferred from the sale of the Xbox 360 to consumers.

### IV. CONCLUSION

For these reasons and those in Microsoft's Opposition, Datel's Motion should be denied.

- 10 - DEF.'S RESPONSE TO AMICI BRIEF
CASE NO. CV 09-5535 EDL

DATED: July 15, 2011                                        Munger, Tolles & Olson LLP


By:     */s/ Rohit K. Singla*
       Rohit K. Singla

Attorneys for Defendant/Counterclaimant Plaintiff

- 11 -

DEF.'S RESPONSE TO AMICI BRIEF
CASE NO. CV 09-5535 EDL