GREGORY P. STONE (SBN 078329)
Gregory.Stone@mto.com
PETER E. GRATZINGER (SBN 228764)
Peter.Gratzinger@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Defendant
MICROSOFT CORPORATION

HOJOON HWANG (SBN 184950)
Hojoon.Hwang@mto.com
ROHIT K. SINGLA (SBN 213057)
Rohit.Singla@mto.com
JONATHAN H. BLAVIN (SBN 230269)
Jonathan.Blavin@mto.com
MICHAEL J. MONGAN (SBN 250374)
Michael.Mongan@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street,
Twenty-Seventh Floor
San Francisco, CA 94105-2907
Telephone: (415) 512-4032
Facsimile: (415) 512-4077

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

DATEL HOLDINGS LTD. and DATEL
DESIGN & DEVELOPMENT, INC.,

    Plaintiffs and
    Counterclaimant
    Defendants,

    v.

MICROSOFT CORPORATION,

    Defendant and
    Counterclaimant.

CASE NO.  CV 09-5535 EDL

**DEFENDANT MICROSOFT
CORPORATION'S MOTION FOR
SUMMARY JUDGMENT ON
PLAINTIFFS' MONOPOLIZATION
CLAIMS**

**CONFIDENTIAL - FILED UNDER SEAL**

Date:        November 4, 2011
Time:       9:30 a.m.
Courtroom: E, 15th Floor
Judge:     Mag. Judge Elizabeth D. Laporte

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on November 4, 2011 at 9:30 a.m., or as soon thereafter as the matter may be heard, before the Honorable Elizabeth D. Laporte, United States District Court, San Francisco, California, Defendant and Counterclaimant Microsoft Corporation ("Microsoft") will and hereby does move for an order granting summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the First Cause of Action asserted in the Complaint of Plaintiffs Datel Holdings Ltd. and Datel Design & Development, Inc. (collectively, "Datel") and on the Fourth, Fifth, and Sixth Causes of Action to the extent that they are based on the same allegations concerning alleged monopolization and attempted monopolization.

This Motion is based on this Notice of Motion, the accompanying Memorandum of Points & Authorities, the Declaration of Marc Whitten, the Declaration of Albert J. Penello, Jr., the Declaration of Eva Moy, the Declaration of Larry Hryb, the Declaration of Scott Loomis, the Declaration of Jonathan H. Blavin, the Declaration of Kevin M. Murphy, the Declaration of Randel Reiss, the concurrently-filed Motion for Summary Judgment on Plaintiffs' "Tying" Claims and State Law Claims, and all papers in support thereof, the pleadings on file in this case, any arguments and evidence that may be presented in Datel's opposition hereto or in Microsoft's reply, and any additional matters that may be presented in connection with the hearing on this Motion.

DATED: September 2, 2011                    Munger, Tolles & Olson LLP


                                            By:   /s/ Hojoon Hwang
                                                 Hojoon Hwang
                                                 Attorneys for Microsoft Corporation

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................. 1

II.  STATEMENT OF FACTS ............................................................................... 3

    A.   Microsoft's Xbox 1 Suffered Because It Lacked a Peripheral
         Authentication System ......................................................................... 3

         1.   Security Attacks Implemented Via Third-Party Devices ........................... 4

         2.   Cheating Enabled by Third-Party Devices .................................................. 5

         3.   Low Quality Third-Party Accessories .......................................................... 6

    B.   Microsoft Designed the Xbox 360 to Be an Improved Platform Centered
         Around Fair and Secure Multi-Player Gaming on Xbox LIVE ............................. 6

    C.   Microsoft Improved the Security of Its Xbox 360 System and Xbox LIVE
         by Adding a Peripheral Authentication System ................................................... 8

    D.   ████████████████████████████████████████████
         ██████████ ......................................................................... 9

    E.   The October 2009 Dashboard Update Sought to Repair the Authentication
         System ................................................................................................ 11

III. SUMMARY JUDGMENT STANDARD ........................................................ 12

IV.  ARGUMENT .................................................................................................. 12

    A.   The Authentication System Is a Product Improvement Immune from
         Antitrust Liability Under Section 2 of the Sherman Act ..................................... 12

         1.   Products Improvements Do Not Violate the Antitrust Laws .................... 12

         2.   The Undisputed Evidence Establishes That the Authentication
             System Constitutes a Product Improvement ............................................. 16

             a.   The Authentication System Improved Security ............................ 16

             b.   The Authentication System Prevented Online Cheating ............... 18

             c.   The Authentication System Improved Peripheral Quality ............ 19

             d.   Datel Has No Competent Contrary Evidence ............................... 19

         3.   The Dashboard Update Must Be Analyzed as Part of the
             Authentication System Under the Product Improvement Doctrine ......... 22

    B.   Datel Lacks Evidence to Prove That Microsoft Has or Is Likely to Acquire
         Monopoly Power Over Xbox 360 Accessories ................................................... 25

         1.   Datel Offers No Competent Evidence Concerning the Effect of
             Platform Competition on Aftermarket Behavior ..................................... 25

         2.   Microsoft Did Not Change Its Aftermarket Policy Ex Post ..................... 27

1

**TABLE OF CONTENTS**
**(continued)**

2

Page

3.      Xbox 360 Owners Are Not Committed to Additional Aftermarket
        Purchases................................................................................................ 29

C.      Datel's State Law Claims Fail As a Matter of Law ............................................... 30

V.      CONCLUSION ............................................................................................................. 30

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

1

# TABLE OF AUTHORITIES

2

**Page**

3

**FEDERAL CASES**

4

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
   166 F.3d 772 (5th Cir. 1999) ....................................................................................... 28, 29

5

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*,
   592 F.3d 991 (9th Cir. 2010) ........................................................................................ passim

6

7

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
   65 F.3d 1406 (7th Cir. 1995) ................................................................................................ 28

8

9

*Blue Ridge Ins. Co. v. Stanewich*,
   142 F.3d 1145 (9th Cir. 1998) .............................................................................................. 12

10

*California Computer Prods., Inc. v. Int'l Business Machines Corp.*,
   613 F.2d 727 (9th Cir. 1979) .......................................................................................... 14, 19

11

12

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .............................................................................................................. 12

13

14

*Digital Equip. Corp. v. Uniq Digital Techs., Inc.*,
   73 F.3d 756 (7th Cir. 1996) .................................................................................................. 28

15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) .................................................................................................... 3, 12, 30

16

17

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
   703 F.2d 534 (9th Cir. 1983) .............................................................................. 14, 15, 19, 25

18

19

*Harrison Aire v. Aerostar Int'l*,
   423 F.3d 374 (3d Cir. 2005) .................................................................................... 25, 26, 28

20

*Image Tech. Serv. Inc. v. Eastman Kodak Co.*,
   903 F.2d 612 (9th Cir. 1990), aff'd, 504 U.S. 451 (1992) .................................................... 24

21

22

*In re Apple iPod iTunes Antitrust Litig.*,
   --- F. Supp. 2d ---, 2011 WL 2690511 (N.D. Cal. May 19, 2011) ........................ 2, 15, 20, 25

23

24

*In re eBay Seller Antitrust Litig.*,
   2010 WL 760433 (N.D. Cal. Mar. 4, 2010) ......................................................................... 28

25

*In re IBM Peripheral EDP Devices Antitrust Litig.*,
   481 F. Supp. 965 (N.D. Cal. 1979) ...................................................................................... 24

26

27

*LVRC Holdings LLC v. Brekka*,
   581 F.3d 1127 (9th Cir. 2009) .............................................................................................. 12

28

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

**TABLE OF AUTHORITIES**
(continued)

Page

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................ 12

*Newcal Indus. V. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ............................................................ 29

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*,
    883 F.2d 1101 (1st Cir. 1989) ............................................................ 14

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
    797 F.2d 370 (7th Cir. 1986) .............................................................. 14

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
    104 F.3d 811 (6th Cir. 1997) ........................................................ 26, 29

*Rebel Oil Co. v. Atl. Richfield, Inc.*,
    51 F.3d 1421 (9th Cir. 1995) .............................................................. 26

*SMS Sys. Maint. Servs. Inc. v. Digital Equip. Corp.*,
    188 F.3d 11 (1st Cir. 1999) ........................................................ passim

*Universal Avionics Sys. Corp. v. Rockwell*,
    184 F. Supp. 2d 947 (D. Ariz. 2001) ...................................... 25, 26, 27

*Xerox Corp. v. Media Sciences, Inc.*,
    660 F. Supp. 2d 535 (S.D.N.Y. 2009) ........................................ 25, 29

**STATUTES AND RULES**

Fed. R. Civ. P. 56(a) ............................................................................ 12

**OTHER AUTHORITIES**

IIIB P. Areeda & H. Hovenkamp, *Antitrust Law*, § 775c (3d ed. 2008) ...................................... 14

IIIB P. Areeda & H. Hovenkamp, *Antitrust Law*, § 777 (3d ed. 2006) ........................................ 25

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

1    <u>**MEMORANDUM OF POINTS & AUTHORITIES**</u>

2    **I.     INTRODUCTION**

3            Microsoft entered the video gaming platform industry with its Xbox platform in 2001 as

4    an upstart with few competitive advantages.  Microsoft's initial venture ████████████

5    ████████████     but provided important lessons for the next generation of the Xbox platform,

6    the Xbox 360 platform.  To become a viable competitor in an industry dominated by established

7    rivals, Microsoft sought to differentiate the Xbox 360 platform by tightly integrating the console

8    with a safe, secure and fun online environment, Xbox LIVE.  Microsoft hoped that LIVE would

9    help the platform become the hub of digital entertainment of the future.  To do so, Microsoft

10   created a security authentication system for accessories to address a number of problems it

11   experienced with Xbox 1.  That system has served to curtail security threats, reduce cheating, and

12   assure quality gaming experiences for users.  ██████████████████████████

13   ████████████████████████████████████████████

14   ████████████████████████████████

15   ████████████████████████████.  Through

16   continuing improvements to the console, games, Xbox LIVE, and accessories (including the

17   revolutionary Kinect motion sensing control system), Microsoft has achieved some success in this

18   highly-dynamic, innovative and fiercely-competitive industry, and the Xbox 360 has become the

19   second-best selling console in the United States behind the Nintendo Wii.

20           At stake in this case is the viability of the very innovations that have allowed Microsoft to

21   become a meaningful competitor and a source of further innovations in the digital entertainment

22   industry.  Datel asserts that Microsoft unlawfully monopolized or attempted to monopolize

23   purported "markets" for Xbox 360 accessories by attempting to repair Datel's breach of

24   Microsoft's security authentication system.  But the antitrust laws do not condemn a genuine

25   product improvement, even when made by a monopolist (which Microsoft is not), on the theory

26   that the innovation had the effect or purpose of excluding potential competitors.  *See Allied*

27   *Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991 (9th Cir. 2010)

28   ("*Tyco*").  In *Tyco*, the court noted that a "legitimate product improvement can have the effect of

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

1    harming or even destroying competitors." *Id*. at 1001.  Nonetheless, such an effect or

2    "[s]tatements of an innovator's intent to harm a competitor through genuine product improvement

3    are insufficient by themselves to create a jury question under Section 2." *Id*.  Were the rule

4    otherwise, the court cautioned, the antitrust laws may serve to dampen technological innovation

5    that benefits consumers and place the courts, rather than market forces, as the arbiter of the merits

6    of innovative product designs. *Id*. at 1000.  The undisputed facts establish that the Xbox 360's

7    security authentication system is a product improvement that enhanced security, reduced

8    cheating, and prevented low quality accessories from devaluing the Xbox 360 platform.

9        Datel does not offer any competent evidence demonstrating that the security

10   authentication system is not a product improvement.  Instead, it seeks to obscure the benefits of

11   the system by positing that the only relevant event is the October 2009 dashboard update that

12   disabled Datel's Max Memory product, and arguing from that false premise that the update itself

13   did not improve the Xbox 360.  Indeed, Datel has disavowed any claim that Microsoft's

14   implementation of the authentication system itself was anticompetitive.  There is no basis in logic

15   or law for this contention.  If the authentication system is a genuine product improvement

16   immune from antitrust liability, as Datel implicitly concedes, repairing a breach in that system

17   cannot somehow give rise to liability.  Ultimately, Datel's theory is self-serving: it wants

18   Microsoft to be able to maintain the authentication system so that it would not have to compete

19   with other third party vendors, while claiming that excluding third parties harms consumers.

20   Indeed, recent district court authority following *Tyco* confirms that Datel's theory is without

21   merit.  *See In re Apple iPod iTunes Antitrust Litig.*, --- F. Supp. 2d ---, 2011 WL 2690511 (N.D.

22   Cal. May 19, 2011).

23       Not only does *Tyco* preclude Datel's monopolization claims, they fail for an additional,

24   independent reason.  Datel has failed to adduce any competent evidence to show, as it must, that

25   Microsoft is able to exercise, or is likely to acquire, monopoly power over the purported

26   "aftermarket" for Xbox 360 accessories.  For an antitrust claim premised on the existence of an

27   aftermarket, the critical inquiry is whether competitive conditions in the primary market

28   sufficiently discipline the defendant's ability to exercise market power in the aftermarket.  *See*

1   *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469-70 n.15 (1992).  Thus, to

2   overcome summary judgment on an aftermarket theory, the plaintiff must show that a defendant

3   has a substantial ability to exploit its aftermarket customers without suffering the consequences in

4   the primary market, by producing "hard evidence dissociating the competitive situation in the

5   aftermarket from activities occurring in the primary market."  *SMS Sys. Maint. Servs. Inc. v.*

6   *Digital Equip. Corp.*, 188 F.3d 11, 17 (1st Cir. 1999).

7        Rather than attempting to meet this burden, Datel seeks to avoid it altogether by arguing

8   that Microsoft has monopoly power in the primary market (for consoles), so that there is no

9   meaningful competition that constrains Microsoft with respect to accessories.  This contention is

10  premised on the facially-implausible proposition that the Nintendo Wii does not meaningfully

11  compete with two of its main rivals.  As demonstrated in Microsoft's accompanying Motion for

12  Summary Judgment on Plaintiffs' "Tying" Claims, this contention is wrong as a matter of law:

13  the Wii is a significant competitor to Microsoft and has profoundly influenced Microsoft's

14  business strategy.  In the face of intense platform competition from Nintendo and Sony, Microsoft

15  simply has no ability or incentive to exploit its aftermarket customers, as detailed below.  Indeed,

16  Microsoft's customers are capable of punishing Microsoft for any exploitative behavior in

17  multiple and devastating ways that are not available to consumers in the typical aftermarket case.

18  **II.     STATEMENT OF FACTS**

19       **A.    Microsoft's Xbox 1 Suffered Because It Lacked a Peripheral Authentication
              System**

20       Microsoft launched the original Xbox console (Xbox 1) in 2001.  Declaration of Marc

21  Whitten ("Whitten Decl.") ¶ 2.  It entered a highly competitive market.  Its two main rivals —

22  Sony and Nintendo — had sold successful video game platforms for years, and had experience

23  and brand loyalty that Microsoft lacked.  *See id.* ¶ 4.  Microsoft, by contrast, was almost

24  exclusively a software company, having never previously developed any hardware more

25  sophisticated than a mouse.  Ex.[1] 1 at 206:2.  Microsoft ultimately sold around 25 million Xbox 1

26

27  ───────────────────

28  [1] All references to "Ex." are exhibits attached to the Declaration of Jonathan H. Blavin filed
    concurrently herewith, unless otherwise noted.

1    units worldwide.  During the same period, Sony sold more than three times that many PlayStation

2    2 systems.  Whitten Decl. ¶ 6. ████████████████████████████████████████████

3    *Id.* ¶ 7. ███████████████████████████████████████████████████████████████

4    █████████████████████████    *Id.*; Ex. 2 at 119:25-120:23.

5           One shortcoming in the design of the Xbox 1 was Microsoft's limited ability to protect its

6    system from peripheral devices that could harm its customers or the platform.  Whitten Decl.

7    ¶ 25; Expert Report of Randel Reiss ("Reiss Report")[2] ¶ 32.  This flaw caused three serious

8    problems for the Xbox 1 and for Microsoft's online service for multiplayer gaming, Xbox LIVE.

9                    **1.       Security Attacks Implemented Via Third-Party Devices**

10          First, the Xbox 1 was vulnerable to attacks from hackers, leading to game piracy and other

11   security issues.  One such attack involved loading the console with modified game files that

12   bypass the console's security systems.  Ex. 3 at 118:2-13.  Because the Xbox 1 lacked sufficient

13   controls on peripherals, these harmful files could be introduced to the console through

14   unauthorized devices.  Whitten Decl. ¶ 15.  Hackers could use memory units that plugged into

15   Xbox 1 controllers to load modified content onto the console.  Reiss Report ¶¶ 33-34; Whitten

16   Decl. ¶ 15.  For example, a hacker created a "buffer overrun" or "overflow" using a modified

17   save file from the game "James Bond 007: Agent Under Fire," which allowed the hacker to take

18   complete control of the console.  Reiss Report ¶ 46; Ex. 3 at 121:3-13.  Similarly, modified game

19   save files for the game "MechWarrior" were loaded onto and then used to boot the console with

20   an altered version of the operating system.  Ex. 4 at 93:8-13.  Other hackers also attacked the

21   system by building upon these techniques, leading to widespread piracy and cheating on Xbox

22   LIVE.  Reiss Report ¶ 46; *see* Ex. 4 at 93:8-13.  These security breaches demonstrated that third-

23   party peripherals were a potential attack vector for hacks against the system.  Whitten Decl. ¶ 27.[3]

24          Datel was well aware of this security vulnerability of the Xbox 1. ███████████████

25   _____

26   [2] The "Reiss Report" is attached as Exhibit 1 to the Declaration of Randel Reiss filed
     concurrently herewith.

27   [3] *See also* Ex. 3 at 121:3-13 █████████████████████████████████████████████

28   ███████████████████████████████████████; Ex. 1 at 144:7-20 ███████████████████████
     ██████████████████████████████); Whitten Decl. ¶ 19.

DEF'S MSJ ON PLS' MONOP. CLAIMS
                                                      CASE NO. CV 09-5535 EDL

1 ████████████████████████████████████ Ex. 5 at 64:21-65:11. ████

2 ██████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████

4 *Id*. at 68:1-70:1 (███████████████████████████) & Ex. 6. ████

5 ████████████████████████████████████████████

6 ██████████████████████████████████████████████████████

7 ███████████ Ex. 5 at 70:2-71:4. ██████████████████████████

8 ████████████████████████████ *Id*. at 65:12-66:22.

### 2.   Cheating Enabled by Third-Party Devices

Cheating also was a major problem during the Xbox 1 era.  Many forms of cheating were enabled by third-party devices.  *See* Whitten Decl. ¶¶ 14-17.  For example, some gamers used unauthorized keyboard-and-mouse devices that provided a faster response time than standard controllers.  Ex. 7 at MS-DTL_ITC_07_0824998 (███████████████████████

████████████████████████████████████████████).  This device gave users an unfair advantage over others in Xbox LIVE.  Whitten Decl. ¶ 14; Reiss Report ¶ 34.

Another form of cheating on Xbox 1 relied on modified game save files.  In addition to creating security risks, modified game save files gave users advantages in games, like unlimited lives, better weapons, or the ability to fly.  Whitten Decl. ¶ 15; Reiss Report ¶ 38; Ex. 5 at 56:3-60:14.  Again, these files were introduced onto the Xbox 1 using peripheral devices.  Whitten Decl. ¶ 15.  Datel sold a product called "Action Replay" that used an 8 megabyte memory card filled with game saves to enable cheating on Xbox 1.  Reiss Report ¶ 38.  Datel's device enabled gamers to obtain unintended benefits, like doubling the number of virtual goods they possessed in the game Phantasy Star Online.  *Id.* ¶¶ 38-42.  Cheating on Phantasy Star Online became so pervasive that the game was effectively ruined.  *Id.* ¶¶ 35, 43.  Another Xbox 1 game, Rainbow Six 3, suffered a similar fate.  *Id.* ¶¶ 47-49.  Gamers complained that "Rainbow Six 3 is being overtaken by people using Action Replay cheats as well as other cheating devices."  *Id.* ¶ 48.

Microsoft received numerous complaints of cheating on Xbox LIVE.  ██████████████

██████████████████████████████████████████████████

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

1   Declaration of Lawrence Hryb ("Hryb Decl."), Ex. 1. █████████████████████

2   ████████████████████████████ *Id.*, Ex. 2.  Some customers even launched an online

3   petition urging Microsoft to ban devices like Datel's Action Replay that allowed cheating.  Reiss

4   Report ¶ 48.  In February 2004, Microsoft exhorted Xbox LIVE users not to use Action Replay or

5   similar devices and to report users suspected of cheating through such means.  Hryb Decl., Ex. 4

6   at MS-DTL 0085377 █████████████████████████████████

7   ████████████████████████████).

8           **3.    Low Quality Third-Party Accessories**

9           Microsoft's inability to control peripheral devices on the Xbox 1 also exposed the

10  platform to substandard accessories that harmed the experience of users.  Whitten Decl. ¶ 20; Ex.

11  8 at 24:18-21; Ex. 9 at 83:7-84:3.  Devices sometimes "broke or fell apart" because of their

12  inferior design or use of low-quality materials.  Whitten Decl. ¶ 20.  Controllers with poor

13  sensitivity on the trigger caused their users to fall behind other gamers.  *Id.*  There was little that

14  Microsoft could do to regulate the quality of third-party peripherals for the Xbox 1.  *Id.* ¶¶ 20-21.

15  ████████████████████████████████████████████████

16  ██████████████████████████████████████████████ Ex. 8

17  at 26:9-14.  Beyond harming the experience of its customers, low-quality accessories created a

18  reputational problem for Microsoft and its game developers.  *See* Whitten Decl. ¶ 23; Ex. 10 at

19  181:8-183:2.  Customers could not always discern that the problems they experienced were

20  caused by the accessories, rather than the Xbox 1 system or the video game.  *Id.*  And gamers

21  could mistakenly assume that third-party accessories were endorsed by Microsoft.  *Id.*

22          **B.    Microsoft Designed the Xbox 360 to Be an Improved Platform Centered
                Around Fair and Secure Multi-Player Gaming on Xbox LIVE**

23          In light of its Xbox 1 experience, Microsoft was determined to improve its next-

24  generation platform and differentiate it from the competing systems sold by Sony and Nintendo.

25  Whitten Decl. ¶ 11.  Microsoft planned for Xbox LIVE to be this "differentiator."  Ex. 11 at MS-

26  DTL_0663042.  Its strategy was to build the Xbox 360 and Xbox LIVE into the premier platform

27  for online, multi-player video game play.  *Id.*  Xbox LIVE was an area where Microsoft had a

28

head start on its competitors, having launched well before Sony and Nintendo introduced competing services. Whitten Decl. ¶ 10. Microsoft had originally viewed Xbox LIVE as merely an adjunct to its video game system. *Id.* But with the Xbox 360, Microsoft aspired to make LIVE the paramount focus of the platform, which it hoped would evolve into a virtual world for gamers and the hub for all forms of digital entertainment. *Id.* ¶ 11.

Microsoft made technological improvements to Xbox LIVE to accomplish this goal. It redesigned the service so that it would be fully integrated with the Xbox 360 console and easily accessible from the user interface; it added improved graphics; and it incorporated as many Xbox 360 game products into LIVE as possible. *Id.* ¶ 12; Reiss Report ¶ 52. Microsoft also added new features to LIVE, such as private chat between players and enhanced "friends lists." Whitten Decl. ¶ 12. And it introduced "Achievements" and "Gamerscores," a player ranking system that reflected online and offline game play and gave "users status in the gaming community and fuel[ed] competition between players." Reiss Report ¶ 54; *see also* Whitten Decl. ¶ 12.

Microsoft also focused on improving its system to ensure that Xbox LIVE was fair and secure. Whitten Decl. ¶ 13. ████████████████████████████████████████ ████████████████████████████████████████████████ *Id.* ¶ 18. ████ ████████████████████████████████████████████████████ ████████████████████ Ex. 4 at 259:5-11. Security breaches of the kind experienced during the Xbox 1 era would significantly undermine that environment. Whitten Decl. ¶ 19; Ex. 4 at 259:5-260:4. The success of Xbox LIVE also hinged on creating "a level playing field." *Id.* ¶ 18. Gamers would have no incentive to join LIVE if they believed games were unfair; and cheating would undermine the credibility of the Achievement and Gamerscore ranking systems. *Id.* As J. Allard, a Microsoft executive often referred to as the "father of the Xbox," testified:

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

████████████████████████████████████████████

Ex. 1 at 60:2-13.

### C.    Microsoft Improved the Security of Its Xbox 360 System and Xbox LIVE by Adding a Peripheral Authentication System

Microsoft designed the Xbox 360 with these security goals in mind.  It added Hypervisor technology to the console to enhance system stability.  Reiss Report ¶ 55.  And it improved the security of the console by providing multiple levels of protection against piracy and attacks from hackers that could threaten the platform.  *See, e.g.*, Ex. 12 at MS-DTL-ITC_007_0825123.  One critical component of this security initiative was an updateable peripheral authentication system, designed to protect the Xbox 360 console and Xbox LIVE from third-party devices that threatened the platform.  *See* Whitten Decl. ¶ 25.  ████████████████████████

███████████████████████████████████████████████

██████████████████ Ex. 7; Declaration of Eva Moy ("Moy Decl."), Ex. 2.

Microsoft ultimately adopted a system ██████████████████████████

████████████████████████████████████████ so that only

authorized devices that contained the security chip could function with the console.  *See* Whitten

Decl. ¶ 25.  ████████████████████████████████████████

████████████████████████████████████████ *See*

Whitten Decl. ¶ 32; Expert Rebuttal Report of Randel Reiss ("Reiss Rebuttal") ¶ 52. [4] ████

████████████████████████████████████████████████

███████████████████████████████████████ Ex. 15 at MS-

DTL_0714835.  *See also* Ex. 16 at MS-DTL 0177867 (████████████████████

████████████████████████████████████████████████

█████████████████████████ . ████████████████████████

████████████████████████████████████ Whitten ¶ 32.

The authentication system mitigated the problems that had plagued the Xbox 1 system.  It

prevented some attacks against the system from rogue devices.  Whitten Decl. ¶ 27; *see also* Ex.

---

[4] The "Reiss Rebuttal" is attached as Exhibit 2 to the Declaration of Randel Reiss filed
concurrently herewith.

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

18 at MS-DTL_1719246.  It helped Microsoft preserve a level playing field on Xbox LIVE by blocking access to devices that would facilitate cheating.  Whitten Decl. ¶ 26; Moy Decl., Ex. 1 at MS-DTL_0714821.  And it allowed Microsoft to ensure that key accessories like gamepads met Microsoft's quality standards.  Whitten Decl. ¶ 29; Declaration of Scott Loomis ("Loomis Decl."), Ex. 1 at 4.

The effectiveness of the system in preventing cheating was not lost on Datel.  Ken Tarolla, the president of Datel's U.S. distribution company, testified that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 20 at 73:2-75:5.  It was only after Datel circumvented that system in 2009, that it became possible to sell, ████████████, modified game save products for the Xbox 360.  *Id.* at 192:5-195:12 & Ex. 21. ████████████████████████████████████ Whitten Decl. ¶ 30; Ex. 15 at 4. ████████████████████████████████████████████████████████████████████████████████████ Ex. 17 at 41:2-42:12, 247:16-248:19; Ex. 22 at 19:21-20:22, 24:22-25:24. ██████████████████████████████████████████████████████ *See generally* Expert Report of Kevin M. Murphy ("Murphy Report") ¶¶ 77-85.[5] ████████████████████████████████████████████████████████████ *Id.* ¶¶ 72-76.

**D.** ████████████████████████████████████████████████

---

[5] The "Murphy Report" is attached as Exhibit 1 to the Declaration of Kevin M. Murphy filed concurrently herewith.

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

1  ████████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████████

3  ████████████████████    Declaration of Albert J. Penello ("Penello Decl.") ¶ 3; Whitten

4  Decl. ¶ 30. ████████████████████████████████████████████

5  ████████████████████████████████████████████    Penello Decl. ¶ 3; Whitten Decl.

6  ¶ 31; Ex. 15 at 4. ██████████████████████████████████████

7  ████████████████████████████████████████████████████████

8  ████████████████████████████████████████████    Penello Decl. ¶ 3;

9  Ex. 23 at 21:13-24:5; Ex. 24 at 185:8-186:10; Ex. 1 at 21:9-23:14; 26:22-27:15.

10  ██████████████████████████████████████████

11  ████████████████████████████████████████████████████

12  ██████████████████    Penello Decl. ¶¶ 4, 8-9. ████████████████

13  ████████████████████████████████████████████████████████

14  ████████████████████████    *See* Penello Decl. ¶ 8 & Ex. 1. ██████████

15  ████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████

17  ████████████████████████████    Penello Decl. ¶ 9 & Exs. 2, 3, 4, 5. ████

18  ████████████████████████████████████████████████████████

19  ████████    Ex. 2 at 101:16-103:9; Ex. 23 at 21:13-24:5; Ex. 25 at 137:1-138:18; Ex. 26.

20  ██████████████████████████████████████████████████

21  ████████████████████████████████████████████████████

22  Microsoft built high speed wireless networking capability into new models of the Xbox 360

23  console sold after June 2010. ██████████████████████████████

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ██████████████████    Penello Decl. ¶ 11 & Ex. 4 (MS-DTL-203574); Ex. 27 at 38:13-

27  40:15.  Microsoft also decided to support non-proprietary USB memory devices beginning in

28  April 2010. ██████████████████████████████████████████



Penello Decl. ¶¶ 13-19. ████████████████████████

████████████████████████ *Id.* █████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ *Id.* ¶ 19; *see also*

Ex. 1 at 26:22-27:15 ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ ).

      **E.**        **The October 2009 Dashboard Update Sought to Repair the Authentication System**

████████████████████████████████████

████████████████████████████████ Ex. 28 at MS-DTL_0255951 (May 14,

2009 email noting that ████████████████████████

████████████████████████████████████

██████ . ████████████████████████████

████████████████████████████████ Ex. 29 at

MS-DTL_0216942 (July 20, 2009 email noting that ████████████

████████████████████████████████████

████████████████ ); Ex. 28 at MS-DTL_0255951.  On October 28, 2009, Microsoft

issued a "dashboard update," ████████████████████████

████████████████████████████████

████████████████████████████[6] Sebastian

───────────────

[6] ████████████████████████████████████

████████████████████████████████████

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

1  Lange, the Principal Program Manager at Microsoft ███████████████████████

2  ████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████

4  ███████████████████████████████████████  Ex. 4 at 257:21-260:4.

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there exists "no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The burden then shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial.*'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  While the Court "must draw all reasonable inferences in favor of the non-moving party," it may "not draw inferences that are based solely on speculation."  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1136 (9th Cir. 2009).  Moreover, "[i]f the factual context makes the non-moving party's claim of a disputed fact implausible, then that party must come forward with more persuasive evidence than otherwise would be necessary to show there is a genuine issue for trial."  *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147 (9th Cir. 1998).  In antitrust cases, the plaintiff's theory must make economic sense in order to survive summary judgment.  *Kodak*, 504 U.S. at 468-69.

### IV.    ARGUMENT

**A.    The Authentication System Is a Product Improvement Immune from Antitrust Liability Under Section 2 of the Sherman Act**

**1.    Products Improvements Do Not Violate the Antitrust Laws**

Under settled Ninth Circuit law, a "product improvement by itself does not violate Section 2 [of the Sherman Act], even if it is performed by a monopolist and harms competitors as a

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███ Ex. 4 at 221:20, 224:3-11. ██████████████

████████████████████████  Ex. 31 at 346:19-23.

12

result." *Tyco*, 592 F.3d at 999-1000.  In *Tyco*, the defendant (Tyco) sold pulse oximetry sensors that attach to a patient's body and monitors that receive and interpret signals from the sensors and display the patient's level of blood oxygenation.  592 F.3d at 994.  "[A]nticipat[ing] that upon expiration" of its patent over the line of sensors "competitors would begin to produce generic sensors compatible with its installed base of monitors," Tyco "creat[ed] a new proprietary oximetry technology."  *Id*.  It was "undisputed" that "Tyco made its new OxiMax system incompatible with generic sensors and harmed generic sensor manufacturers."  *Id*. at 1000.  A generic sensor manufacturer brought suit against Tyco alleging that the design change violated Section 2.  The Ninth Circuit affirmed the district court's order granting Tyco summary judgment.  The court held that Tyco's new technology "facilitate[d] the introduction of new types of sensors with added capabilities at less cost to consumers" and therefore was a "product improvement" immune from antitrust liability.  *Id*. at 1002.

The *Tyco* court was concerned that subjecting product improvements to judicial scrutiny and jury determinations would unduly chill innovation.  *Id*. at 1000 ("Antitrust scholars have long recognized the undesirability of having courts oversee product design, and any dampening of technological innovation would be at cross-purposes with antitrust law.") (internal quotation omitted).  The Court stressed that "[i]f a monopolist's design change is an improvement," then courts may not "balanc[e] the benefits or worth of [the] product improvement against its anticompetitive effects," declaring such an exercise "unadministrable" and "unwise" as even a "seemingly minor" change might lead to "much greater advances in the future."  *Id*.

Although Tyco "statements show[ed] that Tyco hoped its new technology would constitute a barrier to entry for generic sensor manufacturers," the court held that "even legitimate product improvement can have the effect of harming or even destroying competitors," and that "[s]tatements of an innovator's intent to harm a competitor through genuine product improvement *are insufficient by themselves to create a jury question under Section 2*."  *Id*. at 1001 (emphasis added).[7]  As the leading antitrust treatise states, making liability in product design cases turn on

_____

[7] This holding is consistent with Section 2 case law generally, which adopts an objective test out of the recognition that every competitor wants to harm its competitors and gain an advantage.

1    intent is "the worst way of handling claims that innovation violates the antitrust laws."  IIIB P.

2    Areeda & H. Hovenkamp, *Antitrust Law*, § 775c, p. 284 (3d ed. 2008).  "An antitrust rule

3    permitting juries to sift through records pertaining to a firm's intent cannot help but chill perfectly

4    appropriate behavior that the antitrust laws are intended to encourage." *Id.* at 285.

5         The only exception to *Tyco's* product improvement rule is if the defendant engaged in

6    some conduct that is independently unlawful and goes *beyond* the product change.  As the Ninth

7    Circuit held, "[t]here is no violation of Section 2 unless [a] plaintiff proves that some conduct of

8    the monopolist associated with its introduction of a new and improved product design 'constitutes

9    an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of

10   attempting to monopolize the relevant market.'"  *Tyco*, 592 F.3d at 1000.

11        *Tyco* followed two earlier Ninth Circuit decisions embracing the same product

12   improvement rule.  In *California Computer Products, Inc. v. International Business Machines*

13   *Corp.*, 613 F.2d 727 (9th Cir. 1979) ("*CalComp*"), the court affirmed the entry of directed verdict

14   for IBM against a claim by a manufacturer of peripheral computer devices that "IBM made

15   design changes" to its products "of no technological advantage and solely for the purpose of

16   frustrating competition" from peripheral manufacturers.  *Id.* at 739.  In light of undisputed

17   evidence that IBM's changes reduced manufacturing costs and improved performance of the

18   product (*id.* at 744), the Ninth Circuit held that even "assuming [IBM] was a monopolist," it "had

19   the right to redesign its products to make them more attractive to buyers," and was "under no duty

20   to help CalComp or other peripheral equipment manufacturers survive or expand." *Id.*  Thus, the

21   "reasonableness" of IBM's conduct did "not present a jury issue." *Id.*

22        Similarly, in *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir.

23   1983) ("*Foremost*"), Kodak introduced a new line of cameras and related film products that could

24   not be processed with previously used photographic paper and chemicals, such that photofinishers

25

26   *E.g., Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986) ("if conduct is not objectively anticompetitive the fact that it was motivated by hostility to
27   competitors . . . is irrelevant");  *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1113 (1st Cir. 1989) ("[T]he desire to crush a competitor, standing
28   alone, is insufficient to make out a violation of the antitrust laws.").

had to buy all new paper and chemicals from Kodak. *Id*. at 537.  One photofinisher, Foremost, brought suit alleging that Kodak introduced its new system to maintain its monopoly. *Id*. at 543. The Ninth Circuit affirmed the district court's granting of Kodak's motion to dismiss the Section 2 claim.  It was "of no legal import" that Foremost had characterized Kodak's conduct "as a form of technological predation" because a company has the "right to redesign its products to make them more attractive to buyers." *Id*. at 545.  The Ninth Circuit emphasized that a "dominant firm" may use "technological innovation" to "expand its market share," which "is perfectly consistent with the competitive forces that the Sherman Act was intended to foster." *Id*. at 546.

The product improvement doctrine protects software updates repairing security breaches and disabling products that were made interoperable through "reverse engineering," as Datel claims to have done here.  In *In re Apple iPod iTunes Antitrust Litigation*, --- F. Supp. 2d ---, 2011 WL 2690511 (N.D. Cal. May 19, 2011), Apple implemented a security system called "FairPlay" which encrypted music offered on iTunes. *Id*. at *1.  RealNetworks subsequently reverse engineered FairPlay with its "Harmony" technology, and was "able to make music purchased from its online music store playable on Apple's iPods." *Id*.  Apple then issued a FairPlay update with a new version of iTunes that "ended the interoperability" of Harmony files on the iPod. *Id*.  The plaintiffs, a class of iPod customers, alleged that Apple violated Section 2, as its "real aim was to end RealNetworks' interoperability with the iPod, rather than to prevent hacks." *Id*. at *4.  The court held that the update constituted a product improvement immune from antitrust liability, as it was undisputed that FairPlay was designed "to guard against piracy," it previously had been "hacked," and the update was "more resistant to attack" than previous versions of iTunes. *Id*. at *5 (citing *Tyco*, 592 F.3d at 1000).  Because the update, by restoring the effectiveness of the FairPlay system, was a "genuine improvement," the court could "not balance the benefits or worth" of it "against its anticompetitive effects" under *Tyco. Id*. at *5.[8]

---

[8] The court held with respect to a separate iTunes software update, which prevented third-party applications like RealNetworks' RealPlayer from placing music onto the iPod, that there were disputed issues of fact as to whether that update improved the product. *Id*. at *7.  As discussed below, the evidence here is undisputed that the authentication system improved the Xbox 360.

2. **The Undisputed Evidence Establishes That the Authentication System Constitutes a Product Improvement**

The product design at issue in this case is Microsoft's decision to include an updateable security authentication system for certain categories of Xbox 360 accessories. *See* Expert Rebuttal Report of Kevin M. Murphy ("Murphy Rebuttal")[9] ¶ 64; Reiss Rebuttal ¶ 52. The product that was "improved" by this system is the entire Xbox 360 platform. *See* Whitten Decl. ¶¶ 25-29. The uncontroverted evidence establishes that the authentication system is a product improvement under *Tyco* because  (1) it improved the security of the Xbox 360 console; (2) it reduced cheating and created a fairer, more competitive online gaming environment; and (3) it improved the quality of peripheral devices.

a. **The Authentication System Improved Security**

The undisputed evidence establishes that the peripheral authentication system for the Xbox 360 sought to mitigate the security vulnerabilities of Xbox 1, discussed above. ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Loomis Decl., Ex. 1 at 4. ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Moy Decl., Ex. 1 at MS-DTL 0714821, MS-DTL 0714837.

████████████████████████████████████████

████████████████                    *Id.*; *see also* Whitten Decl. ¶ 27. Numerous other contemporaneous documents make  similar points.[10] These documents are the very kind of evidence that the Ninth

---

[9] The "Murphy Rebuttal" is attached as Exhibit 2 to the Declaration of Kevin M. Murphy filed concurrently herewith.

[10] *See, e.g.,* Ex. 13 at MS-DTL_0177747 ████████████████████████

████     ; Moy Decl., Ex. 2 (████████████████████████████

████     ; Moy Decl., Ex. 3 at MS-DTL 0186817 (████████████████████

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

1  Circuit in *Tyco* found as compelling proof of a product improvement.  *See* 592 F.3d at 1001

2  ("Tyco's internal documents show that from the very earliest stages of its development of

3  OxiMax, it aimed to produce a new technology that both served as 'a new, flexible platform for

4  future oximetry innovation' and added customer value by improving performance").[11]

5      A specific concern of Microsoft in designing the authentication system was that

6  unauthenticated devices could be used to ████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████████████

8  ████████   Ex. 4 at 92:4-93:13; 80:12-81:25.  Hacks on the Xbox 1 and more recent attacks on

9  Sony's PS3 demonstrate the perils of designing a video game system without the capability to

10  block untrustworthy peripherals.  The PS3 and PlayStation Network ("PSN") recently suffered a

11  catastrophic security meltdown, with millions of users' personal information, including credit

12  card data, stolen.  Ex. 32; Reiss Report ¶¶ 140-150.  This apparently occurred from a buffer

13  "overrun" on an unsecure USB port on the PS3 using an unauthorized device, the very ports that

14  the authentication system protects on the Xbox 360, and that Datel hacked.  *See* Reiss Report

15  ¶¶ 150-160; Reiss Rebuttal ¶¶ 51-61; Ex. 4 at 80:12-83:22.  Since the attack, Sony, like Microsoft

16  before it, is reported to have implemented a policy that only authorized accessories can be used

17  on the PSN and has issued software updates disabling all unauthorized accessories.[12]

18      These same security concerns drove Microsoft's decision to repair the authentication

19  system via the update.  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████

22  ████████████   .

---

[11] Further evidence that the authentication system constitutes a product improvement is that it received a patent from the U.S. Patent and Trademark Office.  As the Ninth Circuit held in *Tyco*, "the existence of a patent on a new product design is some evidence that the change is an improvement over previous designs."  592 F.3d 991 at 1000-01.  The patent states that the "security threat" posed by online communications requires "increasingly strong cryptographic techniques that provide enhanced levels of security," and that the authentication system provides "fast and extremely secure encryption and decryption."  Ex. 33 at col. 2:40-49, col. 1:10-14.

[12] *See* Ex. 34 at 2 (article noting that since hack, users may "not use any unauthorized hardware, including peripherals not sold or licensed by a Sony company" ); Ex. 35 at 2 (article noting that since hack, "Sony has issued numerous firmware updates for the PS3 to increase security and prevent any sort of unlicensed accessories from working").

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

1  ████████████████████████████████ Ex. 29 at MS-DTL_0216942.  *See also* Ex. 28 at MS-

2  DTL_0255951 (████████████████████████████████████████

3  ████████████████████████████████████████████████████████████

4  ████████████).  Just as the initial security layer of the authentication system had done, the

5  dashboard update reduced the dangers of hackers exploiting vulnerabilities in the Xbox 360

6  operating system, which could result in game piracy and other threats to the console and LIVE

7  environment.  *See* Reiss Rebuttal ¶¶ 51-67 (unsecure console ports "could lead to irreversible

8  exposure to hacks, cheats, software piracy and even 'bricking,' or complete hardware failure of

9  the consumer's Xbox 360 and Xbox LIVE"); Reiss Report ¶¶ 137-160.

10              **b.**      **The Authentication System Prevented Online Cheating**

11          The undisputed evidence establishes that the Xbox 360's authentication system addressed

12  the cheating problems experienced with Xbox 1. ████████████████████████████

13  ████████████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████ Moy

15  Decl., Ex. 1 at MS-DTL_0714821. ████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████

18  ████████████ Ex. 36 at MS-DTL_0637391. ██████████████████████████

19  ██████████████████████████████████████████████████████

20  ██████████████████████████████████████████████ *Id.  See also* Ex. 7 at MS-

21  DTL-ITC_007_0824994 (████████████████████████████████████████

22  ████████████████████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████); Whitten Decl. ¶ 26.

25          These cheating concerns similarly informed Microsoft's decision to issue the dashboard

26  update. ████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████

18                                          DEF'S MSJ ON PLS' MONOP. CLAIMS

1    ██████████████████████ Ex. 28 at MS-DTL_0255951.  *See also* Ex. 29 at MS-DTL_0216942

2    ████████████████████████████████████████████████████████████████████████

3    ████████████████████ .  Datel's MAX Memory allows the transferring of game content

4    to and from a PC where it can be modified and shared, enabling cheating on Xbox LIVE.  *See*

5    Reiss Rebuttal ¶¶ 11-26; Reiss Report ¶¶ 113-124; Whitten Decl. ¶ 15.

6                    **c.      The Authentication System Improved Peripheral Quality**

7            The undisputed evidence also establishes that the authentication system sought to address

8    quality issues relating to Xbox 1 unlicensed peripheral devices and improved the Xbox 360

9    customer's overall experience with the platform. ██████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████ Loomis Decl., Ex. 1 at 4.  As Andre Botha, the technical manager for

13   Xbox 360 licensing, testified, ████████████████████████████████

14   ████████████████████████████████████████████████████

15   ████████████████████████████ Ex. 8 at 24:16-25:13; *see also* Ex. 9 at 83:7-23 ████

16   ████████████████████████████████████████████████████

17   ██████ ; Reiss Report ¶ 66; Reiss Rebuttal ¶¶ 62-67; Whitten Decl. ¶ 28.

18                   **d.      Datel Has No Competent Contrary Evidence**

19           Datel offers no evidence at all to contradict the abundant evidence that the authentication

20   system made the Xbox 360 platform "more attractive to buyers."  *CalComp*, 613 F.2d at 744;

21   *Foremost*, 703 F.2d at 545. ████████████████████████████████

22   ████████████████████████████████████████████████████████████

23   ████████████████████████████ Ex. 31 at 342:6-23; Ex. 37 ¶ 120.  But as discussed below

24   (*infra* Part IV(A)(3)), the update, in so far as it repaired a breach of the authentication system,

25   cannot be considered in isolation to the exclusion of the overall benefits of the system.

26           Moreover, the Ninth Circuit has made clear that alleged injuries from technological

27   incompatibility are competitive in nature, *Tyco*, 592 F.3d at 1000, and it is improper under the

28   product improvement doctrine "to weigh as-yet-unknown benefits against current competitive

                                        19

1    injuries.  Our precedents and the precedents we have relied upon strongly counsel against such a

2    test." *Id.*[13]  Thus, in *iTunes*, the court did not consider the purported injuries suffered by iPod

3    owners whose RealNetworks' Harmony files would no longer function with the iPod,

4    emphasizing that it could "not balance the benefits or worth" of the update "against its

5    anticompetitive effects."  2011 WL 2690511, at *5.

6        Mr. Crane also claims that the update was a "design downgrade" ███████████████

7    ███████████████████████████████████████████████ Ex. 37 ¶ 120. ██

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████ Ex. 31 at 340:1-341:24; 345-46.

11       With respect to security, cheating, and peripheral quality, Datel presents no contrary

12   evidence.  On security, it is undisputed that the authentication system protects the game console

13   from unauthenticated devices that could insert malicious code onto the console.  Crane dismisses

14   these risks as "hypothetical situations, claiming to address some future security need," Ex. 40 ¶ 9,

15   but entirely ignores the actual attacks that occurred through this precise means with the Xbox 1

16   and, more recently, the Sony PS3.  *See supra* at 17. ████████████████████████

17   ██████████████████ *See* Ex. 5 at 69:23-70:1 (██████████████████████████

18   ████████████████████████████████████████████

19   ██); Ex. 41 at 195:12-199:17 (████████████████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████

---

[13] Nor does the authentication system prevent consumers from having portable storage devices of
comparable size.  Datel's MAX Memory comes in a 2 GB and a 4 GB version.   Since April
2010, Microsoft has supported the use of *16 GB* USB memory devices.  *See* Penello Decl. ¶¶ 12-
19.  Unlike the MAX Memory device, however, Microsoft instituted additional, software-based
restrictions to prevent hacking and cheating misuse of game content moved onto USB devices.
This software prevents users from copying the content to a PC, where it could be shared or
modified.  *See* Ex. 38 at 194:24-198:1 ████████████████████████████████
████████████████; Ex. 39 at 238:8-21; *id*. at 268:24-269:19.  It is *undisputed* that today Datel's
MAX Memory software and its other PC file transfer and management software does *not* work
with game saves created on a USB device protected by this software, and the content on a USB
device *cannot* be copied to a PC.  Reiss Rebuttal ¶ 78.

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

1  ███████████████████████████████████████████).  Indeed, Mr.

2  Crane acknowledged the same risk, (Ex. 31 at 358:9-14), and testified that he saw hackers using

3  Datel's products to do "hardware modifications to disable the security on video game disk

4  software," "[v]ideo game piracy," and "[t]earing apart the Xbox 360 and figuring out ways to get

5  into the DVD player."  *Id.* at 269:2-21; 270:23-271:20.

6        On cheating, Datel presents no contrary evidence, and Mr. Tarolla admitted that the

7  system prevented Datel from producing cheat products for the Xbox 360.  *See* supra at 9.  Mr.

8  Crane simply opines that such "cheating," like "resigning" game content, is "innocent."  Ex. 37

9  ¶¶ 35, 159-165.  Crane admits, however, that his views on cheating are personal opinions based

10  on a "moral judgment" instead of "factual basis or evidence," Ex. 42 at 97:10-98:5; 176:24-

11  177:15; 171:15-172:2, and that he has no expertise regarding the sharing or modification of game

12  files in the context of online games, *id*. at 173:23-174:2.  Indeed, he admits that he has no idea

13  what game developers for modern consoles think about cheats, and that he has made no effort to

14  research that question.  *Id*. at 178:10-179:1; 170:15-25.[14]

15        Finally, Datel does not dispute that the authentication system improved the quality of

16  accessories connected to the Xbox 360.  Instead, its proposed experts (Crane and MacKie-Mason)

17  simply say that consumers are capable of choosing products that suit their needs, and that

18  manufacturers have an incentive to produce consumers' "preferred level of quality."  Ex. 40 ¶¶

19  28, 32; Ex. 51 at 91-92.  They present no evidence disputing that the authentication system, with

20  product certification and testing, prevented products whose quality has not been tested and

21  certified from functioning.  ████████████████████████

22  ████████████████████████████████

23  ██████████████████████████

24  ███████████████████████  Ex. 44 at 65:5-66:13.

25

26  ────────────────────

[14] Similarly, another of Datel's proposed experts, Dr. MacKie-Mason, acknowledged that the

27  cheating "decisions of individual participants affect the experiences of other" gamers, but admitted that he made no "effort to investigate" whether there were net negative externalities

28  associated with cheating using Xbox 1 accessories.  Ex. 43 at 195:18-196:7; 229:23-230:16.

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.    The Dashboard Update Must Be Analyzed as Part of the Authentication System Under the Product Improvement Doctrine

Datel has taken the position that the dashboard update should be viewed separately from the authentication system because Datel "invested in reverse engineering" the system to make "interoperable" products, and the update was "directly targeted" at "existing competition in an established market." Ex. 45 (Supp. Response to Interrogatory No. 24).  Datel states that it "does not challenge" the "security and authentication scheme, as it existed before the October 2009 update, as anticompetitive," and "is not claiming any injury based" upon it.[15]  Ex. 46 at 4-7 (Plaintiff's Responses to Microsoft's First Set of Requests for Admissions).

It would defy logic and the antitrust laws to say that a company can develop and use a security system but cannot repair or improve it when it is defeated through a security breach. If one has the right to build a fence around his or her property, it cannot be that repairing a hole in the fence that a trespasser punched through is somehow wrongful; indeed, a security system would be wholly ineffective if, once someone breaches it, the owner is prohibited from repairing it.  Murphy Report ¶¶ 142-144; Ex. 54 at 313:11-314:24.  The product improvement at issue is the *updateable* security authentication system, not a static, and therefore ineffective, system.  Reiss Rebuttal ¶¶ 51-52; Whitten Decl. ¶ 32 ██████████████████████████████

███████████████████████████████████████████████████████████████████

████████████).  As Mr. Crane states in his report, "[i]dentifying, remediating and mitigating vulnerabilities is the cornerstone of an effective computer security strategy."  Ex. 37 ¶ 50.  The update, which "remediated" the authentication system, falls squarely within Mr. Crane's definition of "an effective computer security strategy."  Because Microsoft had the right to adopt

---

[15] This position is rooted in self interest.  As Datel has stated in its discovery responses, its "primary interest is in competing with Microsoft in the aftermarket for these Xbox 360 accessories *as the aftermarket now exists and existed in 2009 when Datel first marketed its products*."  Ex. 45 (Supp. Response to Interrogatory No. 24) (emphasis added).  In other words, Datel does not seek to dismantle the authentication system, because doing so would open the door to other competitors selling unauthorized Xbox 360 accessories and presumably reduce Datel's profits.  ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████
████████████████████████████████████████████Ex. 47 at 377:22-397:18.

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

1    the security authentication system, which Datel does not dispute, Microsoft equally had the right

2    to protect that system from being thwarted and to protect the Xbox 360 platform against security

3    threats, online cheating, and other harmful conduct that led to the adoption of the system in the

4    first place.  Nothing in the antitrust laws requires otherwise.

5         Indeed, the dashboard update addressed not only Datel's Max Memory but all of the

6    unknown and myriad threats that the hack of the authentication system portended, as the system

7    was originally intended to address.  The update applied to *any* unauthorized devices using the

8    same technology.  Microsoft could not adopt a wait and see, case-by-case approach to security

9    and cheating.  Datel does not dispute that large-scale console security circumvention historically

10   starts with a relatively small, even innocuous exploit.  *See* Reiss Rebuttal ¶¶ 53-61; Reiss Report

11   ¶¶ 137-160.  The hack of the PS3, for example, began with a buffer overrun on an unsecure USB

12   port.  Reiss Report ¶¶ 137-152; Reiss Rebuttal ¶¶ 57-61.  Although hackers initially used the

13   exploit to run innocent "homebrew" applications on the PS3, the hack eventually resulted in the

14   near collapse of the console and PSN.  Reiss Report ¶¶ 140-149.

15        Those very risks were presented here.  At the time of its decision to issue the update,

16   Microsoft did not know the full extent or scope of the hack of the authentication system.  Beyond

17   the risks presented by Datel's MAX Memory product itself, Microsoft could not assume that

18   Datel would refrain from producing even more nefarious product updates or new products relying

19   on the hack.[16] ███████████████████████████████████████████████████████

20   ████████████████████████████████████████ (*see, e.g.*, Ex. 21; Reiss Report

21   ¶¶ 95-96), █████████████████████████████████████████████████

22   ██████ (*id.* ¶¶ 125-29; Reiss Rebuttal ¶¶ 27-46, Ex. D), ████████████████████████,

23   Ex. 48, ████████████████████████████████████████ *id.*, ███

24   ████████████████████████████████████████████████

25   ██████████████████████████████████████ Reiss Report ¶¶ 131-32.

---

[16] Datel itself had a well-known reputation for creating dangerous products.  It previously sold a product for the Sony PSP (the "Lite Blue Tool") that cracked the device's firmware and allowed the pirating of games.  Sony promptly sued Datel in the UK to prevent release of the product.  *See* Exs. 60-61; Reiss Report ¶ 151.

1  Microsoft also had to consider potential proliferation of the hack to unknown third parties.

2  ███████████████████████████████████

3  ████████████████████████████████████████

4  ████████████████████████████████  Ex. 49 at 343:14-21.

5  ████████████████████████████████████████

6  ███████████████████████████████████

7  ████████████████████████████████████████

8  ██████████████████████████  Ex. 4 at 254:7-255:24.  *See also* Reiss

9  Report ¶ 139. ████████████████████████████████

10 ███████████████████████████████████

11 ████████████████████████████████████████

12 ████████████████████████████████  Ex. 17 at 162:19-

13 164:6, 230:22-232:4 ██████████████████████████████████

14 ████████████████████████████████████████

15 ████████████████████████████████████████

16 █████████████████████████).  Thus, the dashboard update was an extension of the

17 overall security authentication system in purpose as well as in function.

18  Datel's request that the Court second-guess Microsoft's decision and method of repairing

19 its security authentication system in the face of these known and unknown threats is directly

20 contrary to the law.  As courts have made clear, it would be a "novel theory with serious and far

21 reaching anticompetitive effects" if a monopolist could not improve the design of a product "if

22 any alternative was open to them which would have less impact on competitors."  *In re IBM

23 Peripheral EDP Devices Antitrust Litig.,* 481 F. Supp. 965, 1021 (N.D. Cal. 1979), *aff'd,* 698

24 F.2d 1377 (9th Cir. 1983); *Tyco,* 592 F.3d at 1000.[17]  This is because "[a]n antitrust rule

25 prohibiting a firm from improving its own invention," even if the "improvement turns out *ex post*

26 _____

27 [17] And in fact, "there is no least restrictive alternative requirement in the context of a Section 2 claim." *Image Tech. Serv. Inc. v. Eastman Kodak Co.,* 903 F.2d 612, 620 (9th Cir. 1990), *aff'd,*

28 504 U.S. 451 (1992).

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

1   not to be much of an improvement at all" and "makes rivals' complementary products obsolete,"

2   would "chill innovation unnecessarily."  IIIB P. Areeda & H. Hovenkamp, *Antitrust Law*, § 777

3   at p. 307 (3d ed. 2006).  *See also Tyco*, 592 F.3d 991 at 1001 (because "technological innovation

4   'is accompanied by tremendous uncertainty as to cost, technical success, and eventual market

5   success . . . *ex post* realizations are rarely a useful indicator of *ex ante* expectations.'").  In *iTunes*

6   the court held that Apple's software update repairing breaches to its FairPlay security system was

7   a lawful product improvement, even though it disabled RealNetworks' Harmony files, which

8   were the result of RealNetworks' reverse engineering investments and efforts, no different from

9   Datel's here.  2011 WL 2690511, at *4-5.  The court did not ask whether Apple could have

10  repaired FairPlay in a way that would have been *less* harmful to RealNetworks' interests.  And

11  just like Datel here, the plaintiffs in *Tyco*, *CalComp*, *Foremost* and *iTunes* all argued, and it was

12  undisputed, that the technological change was "targeted" at their products and existing

13  competition, but that did not save their claims.  Nor does it save Datel's claims here.[18]

14      **B.**    **Datel Lacks Evidence to Prove That Microsoft Has or Is Likely to Acquire Monopoly Power Over Xbox 360 Accessories**

15

16      **1.**    **Datel Offers No Competent Evidence Concerning the Effect of Platform Competition on Aftermarket Behavior**

17         Numerous federal courts have disposed of aftermarket antitrust claims on summary

18  judgment where the plaintiff failed to demonstrate that the defendant can exercise market power

19  in the aftermarket notwithstanding the competition it faces in the primary market.  *See SMS*, 188

20  F.3d 11; *Harrison Aire v. Aerostar Int'l*, 423 F.3d 374 (3d Cir. 2005); *Universal Avionics Sys.*

21  *Corp. v. Rockwell*, 184 F. Supp. 2d 947 (D. Ariz. 2001); *Xerox Corp. v. Media Sciences, Inc.*, 660

22  F. Supp. 2d 535 (S.D.N.Y. 2009); *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th

23

24  [18] As noted above, the *Tyco* court held that immunity for product improvements that it re-affirmed did not extend to independently anticompetitive conduct that accompanied the product

25  improvement.  592 F.3d at 1001.  Datel has not identified and cannot identify any such conduct. Its complaint is inextricably bound with the product improvement itself — the security

26  authentication system and the update that sought to strengthen it — and therefore does not constitute anticompetitive conduct "associated with" and therefore independent of the product

27  improvement.  *See Foremost*, 703 F.2d at 545 (rejecting claim that "creation of technological incompatibilities" constituted actionable "associated conduct" because the incompatibilities

28  resulted from "redesign [of defendants'] products to make them more attractive to buyers").

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

1   Cir. 1997). They recognize the "conventional antitrust theory" that exploiting customers in the

2   aftermarket is a "short-run game" that results in the firm losing those customers to primary

3   market competition. *Harrison Aire*, 423 F.3d at 381-82. Thus, courts have stressed the

4   "substantial burden" that the plaintiff must bear "to overcome the presumption under the antitrust

5   laws that 'normal' market forces are at work," *Universal Avionics*, 184 F. Supp. 2d at 955, and

6   the need for "hard evidence dissociating the competitive situation in the aftermarket from

7   activities occurring in the primary market" to survive summary judgment. *SMS*, 188 F.3d at 17;

8   *Harrison Aire*, 423 F.3d at 383.

9        Datel cannot meet — indeed, does not even attempt to meet — this burden. Datel's

10   economic expert, Dr. Jeffrey MacKie-Mason, did not analyze this issue at all in his opening

11   report. In his rebuttal report, he claims that the analysis of Microsoft's expert, Dr. Kevin Murphy,

12   is not supported by sufficient facts. However, while claiming that these economic issues

13   "require[] a factual analysis" (Ex. 50 at 2 ¶ A) or are "ambiguous" as a matter of theory and thus

14   "depend[] on the facts" (*id.* at 14 ¶ L), he himself offers no factual or economic analysis of the

15   issue even in his rebuttal report. Instead, he simply divides various accessories into their own

16   distinct markets, calculates Microsoft's market share, asserts that there are barriers to entry with

17   respect to those accessories, and concludes that Microsoft has market power. *See* Ex. 51 at 56-66.

18   But the Ninth Circuit has long held that "market power cannot be inferred solely from the

19   existence of entry barriers and a dominant market share." *Rebel Oil Co. v. Atl. Richfield, Inc.*, 51

20   F.3d 1421, 1442 (9th Cir. 1995). This is especially true in aftermarket cases. As the Third

21   Circuit explained in *Harrison Aire*:

22        Aftermarket monopolization cases require a more comprehensive analysis,
         because market share data standing alone is not necessarily a reliable proxy for

23        market power . . . . Many firms supply unique and/or proprietary aftermarket
         parts and services for their primary market products [and] can be expected to have

24        a very high percentage [share]. But high aftermarket share is not necessarily
         indicative of monopoly power . . . because aftermarket behavior generally is

25        disciplined by competition in the primary market.

26   423 F.3d at 381-82.

27        Thus, to avoid summary judgment, Datel must show that Microsoft has a *substantial*

28   ability to exploit its aftermarket customers *without* suffering the consequences in the platform

DEF'S MSJ ON PLS' MONOP. CLAIMS
                                              CASE NO. CV 09-5535 EDL

1   market.  *Universal Avionics*, 148 F. Supp. 2d at 955 (high switching cost, high information cost,

2   ability to price discriminate between uninformed and knowledgeable customers "must *all* be"

3   present in order for claim to survive summary judgment) (emphasis in the original); *see also SMS*,

4   188 F.3d at 21 ("a lock-in phenomenon must be *shown*, not *assumed*") (emphases added).  Datel

5   has demonstrated none of these conditions in the proposed aftermarket: it has not even addressed

6   them.  In fact, none of the indicia of a "lock in" phenomenon are present in this case.

7                **2.       Microsoft Did Not Change Its Aftermarket Policy *Ex Post***

8                Unlike the situation in *Kodak*, Microsoft's policy of prohibiting unlicensed accessories

9   was adopted at the outset and is not a change in aftermarket policy implemented after the

10  customers had already purchased the console.  Retailers were informed of the policy including the

11  security authentication system even before the console launched.  Ex. 9 at 89:7-90:8; Ex. 52

12  (███████████████████████████████████████████) .  Similarly, months

13  before the console launched, industry analysts learned and publicized the fact that only licensed

14  accessories would be allowed.  Murphy Rebuttal ¶ 60 & Ex. 53 (cnet.com article dated August

15  10, 2005 stating "in order to ensure that only authorized products connect to the new console,

16  Microsoft is adding a security mechanism that will be available exclusively to those that sign a

17  deal with the company").  Since then, Microsoft has never increased the price of any accessory

18  above the price at which the product was introduced.[19]  Penello Decl. ¶ 7.  In other words, the

19  policy and the prices that Datel now argues are exploitative of the installed base were adopted

20  before there was any installed base and at a time when Microsoft was still a new entrant in the

21  industry coming off a financially-disastrous Xbox 1 experience.

22               The significance of these undisputed facts cannot be overstated.  First, there could be no

23  credible claim that Microsoft had any market power in the gaming platform market at the time it

24  was working on the Xbox 360.  As such, there could be no credible claim that the policy and the

25  prices reflected or resulted from monopoly power.  Moreover, courts have emphasized that a

26  ───────────────────────
27  [19] Microsoft has sold specialized accessories, such as a special edition gamepad that is branded
    with a popular game like Halo, at a premium.  However, the standard wireless gamepad price has
28  remained the same, and Microsoft has not raised the price of the specialty accessories beyond its
    price at the time of introduction.

1    showing that the defendant's prices are higher than those of its aftermarket competitors does not

2    support a reasonable inference of market power or supracompetitive pricing and does not create a

3    triable issue. *Harrison Aire*, 423 F.3d at 381; *Blue Cross & Blue Shield United v. Marshfield*

4    *Clinic,* 65 F.3d 1406, 1411-12 (7th Cir. 1995) ("when dealing with a heterogeneous product or

5    service . . . a reasonable finder of fact cannot infer monopoly power just from higher prices").[20]

6    This is so even where the defendant *raised* prices over the relevant period, much less where, as

7    here, the defendant has never once done so. *See In re eBay Seller Antitrust Litig.*, 2010 WL

8    760433, at *5 (N.D. Cal. Mar. 4, 2010) ("[E]vidence that eBay has raised prices over a period of

9    years and that several of its employees believe that the company may have raised them too high,

10   proves nothing with respect to whether the prices are supracompetitive.").

11           Second, the lack of a change in policy dooms any claim of a "lock in."  As the Seventh

12   Circuit has explained:

13           The [*Kodak*] Court did not doubt in *Kodak* that if spare parts had been bundled
             with Kodak's copiers from the outset, or Kodak had informed customers about its
14           policies before they bought its machines, purchasers could have shopped around
             for competitive lifecycle prices. The material dispute that called for a trial was
15           whether the change in policy enabled Kodak to extract supra-competitive prices
             from customers who had already purchased its machines.
16

17   *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996).  Thus, "a

18   unilateral change in aftermarket policy [that] exploits locked-in customers" is critical to

19   establishing that the defendant can exploit its aftermarket customers.  *Harrison Aire*, 423 F.3d at

20   383; *see also SMS,* 188 F.3d at 17-19; *Alcatel USA, Inc. v. DGI Techs., Inc.,* 166 F.3d 772, 783

21   (5th Cir. 1999); *PSI,* 104 F.3d at 820.  Indeed, some Courts of Appeals have held that a change in

22   aftermarket policy is an essential *threshold requirement* for an aftermarket monopolization claim.

23   *See PSI,* 104 F.3d at 820 ("we thus hold that an antitrust plaintiff *cannot succeed* on a *Kodak*-type

24   [20] Consumer perceptions of reliability and quality and the value of the first party brand often
     result in a price differential between the first party and third party products.  Murphy Report ¶¶
25   37-38. ████████████████████████████████    *See, e.g.,* Ex. 5 at 187:11-188:11 ████████

26   ████████████████████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████  ; Ex. 59 at

28   85:12-86:8 ████████████████████████████████████ .

                                        28                    DEF'S MSJ ON PLS' MONOP. CLAIMS

1  theory when the defendant has not changed its policy after locking-in some of its customers")

2  (emphasis added); *Alcatel*, 166 F.3d at 783 n.29 ("[w]e likewise agree [with the Sixth Circuit in

3  *PSI*] that the change in policy in Kodak was the crucial factor in the Court's decision").[21]

4  Because Microsoft's policy has always been to limit third party accessories for the Xbox 360,

5  there can be no claim that the policy was imposed after customers were locked-in.

### 3.  Xbox 360 Owners Are Not Committed to Additional Aftermarket Purchases

7  With respect to the so-called "switching" costs, the video gaming platform market differs

8  from other industries examined in aftermarket cases in a crucial way that fatally undermines

9  Datel's theory.  In the typical aftermarket case, the primary market product is rendered useless

10  and the buyer's investment entirely lost without purchasing the aftermarket good.  That is true of

11  a copier that needs a part to function (as in *Kodak*); a printer that needs an ink cartridge (as in

12  *Xerox*); or a hot air balloon needing replacement fabric (as in *Harrison Aire*).   Thus, the

13  discipline that the primary market imposes on aftermarket practices is with respect to sales of the

14  durable good — that a customer unhappy with aftermarket practices would not buy the firm's

15  primary market product in the future or immediately switch to another product.  The same does

16  not hold for gaming consoles.  Nothing *compels* Xbox 360 owners to buy an additional game or

17  an additional accessory or continue their subscription to Xbox LIVE in order to continue using

18  their console.  The customers can simply use the console with the accessories and games they

19  already have and do not necessarily have to purchase another console.  *See* Penello Decl. ¶ 5.

20  Thus, in the context of gaming consoles, "switching" occurs across multiple components of the

21  platform, not just the console.  Customers who are unhappy with Microsoft's accessories policy

22  or prices — even assuming that they were unaware of them when they bought the console — can

23

24  [21] Similarly, the Ninth Circuit in *Newcal* noted that, in *Kodak*, "consumers could not, at the time
of the purchase, reasonably discover that Kodak monopolized the service market and charged

25  supracompetitive prices."  *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1048 (9th Cir.
2008).  The Court also relied on the plaintiffs' allegation that IKON's aftermarket customers were

26  misled into extending their leases beyond the original term in holding that the plaintiffs had stated
a valid aftermarket claim.  There, the allegation of fraud substituted for the switch in policy that

27  occurred in *Kodak*.  *See id*. at 1050 ("market imperfections, as well as IKON's fraud and deceit,
prevent customers from realizing that their choice in the initial market will impact their freedom

28  to shop in the aftermarket").

DEF'S MSJ ON PLS' MONOP. CLAIMS
CASE NO. CV 09-5535 EDL

1   simply choose not to make additional purchases of the aftermarket goods, like games, accessories

2   and Xbox LIVE subscriptions and content.  Ex. 54 at 77:13-81:14.

3        Moreover, many of the customers do not need to make any additional investment in

4   another console in order to deprive Microsoft of these profits.  ████████ Xbox 360 owners

5   already own a PS3.  Penello Decl. ¶ 5.  Over ██████ own either a Wii or PS3, and ██████ of

6   them own both.  *Id.*  Most undoubtedly own a PC as well which can be used for gaming.  Most of

7   the popular games, including the most popular first-person-shooter game, the "Call of Duty"

8   series, are available on all of these platforms (*see* Murphy Report, Ex. 4), and the customer can

9   simply buy the next game for a different platform.

10       Thus, in the context of this industry, there are immediate and effective ways in which

11  customers can punish Microsoft for any exploitative behavior in the purported aftermarket.  ██

12  ████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████

14  ████████████████████████████  The financial risk to Microsoft is enormous.  ████████

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████

18  Penello Decl. ¶ 6.  It would make no sense for Microsoft to attempt to increase accessory profits

19  and risk alienating its customers on whom Microsoft depends for continued game and Xbox

20  LIVE purchases.  *Id.*  In short, Datel's aftermarket hypothesis is economically senseless and fails

21  as a matter of law.  *Kodak*, 504 U.S. at 468-469.

22       **C.**    **Datel's State Law Claims Fail As a Matter of Law**

23       For the reasons stated in Microsoft's Motion for Summary Judgment on Plaintiffs' Tying

24  Claims (at 18-19), Datel's state law claims fail as a matter of law and should be dismissed.

25  **V.**    **CONCLUSION**

26       For the foregoing reasons, the Court should enter summary judgment on Datel's

27  monopolization claims.

28

30

1    DATED: September 2, 2011                  Munger, Tolles & Olson LLP

2

3                                             By:___*/s/ Hojoon Hwang*_____

4                                                  Hojoon Hwang
                                                   Attorneys for Microsoft Corporation

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEF'S MSJ ON PLS' MONOP. CLAIMS
                                              CASE NO. CV 09-5535 EDL